Hillsborough-northern judicial district
No. 2008-945

## THE STATE OF NEW HAMPSHIRE

v.

## MICHAEL ADDISON
### (Capital Murder)

Argued: November 14, 2012
Opinion Issued: November 6, 2013

384

398

400

*Michael A. Delaney*, attorney general (*Peter Hinckley*, assistant attorney general, *Janice K. Rundles*, senior assistant attorney general, and *Thomas E. Bocian*, assistant attorney general, on the brief, and *Elizabeth C. Woodcock*, assistant attorney general, *Mr. Hinckley*, and *Ms. Rundles* orally), for the State.

*David M. Rothstein*, deputy chief appellate defender, *Christopher M. Johnson*, chief appellate defender, *Richard C. Guerriero*, New Hampshire public defender, and *Heather S. Ward*, New Hampshire public defender, of Concord, on the brief, and *Mr. Rothstein* orally, for the defendant.

## TABLE OF CONTENTS

I. THE CAPITAL MURDER.................................................. 412

II. PROCEDURAL HISTORY............................................... 414

III. PROCEDURE IN CAPITAL MURDER.................................. 417

410

IV. APPELLATE STANDARDS OF REVIEW ............................... 418

V. VENUE AND JURY SELECTION REVIEW ........................... 419
 A. VENUE ................................................................. 421
 B. PEREMPTORY CHALLENGES .................................... 439
 C. CHALLENGES FOR CAUSE ....................................... 443

VI. GUILT PHASE REVIEW ....................................... 452
 A. RULE 404(B) PRIOR CRIMES EVIDENCE .................... 457
 B. REASONABLE DOUBT INSTRUCTION ....................... 474

VII. SENTENCING PHASE REVIEW ............................... 479
 A. ELIGIBILITY PHASE TRIAL .................................... 487
 1. ADDISON'S STATEMENT ...................................... 488
 B. SENTENCE SELECTION PHASE TRIAL ...................... 498
 1. VICTIM IMPACT EVIDENCE ................................. 500
 2. CONDITIONS OF CONFINEMENT AND
 MODE OF EXECUTION ......................................... 513
 3. PRIOR CRIMES ................................................... 526
 4. CLOSING ARGUMENT ......................................... 544

VIII. CONSTITUTIONAL AND STATUTORY REVIEW ................... 563
 A. DEATH PENALTY CHALLENGE UNDER STATE 564
 CONSTITUTION .................................................. 564
 B. STATUTORY AGGRAVATING FACTORS
 (NARROWING FUNCTION) .................................... 575
 C. STATUTORY BURDENS OF PROOF ........................... 586
 D. INAPPLICABILITY OF RULES OF EVIDENCE ............. 596
 E. IMPACT OF RACE IN CAPITAL SENTENCING ........... 602
 F. DEATH-QUALIFIED JURY ........................................ 618
 G. NON-STATUTORY AGGRAVATING FACTORS
 (SEPARATION OF POWERS; GRAND JURY
 INDICTMENT; DUPLICATIVE FACTORS) ................ 627
 H. POST-VERDICT REQUEST FOR DISCOVERY .............. 641

IX. MANDATORY SUPREME COURT REVIEW .......................... 653
 A. PASSION, PREJUDICE OR OTHER ARBITRARY
 FACTOR ............................................................. 654

B. EVIDENCE OF AGGRAVATING CIRCUMSTANCES ...... 655

X. APPENDIX
 A. SPECIAL FINDINGS FORM ........................................ 657
 B. SPECIAL VERDICT FORM........................................ 662

PER CURIAM. The defendant, Michael Addison, was convicted in Superior Court (*McGuire*, J.) of the capital murder of Manchester Police Officer Michael Briggs and sentenced to death. This is the first death sentence imposed in New Hampshire since the enactment of the current statutory scheme in 1977. *See* Laws 1977, 440:2. The defendant appeals his conviction and his sentence. SUP. CT. R. 7. The capital sentencing statute also requires independent review by this court when a defendant has been sentenced to death. RSA 630:5, X-XII (2007).

On appeal, the defendant contends that numerous errors undermine his conviction and sentence. This opinion addresses each of the twenty-two issues briefed by the defendant. Regarding his capital murder trial, the defendant's claims of error relate to venue, peremptory challenges and challenges for cause to prospective jurors, prior crimes evidence under New Hampshire Rule of Evidence 404(b), and the jury instruction on reasonable doubt. Regarding sentencing, the defendant's claims of error relate to his custodial statement, victim impact evidence, evidence of conditions of confinement, evidence of and jury instruction on mode of execution, prior crimes evidence, and closing argument. He also raises several constitutional and statutory issues that relate to the constitutionality of the capital punishment statute, the narrowing function of the statutory aggravating factors, the statutory burdens of proof, the inapplicability of the rules of evidence, the impact of race in capital sentencing, the process of "death qualifying" the jury, the non-statutory aggravating factors' compliance with certain constitutional requirements, and his post-verdict request for discovery.

In addition, we are statutorily required to address: (1) whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor; (2) whether the evidence supports the jury's finding of an aggravating circumstance, as authorized by law; and (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. RSA 630:5, XI. Only the first two statutory questions are before us at this stage of the proceeding; we will address the third question after further briefing and oral argument.

With respect to the issues raised by the defendant on appeal, we find no reversible error. Accordingly, we affirm the defendant's *conviction* for capital murder. Furthermore, we conclude that the sentence of death was not imposed under the influence of passion, prejudice or any other arbitrary factor, and that the evidence was sufficient to support the jury's findings of aggravating circumstances. We note that our review of the defendant's sentence is not yet complete. Only after additional briefing and oral argument on comparative proportionality under RSA 630:5, XI(c) will we conclude our review of the defendant's sentence of death, at which time we will issue a further opinion.

## I. THE CAPITAL MURDER

The following facts are based upon the evidence adduced at the guilt phase of the trial and upon the jury's findings and verdict. On October 16, 2006, the defendant shot Officer Briggs in the head in order to evade apprehension by the police. The shooting occurred at approximately 2:45 a.m. in Litchfield Lane, an alley in Manchester. The defendant fled the crime scene, but the police located him later that day at his grandmother's home in Massachusetts and took him into custody. Officer Briggs died the following day.

During the week before the shooting, the defendant committed several violent crimes in the area. On October 10, he and Antoine Bell-Rogers robbed the El Mexicano Restaurant in Manchester. The defendant, a convicted felon, was armed with a knife, and Bell-Rogers fired his semi-automatic handgun twice during the robbery. After the men fled the scene, Manchester police officers recovered two empty shell casings from the floor and a bullet lodged in the ceiling.

The following morning, the defendant and Bell-Rogers robbed at gun-point the clerk of a 7-Eleven convenience store in Hudson. As the defendant brandished the same weapon that had been used in the restaurant robbery, Bell-Rogers took the cash drawer, and the men fled. A store surveillance camera recorded the robbery.

In the early morning of October 15, the defendant and Bell-Rogers drove to an apartment complex on Edward J. Roy Drive in Manchester. They approached the building, at which Bell-Rogers fired several rounds, and the two men fled. Manchester police recovered shell casings, bullet fragments in a parked car, and a bullet lodged in the bedroom wall of an apartment. The police later found a bullet lodged in the living room floor of another apartment.

Prior to the shooting of Officer Briggs, the defendant knew that the police were searching for him, and throughout the week he told friends that

if the police approached him he would shoot. On the day of the Roy Drive shooting, Manchester police interviewed several people associated with the defendant and Bell-Rogers. A friend warned the men that the police were nearby looking for them; the defendant and Bell-Rogers responded by declaring that they were "out for blood." That afternoon, the men brought the car that they had used in two of the previous crimes to a friend so that he could "wipe it out," and they made plans to leave the state.

That evening, Officer Briggs and his partner, Officer John Breckinridge, reported to the Manchester Police Department for the 6:30 p.m. to 3:00 a.m. shift. Their shift began with a roll call and briefing during which they learned that the defendant and Bell-Rogers were wanted in connection with a shooting. The officers received physical descriptions and photographs of the defendant and Bell-Rogers, as well as information about the people, places, and vehicles associated with them. A detective told the officers that the defendant and Bell-Rogers likely were armed and dangerous and that, if apprehended, they should be held for questioning. Officer Briggs was familiar with the defendant as a result of a prior encounter with him.

Officers Briggs and Breckinridge were assigned to bicycle patrol on the east side of Manchester. They were in uniform and wearing bicycle helmets marked "Police." Numerous officers in patrol vehicles were canvassing the area, searching for the defendant and Bell-Rogers. By the early morning of October 16, arrest warrants had been issued for both men, and the officers were instructed to arrest the defendant and Bell-Rogers on sight. At that time, the defendant and Bell-Rogers were at an apartment on Lake Avenue in Manchester, aware that the police were in the immediate vicinity looking for them.

Shortly before 2:00 a.m., Officers Briggs and Breckinridge heard a dispatch report of a gunshot having been fired during a domestic incident at an apartment on Lake Avenue. They responded to assist and, while on their way, learned that the suspects had fled on foot. At the scene, the police searched the apartment building to make sure that the shooter was no longer there. Officers Briggs and Breckinridge assisted with that investigation, and learned that the defendant and Bell-Rogers had been involved.

At approximately 2:45 a.m., Officers Briggs and Breckinridge left the Lake Avenue apartment. At that time, the defendant and Bell-Rogers were walking past a marked police vehicle and entering the Litchfield Lane alley. Both men were wearing sweatshirts with hoods over their heads and the defendant had Bell-Rogers's loaded semiautomatic handgun tucked in his waistband; the gun was concealed by his sweatshirt. As Officers Briggs and Breckinridge were crossing the intersection of Lincoln Street and Litchfield Lane, they spotted the defendant and Bell-Rogers in the alley. Another officer in a police vehicle traveling on the same street also saw the

defendant and Bell-Rogers in the alley and maneuvered his vehicle to get a closer look at them. Officer Briggs turned his bicycle sharply to pursue the defendant and Bell-Rogers. Officer Breckinridge quickly followed.

As Officer Briggs approached the two suspects, he commanded, "Stop, Police!" Bell-Rogers stopped almost immediately, but the defendant continued walking away, keeping his hands near his waist and out of the officer's sight. His head was "leaning down and forward a little bit." As Officer Briggs neared the defendant, he again issued the same command — "Stop, Police!" The defendant continued walking away, "rolling his shoulders forward" and "looking downward" in a "balling-up sort of a motion." He slowed his pace while Officer Briggs closed the gap between them. When Officer Briggs was within an arm's length, he issued a third command — "Stop, Police!" The defendant suddenly turned, raised both arms together "in a unified motion" about "chest to head high," and fired a single gunshot at Officer Briggs. The bullet penetrated the side of Officer Briggs's helmet and he instantly collapsed to the ground. The defendant turned and ran up the alley as Officer Breckinridge fired several shots at him.

Police officers in the area responded immediately. One officer saw the defendant in the alley looking for a way to escape. The officer saw the defendant turn and raise his arm toward the officers as though he was going to fire a gun at them; the officer took aim at the defendant and fired his weapon four or five times. Another officer also took aim at the defendant but did not fire because she could not take a clear shot. The defendant looked back at the officers, then "hunched down" and moved his arm back and forth at waist level as if trying to clear a jam from his gun. Several officers chased the defendant up the alley, while others went to Officer Briggs's aid.

The police discovered the defendant's cellular telephone at the scene and his red sweatshirt nearby. Later that day, they tracked him to his grandmother's Boston apartment, where he surrendered to the police and was taken into custody. A resident in the neighborhood of the shooting later found the gun in her backyard where the defendant had discarded it while fleeing, and she notified the police.

Officer Briggs never regained consciousness. He died the next day, October 17, from a single gunshot wound to his head.

## II. PROCEDURAL HISTORY

On February 20, 2007, a grand jury indicted the defendant on one count of capital murder. The indictment alleged that

> Michael K. Addison . . . of Manchester, New Hampshire, on or about October 16, 2006, at Manchester in the County of Hillsborough, with force and arms, . . . knowingly caused the death of Manchester Police Officer Michael L. Briggs, a law enforcement officer, by shooting Officer Briggs in the head with a firearm, while Officer Briggs was acting in the line of duty . . . .

*See* RSA 630:1, I(a) (2007). The indictment also alleged certain statutory aggravating factors that would make the defendant eligible to receive a death sentence. On May 7, 2007, the State filed its notice of intent to seek the death penalty, identifying statutory and non-statutory aggravating factors pursuant to RSA 630:5, I (2007). This notice was later amended.

The defendant's capital murder trial took place from October to December 2008. At the defendant's request, the trial court bifurcated sentencing into two stages. Consequently, the trial consisted of three phases: (1) the guilt phase, in which the jury determined whether the defendant committed capital murder; (2) the eligibility phase, in which the jury determined whether there existed statutory aggravating factors making the defendant eligible for the death penalty; and (3) the sentence selection phase, in which the jury determined, based upon consideration of all the evidence, including aggravating and mitigating factors, whether to sentence the defendant to life imprisonment without possibility of parole or to death.

The guilt phase began on October 20, 2008, and the evidence included numerous exhibits and the testimony of more than forty witnesses. The guilt phase ended on November 13, when the jury found the defendant guilty of capital murder for having knowingly killed a law enforcement officer acting in the line of duty. *See* RSA 630:1, I(a). The eligibility phase lasted one day, November 17, and included one witness who testified for the State, and a stipulation relating to the defendant's prior incarceration. At the conclusion of this phase, the jury determined that the State had proven statutory aggravating factors making the defendant eligible for the death penalty. *See* RSA 630:5, VII (2007). The jury recorded these findings on a Special Findings Form, which is included in Appendix A to this opinion. The sentence selection phase began on November 21, and the evidence included numerous exhibits and the testimony of more than fifty witnesses. This final phase ended on December 18, when the jury returned findings on the non-statutory aggravating factors evidence proffered by the State and the mitigating factors evidence proffered by the defendant, and recommended that the defendant be sentenced to death. *See* RSA 630:5, IV (2007). The jury recorded these findings and its verdict on a Special Verdict Form, which is included in Appendix B to this opinion. As required by statute, the superior court imposed the recommended death sentence on December 22.

*See* RSA 630:5, V (2007). On December 31, 2008, this court docketed the automatic appeal required under RSA 630:5, X (2007). On May 1, 2009, the defendant filed his notice of appeal pursuant to Supreme Court Rule 7.

We previously have issued several decisions related to this case. In 2009, we concluded that formal rulemaking for review of death penalty cases was not required. *State v. Addison*, 159 N.H. 87, 93 (2009). In 2010, we determined the standard applicable for comparative proportionality review under RSA 630:5, XI(c) (2007), and noted that we would decide the applicable standards under sections XI(a) and (b) as necessary in our decision on the appeal. *State v. Addison*, 160 N.H. 732, 741 (2010). Also in 2010, the defendant moved for a partial remand to the trial court for additional discovery and proceedings. We granted his motion, in part, to allow the trial court to rule upon his post-verdict motion for discovery. The trial court conducted further proceedings and denied the defendant's post-verdict motion.

We also issued decisions in the appeals of three non-capital cases involving the defendant. During the sixteen months between the State's filing of its initial notice to seek the death penalty and the start of the defendant's capital murder trial, the parties tried three felony cases arising out of the events that occurred during the week preceding the shooting of Officer Briggs. These three cases are relevant to the capital murder proceedings because they relate to certain non-statutory aggravating factors identified in the State's amended notice of intent to seek the death penalty.

First, the defendant was convicted of armed robbery and of being a felon in possession of a deadly weapon for participating in the robbery of the El Mexicano Restaurant in Manchester on October 10, 2006. Second, he was convicted of conspiracy to commit robbery, armed robbery, and of being a felon in possession of a firearm for participating in the robbery of the 7-Eleven convenience store in Hudson on October 11, 2006. Third, he was convicted of conspiracy to commit criminal threatening and accomplice to reckless conduct with a firearm for participating in the shooting at the apartment complex located on Edward J. Roy Drive in Manchester on October 15, 2006. He was acquitted of the charge of being a felon in possession of a deadly weapon during the Roy Drive shooting. We affirmed the defendant's non-capital convictions in all three cases. *See State v. Addison*, 160 N.H. 493 (2010) (7-Eleven robbery); *State v. Addison*, 160 N.H. 792 (2010) (El Mexicano Restaurant robbery); *State v. Addison*, 161 N.H. 300 (2010) (Roy Drive shooting). The trial court imposed sentences for each of these convictions on December 22, 2008, the same day it imposed the death sentence for the capital murder.

## III. PROCEDURE IN CAPITAL MURDER

Under New Hampshire law, a defendant is eligible for a death sentence if a unanimous jury finds beyond a reasonable doubt both that the defendant is guilty of capital murder as defined under RSA 630:1 (2007) (amended 2011), and, following a sentencing hearing, that the State has proven two statutory aggravating factors. RSA 630:5, I, II, IV, VII (2007). When the crime in this case occurred, the statute identified six types of capital murder, each defined as "knowingly caus[ing] the death of another" in specific circumstances. RSA 630:1; *see* RSA 630:1, I(g) (Supp. 2012) (statute amended in 2011 to add seventh type of capital murder). One type of capital murder is defined as knowingly killing "a law enforcement officer acting in the line of duty." RSA 630:1, I(a). One of the two requisite statutory aggravating factors relates to whether the defendant acted "purposely" when committing the capital murder. RSA 630:5, VII(a)(1)-(3). The second relates to the circumstances of the crime, the background of the defendant, or the status of the victim. RSA 630:5, VII(b)-(j).

At a capital sentencing hearing, the jury also considers whether additional aggravating factors exist, provided such factors were set forth in the State's notice of intent to seek the death penalty. RSA 630:5, I, III (2007). These additional factors may be those identified in the statute (statutory aggravating factors) or may be "other aggravating factors which the state will seek to prove as the basis for the death penalty" (non-statutory aggravating factors). RSA 630:5, I(b). Further, each juror considers whether mitigating factors exist. RSA 630:5, III. Although the jury's finding with respect to an aggravating factor must be unanimous, "any member of the jury who finds the existence of a mitigating factor may consider such a factor established." RSA 630:5, IV. The State bears the burden of proving the existence of an aggravating factor beyond a reasonable doubt; the defendant bears the burden of proving the existence of a mitigating factor by a preponderance of the evidence. RSA 630:5, III.

If a sentencing jury unanimously finds the existence of the two statutory aggravating factors that are necessary to make the defendant eligible for a death sentence, then each juror considers whether all of the aggravating factors found to exist "sufficiently outweigh any mitigating factor or factors found to exist, or in the absence of mitigating factors, whether the aggravating factors are themselves sufficient to justify a sentence of death." RSA 630:5, IV. A recommendation "that a sentence of death be imposed rather than a sentence of life imprisonment without possibility of parole" must be "by unanimous vote." *Id.* Moreover, "[t]he jury, regardless of its findings with respect to aggravating and mitigating factors, is never required to impose a death sentence and the jury shall be so instructed." *Id.*

Should the jury recommend a death sentence, the court is required to impose that sentence. RSA 630:5, V (2007).

## IV. APPELLATE STANDARDS OF REVIEW

The issues before us raise questions of statutory and constitutional interpretation and require our review of the trial court's evidentiary rulings. Our settled principles of judicial review apply to this appeal. The trial court's rulings on questions of law, including statutory interpretation and constitutional questions, are reviewed *de novo. State v. Marshall*, 162 N.H. 657, 661 (2011). Because we decide cases on constitutional grounds only when necessary, when a claim of error is based upon both a statutory provision and a constitutional provision, we first will address the statutory argument. *See State v. Wamala*, 158 N.H. 583, 592 (2009).

In matters of statutory interpretation, we are the final arbiter of the intent of the legislature as expressed in the words of a statute considered as a whole. *State v. Etienne*, 163 N.H. 57, 71 (2011). We first examine the language of the statute and ascribe the plain and ordinary meanings to the words used. *State v. Moussa*, 164 N.H. 108, 128 (2012). Absent an ambiguity we will not look beyond the language of the statute to discern legislative intent. *Etienne*, 163 N.H. at 72. We interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language it did not see fit to include. *State v. Addison*, 160 N.H. 732, 754 (2010). Our goal is to apply statutes in light of the policy sought to be advanced by the entire statutory scheme. *Id.* Accordingly, we interpret a statute in the context of the overall statutory scheme and not in isolation. *Id.* Additionally, "we construe provisions of the Criminal Code according to the fair import of their terms and to promote justice." *Id.* (quotation and citation omitted).

■ Legislative acts are presumed to be constitutional and will not be declared invalid "except upon inescapable grounds." *Duquette v. Warden, N.H. State Prison*, 154 N.H. 737, 745 (2007). "This means that we will not hold a statute to be unconstitutional unless a clear and substantial conflict exists between it and the constitution." *Petition of S. N.H. Med. Ctr.*, 164 N.H. 319, 324 (2012) (quotation omitted). "It also means that when doubts exist as to the constitutionality of a statute, those doubts must be resolved in favor of its constitutionality." *Id.* (quotation omitted). "The party challenging a statute's constitutionality bears the burden of proof." *State v. Pierce*, 152 N.H. 790, 791 (2005). To prevail on a facial challenge, the defendant must establish that no set of circumstances exists under which the challenged statute would be valid. *State v. Hollenbeck*, 164 N.H. 154, 158 (2012).

■Where the defendant claims a violation of both the State and Federal Constitutions, we first address his claims under the State Constitution, and rely upon federal law only to aid our analysis. *See State v. Ball*, 124 N.H. 226, 231-33 (1983). When the United States Supreme Court has decided an issue of federal law, we must "follow the case [that] directly controls, leaving to [the Supreme Court] the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Exp.*, 490 U.S. 477, 484 (1989); *see State v. Melvin*, 150 N.H. 134, 140 (2003) ("When interpreting federal law, . . . we are bound by the United States Supreme Court's current explication of it.").

The admission of evidence falls within the trial court's sound discretion. *State v. Oakes*, 161 N.H. 270, 280 (2010); *State v. Giddens*, 155 N.H. 175, 179 (2007). We review the trial court's ruling for an unsustainable exercise of discretion. *See Giddens*, 155 N.H. at 179. To prevail under this standard, the defendant must demonstrate that the challenged evidentiary ruling was "clearly untenable or unreasonable to the prejudice of his case." *Id.* Additionally, we review the propriety of the trial court's pretrial rulings in the context in which evidentiary disputes were presented to the court. *See State v. Glodgett*, 144 N.H. 687, 694 (2000); *State v. Bassett*, 139 N.H. 493, 497 (1995).

## V. VENUE AND JURY SELECTION REVIEW

On appeal, the defendant raises one challenge to venue and two to jury selection. He first argues that the trial court erred in denying his motions for change of venue. Regarding jury selection, he argues that the trial court erred in denying his request that he be allotted thirty peremptory challenges and in denying his motions to dismiss two prospective jurors for cause. We first provide an overview of the jury selection process in this case.

In September 2008, at the start of the first day of juror *voir dire*, the trial court described the jury selection process that had taken place to that point. Approximately 1,200 prospective jurors had been summoned for the case and those who responded to the summons submitted a completed five-page preliminary questionnaire. Counsel jointly determined which individuals should be excused immediately based upon the questionnaire responses alone, and they met periodically with the trial court to discuss their recommendations. The court noted that counsel "almost always agreed on who should be excused and . . . whose request should be denied." In addition, the court excused persons who clearly were not eligible for jury service, as well as those who were entitled to be excused.

Juror *voir dire* lasted approximately seventeen days, generating approximately 2,800 pages of transcript testimony. Over 300 prospective

jurors reported to the courthouse for jury selection and the trial court divided them into several panels. Each panel was brought before the court for preliminary *voir dire*, during which the trial court described the charge against the defendant, the jury selection process, and the law generally applicable to criminal cases, including capital cases. Prospective jurors who knew any of the potential witnesses were excused, and the remainder completed a long-form juror questionnaire, specially prepared for the case.

This forty-one page form, modeled largely upon the defendant's proposed questionnaire, covered a variety of topics ranging from the prospective juror's views on racial discrimination, the death penalty, and the criminal justice system, to opinions that he or she might have formed about the guilt or innocence of the defendant or the possible punishment if he were convicted. The questionnaire included several questions about the prospective juror's media exposure, including his or her sources for news (*e.g.*, newspaper, talk radio, television, or internet) and frequency of reading or listening to the news. The questionnaire included a list of television shows and channels, and radio stations and programs and prompted the prospective juror to indicate which he or she watched or listened to on a regular basis. The questionnaire asked whether the individual participated in social media such as MySpace or Facebook. In addition, the questionnaire asked a series of questions concerning aspects of the case that the prospective juror might have read about, heard, or discussed with anyone, including information about the defendant and Officer Briggs. Many of the questions were designed to prompt narrative or explanatory answers, and each prospective juror signed his or her completed questionnaire under oath.

Next, approximately 114 prospective jurors participated in individual, sequestered *voir dire*. Before each prospective juror entered the courtroom, the trial court asked counsel whether specific questioning was necessary in light of the individual's answers to the long-form questionnaire. If requested by either party, the trial court asked targeted questions of the prospective juror based upon information provided in response to questions in the questionnaire. The court then questioned each prospective juror as to whether he or she understood, and accepted, certain principles of law, including that the defendant was presumed innocent unless and until the State convinced a unanimous jury beyond a reasonable doubt that he was guilty. The court explained to each individual the phases of a death penalty case and questioned each as to his or her understanding of these phases. The court also asked the prospective juror whether he or she understood that the jury would not be required to impose the death penalty, and that the jury could impose the death penalty only if it unanimously found that aggravating factors sufficiently outweighed miti-

gating factors. It asked each prospective juror if there was any reason that he or she could not be a fair and impartial juror in the case. Following this questioning, counsel for both the defendant and the State were allowed equal time to question the prospective juror, including questioning about information provided on the long-form questionnaire. Counsel's questioning ranged from exposure to media coverage, community ties, and opinions of police officer credibility, to the ability to be fair and impartial and opinions about the death penalty.

During *voir dire*, the State and the defendant moved to dismiss certain prospective jurors for cause; some of the motions were granted, and others were not. Individuals were dismissed by the trial court for a variety of reasons including their particular views about the death penalty, and other statements indicating a lack of impartiality or an inability to follow the law. The State exercised eleven of its twelve allotted peremptory challenges. The defendant exercised the last of his twenty-four allotted peremptory challenges after the seventeenth juror was seated. Ultimately, the trial court seated eighteen jurors, including six alternates. The defendant did not move to dismiss the eighteenth selected juror for cause.

## A. Venue

### 1. Background

The superior court for the Hillsborough-North judicial district is located in Manchester. Approximately six months before trial, the defendant moved for a change of venue, arguing that "[t]he crime with which he is charged set in motion an unprecedented wave of public passion, outcry, and outrage in the community in which the prospective venire resides," and that "[t]his community has rallied around the victim, his surviving family, and his brother officers, and against [the defendant], such that it would be fundamentally unfair to compel [him] to select his jury in the Hillsborough-North district." In support of this argument, the defendant alleged, among other things, that: "[w]ithin roughly two hours of [Officer Briggs's] death, in a widely broadcast press conference, [then] Attorney General Kelly Ayotte announced that the State would seek to execute the man responsible for killing [him]"; the community's reaction to Officer Briggs's death "reveals how the community . . . felt about the crime, the police, and the level of violence in the community"; and "[t]he case has prompted politicians, public figures, and the media to emphasize the threat posed by crime to the community, and to focus community outrage at [the defendant]."

The defendant included with his motion copies of *Union Leader* and *Concord Monitor* newspaper articles, WMUR Channel 9 telecasts, a summary of reader comments posted on the *Union Leader* website, a list

of blogs and websites that mentioned Officer Briggs, a table of the *Union Leader*'s print circulation figures, the Manchester Police Department 2006 annual report, population figures for New Hampshire counties and selected cities, photographs and maps establishing the relative locations of the Manchester Police Department and the Hillsborough-North Superior Court, and memoranda documenting the *Union Leader*'s coverage of two other high-profile murder cases. He argued that the "voluminous" publicity "in itself justifies moving th[e] trial from Hillsborough-North." In addition, the defendant alleged that on a blog maintained on the *Union Leader* website, "many Manchester residents have expressed their views on the proper outcome of th[e] prosecution." According to the defendant, "[b]ecause this community has reacted so powerfully to the crime, the trial must be moved to a less deeply affected judicial district . . . [where he] can . . . get the fair and impartial trial society mandates." The defendant subsequently supplemented his motion with additional materials.

The State objected, arguing that the motion should be denied because the defendant "has failed to meet his burden to establish that the media coverage of his case has inherently or presumptively prejudiced the potential jury pool." According to the State, the "overwhelming bulk of the media coverage, which the defendant cites, occurred over eighteen months [earlier], in the immediate aftermath of the murder of [Officer] Briggs," and "the media coverage has been primarily factual." The State noted that for jury selection, the trial court intended to call a larger pool of potential jurors than usual, that each juror would receive a detailed questionnaire asking about familiarity with the case, and that the court and the parties would undertake individual, sequestered *voir dire* of the prospective jurors. Thus, the State argued, "[t]he extensive *voir dire* by the Court and the parties . . . will resolve whether it is possible to obtain a fair and impartial jury."

Following a hearing, the trial court denied the defendant's motion by written order dated June 25, 2008. Having examined the publicity surrounding the case, the trial court found that much of it "occurred immediately after the shooting of Officer Briggs." It noted that the television clips were "largely factual, discussing developments in the investigation of the death of Officer Briggs and subsequent charging and prosecution of the defendant," while other articles and television clips discussed "debates over the death penalty in general, . . . the defendant's personal history, and ways in which people have posthumously honored Officer Briggs and supported his widow and children." In addition, however, the trial court found that "[s]ome of the articles and television clips refer to evidence that may be inadmissible during the defendant's capital murder trial"; for example, extensive coverage of the three non-capital trials and

articles about the defendant's criminal history. Regarding comments posted by readers on the *Union Leader* website, the trial court found that many were "personal attacks on the defendant" or were "messages of support to the Briggs family or remembrances of Officer Briggs," that others concerned "crime in Manchester" or "the death penalty in general," and that some were reactions to developments in the defendant's case.

After reviewing the materials submitted by the defendant, the trial court concluded that "while the press concerning this case has been voluminous, especially immediately after the death of Officer Briggs, it is not the kind of adverse inflammatory publicity that raises a concern about inherent prejudice." The trial court found that although "some of the pieces are hostile in tone and accusatory in content, the overwhelming bulk of the material submitted consists of straightforward, unemotional factual accounts," and that "[w]hile some of the articles and television clips about the death of Officer Briggs had an emotional tone, very few related facts about the defendant in a way that could be described as prejudicial." (Quotation omitted.) In addition, the trial court stated that "very few editorials about the case displayed hostility towards the defendant"; rather, "[m]ost expressed sadness about the death of Officer Briggs, debated the value of the death penalty, and generally discussed crime in Manchester." While some of the media coverage revealed facts about the defendant's criminal history that might be inadmissible during the guilt phase of his trial, the court noted that "[e]xposure to inadmissible evidence . . . is not sufficient to presume jury prejudice." (Quotation omitted.)

The trial court declined to consider media website comments such as those posted on the *Union Leader* website as "publicity" for the purposes of its analysis of inherent prejudice, characterizing media websites as "merely places where members of the public can express their opinions about any topic, a kind of electronic general store," and stating that such comments were "clearly not posted to transmit information or news in an objective fashion but [were] often emotional reactions to articles posted on the Union Leader website." Further, the court rejected the defendant's argument that internet comments and community reaction as reported in the media reflected a deep hostility that would make it impossible to select an impartial jury in the Hillsborough-North judicial district. The trial court found that: "the total number of comments is small"; the majority of the comments were from webboards where the writers were often anonymous and posted opinions more than once, and therefore the number of "commenters" could not be accurately gauged; about two-thirds of the "commenters" who identified themselves lived in towns outside the judicial district; and "the vast majority of the comments express support for Officer Briggs, his family, the police department, or describe memories of Officer

Briggs." The court's "informal" review revealed that less than one quarter of the small number of comments were of "an inflammatory nature," which, in a judicial district of more than 190,000 people, "does not signal inherent community prejudice."

The trial judge noted that, because she had previously presided over the defendant's two non-capital trials held in Manchester, she "ha[d] been able to test the effect of pretrial publicity on jurors" and that, through juror *voir dire*, the court had been "able to secure fair and impartial juries in those cases without exhausting the jury pools." Finally, the trial court disagreed with the defendant's assertion that the close proximity of the Manchester Police Station — where a monument to fallen officers, including Officer Briggs, was located — to the courthouse weighed in favor of a change of venue because jurors could be prejudiced as they entered the courthouse. The court found that the Manchester Police Station, located diagonally across the street from the courthouse, was a nondescript building and that the monument was not readily visible from the courthouse. In addition, the court found that the monument listed Officer Briggs "as one of four downed police officers in Manchester's history" and that the names of the officers could be read only upon close inspection. The trial court noted that "during the trial, the jurors will park at an off-site location and be bused to the courthouse each day where they will enter through the backdoor, out of sight of the Manchester Police Station."

The defendant then petitioned this court to exercise its original jurisdiction and order the trial court to grant a change of venue. We denied the petition.

Following jury selection, the defendant renewed his motion for change of venue, arguing that "[a] review of actual juror comments, both to the Court and in questionnaires, indicates that this community is so aligned with the Manchester Police, and so hostile to [him], that a trial in this judicial district is fundamentally unfair." The defendant argued that "in spite of the jury selection process, he [would] suffer actual prejudice by having his trial in [the Hillsborough-North] judicial district," and asked the court to strike the panel and change venue.

The State objected, arguing that the defendant had not provided "any objective factual basis that even call[ed] into question, let alone undermine[d], the propriety of the Court's earlier rejection of his request for a change of venue, or to strike the eighteen jurors who were fully vetted by the Court and the parties and who are qualified to serve on this case." The State argued that "the 'data' selectively culled by the defendant in support of his renewed motion [did] not accurately portray the pool of prospective jurors and altogether ignore[d] the views expressed by those jurors that he ultimately ha[d] agreed to hear his case." As to the pool of prospective

jurors who participated in the individual *voir dire*, the State noted that the "vast majority of those . . . excused by the Court for cause were not removed because of prejudgment of the case or worry over community pressure, but for hardship or because their views regarding the death penalty, both for and against, disqualified them from service on this case."

In addition, the State noted that the process of selecting fair and impartial jurors, although lengthy, resulted in the selection of prospective jurors "acceptable to both sides to serve and hear the case" and that those jurors "gave unequivocal assurances that their decisions in the case would not at all be influenced by any community reaction as to verdict or sentence." The State argued that the defendant's concerns about "prejudice, prejudgment, and community pressures . . . were fully addressed by the exhaustive and multitiered selection process that all prospective jurors had to go through." By written order dated October 20, 2008, the trial court denied the defendant's renewed motion for "change of venue based on data collected during jury selection," in light of the law set out in its previous order on the defendant's original motion to change venue and "for the reasons set forth in the State's objection."

### 2. Appellate Argument

The defendant argues that the trial court erred in denying his motions for change of venue. He contends that "jurors not only had been exposed to an amount of adverse publicity unprecedented in this State, but were also uniquely susceptible to the State's pleas for the condemnation of the murderer of a Manchester police officer." Further, he argues that "[e]ven if jury selection procedures addressed the concern about publicity, they could not have remedied the prejudice inherent in holding a capital murder trial before jurors drawn from the community that suffered the loss of Officer Briggs." He asserts that "[i]f the volume and nature of the media coverage did not create such presumptive prejudice as to warrant a change of venue, the bond between the community and the highly decorated police officer who protected it did." The defendant contends that "[t]he trial court's denial of [his] motions for change of venue violated his State and Federal Constitutional rights to due process, a fair trial, and an impartial jury." *See* N.H. CONST. pt. I, arts. 15, 17, 35; U.S. CONST. amends. V, VI, XIV.

### 3. Discussion

"It is well established that due process requires that an accused must receive a trial by a fair and impartial jury." *State v. Laaman*, 114 N.H. 794, 798 (1974); *see Irvin v. Dowd*, 366 U.S. 717, 722 (1961). Part I, Article 17 of the New Hampshire Constitution provides:

> In criminal prosecutions, the trial of facts, in the vicinity where they happened, is so essential to the security of the life, liberty and estate of the citizen, that no crime or offense ought to be tried in any other county or judicial district than that in which it is committed; except in any case in any particular county or judicial district, upon motion by the defendant, and after a finding by the court that a fair and impartial trial cannot be had where the offense may be committed, the court shall direct the trial to a county or judicial district in which a fair and impartial trial can be obtained.

N.H. CONST. pt. I, art. 17; *see* N.H. CONST. pt. I, art. 35 ("It is the right of every citizen to be tried by judges as impartial as the lot of humanity will admit"); U.S. CONST. amend VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed").

‎ As we have explained, "Part I, Article 17 grants a criminal defendant two rights: the right to be tried where the crime was committed and the right to obtain a change of venue upon proof that he cannot obtain a fair trial there." *Petition of State of N.H. (State v. Johanson)*, 156 N.H. 148, 154 (2007).

> This provision in our bill of rights, designed for the protection of the accused, was regarded by the framers of the constitution as a privilege of the highest importance, because it would prevent the possibility of sending him for trial in a remote county, at a distance from friends, among strangers, and perhaps among parties animated by prejudices of a personal or partisan character.

*State v. Albee*, 61 N.H. 423, 429 (1881). But, "upon proof that a fair trial cannot be had in the place of proper venue, the defendant has an absolute right to a change of venue." *Johanson*, 156 N.H. at 154. "In this way . . . Part I, Article 17 provides the *same* level of protection as the Federal Constitution . . . ." *Id.*; *see State v. Smart*, 136 N.H. 639, 646 (1993) (change of venue principles are the same under the State and Federal Constitutions).

The defendant argues under both the State and Federal Constitutions. We first address the defendant's claim under the State Constitution and rely upon federal law only to aid our analysis. *See State v. Ball*, 124 N.H. 226, 231-33 (1983).

> Publicity about a case can result in two types of prejudice with regard to the accused's right to a fair trial. The first is inherent

prejudice which exists when the publicity by its nature has so tainted the trial atmosphere that it will necessarily result in lack of due process. In such cases the defendant need not show actual identifiable prejudice. The second is actual prejudice which exists when the publicity has infected the jurors to such an extent that the defendant cannot or has not received a fair and impartial jury trial. In this situation the defendant must show that the nature of the opinions formed by the jurors as a result of the publicity are such that they cannot be set aside by the jurors to enable them to render a verdict based on the evidence presented in court.

*Laaman*, 114 N.H. at 798 (citations omitted). The defendant argues that the adverse pretrial publicity and evidence of community sentiment reflected at jury selection compel the conclusion that inherent prejudice denied him his constitutional rights. We address these arguments in turn.

### a. Pretrial Publicity

■ A trial court's determination of the impartiality of the selected jurors "is entitled to special deference." *Smart*, 136 N.H. at 653. "Particularly with respect to pretrial publicity . . . primary reliance on the judgment of the trial court makes good sense." *Id.* (quotation omitted). "The judge of that court sits in the locale where the publicity is said to have had its effect, and brings to his evaluation of any such claim of prejudice his own perception of the depth and extent of news stories that might influence a juror." *Id.* (quotation and brackets omitted). Accordingly, we will not reverse the trial court's decision unless it amounts to manifest error. *Id.*; *see State v. Gribble*, 165 N.H. 1, 18 (2013).

■ "The theory of our trial system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print." *Skilling v. United States*, 130 S. Ct. 2896, 2913 (2010) (quotation and brackets omitted). Therefore, presumptive, or inherent, prejudice may arise when a "barrage of inflammatory publicity immediately prior to trial," *Murphy v. Florida*, 421 U.S. 794, 798 (1975), amounts to a "huge . . . wave of public passion," *Irvin*, 366 U.S. at 728. "[P]rejudice may properly be presumed where prejudicial, inflammatory publicity about a case so saturated the community from which the defendant's jury was drawn as to render it virtually impossible to obtain an impartial jury." *United States v. Angiulo*, 897 F.2d 1169, 1181 (1st Cir. 1990) (quotation and brackets omitted). A presumption of prejudice because of adverse publicity "attends only the extreme case." *Skilling*, 130 S. Ct. at 2915.

■ "[I]t is the adverse nature of the publicity, not merely its quantity, that is critical in finding presumptive prejudice." *Smart*, 136 N.H. at 649; *see United States v. Misla-Aldarondo*, 478 F.3d 52, 58 (1st Cir. 2007) (publicity must be both extensive and sensational in nature). "Distinguishing between straightforward factual publicity about a celebrated case and inflammatory, adverse press is crucial." *Smart*, 136 N.H. at 649. "To ignore these real differences in the potential for prejudice would not advance the cause of fundamental fairness, but only make impossible the timely prosecution of persons who are well known in the community, whether they be notorious or merely prominent." *Id.* (quotation omitted).

Never have we found inherent prejudice in a case such that a change of venue was compelled. In *Smart*, we considered a claim of inherent prejudice based upon "enormous" pretrial publicity, characterized by some as "unprecedented in this State." *Id.* at 649. There, the defendant was charged with, among other things, being an accomplice to the first-degree murder of her husband. *Id.* at 643-45. In the aftermath of the crime and leading up to the trial, there was "extraordinarily heavy and widespread media coverage." *Id.* at 646. Numerous articles appeared in the local newspapers, in addition to news coverage in Boston, Massachusetts, and national media outlets including *Time* magazine. *Id.* Several days before jury selection was to begin, WMUR Channel 9 aired a special program titled "Anatomy of a Murder." *Id.* at 649. The program consisted of "footage from earlier news broadcasts that included film of pre-arrest interviews with the defendant, of her arrest and that of the [co-defendant] teenage boys, along with commentary by a station reporter." *Id.* The program also referred to three new indictments against the defendant, including one charging her with attempting to murder a potential witness. *Id.* at 649-50. The pretrial publicity generated a "several-inch-thick volume of newspaper accounts and videotaped television news stories," which the defendant submitted in support of her motion for a change of venue. *Id.* at 649.

We rejected the defendant's argument that this publicity was "so pervasive and prejudicial" as to establish a presumption that it was impossible to select an impartial jury in the judicial district. *Id.* at 646. After reviewing "the massive amount of pretrial media material submitted by the defendant," we concluded that, although some of the news pieces were "hostile in tone and accusatory in content, the overwhelming bulk of the material submitted" consisted of "straightforward, unemotional factual accounts of events and of the progress" of the case. *Id.* at 649 (quotation, brackets, and ellipses omitted). In addition, we stated that exposure to facts that were not admissible at trial was not sufficient to presume prejudice. *Id.* at 650. At most, the defendant had shown "that the community from which her jury was drawn was exposed to extensive pretrial publicity that

resulted in familiarity with her case," but we concluded that "[m]ere familiarity . . . is not sufficient to presume prejudice." *Id.*

 Only once has the United States Supreme Court reversed a conviction solely based upon presumptive prejudice resulting from pretrial publicity without regard to the jurors' own *voir dire* testimony concerning their impartiality. *See id.* at 647-48. In *Rideau v. Louisiana*, 373 U.S. 723 (1963), police interrogated the defendant in jail, without counsel present, and obtained his confession. *Rideau*, 373 U.S. at 724. The police filmed the interrogation and, on three separate occasions before trial, a local television station broadcast the film to audiences ranging from 24,000 to 53,000 individuals, in a parish with a population of approximately 150,000. *Id.* Reversing the trial court's denial of the defendant's motion for change of venue, the Supreme Court observed that "[w]hat the people [in the community] saw on their television sets was [the defendant], in jail, flanked by the sheriff and two state troopers, admitting in detail the commission of the robbery, kidnapping, and murder." *Id.* at 725. As the Court explained, "to the tens of thousands of people who saw and heard it, [the interrogation and confession] in a very real sense *was* [the defendant's] trial — at which he pleaded guilty to murder." *Id.* at 726. Therefore, the Court "d[id] not hesitate to hold, without pausing to examine a particularized transcript of the *voir dire* examination of the members of the jury, that due process . . . required a trial before a jury drawn from a community of people who had not seen and heard [the defendant's] televised 'interview.' " *Id.* at 727. Thus, as *Smart* and *Rideau* underscore, in order to establish inherent prejudice, the *nature* of the publicity must be adverse and so inflammatory that it is not possible to select an impartial jury.

The defendant argues that we "should not rule that there can be no inherent prejudice unless the facts of the case approximate those involved in *Rideau*." He asserts that "the publicity and community prejudice attendant to the murder of Officer Briggs, in combination with factors deemed relevant to the inquiry by other courts, established that the trial court erred by holding the trial in the Hillsborough-North judicial district." The defendant points out that courts in other jurisdictions consider a number of factors in determining whether there exists a presumption of community prejudice sufficient to require a change of venue. One factor is the lapse of time between the crime and the trial. *See, e.g., Skilling*, 130 S. Ct. at 2916; *Irvin*, 366 U.S. at 725; *Hayes v. Ayers*, 632 F.3d 500, 509 (9th Cir. 2011). Another is the size of the community in the judicial district. *See, e.g., Skilling*, 130 S. Ct. at 2915; *Mu'Min v. Virginia*, 500 U.S. 415, 429 (1991); *State v. Galindo*, 774 N.W.2d 190, 227 (Neb. 2009). Other factors include the prominence of either the victim or the defendant in the

community and the nature and gravity of the offense. *See State v. Biegenwald*, 594 A.2d 172, 182 (N.J. 1991).

The defendant argues that his relative standing in the community in comparison with that of Officer Briggs "weighed in favor of moving the case away from Manchester." He asserts that this was a "rare case in which the victim is so beloved by the community, the defendant so reviled, and the local media coverage reflect[ed] and perpetuate[d] the divide," that there was an increased risk that the verdict might be based "on a desire for revenge, or the fear of social ostracism as the cost of a mitigated verdict." (Quotation omitted.)

One of the cases cited by the defendant in support of this argument is instructive. In *State v. Stubbs*, 123 P.3d 407, 409 (Utah 2005), the seventeen-year-old rape victim's family was well-known and well-regarded in the community. The jury selection *voir dire* indicated that a large number of the prospective jurors knew members of the victim's family and four of the seated jurors knew the victim or the prosecution witnesses. *Id.* The court found that the *voir dire* reinforced the conclusion that a fair and impartial jury could not be found because the victim had so many contacts within the community. *Id.* at 412. "Indeed, as it was eventually composed, the jury was still populated with jurors who personally knew the victim's family or prosecution witnesses . . . ." *Id.* Given so many connections between the jurors and the victim's family, the court held that "fairness can better be ensured in a different venue." *Id.* In the case before us, however, there is no suggestion that any seated juror personally knew Officer Briggs's family. Neither is there a suggestion that the *voir dire* showed an overriding concern on the part of prospective jurors with community reaction to a verdict of not guilty on the capital murder charge or a sentence less than death based upon the relative standing of either the defendant or Officer Briggs.

The defendant next argues that his case is distinguishable from *Smart* and thereby compels the conclusion that he has established inherent prejudice. First, he points to the fact that he "exhausted all of his 24 peremptory challenges," unlike the defendant in *Smart. See Smart*, 136 N.H. at 648. The defendant, however, does not develop this argument or explain why exhausting his peremptory challenges requires a different conclusion. *See State v. Chick*, 141 N.H. 503, 504 (1996).

██ Second, the defendant argues that ninety-eight percent of the prospective jurors who filled out questionnaires knew about his case, unlike the jurors in *Smart*, many of whom knew little about the murder prosecution. Impartiality, however, does not require that "the juror be totally ignorant of the facts and issues involved." *Laaman*, 114 N.H. at 800

(quotation omitted). "[E]xtensive knowledge in the community of either the crimes or the putative criminal is not sufficient by itself to render a trial constitutionally unfair." *Dobbert v. Florida*, 432 U.S. 282, 303 (1977); *see Mu'Min*, 500 U.S. at 429 ("Any killing that ultimately results in a charge of capital murder will engender considerable media coverage . . . .").

> Simply because prospective jurors may have heard about a case through media reports does not render them incapable of jury service, since, in today's "information age," where news of community events [is] disseminated virtually instantaneously by an ever multiplying array of delivery methods, it would be difficult to find 12 jurors who do not at least have some knowledge of the facts of an important and tragic incident like this one.

*Commonwealth v. Briggs*, 12 A.3d 291, 313 (Pa. 2011), *cert. denied, Briggs v. Pennsylvania*, 132 S. Ct. 267 (2011); *see Laaman*, 114 N.H. at 800.

Third, the defendant contends that the State Constitution contains enhanced due process protection, an argument that he avers was not directly addressed in *Smart*. However, despite noting in *Smart* that the defendant "[did] not argue for a higher standard under the New Hampshire Constitution," we nonetheless concluded that the protections afforded in this area under the State Constitution are the same as those afforded under the Federal Constitution. *Smart*, 136 N.H. at 646. The defendant here does not set forth any arguments sufficient to persuade us otherwise.

Fourth, the defendant asserts that "motions to change venue in capital cases warrant special consideration" and that "[t]he capital nature of this prosecution distinguishes it from *Smart*." *See State v. Koedatich*, 548 A.2d 939, 968 (N.J. 1988) (trial courts should grant motions for change of venue in capital cases liberally). Even assuming that the defendant is correct that the change of venue analysis should be different in capital cases, we would reach the same result applying "special consideration" to this issue. Furthermore, it is apparent that the trial court, well aware of the gravity of the charges facing the defendant, took proper measures to ensure that an impartial jury was seated: it enlarged the pool of summoned jurors, required potential jurors to complete an extensive questionnaire, conducted thorough individual, sequestered *voir dire*, and increased the number of peremptory challenges. *Cf. People v. Jenkins*, 997 P.2d 1044, 1075 (Cal. 2000) (murder of police officer weighs in favor of a change of venue but does not by itself require a venue change). He also argues that because in *Smart* we recognized that "[a] claim of inherent prejudice does not require the defendant to show actual identifiable prejudice," *Smart*, 136 N.H. at 647 (quotation omitted), he need only "show a reasonable likelihood that a fair

trial was not had." However, even assuming, without deciding, that this standard applies, as discussed below we conclude that it was not met in this case.

Fifth, the defendant argues that the volume of the publicity was greater than in *Smart* and its adverse nature was more pervasive. We have reviewed the materials submitted by the defendant in support of his initial motion for a change of venue. Regarding the nature of the pretrial publicity, we agree with the trial court that the bulk of the articles and news clips were factual reports, consisting of "descriptions and depictions of [the] circumstances of Officer Briggs's death and funeral, the defendant's arrest for capital murder, and the legal happenings in the capital case." Factual coverage "undermines any claim for a presumption of prejudice." *Angiulo*, 897 F.2d at 1181. We also agree with the trial court that few of the articles and television clips "related facts about the defendant in a way that could be described as prejudicial," that "very few editorials about the case displayed hostility towards the defendant," and that the pretrial publicity was "not the kind of adverse inflammatory publicity that raises a concern about inherent prejudice." *See Commonwealth v. Morales*, 800 N.E.2d 683, 688 (Mass. 2003) (although media coverage frequently mentioned the defendant's confession and his criminal record, as well as the victim's twenty-one-year service as a police officer, his popularity in the community, and the memorials in his honor, those references fell far short of the type of emotionally charged, inflammatory, sensational coverage needed to support a presumption of prejudice). Although some media reports contained information about the defendant that might be inadmissible at trial, we agree with the trial court that such facts were not "as unforgettable as the spectacle of Rideau's dramatically staged and broadcast confession." (Quotation omitted.) *See Rideau*, 373 U.S. at 726.

Importantly, the record supports the trial court's finding that "the publicity . . . was at its heaviest immediately after the death of Officer Briggs and ha[d] diminished substantially since that time." The trial court noted that approximately seventy articles appeared in the *Union Leader* in October 2006, but fewer than ten appeared in May 2008 when the defendant filed his first motion for a change of venue. "Where there has been a substantial lapse of time between the publicity and the trial, there is a far less likelihood the publicity will affect the juror's deliberations." *Calley v. Callaway*, 519 F.2d 184, 208 (5th Cir. 1975) (*en banc*); *see Patton v. Yount*, 467 U.S. 1025, 1033 (1984) (lapse of time of over one year had a profound effect on the jury in softening or effacing opinion); *Gribble*, 165 N.H. at 22 (passage of nearly a year and a half between the crimes and the defendant's trial "diminished any presumptive impact of the publicity at the time the

crime was committed"). Finally, we agree with the trial court's evaluation of comments posted on-line. Other courts have reached similar conclusions. *See State v. Dwyer,* 985 A.2d 469, 476 (Me. 2009) (website comments represent the views of a select group that are addressed to a limited audience and do not necessarily represent the views held by the public at large); *see also United States v. Cassel,* No. CIVA 706CR-00098-04, 2007 WL 419574, at *1 (W.D. Va. Feb. 5, 2007) (because the internet is available in every judicial district, the risk that prospective jurors will encounter these stories cannot be cured by change of venue).

▮ Although the media coverage was extensive, it was primarily factual and the bulk of the publicity that contained material that may be characterized as "inflammatory" appeared during the weeks immediately following the murder, nearly two years before jury selection. In short, the defendant has not presented us with the "type of emotionally charged, inflammatory, sensationalistic coverage needed to support a presumption of prejudice." *Angiulo,* 897 F.2d at 1181; *see Busby v. Dretke,* 359 F.3d 708, 726 (5th Cir. 2004).

### b. Jury Voir Dire

The defendant argues that we "must examine the voir dire and other procedures designed to screen for qualified jurors." He argues that the jury selection *voir dire* in this case "demonstrates that the pretrial publicity permeated the venire" and that "no amount of *voir dire* could have adequately addressed the prejudice attendant to trying the case before jurors drawn from Manchester and its environs." In support, the defendant cites decisions from other courts that have "deemed it significant that, as in this case, an exceptionally high percentage of the venire knew about the case" and a significant number of prospective jurors had a personal connection to the case. The defendant asserts that "nearly half of the jurors who completed questionnaires expressed an opinion on [his] guilt or sentence" and "the fact that roughly 60% of the jurors who came into court either had contact with a Manchester police officer or expressed a case-specific opinion cast doubt on the assurances of impartiality given by the remainder, many of whom had been exposed to the negative publicity this case generated."

▮ As we have stated, a trial court's determination of the impartiality of the jurors selected is entitled to "special deference" and will not be overturned unless it amounts to manifest error. *Smart,* 136 N.H. at 653.

> Appellate courts making after-the-fact assessments of the media's impact on jurors should be mindful that their judgments lack the on-the-spot comprehension of the situation possessed by trial judges.
>
> Reviewing courts are properly resistant to second-guessing the trial judge's estimation of a juror's impartiality, for that judge's appraisal is ordinarily influenced by a host of factors impossible to capture fully in the record — among them, the prospective juror's inflection, sincerity, demeanor, candor, body language, and apprehension of duty. In contrast to the cold transcript received by the appellate court, the in-the-moment *voir dire* affords the trial court a more intimate and immediate basis for assessing a venire member's fitness for jury service.

*Skilling*, 130 S. Ct. at 2918 (citation omitted); *see Mu'Min*, 500 U.S. at 424 (trial judge's function at *voir dire* is to reach conclusions as to impartiality and credibility by relying upon judge's own evaluations of demeanor evidence and of responses to questions).

 Moreover, impartiality does not require that jurors

> be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity and scarcely any of those best qualified to serve as jurors will not have formed some impression as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Laaman*, 114 N.H. at 800 (quotation omitted). "In order for the reviewing court to reach a presumption that inflammatory pretrial publicity so permeated the community as to render impossible the seating of an impartial jury, the court must find that the publicity in essence displaced the judicial process, thereby denying the defendant his constitutional right to a fair trial." *United States v. McVeigh*, 153 F.3d 1166, 1181 (10th Cir. 1998).

The Supreme Court has rejected presumed prejudice claims based upon media coverage in several cases. For example, in *Murphy*, the Court

rejected a presumed prejudice claim because the largely factual publicity in the record appeared several months before trial and the trial court excused for cause only twenty of seventy-eight potential jurors due to opinions as to the defendant's guilt. *Murphy*, 421 U.S. at 802-03. As the Court reasoned, although "[t]his may indeed be 20 more than would occur in the trial of a totally obscure person, . . . it by no means suggests a community with sentiment so poisoned against [the defendant] as to impeach the indifference of jurors who displayed no animus of their own." *Id.* at 803.

In *Patton*, the pretrial publicity revealed the defendant's prior conviction for murder and his confession, information that was inadmissible at trial. *Patton*, 467 U.S. at 1029. Seventy-seven percent of potential jurors admitted that they would carry an opinion as to the defendant's guilt into the jury box and eight of the fourteen jurors and alternates actually seated admitted that, at some time, they had formed an opinion as to the defendant's guilt. *Id.* at 1029-30. Nevertheless, the Supreme Court rejected the defendant's claims that publicity had presumptively prejudiced the outcome of his case. *Id.* at 1031. The Court concluded that the adverse publicity and community outrage had peaked years before and that time had helped "sooth[e] and eras[e]" community opinion. *Id.* at 1032-34. Thus, the relevant question was "not whether the community remembered the case, but whether the jurors . . . had such fixed opinions that they could not judge impartially the guilt of the defendant." *Id.* at 1035. The Court recognized that "[n]ot all members of the venire had put aside earlier prejudice, as the *voir dire* disclosed. They retained their fixed opinions, and were disqualified. But the testimony suggest[ed] that the *voir dire* resulted in selecting those who had forgotten or would need to be persuaded again." *Id.* at 1034.

By contrast, in *Irvin*, an examination of the jury selection process revealed that: (1) the trial court had excused 268 of 430 prospective jurors for cause due to fixed opinions as to the guilt of the defendant; (2) ninety percent of prospective jurors, when asked, "entertained some opinion as to guilt — ranging in intensity from mere suspicion to absolute certainty"; and (3) eight of twelve jurors actually seated "thought [the defendant] was guilty." *Irvin*, 366 U.S. at 727. The Supreme Court vacated the trial court's refusal to change the trial's venue, stating that the defendant was entitled to a jury "other than one in which two-thirds of the members admit, before hearing any testimony, to possessing a belief of his guilt." *Id.* at 728.

 While "adverse pretrial publicity can create such a presumption of prejudice in a community that the jurors' claims that they can be impartial should not be believed," *Patton*, 467 U.S. at 1031, "juror exposure to information about a . . . defendant's prior convictions or to news accounts of

the crime with which he is charged [do not] alone presumptively deprive[ ] the defendant of due process." *Murphy*, 421 U.S. at 799. "Prominence does not necessarily produce prejudice, and juror *impartiality* . . . does not require *ignorance*." *Skilling*, 130 S. Ct. at 2914-15. Thus, "[t]he relevant question is not whether the community remembered the case, but whether the jurors at [the defendant's] trial had such fixed opinions that they could not judge impartially the guilt of the defendant." *Patton*, 467 U.S. at 1035.

█ We have reviewed the extensive *voir dire* testimony of the prospective jurors in this case and have found no evidence of what the defendant characterizes as a community "demonstrably hostile toward [him]." While many of the prospective jurors had prior knowledge about the case, most who were questioned about their exposure to media coverage said that they knew little about the case, had paid attention only when the crime occurred two years earlier, or were too busy in their lives to pay attention to the news. We note that the defendant agrees that the fact that most prospective jurors were familiar with the case did not, in itself, mandate a change of venue.

Of the fifty-six prospective jurors dismissed for cause, most were dismissed for hardship or for their views about the death penalty. *See Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (with respect to capital punishment, a trial court is required to excuse a prospective juror for cause if the juror's views on the death penalty prevent or substantially impair the performance of his or her duties in accordance with the instructions given by the court and the oath given by the juror); *see also Morgan v. Illinois*, 504 U.S. 719, 721, 729 (1992). Others were dismissed because their responses revealed that they lacked impartiality for reasons unrelated to the defendant. Indeed, the record suggests that only ten of the 114 prospective jurors who participated in the individual *voir dire* were dismissed because they had formed some opinion concerning the defendant's guilt. This rate of disqualification is too low to presume prejudice in the community. *See Misla-Aldarondo*, 478 F.3d at 59 (thirteen out of eighty-four jurors excused for possible bias is too low to presume prejudice); *People v. Botham*, 629 P.2d 589, 600 (Colo. 1981) (prejudice presumed where fifty-seven of ninety jurors questioned about their opinion of the defendant's guilt admitted that they felt the defendant was guilty). Further, "[t]he fact that several members of the venire who were not seated admitted that they had already formed an opinion about [the crime] charged demonstrates that the trial judge's questions were sufficient to uncover any bias or prejudice among the jurors." *State v. Addison*, 160 N.H. 493, 499 (2010).

Of the eighteen jurors selected to sit on the case, only ten had even basic knowledge about the crime. *See Gribble*, 165 N.H. at 26-28 (prejudice not presumed even though all sixteen seated jurors reported knowing about the crimes prior to jury selection). Most importantly, only one of the seated jurors indicated that he had formed an opinion of the defendant's guilt. *See Hale v. Gibson*, 227 F.3d 1298, 1333 (10th Cir. 2000). The trial court questioned that juror as follows:

Q. Okay. And can you — what is the basis of your opinion?

A. The basis would be from basic recollection of probably newspaper accounts and hearing opinions of others from when it had occurred a couple of years ago that I formed my opinion from that information.

Q. Okay. Can you set aside anything you know about this case or any opinions that you've heard expressed, . . . and decide this case based only on the evidence here that you hear here in the courtroom?

A. Yeah. I believe I could set aside opinion for, you know, fact.

Q. All right. Do you — can you presume the defendant innocent in this case? Do you understand that —

A. I understand.

Q. — you must presume him to be innocent?

A. I absolutely understand.

Q. And do you understand that he cannot be convicted of this charge unless and until the State proves his guilt beyond a reasonable doubt?

A. I understand.

Q. Okay. So if, as a juror, you found that the State proved, you know, that the defendant probably killed Officer Briggs, probably, but they didn't prove — the State — the Prosecutors didn't prove it beyond a reasonable doubt, what would your verdict be in that case?

A. I believe the verdict would have to be not guilty in that particular charge.

During questioning by defense counsel, the juror agreed that he would approach the trial "with a clean slate [and] with an open mind." The defendant did not challenge this juror for cause. *See Casey v. Moore*, 386 F.3d 896, 903, 909 n.8 (9th Cir. 2004) (where juror expressed opinion that the defendant was guilty based upon extensive media reports but assured court on *voir dire* that she could decide the case based upon evidence at

trial, court dismissed defendant's claims of jury bias); *State v. Manning*, 885 So. 2d 1044, 1066 (La. 2004) (defendant did not identify a single juror the trial court should have excused as a result of preconceived notions of his guilt resulting from pretrial publicity about the case).

Further, each of the eighteen seated jurors answered, under oath, in the negative when asked by the trial court whether there was any reason he or she would not be a fair and impartial juror. *See Laaman*, 114 N.H. at 801. In *Smart*, the defendant, "unable to point to any identifiable, actual prejudice on the part of the jurors who decided her case, [sought] to characterize the pretrial publicity surrounding her as equivalent to that in *Irvin*" and asked this court to "disregard the jurors' *voir dire* statements of impartiality." *Smart*, 136 N.H. at 648. We declined, noting that no member of the defendant's jury expressed an opinion on *voir dire* that she was guilty, and, more importantly, none sat on her jury over her objection. *Id.* Likewise, here, we agree with the State that "[t]he defendant's attempt to portray the vast majority of prospective jurors as prejudiced against him and indicative of a hostile venue in which he [could not] receive a fair trial simply is an unfair characterization and not supported by the record."

 "In essence, the right to a jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Groppi v. Wisconsin*, 400 U.S. 505, 509 (1971) (quotation omitted). In this case, the trial court, obviously aware of the extensive pretrial publicity based upon the newspaper articles and television reports relating to the murder, which were submitted by the defendant in support of his initial motion for a change of venue, recognized that juror *voir dire* would be of paramount importance in determining whether a fair and impartial jury could be impaneled. *See United States v. Sabhnani*, 599 F.3d 215, 234 (2d Cir. 2010) (the key to determining the appropriateness of a change of venue is a searching *voir dire*); *Ritchie v. Rogers*, 313 F.3d 948, 956 (6th Cir. 2002). Accordingly, the trial court "proceeded carefully and cautiously, assessing the jurors' credibility, demeanor, and potential for bias." *Casey*, 386 F.3d at 910.

As we have already noted, the trial court took many precautions designed to assure the selection of an unbiased jury, including assembling a larger than usual jury pool, requiring prospective jurors to complete a forty-one page questionnaire, conducting individual, sequestered *voir dire* during which counsel for the parties were each allowed time for questioning, and increasing the number of peremptory challenges for each side. The extensive juror qualification and selection process took approximately seventeen days, over 300 prospective jurors reported to the courthouse for jury selection, and the *voir dire* generated approximately 2,800 pages of

transcript testimony. *See Patton*, 467 U.S. at 1027 (*voir dire* took ten days, seven jury panels, 292 prospective jurors, and 1,186 pages of testimony); *United States v. Blom*, 242 F.3d 799, 804 (8th Cir. 2001) (court assembled a jury pool three times the normal size, mailed questionnaires to prospective jurors inquiring about exposure to pretrial publicity, and increased the number of peremptory strikes); *cf. State v. Nelson*, 103 N.H. 478, 484 (1961) (fact that it took several weeks to select a jury indicates "the extreme care taken by the Trial Court to insure that an impartial jury was selected"). "This face-to-face opportunity to gauge demeanor and credibility, coupled with information from the questionnaires regarding jurors' backgrounds, opinions, and sources of news, gave the court a sturdy foundation to assess fitness for jury service." *Skilling*, 130 S. Ct. at 2923.

Although the defendant attempts to characterize his case as involving a "heightened risk of prejudice in the community in which the trial occurred" due to the "bond between the community and the highly decorated police officer who protected it" such that "the government had a palpable advantage in trying its case to jurors in that community," the jury selection record does not support this characterization. *See Murphy*, 421 U.S. at 800; *Bell v. State*, 938 S.W.2d 35, 46 (Tex. Crim. App. 1996). Here, "[t]he record gives us no basis to second-guess the trial court's better-positioned assessment." *Hayes*, 632 F.3d at 512.

Accordingly, we hold that there was no manifest error in the trial court's denial of the defendant's motions for a change of venue based upon pretrial publicity or upon the juror *voir dire* and that the defendant has not shown a reasonable likelihood that he was denied a fair trial. Because the Federal Constitution affords the defendant no greater protection than does the State Constitution in these circumstances, we reach the same conclusion under the Federal Constitution as we do under the State Constitution. *See Skilling*, 130 S. Ct. at 2912-15; *Smart*, 136 N.H. at 646.

## B. Peremptory Challenges

### 1. Background

Before jury selection, the trial court informed counsel that it intended to select eighteen jurors, including six alternates. By statute, the defendant was entitled to twenty and the State was entitled to ten peremptory challenges. *See* RSA 606:3, I, :4, I (2001). The parties jointly proposed that the court allot thirty peremptory challenges to the defendant and fifteen to the State. On September 23, 2008, during the second day of jury selection, the court expressed reservations about the parties' joint proposal, and the State took the position that the number of additional peremptory challenges to be awarded to account for alternate jurors was a matter for the

court's discretion. The defendant argued, however, that RSA 606:3 and :4 entitled him to a "certain proportion of peremptory challenges with respect to the number of jurors . . . established by statute." The trial court rejected the parties' joint proposal and ruled that granting the defendant twenty-four, and the State twelve, peremptory challenges was reasonable.

### 2. Appellate Argument

The defendant argues that the trial court's decision constituted error for three reasons. First, he asserts that RSA 606:3, I, required the trial court to "increase the number of each party's peremptory challenges in proportion to the increase in the total number of jurors selected." He contends that when, as in this case, the trial court selects six alternate jurors, a fifty percent increase over the usual twelve jurors, the court must also increase the number of peremptory challenges for each party by fifty percent. Second, he contends that the trial court's alleged violation of RSA 606:3 and :4 also violates his state constitutional right to due process. *See* N.H. CONST. pt. I, art. 15. Third, he argues that, even if the trial court had the discretion to decide how many additional peremptory challenges to grant, it unsustainably exercised that discretion because it failed to explain why it allotted twenty-four peremptory challenges to him and twelve to the State.

### 3. Discussion

Because we decide cases on constitutional grounds only when necessary, we first address the defendant's statutory argument. *See State v. Wamala,* 158 N.H. 583, 592 (2009). RSA 606:3 provides that criminal defendants "may, in addition to challenges for cause . . . , peremptorily challenge" twenty jurors in a capital murder case, fifteen jurors in a first-degree murder case, and three jurors "in any other case." *See* RSA 606:3, I-III (2001). RSA 606:4 provides that the State "shall be entitled to the following number of peremptory challenges, in addition to challenges for cause": ten in a capital murder case; fifteen in a first-degree murder case; and three in "any other case." *See* RSA 606:4, I-III (2001).

The defendant argues that although neither statutory provision "specifies a system for determining the number of additional peremptory challenges to be granted when a trial court decides to empanel a given number of alternate jurors," such silence should not be interpreted "as prohibiting a court from increasing the number of peremptory challenges above the specified twenty and ten, when alternate jurors are selected." Because the trial court did increase the number of peremptory challenges "to some extent," the defendant contends that in doing so "the court had to choose between two possible interpretations of the statutes."

According to the defendant, under one interpretation, the "allocation of twenty and ten peremptory challenges" in RSA 606:3, I, and :4, I, "bespeaks a specific legislative intent in regards to the discretionary control the parties respectively shall have in the selection of the jurors," which requires the court to "increase the number of each party's peremptory challenges in proportion to the increase in the total number of jurors selected." Thus, he asserts that if the court intends to select eighteen jurors, it must increase the number of his peremptory challenges to thirty and the number of the State's peremptory challenges to fifteen.

Under the other interpretation, according to the defendant, the statutes' "allocation of twenty and ten peremptory challenges sets a minimum number each party shall have, but does not express a precise judgment about the measure of discretionary control the parties should have over the selection of jurors." Under this interpretation, the trial court has the discretion to decide whether and by how much to increase the number of peremptory challenges allowed each party when the jury panel will include alternate jurors.

The defendant contends that because the statutes are subject to two reasonable interpretations, we must review legislative history to determine the number of peremptory challenges a trial court may grant when selecting alternate jurors. *See State v. Addison*, 161 N.H. 300, 306 (2010) ("We will review legislative history . . . to aid our analysis if the statutory language is ambiguous or subject to more than one reasonable interpretation."). This history, he contends, reveals that the legislature set the number of peremptory challenges in a capital case to twenty for the defendant and ten for the State in the late nineteenth century, *see* GL 261:9, :10 (1878), long before the legislature enacted a statute regarding the selection of alternate jurors, *see* Laws 1941, 104:1. Thus, he argues, when the legislature set the number of peremptory challenges for each party in a capital case, it must have "contemplated that those peremptories would be exercised in the selection of a jury numbering twelve persons, without alternates." Accordingly, he asserts that "[p]rinciples of statutory interpretation . . . require this Court to hold that, when a court intends to select eighteen jurors for the trial of a capital case, it must grant the defendant thirty peremptory challenges, and the State fifteen."

The State, in addition to arguing that RSA 606:3 and :4 are plain and unambiguous, argues that their legislative histories "cannot support the weight that the defendant has placed upon them." The State observes that although the number of peremptory challenges allotted to each party in a capital case has remained the same since 1878, the number of such challenges in other types of criminal cases has varied significantly over the years. In 1878, for instance, the defendant was allotted two peremptory

challenges in all noncapital cases, while the State was allotted none. *See* GL 261:9, :10. In the early twentieth century, both the defendant and the State were allotted three peremptory challenges in all non-capital cases. *See* Laws 1919, 40:1. In 1974, the legislature allotted the defendant twenty, and the State ten, peremptory challenges in a first-degree murder or capital case. *See* Laws 1974, 34:5, :6. Finally, in 1993, the legislature enacted the versions of RSA 606:3 and :4 that remain in place today. *See* Laws 1993, 143:1, :2. According to the State, "there is simply no basis to conclude that the legislature plainly intended the number of peremptory strikes to be increased in proportion to the number of alternate jurors selected."

We agree with the defendant that RSA 606:3 and :4 are subject to more than one reasonable interpretation as to the number of peremptory challenges allowed in a case with alternate jurors, and, therefore, that considering legislative history is warranted. *See Addison*, 161 N.H. at 306. However, we find the State's interpretation of that history persuasive.

The defendant's interpretation of RSA 606:3 and :4 as requiring an increase in the number of peremptory challenges in proportion to the increase in the number of seated jurors narrowly focuses upon the ratio of peremptory challenges in capital cases set forth therein. However, as the State points out, the legislature has made numerous changes to the number of peremptory challenges allowed each party in criminal cases, including changes made after 1941, when the legislature first enacted a statute regarding alternate jurors. *See* Laws 1941, 104:1. Therefore, we disagree with the defendant that the legislative history of RSA 606:3 and :4 demonstrates legislative intent that the number of peremptory challenges provided in RSA 606:3 and :4 would be exercised *only* for a jury of twelve persons, without alternates.

Further, the statute concerning alternate jurors provides: "In the trial in the superior court of any civil or criminal case, when it appears to the presiding justice that there is reason for the selection of alternate jurors, the jurors shall, at the direction of the presiding justice, be drawn, selected and empaneled in the same manner as the regular jurors." RSA 500-A:13, I (2010). This statute expresses the legislature's intent to vest the trial court with the discretion to decide whether to select alternate jurors at all.

The defendant argues that the statutes do not suggest the number of peremptory challenges to be awarded when alternates are chosen, and the State does not contend otherwise. Accordingly, we will assume the statutes provide no guidance on this matter, and look to legislative history as an analytic aid. *See Addison*, 161 N.H. at 306. When RSA 500-A:13, I, was first enacted, it entitled each party to "one peremptory challenge as to each

alternate juror." Laws 1971, 456:10 (originally codified at RSA 500-A:23); *see* Laws 1941, 104:1 (predecessor to RSA 500-A:13). In 1977, this language was deleted from the statute. *See* Laws 1977, 473:2. We interpret the deletion of this language to mean that the legislature intended the number of peremptory challenges accorded each party to be a matter for the trial court's discretion.

▮ Thus, when we consider RSA 606:3 and :4 in conjunction with RSA 500-A:13, I, as well as pertinent legislative history, we conclude that RSA 606:3 and :4 set the *minimum* number of peremptory challenges allotted to each party. If the trial court decides that the jury panel will include alternate jurors, it has the discretion under RSA 500-A:13, I, to determine whether to increase each party's allotment of peremptory challenges, and, if so, by how many.

We, therefore, hold that the defendant was not statutorily entitled to a proportional number of peremptory challenges based upon the trial court's decision to select six alternate jurors. In light of our conclusion that the trial court's decision did not violate any statutory command, we necessarily reject the defendant's due process argument, which is premised solely upon his assertion that his statutory rights were violated.

▮ We also reject the defendant's contention that the trial court's failure to explain its rationale for rejecting the parties' joint proposal that the court allot thirty peremptory challenges to the defendant and fifteen to the State constituted an unsustainable exercise of discretion. As the State correctly observes, the defendant did not preserve this argument by raising it in the trial court, but even if it had been preserved, we deem it unavailing. *See State v. Eaton*, 162 N.H. 190, 195 (2011); *State v. Winward*, 161 N.H. 533, 542 (2011). Contrary to the defendant's assertion, the trial court had no obligation to explain its reasoning on the record. *See State v. Silva*, 158 N.H. 96, 102 (2008) (we assume trial court made all findings necessary to support its decision).

### C. Challenges For Cause

#### 1. Background

As outlined in some detail at the beginning of Part V (Venue and Jury Selection Review) of this opinion, approximately 114 prospective jurors participated in individual, sequestered *voir dire*. The trial court explained to each the phases of a death penalty case and certain principles of law, and questioned each prospective juror as to his or her understanding of these phases and the applicable law. Following this questioning by the trial court, counsel for both the defendant and the State were allowed equal time to question each prospective juror.

During the *voir dire*, the defendant moved to dismiss two of the prospective jurors on the ground that each held disqualifying views about the death penalty: Jurors A-8 and B-15. The trial court denied both motions, concluding that neither prospective juror held views that warranted dismissal.

In questioning prospective Juror A-8, defense counsel asked a series of questions based upon a hypothetical case in which a defendant is found guilty of capital murder and in which "he acted purposely, there was no self-defense, there is no insanity defense, there's no alibi, [and] there's no accident." For example, defense counsel asked Juror A-8 under those circumstances what "types of things" he would want to know in order to make a decision whether to sentence the defendant to death or life imprisonment without possibility of parole. In response, the prospective juror stated that "if the facts show that he intentionally did it with no back up motive, then no. Then he should get the death penalty."

The trial court asked several questions to determine whether Juror A-8 understood the phases of a capital murder trial and understood that at the sentence selection phase he would engage in a balancing of aggravating and mitigating factors before determining the sentence. In response to the court's specific questions, Juror A-8 indicated that he understood and affirmed that he would "keep an open mind" throughout the trial. The State then asked a series of questions about whether the prospective juror would "fully consider" and "give a fair evaluation" to mitigating evidence, to which he responded that he would. To follow up, the court asked whether evidence of "mental health issues" could be a reason that he might determine that the death penalty was not warranted, and the prospective juror answered, "Yes."

Defense counsel moved to dismiss Juror A-8 for cause on the basis that his "feelings about the death penalty are so ingrained that they would substantially interfere with his ability to consider mitigation." The State objected, contending that the prospective juror "clearly said that he would consider and could consider the mitigating evidence in the case and he was very firm on the fact that he would follow [the court's] instructions in the case." The trial court denied the defendant's motion, finding:

> [T]his man is not an abstract thinker. I think he has a hard time with . . . just conceptualizing, but . . . when he was asked . . . more straightforwardly, I think that . . . his answers were consistent with the law. I think he's very sincere in trying to set forth his views. I think the law is kind of confusing and I think he had a hard time with it, but when it was . . . set forth to him directly, I think that he answered . . . . I wanted to be sure that he understood the law and I think that he would follow the law in the

case if he were chosen as a juror. So I don't find that his views substantially impair . . . the performance of his duties as a juror.

Defense counsel exercised a peremptory challenge to strike Juror A-8.

During the *voir dire* of prospective Juror B-15, the prosecutor explained to her that the State had to prove the aggravating factors beyond a reasonable doubt, while the defense had a lower standard of proof for mitigating factors, and asked the prospective juror whether she would be able to apply that law. She responded that she would accept the law, but that in her mind she would hold them both "to the same standard." Upon further explanation by the State of the relative burdens of proof, Juror B-15 affirmed that she would accept and follow the law and would weigh the aggravating and mitigating factors at the sentence selection phase of trial with an open mind.

Defense counsel asked her a series of questions based upon a hypothetical case in which the defendant had been found guilty of committing a wanton, purposeful murder and the defendant was not mentally incapacitated. Asked whether she could envision a circumstance under which a sentence of life imprisonment without parole, as opposed to death, would be the appropriate sentence in such a case, the prospective juror stated that "if you could present me something very convincing, I probably would. But I don't know what that would be." The trial court followed up with additional questioning, asking her whether she would give as great a consideration to the mitigating factors the defense presented as she would the aggravating factors that the State presented. The prospective juror stated affirmatively that she could consider mitigating evidence of the "person's background."

Defense counsel challenged the juror for cause, questioning her "ability to accept and follow the burden of proof on mitigating factors" and because "she presented very strongly as a juror who is at a very high risk . . . to not be able to follow this Court's law in spite of her stated willingness to do so." The State objected, stating:

> This juror made it very clear from the outset that the decision to impose the death penalty was . . . a very weighty decision, that . . . she had to be convinced that [the defendant] was very deserving of the death penalty . . . . I think the confusion here, and it's clear that English isn't her first language, but she understood the difference between proof of factors and weight of those factors . . . . [S]he said very clearly that she would not hold the defense to a higher burden of proof in proving the facts. But once the facts are proven, how much weight she assigns to those in the equation is completely in her discretion, and the law does not control her. And I think that that's where her . . . mindset is that

those may not weigh very heavily. But we can't ask her to commit to how much weight those are. She said she would consider them if proven.

The trial court agreed with the State, and added:

She was clear that the State must prove to her that the defendant is very deserving of the death penalty before she would vote for it. The other thing is, I noticed that she got . . . quite emotional when she talked about actually imposing the death penalty. This is not going to be someone who would lightly, in any way, impose the death penalty. And I think she would be a very fair juror to both sides.

The defendant exercised a peremptory challenge to strike Juror B-15.

The defendant exhausted all twenty-four of his peremptory challenges, using his last one after the seventeenth juror was selected.

### 2. Appellate Argument

The defendant argues that the trial court's denial of his motions violated his statutory right to excuse for cause any juror who is "not indifferent." RSA 500-A:12, II (2010). He also argues that because he had to expend two of his twenty-four peremptory challenges to correct the trial court's errors, he was "inequitably deprive[d] . . . of peremptory challenges [he] would otherwise have had available." Recognizing that "there is no *constitutional* right to a peremptory challenge," the defendant contends that the trial court violated his statutory right to peremptory challenges, *see* RSA 606:3, I (2001), by requiring him to use two of them curatively. Further, he asserts that the trial court's decision violated his state and federal constitutional rights to due process, trial by an impartial jury, and freedom from cruel and/or unusual punishment. *See* N.H. CONST. pt. I, arts. 15, 16, 18, 33, 35; U.S. CONST. amends. V, VI, VIII, XIV.

### 3. Discussion

We first address the defendant's argument that the trial court's decisions violated his statutory right to excuse for cause any juror who is "not indifferent," RSA 500-A:12, II. *See State v. Wamala*, 158 N.H. 583, 592. (2009).

"It is a fundamental precept of our system of justice that the defendant has the right to be tried by a fair and impartial jury." *State v. Addison*, 160 N.H. 493, 497 (2010) (quotation omitted); *see* N.H. CONST. pt. I, art. 35. A juror who is not indifferent must be excused from the trial of

a case. RSA 500-A:12, II. The question of indifference is determined by "whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (quotation omitted). "[T]he determination is essentially one of credibility, and therefore largely one of demeanor." *Patton v. Yount*, 467 U.S. 1025, 1038 (1984); *see Skilling v. United States*, 130 S. Ct. 2896, 2917 (2010).

> Demeanor plays a fundamental role not only in determining juror credibility, but also in simply understanding what a potential juror is saying. Any complicated *voir dire* calls upon lay persons to think and express themselves in unfamiliar terms, as a reading of any transcript of such a proceeding will reveal. Demeanor, inflection, the flow of the questions and answers can make confused and conflicting utterances comprehensible.

*Patton*, 467 U.S. at 1038 n.14. The trial court's determination of a juror's impartiality "is ordinarily influenced by a host of factors impossible to capture fully in the record — among them, the prospective juror's inflection, sincerity, demeanor, candor, body language, and apprehension of duty." *Skilling*, 130 S. Ct. at 2918. For these reasons, "the trial court's resolution of such questions is entitled . . . to 'special deference.' " *Patton*, 467 U.S. at 1038; *see State v. Smart*, 136 N.H. 639, 653 (1993). Accordingly, a trial court's finding of juror impartiality may be overturned only when it amounts to manifest error. *Smart*, 136 N.H. at 653; *see Mu'Min v. Virginia*, 500 U.S. 415, 428 (1991). "[T]he question is whether there is fair support in the record for the [trial court's] conclusion that the jurors here would be impartial." *Patton*, 467 U.S. at 1038.

The defendant contends that prospective Juror A-8 "was substantially impaired in his ability to consider mitigating evidence." He challenges prospective Juror B-15 both because "her threshold for what evidence she considered mitigating was so high as to effectively render her incapable of considering mitigating evidence," and because "she demonstrated an inability to apply the differential burdens of proof with regard to aggravating and mitigating factors."

 We conclude that the transcripts of the entire *voir dire* of prospective Jurors A-8 and B-15 support the trial court's findings that each of them would be impartial. *See Patton*, 467 U.S. at 1038-40. Although prospective Juror A-8's testimony indicates some initial confusion as to whether he could consider mitigating evidence at the sentence selection phase of trial, upon further questioning he unequivocally stated that he would consider mitigating evidence such as the defendant's difficult upbringing and his mental health, that he would consider all of the evidence presented to him,

and that he would take it into account when deciding the case. As to prospective Juror B-15, although her testimony indicates some initial confusion about the burdens of proof for aggravating and mitigating factors, upon further clarification by the State and the court she unequivocally stated that the differing burdens made sense, that she could accept them, and that she could follow the law.

It is not uncommon for jurors to express themselves in ambiguous and seemingly contradictory ways. *See id.* at 1038-39. This is because lay persons "may never have been subjected to the type of leading questions and cross-examination tactics that frequently are employed" on *voir dire* examination and because "[p]rospective jurors represent a cross section of the community, and their education and experience vary widely." *Id.* at 1039. "Every trial judge understands this, and under our system it is that judge who is best situated to determine competency to serve impartially. The trial judge properly may choose to believe those statements that were the most fully articulated or that appeared to have been least influenced by leading." *Id.*

We are not persuaded that the cases cited by the defendant compel a conclusion that either of these prospective jurors should have been dismissed for cause. The cases present facts that are materially different from those here. For example, in *White v. Mitchell*, 431 F.3d 517 (6th Cir. 2005), as the court characterized the testimony, the juror stated that she had already determined that death was an appropriate punishment and believed that the rest of the jurors would feel similarly, that she "relished" taking part in the imposition of the death penalty, and that she "believed that her anticipated outcome of the case was the true and honest one." *White*, 431 F.3d at 541. Despite the fact that the juror eventually stated that she would consider all of the evidence and follow the law, the court held that because "the line of questioning as a whole reveal[ed] a series of highly troubling and contradictory statements . . . with regard to [the juror's] ability to be a fair and impartial juror," the trial court's failure to excuse the juror resulted in a violation of the defendant's right to a fair trial. *Id.* at 541-42.

Similarly, in *Pope v. State*, 345 S.E.2d 831 (Ga. 1986), *overruled on other grounds by Nash v. State*, 519 S.E.2d 893, 895 (Ga. 1999), the court concluded that a prospective juror should have been excused for bias where he "testified that if the defendant was 'found guilty beyond a shadow of a doubt' and the trial court authorized him to consider the death penalty, he would impose it. He would listen to the evidence, but it would not change his opinion." *Pope*, 345 S.E.2d at 838. As the court stated, "A juror who has made up his mind prior to trial that he will not weigh evidence in mitigation

is not impartial." *Id.*; *see also State v. Maxie*, 653 So. 2d 526, 537-38 (La. 1995) (error not to dismiss prospective juror for cause who stated that she was disposed to impose the death penalty if the defendant was convicted of rape-murder, responded negatively when asked whether her mind was open to both the death penalty and life imprisonment, and indicated at the end of *voir dire* that the death penalty should be imposed once the defendant's guilt was established).

The record in this case supports the trial court's findings that prospective Jurors A-8 and B-15 each exhibited an ability to accept the law as explained by the court and expressed a willingness to consider any mitigating evidence. The record also supports the trial court's determination that neither juror held views that would "substantially impair the performance of his [or her] duties as a juror in accordance with his [or her] instructions and his [or her] oath." *Wainwright*, 469 U.S. at 424; *see Adams v. Texas*, 448 U.S. 38, 45 (1980). We hold that the trial court's denial of the defendant's motions to dismiss for cause did not constitute manifest error, *see Smart*, 136 N.H. at 653, and thus did not impair the defendant's statutory right to excuse for cause any juror who is "not indifferent." RSA 500-A:12, II. In light of our conclusion that the trial court's decision did not violate RSA 500-A:12, II, we necessarily reject the defendant's constitutional argument, which is premised solely upon his assertion that his statutory right was violated.

 Moreover, because the defendant exercised a peremptory challenge against each of these prospective jurors, neither individual sat on his jury. The defendant does *not* argue that the jury that *did* sit on his case was not impartial. "Accordingly, the right of trial by an impartial jury is not implicated in this case." *State v. Goodale*, 144 N.H. 224, 228 (1999); *see State v. Rideout*, 143 N.H. 363, 366 (1999) ("Generally, in a criminal case, a defendant alleging juror bias bears the burden to demonstrate actual prejudice."); *see also Ross v. Oklahoma*, 487 U.S. 81, 86 (1988) (any claim that the jury was not impartial must focus upon the jurors who ultimately sat).

 Even if we accept the defendant's premise that the trial court's denial of his challenges for cause amounted to manifest error, he is not entitled to the relief he requests — reversal of his sentence. "[T]he [United States] Supreme Court has made clear that a court's failure to strike for cause a biased veniremember violates neither the Sixth Amendment guarantee of an impartial jury, . . . nor the Fifth Amendment right to due process, . . . when the biased veniremember did not sit on the jury, even though the defendant must use a peremptory challenge to strike him." *United States v. Mitchell*, 502 F.3d 931, 954-55 (9th Cir. 2007); *see Ross*, 487

U.S. 81; *United States v. Martinez-Salazar*, 528 U.S. 304 (2000); *cf. People v. Hamilton*, 200 P.3d 898, 925 (Cal. 2009) (to preserve an objection to the trial court's failure to excuse a juror for cause, a defendant must exercise a peremptory challenge against the juror, exhaust all peremptory challenges, *and* object to the jury as it is finally empaneled).

We acknowledge that in some jurisdictions, when a defendant exhausts his peremptory challenges after having used a peremptory challenge curatively, reversal of his conviction and sentence is required. *See, e.g., State v. Magee*, 103 So. 3d 285, 307 (La. 2012), *cert. denied*, 82 U.S.L.W. 3180 (U.S. Oct. 7, 2013) (No. 12-9070). In those jurisdictions, peremptory challenges are deemed substantial rights such that when a defendant uses a peremptory challenge curatively, it "so taints the equity of the proceeding that *no* jury selected from that venire could result in a fair trial." *Shane v. Com.*, 243 S.W.3d 336, 340 (Ky. 2008); *see State v. Ho*, 279 P.3d 683, 694 (Haw. 2012). Reversal is required, in part, because the "final jury . . . is not the jury a party was entitled to select." *Shane*, 243 S.W.3d at 340; *see People v. Macrander*, 828 P.2d 234, 243 (Colo. 1992) (*en banc*).

However, this is not the majority rule. "Presently, at least twenty-nine states and the United States do not employ the remedy of automatic reversal" under these circumstances, "but, instead, require a defendant to show prejudice — namely, that a biased juror actually sat on the jury — in order to gain appellate relief." *People v. Roldan*, No. 08CA2487, 2011 WL 174248, at *10 (Colo. Ct. App. Jan. 20, 2011) (Bernard, J., specially concurring). "[A] majority of state courts" and the Supreme Court "hold that the curative use of a peremptory challenge violates neither a constitutional right, nor a rule-based or statute-based right." *State v. Hickman*, 68 P.3d 418, 422 (Ariz. 2003); *see Ross*, 487 U.S. at 88; *Martinez-Salazar*, 528 U.S. at 307. Accordingly, "[a]n erroneous ruling that forces a defendant to use a peremptory challenge, and thus leaves him unable to exclude a juror who actually sits on his case, provides grounds for reversal only if the defendant *can actually show that his right to an impartial jury was affected.*" *People v. Yeoman*, 72 P.3d 1166, 1185 (Cal. 2003) (quotation omitted). The majority of jurisdictions, therefore, reject the notion that reversal is mandated merely because the jury panel is "different from that which would otherwise have decided the case." *Ross*, 487 U.S. at 87. "So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result" does not, alone, require reversal. *Id.* at 88.

Citing *Goodale*, *State v. Brodowski*, and *State v. Anaya*, the defendant argues that our "prior decisions imply that [we] concur[ ] with the view that the erroneous denial of a challenge for cause requires reversal where the

complaining party has exhausted its peremptory challenges." *See Goodale,* 144 N.H. 224; *State v. Brodowski,* 135 N.H. 197 (1991); *State v. Anaya,* 131 N.H. 330 (1988). We disagree. In the cases upon which the defendant relies, we found that the jury selection errors did *not* require automatic reversal of the defendant's conviction and sentence. In *Goodale* and *Anaya,* we found that the errors were not prejudicial. *See Goodale,* 144 N.H. at 230; *Anaya,* 131 N.H. at 331. In *Brodowski,* we ruled that the State failed to prove that the error was harmless beyond a reasonable doubt. *Brodowski,* 135 N.H. at 201-02. In none did we suggest that juror selection errors require automatic reversal.

In *Goodale,* the defendant argued that the trial court erroneously allowed the State to use the criminal records of potential jurors during jury selection while denying him equal access to the records. *Goodale,* 144 N.H. at 227. We held that such a procedure violated the defendant's state constitutional right to due process because it was fundamentally unfair. *Id.* We reasoned that the trial court's ruling "conferred on the State a significant advantage in determining whether to exercise its peremptory challenges" because it allowed "the State access to information that was unavailable to the defendant." *Id.* at 230. Despite finding constitutional error, however, we affirmed the defendant's conviction because he failed to demonstrate "that he was in fact prejudiced by the trial court's ruling." *Id.* In reaching this conclusion, we observed that "[t]he record [was] unclear as to whether the defendant exercised all of his peremptory challenges." *Id.* Because of this, we noted, he was unable to "demonstrate . . . that in fact the lack of information affected his decision whether to exercise his peremptory challenges." *Id.*

The defendant here seizes upon our observation that the record in *Goodale* was unclear to argue that, in New Hampshire, reversal is required when a party has exhausted its peremptory challenges. To the contrary, *Goodale* stands for the proposition that, generally, in order to prevail on a claim that a jury selection procedure violates due process under the State Constitution, a defendant must demonstrate prejudice; prejudice is not presumed.

The defendant's reliance upon *Brodowski* and *Anaya* is similarly unavailing. The error in *Brodowski* was the trial court's failure to record *ex parte* discussions with eight prospective jurors. *Brodowski,* 135 N.H. at 200-01. The State argued that this error was harmless, but we disagreed. *Id.* at 201. We ruled that under the circumstances of that case, the State had failed to show that the error was harmless beyond a reasonable doubt. *Id.* at 201-02.

The facts of *Anaya* are closer to the facts of the instant case. There, as in this case, the defendant argued that the trial court had unsustainably

exercised its discretion when it failed to excuse a prospective juror for cause, "thereby improperly forcing him to exercise a peremptory challenge." *Anaya*, 131 N.H. at 331. We ruled that the defendant's right to challenge and exclude the juror was not impaired because, in failing to exhaust his peremptory challenges, he did not suffer harm from the court's decision. *Id.* Contrary to the defendant's assertions, *Anaya* establishes only that when a defendant has not exhausted his peremptory challenges, he cannot show that a jury selection error has caused harm. *Anaya* does not establish that when a defendant exhausts his peremptory challenges to cure putative error by the trial court, no further showing of harm is required.

 Our decisions in *Goodale, Brodowski*, and *Anaya* are consistent with our case law distinguishing structural errors, which require automatic reversal of a defendant's conviction, and trial errors, which do not. Under New Hampshire law, "only such constitutional errors as necessarily render a trial fundamentally unfair . . . require reversal without regard to the evidence in the particular case." *State v. Williams*, 133 N.H. 631, 634 (1990) (*per curiam*) (quotation omitted). We term these "structural" errors because they "affect[ ] the very framework in which a trial proceeds." *State v. Etienne*, 163 N.H. 57, 79 (2011) (quotation omitted). When such an error occurs, "a criminal trial cannot reliably serve its function as a vehicle for the determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair." *Id.* (quotation omitted); *see Rivera v. Illinois*, 556 U.S. 148, 160 (2009). The harmless error doctrine does not apply to structural errors. *See Etienne*, 163 N.H. at 80.

 Although we have not previously held that errors in jury selection constitute trial errors, we have held that, generally, "if a defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other errors that may have occurred are subject to harmless-error analysis." *Id.* (quotations omitted). To decide that the putative error in this case is a "structural" error compelling reversal of the defendant's sentence would conflict with this precedent. *See Rivera*, 556 U.S. at 160-61 (mistaken denial of peremptory challenge was not a structural error requiring reversal). Thus, even if the trial court had erred in denying the defendant's challenges for cause, reversal would not be warranted because he has failed to demonstrate that he was prejudiced by any such error.

## VI. GUILT PHASE REVIEW

The defendant raises two challenges regarding the guilt phase of trial. First, he argues that the trial court erred in allowing the State to introduce

extensive evidence of the crimes that he committed during the week preceding the murder. Second, he argues that the trial court provided an erroneous reasonable doubt instruction to the jury when it modified the standard instruction set forth in *State v. Wentworth*, 118 N.H. 832, 838-39 (1978). Before addressing these claims of error, we provide, for context, an overview of the guilt phase of the trial, including a summary of the evidence.

The guilt phase of the trial occurred over the course of approximately eighteen days. The State presented its case-in-chief through numerous exhibits, including photographs and forensic evidence from the three non-capital criminal episodes involving the defendant that occurred in the six days preceding the capital murder, and the testimony of more than forty witnesses. The defense presented five witnesses, as well as several exhibits.

During his opening statement, the defendant, through counsel, stated that he shot Officer Briggs recklessly with extreme indifference to the value of human life, but not with the intent to commit capital murder as charged. Therefore, the single issue before the jury during the guilt phase of the trial was the defendant's mental state at the time he shot Officer Briggs.

The State presented evidence of the following facts. The defendant and Antoine Bell-Rogers met in 2006 and soon became close friends. By October 2006, they were spending time with Angela Swist and Teresia Shipley at Shipley's apartment on Central Street in Manchester. Ruth Schulz, who also resided at the Central Street apartment, testified to a conversation with the defendant in which he stated that if the police ever tried to arrest him, "it was them or him, . . . F them, . . . it was going to go his way or no way," and that "it would be a shootout." Another resident of the apartment recalled a conversation with the defendant and Bell-Rogers during which the defendant said that "[a]nybody that tried to stop [them], they were going to get it," and that the men "would pop out, a badge or no badge" because "they weren't going back [to jail]."

On October 10, Bell-Rogers introduced the defendant to his friend, Jeff Hayes. That afternoon, they made plans to rob the owner of the El Mexicano Restaurant in Manchester. They drove to a parking lot near the restaurant and prepared for the robbery; Bell-Rogers loaded his gun, a .38 semiautomatic pistol, and the defendant, a convicted felon, armed himself with a knife. Hayes waited in the car while the defendant and Bell-Rogers entered the restaurant. After several minutes, they came running back with Bell-Rogers holding the gun.

Inside the car, the men recounted the robbery: Bell-Rogers stated that he "had to pop a couple shots," and the defendant said that he had robbed someone inside the restaurant at knifepoint. Shortly after they fled the

area, the police arrived at the restaurant and learned that the shooter had discharged a gun twice, once into the ceiling and once into the floor. The police found two empty shell casings on the floor and a bullet lodged in the ceiling.

Hayes drove to the Central Street apartment where they discussed how to divide the stolen jewelry. Later that evening, while the defendant, Hayes, and Bell-Rogers were talking in an alley, Hayes expressed concern about being outside and visible to the police. According to Hayes, the defendant replied that "if the cops pulled up he would pop shots. He'd pop a cop."

On October 11, the defendant, Bell-Rogers, Swist, and Shipley made plans to commit another robbery. The defendant and Bell-Rogers discussed who would carry the gun, which was the weapon that Bell-Rogers used during the El Mexicano Restaurant robbery, and the defendant said he "would do it." The group traveled to a 7-Eleven convenience store in Hudson. Swist parked near the store, and the two men left the car.

A clerk was alone in the store when the defendant and Bell-Rogers entered shortly after 5:00 a.m. When the clerk approached the counter, the defendant pointed a gun at her and said, "give me all your money." Bell-Rogers jumped over the counter, and the clerk opened the cash register. The defendant stayed on the opposite side of the counter, holding the handgun about an arm's length away from the clerk's face. The men then left with the cash drawer. A surveillance camera inside the store recorded the robbery.

The defendant and Bell-Rogers returned to the car, and drove to Shipley's apartment. There, the defendant put the gun on a table, and the two men started counting the stolen money. Bell-Rogers examined the gun and commented that the weapon would not have discharged because "there was something blocking it or it was stuck." The two men then laughed. At some point, the men asked each other what each would do if ever approached by the police. The defendant stated that he would "pop a cop," and Bell-Rogers remarked that they "weren't afraid . . . no one could get in their way." While at the Central Street apartment, the defendant handled Bell-Rogers's gun; he picked it up and held it for a couple of minutes before Bell-Rogers took it.

A few days after the 7-Eleven convenience store robbery, the defendant participated in a shooting at a residential apartment complex on Edward J. Roy Drive in Manchester. On the evening of October 14, the defendant and Bell-Rogers went to a local club, along with a mutual friend, Paul Birely. At the club, the defendant and Bell-Rogers fought with Bruce Edwards. The men returned to the Central Street apartment "fired up," and several hostile phone calls were exchanged. Swist told the defendant that her brother (Dale Swist) and Edwards had threatened to shoot at her home.

The defendant and Bell-Rogers both responded, "That ain't going to happen. We'll fight fire with fire." The defendant said, "f*** that, let's take it to them." The two men then told Birely to go to the apartment complex and see if anybody was outside or around the building. As they were leaving, Birely saw the defendant holding Bell-Rogers's gun while the defendant was walking down the stairway.

In the early morning hours of October 15, the group traveled in two cars to the Roy Drive apartment complex. The defendant and Bell-Rogers were in Swist's car, along with Shipley and Kyarra Davis, another resident of the Central Street apartment. Swist recalled that the defendant and Bell-Rogers stated that they were going to kill her brother and Edwards.

Once at the Roy Drive apartment complex, the defendant and Bell-Rogers left the car together and within minutes the women heard a series of gunshots. The two men soon ran back to the car; Bell-Rogers had the gun, and the defendant said, "I had to pull a Matrix." Shipley understood this statement as referring to a movie in which an individual "dodges the bullet," and she testified that the men acted "excited" or "amped up." Swist recalled the men saying that "they thought they got them" and she described the men as acting "angry but excited in a way." On the way back to the Central Street apartment, the foursome saw several police vehicles, with lights and sirens activated, heading toward the shooting scene. At the apartment complex, the police found shell casings, bullet fragments in a parked car, a bullet lodged in the bedroom wall of Swist's father's apartment, and a bullet lodged in the living room floor of another apartment.

When they returned to the Central Street apartment, the defendant and Bell-Rogers described the shooting, explaining to the group that "we popped at them and then they popped back." One of the men estimated that seventeen shots had been fired. The defendant and Bell-Rogers left and spent the night at another friend's apartment.

Throughout the day of October 15, the police continued to investigate the shooting and interviewed Swist, Shipley, and Davis. At one point, police officers were inside the Central Street apartment speaking with some residents when the defendant and Bell-Rogers arrived at the back alley in Swist's car, the same vehicle used in both the 7-Eleven robbery and the Roy Drive shooting. Shipley met them in the alley where she warned them that the police were looking for them. The men said, "We don't give a f***. We're out for blood." She saw the gun in Bell-Rogers's lap and urged them to leave immediately. At Shipley's repeated insistence, the men drove away.

The defendant and Bell-Rogers later learned that Shipley and Swist had spoken to the police. Shipley told the men that she had lied to the police.

The defendant and Bell-Rogers knew that Swist intended to return to the police station that evening and told her "not to say anything." The foursome then made plans to leave the state.

That night, the defendant and Bell-Rogers met Jennifer Roman, one of Bell-Rogers's girlfriends. They returned to her Lake Avenue apartment at approximately midnight, where Roman's mother warned the defendant and Bell-Rogers that the police were in the area looking for them. The men responded, "You think we don't know that?" The defendant later spoke to someone on the telephone, stating repeatedly, "I'm not going down . . . I'm not going back to jail."

At some point, an argument erupted between Roman and Bell-Rogers, which escalated to physical violence. Bell-Rogers threatened to kill Roman and pointed his gun at her. The defendant pushed Bell-Rogers into the hallway, where a single shot was fired. Roman's mother slammed the door and heard one of the men yell, "[P]ick up the shell casings. That's evidence." The men then left the apartment building.

Roman's mother immediately called the police, who soon arrived and began interviewing occupants of the apartment and investigating the scene. Officers Briggs and Breckinridge also responded to the dispatch call and assisted in the investigation at the Lake Avenue apartment. During this time, the defendant called Roman, who informed him that the police were at the apartment.

When the defendant and Bell-Rogers left Roman's apartment, they went to Kelly Ann Grady's nearby apartment. Before leaving Grady's apartment around 2:45 a.m., the defendant placed the gun in the waistband of his pants with the handle sticking out and put his sweatshirt over it. The two men were seen walking near Roman's Lake Avenue apartment, passing by a vehicle marked "Manchester Police." They then entered the Litchfield Lane alley.

Meanwhile, Officers Briggs and Breckinridge left the Lake Avenue apartment. As they were riding their bicycles by Litchfield Lane, they caught sight of the defendant and Bell-Rogers walking in the alley. Officer Briggs commanded, "Stop, Police!" Bell-Rogers stopped, but the defendant, with his hood up and his hands out of sight near his waist, continued walking away, slowing his pace. Officer Briggs issued the same "Stop, Police!" command twice more while closing the gap between them. When Officer Briggs was within an arm's length, the defendant suddenly turned, with Bell-Rogers's gun in both hands, and fired one shot at Officer Briggs, hitting him in the side of his head. The defendant then fled as police fired at him and several officers gave chase.

The defendant ran to the nearby apartment of a girlfriend, Jennifer Joseph, and, along the way, discarded his red sweatshirt and threw the gun

into a backyard. He explained to Joseph that he and Bell-Rogers were walking in an alley when a police officer called out to him and he immediately started running. He told her that the gun "went off in his pocket," that he threw the weapon away in an alley, and that "a cop was shot." He then called Roman, telling her that "I just shot a cop," and that she would never see him again. The defendant stayed at Joseph's apartment for the remainder of the night. In the morning, the defendant, Joseph, and her sister drove to Massachusetts, where the defendant was arrested that evening.

Within a few days of the murder, the police found the red sweatshirt that the defendant had been wearing when he shot Officer Briggs, his cellular telephone, and the gun that he had discarded. When the gun was found, it was loaded, its safety mechanism was off, it was in a firing position, and it was jammed. Forensic testing later matched the gun that the defendant used to kill Officer Briggs to the evidence collected at the El Mexicano Restaurant robbery and Roy Drive shooting scenes.

### A. Rule 404(b) Prior Crimes Evidence

#### 1. Background

 The parties filed numerous motions *in limine* to determine the admissibility of prior crimes evidence in each phase of the capital murder trial. Regarding the guilt phase of the trial, the parties disputed the admissibility of evidence of the defendant's participation in the October 10, 2006 armed robbery of the El Mexicano Restaurant, the October 11, 2006 armed robbery of the 7-Eleven convenience store, and the October 15, 2006 Roy Drive shooting. The State sought to introduce this evidence to establish, among other things, the defendant's motive to commit capital murder and his intent to do so. The trial court permitted the proffered evidence to be introduced at the guilt phase of the trial pursuant to New Hampshire Rule of Evidence 404(b). Generally stated, Rule 404(b) precludes the admission of evidence of other crimes or wrongs to prove a person's propensity to act in conformity with such prior actions, while permitting use of such evidence for other purposes, such as proof of motive or intent. *See* N.H. R. Ev. 404(b).

On appeal, the defendant challenges three evidentiary rulings made by the trial court regarding the guilt phase prior crimes evidence: one ruling was issued by written decision on October 10, 2008, and two rulings were issued from the bench during the guilt phase of the trial. We set forth the pertinent pretrial procedural facts as context for the court's pretrial ruling and the trial procedural facts as context for the court's bench rulings.

In August 2008, approximately six weeks before the guilt phase of the trial, the parties filed cross-motions concerning the admissibility of the

prior crimes evidence under Rule 404(b). The State sought to admit evidence of the defendant's convicted felon status, his participation in the three October 2006 prior crimes, and his familiarity with the murder weapon. It presented an offer of proof, outlining evidence that it contended demonstrated, among other things, the defendant's deliberate participation in the three prior crimes, his knowledge that the police were pursuing him as a suspect in those crimes, and his knowledge that the gun he possessed at the time of the shooting was linked to forensic evidence left behind at two of the crime scenes. According to the State, evidence of the three prior crimes was highly probative for several legitimate, non-propensity purposes, including: motive to commit capital murder; intent to do so; knowledge that Officer Briggs was a police officer; lack of accident; opportunity and identity; and context for incriminating statements that the defendant made prior to the shooting of Officer Briggs.

The defendant countered that the State should be precluded from presenting the prior crimes evidence during its case-in-chief because its probative value was diminished by other evidence available to the State. Alternatively, he asserted that the evidence should be limited to certain events that occurred on October 15 and a minimal presentation of the Roy Drive shooting, arguing that no incremental probative value would be gained by admitting additional evidence of the two armed robberies. While agreeing with the premise that "the more serious the crimes for which someone is a suspect, the greater the motive they have to flee," he disputed that "a suspect who is wanted for several crimes necessarily has any more motive to kill [a police] officer." He also informed the court that he would not assert that the shooting was an accident or that Bell-Rogers was the shooter.

The trial judge, who had presided over the defendant's three non-capital felony trials, conducted a hearing on the parties' motions in September 2008. The State represented that it did not intend to retry the three prior crimes and would limit the witnesses to the primary participants in those crimes and the clerk of the 7-Eleven convenience store.

In advance of trial, the court issued a written order dated October 10, 2008, ruling that the State's proffered evidence was highly probative as to the defendant's motive for shooting Officer Briggs, his intent in doing so, his knowledge that Officer Briggs was a police officer, and his identity as the gunman. It determined that evidence of the defendant's recent criminal conduct would not be unfairly prejudicial because the evidence would be circumscribed in scope, a limiting instruction would be provided to the jury, and the nature of the criminal acts was not likely to cause the jury to rest its decision upon an improper basis of bad character or propensity. The trial court also granted the State's request to present evidence of the defen-

dant's handling of Bell-Rogers's gun during the two weeks prior to the shooting to show, among other things, "his ability to operate the murder weapon and his opportunity to do so."

The day before the trial began, the court conducted a second hearing during which it directed the State to limit evidence of the details of the crimes to the issues identified in the court's written order. At the hearing, the State summarized the prior crimes evidence it intended to present during the guilt phase of the trial, including forensic evidence collected at the El Mexicano Restaurant and Roy Drive crime scenes. It also advised the court that it might seek to show the jury the surveillance video recording of the 7-Eleven robbery. Although defense counsel questioned the quantity of prior crimes evidence to be admitted, he observed that "we'll just have to see how things play out" during trial.

On the first day of trial, the defendant, through counsel, informed the court that he was conceding the issues of identity and causation, adding to his pretrial notification that he would not claim that the shooting was an accident or that Bell-Rogers was the shooter. The parties then presented opening statements to the jury, setting forth their respective theories of the case.

In its opening statement, the State alleged that the defendant intentionally and purposely killed Officer Briggs to evade capture by the police because of his participation in a crime spree during the six days prior to the murder. Specifically, the prosecutor outlined evidence that the defendant, along with Bell-Rogers, had participated in the October 10 armed robbery of the El Mexicano Restaurant, followed by the armed robbery of a 7-Eleven convenience store several hours later on October 11, and then the Roy Drive shooting on October 15. The State previewed evidence that the defendant had been warned several times that the police were closing in on him for these crimes, and that he acted brazenly and, on several occasions, made statements threatening to shoot the police if ever approached by them. According to the State, its evidence would show that when he was approached by Officer Briggs, the defendant knew that, as a convicted felon, he was unlawfully carrying a gun and, further, that it was the same gun involved in his three recent crimes. Finally, the State described the circumstances immediately surrounding the murder, including the defendant's flight, to establish that the shooting was not an accident, a mistake, or a reckless act.

In his opening statement, the defendant, through counsel, admitted that he shot Officer Briggs recklessly with extreme indifference to the value of human life. He stated that because he did not intend to commit capital murder, the State had not charged him with the "right crime." The defendant developed various themes to support his position, including his

lack of familiarity with Bell-Rogers's gun, and his benign motivation for taking possession of it. Defense counsel explained that just prior to the shooting, there had been an intense, violent fight between Bell-Rogers and his girlfriend, and that the defendant had intervened and taken the gun from Bell-Rogers who had threatened to shoot her. Thus, the defense asserted that the defendant was trying "to prevent harm that night and not to cause harm." Defense counsel stated:

> The State will ask you to believe that because Michael Addison was being wanted for such serious crimes he had not only the motive to flee the officer, but he had a specific motive to intentionally kill the police officer. This we dispute.
>
> Michael Addison had Antoine Bell-Rogers' gun because Antoine Bell-Rogers was out of control. He had it for at most forty-five minutes that entire day. He never fired this gun except for the single fatal shot that took Officer Briggs' life.

The defendant acknowledged that he had a reason to flee the police, that he had participated in the Roy Drive shooting, and that the same gun was used in both armed robberies and in the Lake Avenue apartment domestic disturbance. Still, he argued that these facts did not show that he had a motive to kill when he shot Officer Briggs. The defendant contended that he had committed reckless murder with extreme indifference to the value of the life of Officer Briggs, not capital murder.

Thus, the opening statements made clear that the defendant's *mens rea* was the dispositive issue in the guilt phase.

Before the guilt phase trial testimony began, the court provided the jury with a lengthy limiting instruction on the jury's use of the anticipated prior crimes evidence during its deliberations on the capital murder charge. The trial court gave a substantively identical limiting instruction again mid-trial and as part of its final instructions at the guilt phase of the trial.

During its case-in-chief, the State presented nine witnesses to testify regarding the three prior criminal episodes. Consistent with its pretrial representations to the trial court, only one witness was a victim — the 7-Eleven store clerk. Five witnesses were participants in one or more of the three crimes or were witnesses to the events surrounding them: Jeffrey Hayes, Teresia Shipley, Angela Swist, Ruth Schulz, and Paul Birely. Their testimony established that the defendant had participated in both the planning and the commission of the crimes, all of which involved the gun he later used to shoot Officer Briggs. Finally, three police officers who had investigated either the El Mexicano Restaurant or the Roy Drive crime scenes testified about the forensic evidence found at those sites and referred to numerous photographs of the crime scenes that illustrated

where shell casings, bullet holes, and bullets were found. The officers also referred to forensic evidence consisting of shell casings, bullets, and bullet fragments admitted as trial exhibits.

During trial, the court issued two evidentiary rulings that the defendant challenges on appeal. The first permitted the State to show the jury the 7-Eleven surveillance video recording of the armed robbery. The second allowed the State to elicit testimony from Paul Birely that the defendant possessed Bell-Rogers's gun immediately before leaving the Central Street apartment to go to the Roy Drive apartment complex.

On October 28, the seventh day of the trial, the court conducted a hearing to address whether the State could play the 7-Eleven convenience store surveillance video. The defendant objected, arguing that the video was the kind of detailed evidence that he understood the trial court's pretrial order to exclude. According to the defendant, because the video showed him committing a crime with a handgun, it constituted improper propensity evidence and went far beyond the evidence necessary to establish that he knew he was wanted for this robbery and, thus, had a motive to evade capture. He argued that the jury would hear evidence through Teresia Shipley that he had handled the same gun on a prior occasion and offered to stipulate that he was the person holding the handgun during the 7-Eleven robbery.

The State countered that the video was admissible to rebut the defendant's theory that he possessed the gun at the time of the murder for the sole purpose of keeping it away from Bell-Rogers and that he was unfamiliar with it. It argued that the defendant's offer to stipulate that he was holding the gun during the robbery was inadequate because he was not conceding that he was comfortable handling the weapon, and the video recording showed his confidence in so doing.

After viewing the video outside the jury's presence, the trial court ruled that the defendant's theory rendered it highly probative as to whether he used the gun recklessly or knowingly when he shot Officer Briggs because the video recording illustrated his comfort with, and knowledge of, the gun. In so ruling, the court cited the defense theory that the defendant possessed the gun that night merely to protect Bell-Rogers from himself and to protect Jennifer Roman, he normally would not have had the gun, and he was not otherwise familiar with the gun. The court found that the probative value of the video was not outweighed by its prejudicial effect because the jury would hear about the robbery through other evidence and the court would provide a limiting instruction.

The State played the video during Shipley's testimony, and she identified the defendant as the man holding the gun. The video shows the following: the store clerk was standing near the cash register when two men

approached the counter; Bell-Rogers jumped over the counter, while the defendant leaned on the counter pointing the gun at the store clerk; Bell-Rogers made physical contact with the store clerk, and she quickly moved away from the cash register; Bell-Rogers took the cash drawer, and both men then left the camera's field of view. The video is less than one minute long, and the time during which the defendant and Bell-Rogers are present in the video is even shorter.

On November 4, the twelfth day of the trial, the court conducted another hearing because the State requested a ruling in advance of Paul Birely's testimony. The State sought to elicit testimony that Birely had observed the defendant with Bell-Rogers's gun in his possession at the Central Street apartment just before the Roy Drive shooting. Although in a prior trial the defendant had been acquitted of the charge that he possessed the gun at the Roy Drive crime scene, the State sought to introduce Birely's observation to show the defendant's knowledge of and ability to use the murder weapon. It also sought to rebut the defense theory that the defendant possessed the gun at the time of the murder merely to keep it away from Bell-Rogers, that he was a novice with this handgun, and that Bell-Rogers ordinarily controlled the gun. The defendant objected, arguing that the proffered testimony fell outside the scope of the pretrial order and lacked probative value because the jury was expected to hear testimony from Birely regarding the defendant's other activities with the gun.

The trial court rejected the defendant's argument, ruling that the probative value of the proffered testimony was not outweighed by the danger of unfair prejudice. In so ruling, the court noted that the testimony expected from Birely was similar to the testimony of other witnesses concerning the defendant's familiarity with and handling of Bell-Rogers's gun. Accordingly, Birely was permitted to testify that when the defendant was leaving the Central Street apartment he was carrying Bell-Rogers's gun.

### 2. Appellate Argument

The defendant argues that the trial court erred in permitting the State to introduce during its case-in-chief an "unprecedented" amount of detailed evidence of his October 2006 non-capital crimes. According to the defendant, "[g]iven the risk of prejudice inherent in other crimes evidence, the admission of too much evidence can lead to reversal just as surely as the admission of 'inadmissible' evidence, [and] [t]he trial court's Rule 404(b) ruling is an example of the former." The defendant urges that the erroneous admission of the prior crimes evidence violated New Hampshire Rules of

Evidence 401, 403, and 404(b), as well as his State and Federal Constitutional rights to due process and a fair trial, *see* N.H. CONST. pt. I, art. 15; U.S. CONST. amends. V, XIV.

### 3. Discussion

We first consider whether the trial court unsustainably exercised its discretion in admitting the challenged evidence under Rule 404(b). *See State v. Wamala*, 158 N.H. 583, 592 (2009).

Rule 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

N.H. R. Ev. 404(b). The purpose of the rule is to ensure that an accused is tried on the merits of the crime charged and to prevent a conviction that is based upon propensity and character inferences drawn from evidence of other crimes or wrongs. *State v. Davidson*, 163 N.H. 462, 469 (2012); *State v. McGlew*, 139 N.H. 505, 509 (1995). This evidentiary rule is grounded in "long-established notions of fair play and due process, which forbid judging a person on the basis of innuendos arising from conduct which is irrelevant to the charges for which he or she is presently standing trial." *State v. Melcher*, 140 N.H. 823, 827 (1996) (quotations omitted).

Before evidence of other bad acts may be admitted at trial, the State must demonstrate that: (1) such evidence is relevant for a purpose other than proving the defendant's character or disposition; (2) clear proof establishes that the defendant committed the other bad acts; and (3) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice to the defendant. *Davidson*, 163 N.H. at 469; *State v. Beltran*, 153 N.H. 643, 647 (2006). The trial court's evidentiary decision under this three-prong test lies within its sound discretion, and we will disturb its judgment only if the defendant shows that the decision was clearly untenable or unreasonable to the prejudice of his case. *Davidson*, 163 N.H. at 467. The trial court is well positioned to evaluate the particulars of a case, and we accord considerable deference to its conclusion as to the balance between probative worth and prejudicial impact. *State v. Smalley*, 151 N.H. 193, 198 (2004). Only the first and third prongs of the Rule 404(b) analysis are at issue in this appeal.

■ As to the first prong, in order to be relevant, other bad acts evidence must have some direct bearing on an issue actually in dispute and have a clear connection to the evidentiary purpose for which it is offered. *Davidson*, 163 N.H. at 469; *see Beltran*, 153 N.H. at 647-48. When a defendant objects to other bad acts evidence, the State must identify the purpose for which the evidence is offered and articulate the precise chain of reasoning by which the offered evidence will tend to prove or disprove an issue actually in dispute, without relying upon forbidden inferences of bad character or criminal propensity. *Davidson*, 163 N.H. at 469; *McGlew*, 139 N.H. at 510. Should the trial court rule the evidence admissible, it must articulate for the record the theory upon which the evidence is admitted, without invoking propensity, and explain precisely how the evidence relates to the disputed issue. *Davidson*, 163 N.H. at 469.

■ The third prong of the test requires the trial court to consider both the probative value of the relevant evidence and the risk that such evidence will inject unfair prejudice against the defendant into the trial process. *State v. Ericson*, 159 N.H. 379, 389 (2009); *Smalley*, 151 N.H. at 199; *McGlew*, 139 N.H. at 510-11. Even when other bad acts evidence is relevant for a proper purpose, its probative worth may be minimal. *State v. Costello*, 159 N.H. 113, 123 (2009); *State v. Kim*, 153 N.H. 322, 330 (2006). On the other hand, the risk of unfair prejudice may be diminished by providing limiting instructions to the jury. *See Costello*, 159 N.H. at 123.

■ Although "[t]he proper balancing of prejudice and probative value cannot be reduced to formulae," *State v. Lesnick*, 141 N.H. 121, 127 (1996), we have identified several factors for the trial court to consider, including: "whether the evidence would have a great emotional impact upon a jury" or great "potential for appealing to a juror's sense of resentment or outrage"; "the extent to which the issue upon which it is offered is established by other evidence, stipulation, or inference"; and "whether the evidence is relevant to prove an issue that is actually in serious dispute." *Smalley*, 151 N.H. at 198; *see State v. Russell*, 159 N.H. 475, 485 (2009); *Costello*, 159 N.H. at 123; *Lesnick*, 141 N.H. at 127. We have repeatedly emphasized that whether the evidence is relevant to prove an issue that is actually in serious dispute is particularly important to the calculus. *See State v. Cassavaugh*, 161 N.H. 90, 98 (2010); *Russell*, 159 N.H. at 485; *State v. Brewster*, 147 N.H. 645, 650 (2002).

### a. Pretrial Ruling

Turning first to relevance and probative value, the trial court ruled:

That the defendant had committed very serious crimes in the days preceding Officer Briggs' murder, was a convicted felon, and

possessed the same gun when confronted by the police on October 16 as was used in these prior offenses, provide an explanation as to why the defendant did not stop when Officer Briggs told him to and a motive to shoot Officer Briggs and flee. The defendant's motive is even clearer in light of the evidence that he had learned hours before the shooting that the police were looking for him as a suspect in the armed robberies and the Edward J. Roy Drive shooting. Because the defendant knew he faced many years of imprisonment if apprehended by the police, he had a powerful incentive to elude their grasp by whatever means. This is the State's theory of the case and the State is entitled to introduce evidence to support its theory. For the same reasons this evidence is relevant to prove motive, it is also highly probative of the defendant's intent to kill a police officer, his knowledge that he was doing so, and his identity as the shooter.

The trial court ascribed "very high" probative value to the proffered prior crimes evidence on the issues of intent, motive, and knowledge. We discern no error in these pretrial rulings.

When a culpable *mens rea* is an element of the charged offense and the defense has not conceded the element, the issue of intent is sufficiently disputed as to require evidence at trial. *Cassavaugh*, 161 N.H. at 97; *Brewster*, 147 N.H. at 649; *cf. State v. Glodgett*, 144 N.H. 687, 691-92 (2000) (holding that other bad acts evidence was not admissible to show intent because the defendant had specifically conceded the *mens rea* element when he informed the court that it could omit that element from the jury instructions). "Because persons rarely explain to others the inner workings of their minds or mental processes, one's culpable mental state must, in most cases, . . . be proven by circumstantial evidence," and the fact finder may draw relevant inferences on the issue of intent from an accused's conduct. *State v. Sharon*, 136 N.H. 764, 765-66 (1993); *see Smalley*, 151 N.H. at 199. Evidence of an accused's other bad acts may be critical to establishing the actor's state of mind on the charged offense, even though it also implicates criminal propensity or bad character. *Smalley*, 151 N.H. at 199; *Brewster*, 147 N.H. at 649. When intent is in serious dispute, the trial court is justified in assigning a high probative value to other bad acts evidence that tends to prove criminal *mens rea* with respect to the charged act. *See State v. Ayer*, 154 N.H. 500, 513 (2006).

Further, evidence of other bad acts that evinces an accused's motive to commit the charged crime is particularly relevant to the issue of intent. *Kim*, 153 N.H. at 327-28. Motive supplies the reason that "nudges the will

and prods the mind" to indulge criminal intent. *Costello*, 159 N.H. at 119; *see also State v. Palmer*, 65 N.H. 216, 218 (1890); *State v. Dearborn*, 59 N.H. 348, 349 (1879). Although the reason why an individual commits a criminal act is not an element of the charged offense, presenting motive evidence can help explain to the jury why the accused would commit an otherwise senseless criminal act. *Kim*, 153 N.H. at 328-29; *see Costello*, 159 N.H. at 121. Indeed, we have long recognized that "[t]he absence or presence of a motive renders the alleged fact less or more probable," such that the lack of motive evidence operates as a distinct disadvantage to the State and a corresponding advantage to the defense regarding the issue of whether the accused committed the charged crime. *Palmer*, 65 N.H. at 218-19; *see Dearborn*, 59 N.H. at 349. Therefore, evidence of a defendant's commission of other bad acts at or near the time of the alleged offense often carries high probative value, even when those acts constitute a crime. *State v. Avery*, 126 N.H. 208, 213 (1985); *see State v. Martineau*, 116 N.H. 797, 798-99 (1976) ("[I]t is well established that where the motive for the crime charged is the concealment of a prior crime, evidence of the prior crime is admissible for the limited purpose of showing motive.").

 Here, to establish that the defendant committed capital murder, the State was required to prove beyond a reasonable doubt that the defendant knowingly caused the death of a law enforcement officer who was acting in the line of duty. RSA 630:1, I(a) (2007) (amended 2011). "A person acts knowingly with respect to conduct or to a circumstance that is a material element of an offense when he is aware that his conduct is of such nature or that such circumstance exists." RSA 626:2, II(b) (2007). Thus, the prosecution had to establish that when the defendant shot Officer Briggs on October 16, he was aware that his actions would cause the death of a police officer who was acting in the line of duty. Convincing a jury of this *mens rea* beyond a reasonable doubt was a heavy burden, and we have recognized that "[t]he unlikelihood of developing direct testimony on the defendant's state of mind calls for consideration of all proper proof that can be proffered by the prosecution." *State v. Dushame*, 136 N.H. 309, 317-18 (1992).

Two critical aspects of the defendant's *mens rea* at the time he shot Officer Briggs were his state of mind concerning his possession of Bell-Rogers's gun and his state of mind concerning his potential capture by the police. As part of its evidence of intent, the State sought to establish that the defendant's participation in the recent crimes supplied the motive for knowingly killing a police officer in order to evade capture.

The State asserted that the evidence, including the prior crimes evidence, would establish that when confronted by Officer Briggs, the

defendant knew that, because he was a convicted felon, his possession of any gun was unlawful. He also was aware that the gun he possessed was the gun used during the two recent armed robberies and the Roy Drive shooting. The defendant knew that his connection to those crimes would likely be discovered if he were apprehended because he was aware that forensic evidence had been left behind at two of the crime scenes. He further knew that the police were looking for him in connection with the Roy Drive shooting and that the police had spoken with Shipley and Swist.

As the trial court recognized, the State sought to introduce the prior crimes evidence to establish not only that the defendant had a motive and intent to evade the police when he fired the gun, but also that he had a motive and intent to take extreme measures to avoid capture, including using deadly force on any police officer who tried to apprehend him. The State's proffered evidence created a strong inference that the three prior crimes figured prominently in the defendant's mind when Officer Briggs confronted him. Therefore, we conclude that on this record the trial court acted well within its discretion when it ruled that evidence of the defendant's participation in the October 2006 non-capital crimes was highly probative of the State's theory that when he shot Officer Briggs, the defendant was aware that his actions would cause the death of a law enforcement officer who was acting in the line of duty.

We reject the defendant's argument that the trial court failed to appreciate what he characterizes as other "ample evidence" available to the State to prove the disputed issues of motive and intent. The other evidence cited by the defendant, such as the events of October 15, did provide the jury with some insight into aspects of his state of mind at the time of the shooting. Nonetheless, the availability of this evidence does not undermine the trial court's determination that the challenged evidence regarding the defendant's participation in the three non-capital crimes was highly probative on the disputed *mens rea* issue. *See Smalley*, 151 N.H. at 199 (holding that the bad acts evidence added significant incremental probative value on the central issue of the accused's state of mind at the time of the murder, despite the existence of other state of mind evidence in the case); *State v. Cantara*, 123 N.H. 737, 739 (1983) ("Although probative value might be reduced by the availability of other evidence, there is no requirement that a prior conviction be excluded simply because other evidence may be available on the same issue."); *see also United States v. Sampson*, 486 F.3d 13, 43 (1st Cir. 2007) (concluding that "other means" available to the government to prove salient issues did not diminish the highly probative value of prior crimes evidence because "within reasonable limits, the

prosecution — even in a capital case — is entitled to present its case through the evidence it deems most appropriate").

We have held that even when a defendant concedes the admissibility of certain evidence of other bad acts, further details of the factual circumstances surrounding those acts may be admitted ·if that evidence is probative of the state of mind of the accused as to the charged crime. *See Kim*, 153 N.H. at 329-32 (holding that the defendant's acquiescence to the admission of evidence showing his dire financial situation did not diminish the probative value of evidence detailing his financial deterioration to show his state of mind at the time of the murders); *cf. Beltran*, 153 N.H. at 648-49 (holding that the defendant's decision not to challenge evidence that he abused his girlfriend did not diminish the probative value of evidence detailing the specific circumstances of this past abuse to show his girl-friend's state of mind). Such is the case here.

Nonetheless, the defendant argues that the trial court failed to appreci-ate fully the prejudicial impact of providing a detailed account of his prior crimes. He identifies three aspects of the prior crimes evidence as giving rise to unfair prejudice: its content; its volume; and the manner in which the State used it.

In its pretrial ruling, the trial court concluded that:

> Although the prior crimes and the capital murder charge are similar in that they are acts of violence involving guns, they are not so similar as to cause unfair prejudice to the defendant. The evidence at issue in this motion is not being introduced to appeal to the jury's sympathies or to arouse any other emotional reaction. Rather, it is being introduced for the proper purpose of proving motive, intent, knowledge and identity. These acts are not likely to cause the jury to base its decision on something other than the established propositions in the case.

(Citations and quotation omitted.) The court further stated that any prejudicial effect would be minimized by its providing limiting instructions and circumscribing the scope of the details to "explain, for example, the defendant's actions at the time of the shooting of Officer Briggs, his relationship with the witnesses in this case, and that the gun used in the prior crimes was the same as that used in the Briggs murder." Again, we discern no error in this ruling.

"Evidence is unfairly prejudicial if its primary purpose or effect is to appeal to a jury's sympathies, arouse its sense of horror, or provoke its instinct to punish, or trigger other mainsprings of human action that may cause a jury to base its decision upon something other than the established

propositions in the case." *State v. Belonga,* 163 N.H. 343, 360 (2012) (quotation omitted). Unfairly prejudicial evidence "is not, however, evidence that is merely detrimental to the defendant because it tends to prove his guilt." *Beltran,* 153 N.H. at 649.

██ Among the factors germane to the unfair prejudice inquiry is the degree of similarity, if any, between the other bad acts and the charged offense. *Belonga,* 163 N.H. at 360; *Beltran,* 153 N.H. at 649. Generally, the greater the similarity, the greater the potential for unfair prejudice. *Belonga,* 163 N.H. at 360; *Kim,* 153 N.H. at 331. The trial court must examine the nature of the other bad acts evidence to determine whether it is inflammatory in a manner that would arouse the emotions of a jury and cause the jury to decide the case based upon emotion rather than reason. *See Russell,* 159 N.H. at 485; *McGlew,* 139 N.H. at 510. Even when the nature of prior crimes evidence gives rise to a significant potential for prejudice, however, that potential "is frequently outweighed by the relevance of the evidence when a defendant's knowledge or intent is a contested issue in the case." *Smalley,* 151 N.H. at 200; *see Russell,* 159 N.H. at 485.

With respect to the content of the prior crimes evidence, the defendant contends that because the recent crimes were violent and similar in nature, the evidence carried a greater risk of inviting the jury to convict him based upon inferences about his character. We agree with the trial court that all three prior crimes are serious, and, like the charged capital murder, are acts of violence involving guns. Yet, the record supports the trial court's conclusion that the recent crimes are not so similar to the charged capital murder that the danger of unfair prejudice substantially outweighed their probative value.

The defendant possessed the gun during only one of the prior crimes, and the crimes did not involve violence comparable to the conduct alleged in the capital murder charge. During the El Mexicano Restaurant robbery, for instance, the defendant used a utility knife, not a gun, to threaten a customer and steal jewelry and cash. In the Roy Drive shooting, Bell-Rogers was the gunman. Furthermore, even though the defendant pointed a loaded gun at the clerk during the 7-Eleven convenience store robbery, in contrast to the charged capital murder, no physical violence occurred. In short, each of the three crimes differed in significant ways from the capital murder charge.

The defendant also contends that the volume of the detailed recent crimes evidence gave rise to unfair prejudice. He identifies approximately 168 transcript pages of direct examination testimony, as well as forty exhibits pertaining to his prior non-capital crimes.

The trial court's pretrial order allowed the State to present "only those details of the prior crimes that were necessary to explain, for example, the defendant's actions at the time of the shooting of Officer Briggs, his relationship to the witnesses in this case, and that the gun used in the prior crimes was the same as that used in the Briggs murder." We conclude that the volume of transcript testimony and related exhibits admitted pursuant to that order was not excessive. The 168 pages of transcript and forty exhibits represent the evidence admitted during the direct testimony of nine witnesses concerning the three serious non-capital crimes that involved different participants, different investigating officers, and different locations. Indeed, 168 pages constitutes less than one day of trial testimony in the guilt phase trial that lasted approximately three weeks and included more than forty witnesses and numerous exhibits.

■■■ Our unfair prejudice analysis under the balancing prong of Rule 404(b) generally focuses upon the content of the evidence, not its volume. Assuming, without deciding, however, that the volume of prior crimes evidence, in and of itself, may give rise to unfair prejudice, we conclude that the defendant has failed to demonstrate that the evidence allowed by the trial court's ruling was unduly voluminous. The scope of the prior crimes evidence was consistent with the State's pretrial proffer, and the trial court's decision to allow this volume of evidence, as confined by the boundaries it established in its order, fell within its sound discretion.

The defendant next contends that the manner in which the State actually presented the prior crimes evidence created an undue risk that it would have a great emotional impact and appeal to a juror's sense of resentment. He cites testimony that the State elicited from witnesses "implying that he enjoyed committing the other crimes," as well as the State's discussion of the prior crimes during its closing argument.

With respect to the trial testimony, the defendant gives examples of Shipley and Swist describing his demeanor: he appeared unconcerned that a patron was scared when he robbed him at knifepoint during the El Mexicano Restaurant crime; he laughed when learning that the gun he pointed at the 7-Eleven store clerk was jammed; and he was excited about dodging bullets during the Roy Drive shooting. The defendant's challenge to this particular testimony, however, was not preserved for appellate review. The demeanor testimony upon which the defendant now bases his challenge to the trial court's pretrial evidentiary ruling was not expressly identified by the State's detailed proffer upon which the trial court relied when deciding to admit prior crimes evidence, and, as the State notes, the defendant did not object at trial to the demeanor testimony. *See State v. Eaton*, 162 N.H. 190, 195 (2011); *State v. Winward*, 161 N.H. 533, 542 (2011).

Nonetheless, even assuming this challenge was preserved, we find no reversible error. The challenged testimony consists of brief descriptions of the defendant's conduct and statements. These relatively minor aspects of the prior crimes evidence provided insight into the defendant's state of mind and were not unfairly prejudicial.

The defendant also points out that the State "addressed the extrinsic offenses" during its closing argument. While he does not challenge the State's closing remarks "as independently-preserved error," the defendant urges us to consider them when assessing the prejudicial impact of the prior crimes evidence. Even assuming that the State's closing remarks regarding the challenged prior crimes evidence are pertinent to the third prong of the Rule 404(b) analysis, the defendant merely cites isolated pages of the transcript of the State's closing without developing any argument concerning the particular points presented to the jury. *See State v. Chick*, 141 N.H. 503, 504 (1996). In any event, the cited transcript pages show that the State complied with the trial court's orders limiting the use of the prior crimes evidence to the proper purposes of establishing motive, intent, or knowledge. We conclude that the State's closing statements were not inflammatory and did not invite a verdict based upon criminal propensity.

■ We further observe that the trial court provided a clear limiting instruction to the jury as to the relevance and proper use of the prior crimes evidence. *See Ayer*, 154 N.H. at 513 (whether the trial court provided a limiting instruction is part of the evaluation of the Rule 404(b) balancing calculus). Indeed, it instructed the jury three times on both the proper and improper uses of the evidence, stating:

> [Y]ou may not consider the evidence as it might reflect on Michael Addison's character. This trial is about Michael[ ] Addison's conduct when Officer Briggs was shot and Michael Addison's state of mind at the time of that conduct. Michael Addison's character is not on trial. You may not consider any evidence, which reflects badly on Michael Addison's character, as evidence that Addison is more likely to have committed capital murder.
>
> Thus, while you may consider the prior crimes as evidence of motive, intent, or knowledge, you may not consider it as evidence that Michael Addison is the type of person who was more likely to have knowingly shot a police officer.
>
> The evidence may only be considered as it relates to Michael Addison's state of mind at the time of the shooting, not as it relates to his character or personality in general.

In sum, we reject the defendant's argument that the content, volume, and manner in which the State used the evidence gave rise to a danger of unfair

prejudice that substantially outweighed its probative value. Accordingly, we hold that the defendant has failed to demonstrate that the trial court's pretrial ruling to admit the prior crimes evidence was clearly untenable or unreasonable to the prejudice of his case. *See Davidson*, 163 N.H. at 467.

Our holding is in keeping with the rulings of numerous courts in other jurisdictions that have addressed such evidentiary issues in similar contexts. *See, e.g., Lesko v. Owens*, 881 F.2d 44, 53-54 (3d Cir. 1989) ("Where the motive of a killing is interference with law enforcement — in this case the most extreme example, killing a policeman — the severity and circumstances of the crime being hidden is highly probative."); *State v. Pearson*, 943 P.2d 1347, 1351 (Utah 1997) (affirming decision to admit evidence of defendant's prior drug activities to prove motive and intent to commit aggravated murder of a police officer because, among other things, "[t]he more reasons [the defendant] had to kill the officer and thus evade capture and future dealings with law enforcement, the more plausible was the State's theory that he did so intentionally rather than recklessly"); *State v. Mallett*, 732 S.W.2d 527, 535 (Mo. 1987) (*en banc*) (affirming trial court's admission of detailed account of defendant's participation in an armed robbery about one month before the commission of the charged first-degree murder of a police officer, emphasizing that "[w]ide latitude is generally allowed in the development of evidence of motive").

### b. Trial Rulings

We next address the defendant's challenge to two bench rulings that the court made during the guilt phase of the trial: the first ruling allowed the jury to view the 7-Eleven surveillance video recording; and the second allowed Paul Birely to testify that he saw the defendant in possession of the gun at the Central Street apartment before the Roy Drive shooting.

The defendant first argues that the State unfairly changed its tactic at trial regarding the expected use of the video. The record, however, shows that the defendant was informed before trial that the State might seek to show the video to the jury. Moreover, it was the defendant's strategy — as it became apparent during the trial — that prompted the State to seek admission of the surveillance video. The trial court ruled that the video was highly probative of whether the defendant recklessly or knowingly shot Officer Briggs. In so ruling, the court cited the defense theory that the defendant was unfamiliar with Bell-Rogers's gun and possessed it at the time of the murder only to keep it away from Bell-Rogers. We also reject the defendant's argument that Birely's testimony fell outside of the State's pretrial proffer. Again, the record shows otherwise. In its pretrial offer of proof, the State outlined the anticipated evidence that "the defendant

handled the gun before they left Shipley and Swist's apartment while he and Bell Rogers discussed going over to [Roy] Drive to shoot at Dale Swist and Bruce Edwards."

The defendant next argues that the probative value of the video and Birely's testimony of his possession of Bell-Rogers's gun at the Central Street apartment was diminished by other evidence available to the State that adequately showed his familiarity with the gun. For instance, the defendant points to Swist's testimony that Bell-Rogers and the defendant discussed who would carry the gun during the 7-Eleven robbery, as well as to the testimony of another witness, Kelly Ann Grady, that the defendant possessed the gun at her apartment just prior to the murder. We reject the defendant's challenge.

The defendant placed his state of mind squarely at issue at the inception of the trial when he stated to the jury in his opening statement that his shooting of Officer Briggs was a reckless act rather than one committed knowingly and that he possessed Bell-Rogers's gun at the time of the shooting merely to protect others, not to cause harm. Throughout the trial, the defendant developed themes that he had little prior experience with the gun and that it was Bell-Rogers who was knowledgeable about and controlled the weapon. The trial court referred to these defense themes in making its evidentiary rulings, and the defendant did not assert that the court mischaracterized his defense. Indeed, during one colloquy with the trial court, defense counsel candidly acknowledged that the defendant's knowledge of Bell-Rogers's firearm was "the most important issue in this case." *See Russell*, 159 N.H. at 485 (emphasizing the importance under Rule 404(b) that bad acts evidence be relevant to an issue in serious dispute).

■■■ We conclude that the trial court exercised sound discretion when ruling that evidence of the defendant's handling of the gun as depicted in the 7-Eleven surveillance video and of Birely's observation at the Central Street apartment before the Roy Drive shooting was highly probative of disputed issues in the case. *See State v. Hennessey*, 142 N.H. 149, 156 (1997) (concluding that the victim's testimony about a pornographic video did not eliminate the probative value of playing the video for the jury in order to convey its graphic nature).

Regarding unfair prejudice, the defendant argues that "[s]howing the jury a video of [him] committing another crime with a gun risked inspiring the kind of emotion and outrage that" Rule 404(b) is intended to prevent. The video shown to the jury, however, was brief — it lasted less than one minute and the defendant appears on the screen for only a portion of that time. Moreover, his participation in the armed robbery itself was already in

evidence through testimony of the store clerk, as well as that of Shipley and Swist. *See id.* (affirming decision to allow display of pornographic video, in part, because it was brief and the jury had already heard the victim's testimony about the video). We note that the defendant does not argue that Birely's testimony had an unfairly prejudicial impact on the jury.

Accordingly, we hold that the defendant has failed to demonstrate that the trial court's bench rulings to admit the video recording and Birely's testimony were clearly untenable or unreasonable to the prejudice of his case. *See Davidson*, 163 N.H. at 467.

The defendant argues in passing that the trial court's rulings violated not only Rule 404(b), but also New Hampshire Rules of Evidence 401 and 403, as well as his due process rights to a fair trial under the State and Federal Constitutions, *see* N.H. CONST. pt. I, art. 15; U.S. CONST. amends. V, XIV. Our analysis under Rule 404(b) necessarily incorporates an analysis of the import of Rules 401 and 403 as to those rulings. *See Ayer*, 154 N.H. at 512. The defendant presented his constitutional arguments in a similarly cursory fashion to the trial court, which, we assume, the court rejected even though it did not expressly address them. The defendant's constitutional arguments on appeal are presented without developed legal argument apart from his Rule 404(b) argument. Accordingly, we conclude that these claims do not warrant independent constitutional analysis. *See id.* at 513; *see also Chick*, 141 N.H. at 504.

*B. Reasonable Doubt Instruction*

*1. Background*

Toward the end of the guilt phase of the trial, the court reviewed the final jury instructions with counsel. The reasonable doubt instruction included a sentence that is not part of the model reasonable doubt instruction set forth in *State v. Wentworth*, 118 N.H. 832, 838-39 (1978). Defense counsel objected and asked the court to give only the *Wentworth* instruction. The State, however, argued that the reasonable doubt instruction with the challenged sentence accurately reflected the case law on the definition of reasonable doubt. The trial court overruled the defendant's objection and gave the jury the following reasonable doubt instruction at the conclusion of the guilt phase:

> Under our Constitutions, all Defendants in criminal cases are presumed to be innocent until proven guilty beyond a reasonable doubt. The burden of proving guilt is entirely on the State. The Defendant, Michael Addison, does not have to prove his innocence.
>
> .... Remember that the Defendant enters this courtroom as an innocent person, and you must consider him to be an innocent

person until the State convinces you — beyond a reasonable doubt — that he is guilty of every element of the alleged offense.

*Beyond a reasonable doubt does not mean that the State must prove its case beyond all doubt or to a mathematical certainty or demonstrate the complete impossibility of innocence.* Rather, a reasonable doubt is just what the words would ordinarily imply. The use of the word reasonable means simply that the doubt must be reasonable rather than unreasonable. It must be a doubt based on reason. It is not a frivolous or fanciful doubt, nor is it one that can be easily explained away.

Rather, it is such a doubt based on reason as remains after consideration of all of the evidence that the State has offered against it. The test you must use is this. If you have a reasonable doubt as to whether the State has proved any one or more of the elements of the crime charged, you must find the Defendant not guilty.

However, if you find that the State has proved all of the elements of the offense charged beyond a reasonable doubt, you should find the Defendant guilty. Your verdict must be unanimous.

(Emphasis added.) The defendant's challenge relates only to the inclusion of the emphasized sentence.

### 2. Appellate Argument

The defendant argues that the trial court's reasonable doubt instruction impermissibly lowered the State's burden of proof and thereby violated his state and federal due process rights, entitling him to a new trial. *See* N.H. CONST. pt. I, art. 15; U.S. CONST. amend. XIV.

### 3. Discussion

As the State notes, the defendant did not object to the trial court's preliminary jury instructions, which included the identical reasonable doubt instruction that he challenges on appeal. We, however, assume without deciding that his appellate argument was preserved by his objection to the final instructions. *See State v. Eaton*, 162 N.H. 190, 195 (2011); *State v. Winward*, 161 N.H. 533, 542 (2011). We first address the defendant's claim under the State Constitution and rely upon federal law only to aid our analysis. *See State v. Ball*, 124 N.H. 226, 231-33 (1983).

Both the State and Federal Constitutions require the State to prove each element of the crime charged beyond a reasonable doubt. *State v. Saunders*, 164 N.H. 342, 349 (2012); *see In re Winship*, 397 U.S. 358, 364

(1970). Neither the State nor the Federal Constitution "prohibits trial courts from defining reasonable doubt" or "requires them to do so as a matter of course." *Victor v. Nebraska*, 511 U.S. 1, 5 (1994); *see State v. Belkner*, 117 N.H. 462, 471 (1977); *State v. Slade*, 116 N.H. 436, 439 (1976). "[S]o long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt," the State and Federal Constitutions "do[ ] not require that any particular form of words be used in advising the jury of the government's burden of proof." *Victor*, 511 U.S. at 5; *see Belkner*, 117 N.H. at 471; *Slade*, 116 N.H. at 439. Rather, both constitutions require that the instructions, "taken as a whole, . . . correctly convey the concept of reasonable doubt to the jury." *Victor*, 511 U.S. at 5 (quotation and brackets omitted); *see Slade*, 116 N.H. at 439. This means that the instructions must impress upon the jury the need for it to reach a "subjective state of near certitude" as to the accused's guilt. *Victor*, 511 U.S. at 15; *State v. Aubert*, 120 N.H. 634, 637 (1980) (citing *Jackson v. Virginia*, 443 U.S. 307, 315 (1979)). Although in *Wentworth*, we suggested a model charge on reasonable doubt and, under our supervisory authority, instructed trial courts to use it, we have never held that the model *Wentworth* charge is constitutionally required. *See Wentworth*, 118 N.H. at 838-39.

■■■ We review a challenged reasonable doubt instruction in the context of the overall jury charge. *Saunders*, 164 N.H. at 350; *see Cupp v. Naughten*, 414 U.S. 141, 146-47 (1973). "The constitutional question is whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet" the reasonable doubt standard. *Saunders*, 164 N.H. at 353 (quotation and ellipsis omitted); *Victor*, 511 U.S. at 6. "[T]he proper inquiry is not whether the instruction could have been applied in an unconstitutional manner, but whether there is a reasonable likelihood that the jury *did* so apply it." *Victor*, 511 U.S. at 6; *see Saunders*, 164 N.H. at 352-53. If there is a reasonable likelihood that the jury understood the instructions to allow conviction based upon less than that required by the "beyond a reasonable doubt" standard, then we must reverse the defendant's conviction. *See Sullivan v. Louisiana*, 508 U.S. 275, 278-82 (1993); *State v. Hall*, 148 N.H. 394, 400 (2002).

The defendant argues that because "the trial court emphasized that the State need not prove guilt 'beyond all doubt' or 'to a mathematical certainty' and that [it] need not 'demonstrate the complete impossibility of inno-cence,' " there was a reasonable likelihood that the jury believed that it could convict him upon a lesser standard of proof than "beyond a

reasonable doubt." He likens the instruction in this case to the instruction we held unconstitutional in *Aubert*, 120 N.H. at 637-38.

In *Aubert*, the trial court added the following language to the model *Wentworth* charge:

> Now, it is not an object of this rule of proof to impose upon you the duty of looking . . . or examining this evidence in any strange, peculiar or extraordinary way. Nor is it intended by this rule to impose upon the State an impossible burden in establishing its case. It is a matter of common knowledge to all of us that absolute positive certainty can almost never be attained. But bear in mind, Members of the Jury, that the State is not required to establish guilt beyond all doubt. That is not the State's burden. The State is not required to establish guilt to a mathematical certainty. That is not the State's burden. Neither is the State required to establish guilt to a scientific certainty. The State's burden is fully met when it has established guilt beyond a reasonable doubt.

*Id.* at 636 (quotation and emphases omitted). We held that this paragraph "overly favored the prosecution." *Id.* We observed that the United States Supreme Court has indicated that a reasonable doubt instruction should impress upon the jury "the need to reach a 'subjective state of near certitude.' " *Id.* at 637 (quoting *Jackson*, 443 U.S. at 315). We concluded that the trial court's "repeated emphasis that the State need not establish guilt to a mathematical certainty, and need not establish guilt to a scientific certainty, and need not establish guilt beyond all doubt violated the spirit of that standard." *Id.*

Because the instruction we ruled unconstitutional in *Aubert* is similar to that in *Blaine v. United States*, 18 A.3d 766 (D.C. 2011), we find *Blaine* instructive. In *Blaine*, the trial court initially gave the jury the "standard" reasonable doubt instruction which the District of Columbia Court of Appeals had approved in *Smith v. United States*, 709 A.2d 78, 81 (D.C. 1998) (*en banc*). *Blaine*, 18 A.3d at 769. That instruction stated the following:

> Reasonable doubt is the kind of doubt that would cause a reasonable person, after careful and thoughtful reflection, to hesitate to act in the graver or more important matters in life. However, it is not an imaginary doubt, nor a doubt based on speculation or guesswork; it is a doubt based upon reason. *The government is not required to prove guilt beyond all doubt, or to a mathematical or scientific certainty. Its burden is to prove guilt beyond a reasonable doubt.*

*Id.* (quotation omitted and emphasis added); *see Smith*, 709 A.2d at 82.

In response to a jury question, the trial court again instructed the jury on reasonable doubt, revising the final sentence of the instruction to say: "The government *never* has to prove guilt beyond all doubt, *they do not have to prove guilt beyond a shadow of a doubt, they do not have to prove guilt to a mathematical certainty, and they do not have to prove guilt to a scientific certainty*; they have to prove guilt beyond a reasonable doubt." *Blaine*, 18 A.3d at 771 (quotation omitted). The District of Columbia Court of Appeals ruled that there was a reasonable likelihood that the jury understood the reinstruction to impose a burden of proof lower than beyond a reasonable doubt. *Id.* at 771, 779. Specifically, the court explained that "the reinstruction became unbalanced from added weight on the government's side created by an extended rat-a-tat explaining of what reasonable doubt is 'not.' " *Id.* at 779. Even if the new language was not "itself . . . inherently a violation of due process," the court reasoned, "there is a reasonable likelihood that [it] conveyed to the jury a lower standard of reasonable doubt than due process requires, and that the jury came to its verdict accordingly." *Id.*

In both *Aubert* and *Blaine*, the challenged reasonable doubt instructions included an extended explanation of what reasonable doubt is not. In *Aubert*, the trial court did not merely instruct the jury that the State need not establish guilt beyond all doubt or to either a mathematical or scientific certainty. Instead, the court's instruction repeatedly emphasized what the State's burden was "not": "[T]he State is not required to establish guilt beyond all doubt. That is not the State's burden. The State is not required to establish guilt to a mathematical certainty. That is not the State's burden. Neither is the State required to establish guilt to a scientific certainty." *Aubert*, 120 N.H. at 636 (quotation and emphases omitted). Similarly, in *Blaine*, instead of the "short sentence in *Smith* — 'The government is not required to prove guilt beyond all doubt, or to a mathematical or scientific certainty' " — the trial court used "new, . . . 'more graphic,' emphatic, and repetitive language" to explain the level of doubt "the jurors need *not* have." *Blaine*, 18 A.3d at 772-73, 779.

The challenged sentence in this case is like the "short sentence" in *Smith* rather than the extended, repetitive explanations in *Aubert* and *Blaine*. Here, in addition to the model *Wentworth* charge, the trial court stated the following: "Beyond a reasonable doubt does not mean that the State must prove its case beyond all doubt or to a mathematical certainty, or demonstrate the complete impossibility of innocence." Unlike the instructions in *Aubert* and *Blaine*, the trial court's instruction neither repeated nor excessively emphasized what was not the State's burden. We also note that the challenged sentence in this case is nearly identical to language approved in other jurisdictions. *See, e.g., Com. v. Gartner*, 381 A.2d 114, 122

(Pa. 1977); *Laird v. Horn*, 159 F. Supp. 2d 58, 90-92 (E.D. Pa. 2001) (approving charge on habeas review in capital case), *aff'd*, 414 F.3d 419 (3d Cir. 2005).

Moreover, throughout the jury charge, the trial court repeatedly emphasized the State's duty to prove the defendant's guilt beyond a reasonable doubt. It mentioned the State's burden of proof more than ten times. *See United States v. Van Anh*, 523 F.3d 43, 58 (1st Cir. 2008) (instruction adequate when, among other things, district court referenced government's burden ten times). The court also repeatedly underscored the presumption of innocence afforded to the defendant. In addition to the presumption of innocence language in the model *Wentworth* charge, the trial court instructed the jury: "The seriousness of this crime has no bearing on the presumption of innocence . . . . [W]hether a Defendant is charged with a very serious crime — or a minor offense — he is presumed innocent." The court further instructed the jury: "[S]imply because you were asked questions about the death penalty does not affect your obligation to presume the Defendant innocent of capital murder." *See id.*; *see also United States v. O'Shea*, 426 F.3d 475, 483 (1st Cir. 2005) (instruction adequate when district court "gave a careful and cogent discussion of the presumption of innocence").

Viewing the charge as a whole, we hold that there is no reasonable likelihood that the jury understood the challenged instruction as allowing it to convict the defendant based upon proof less than that required by the "beyond a reasonable doubt" standard. *Saunders*, 164 N.H. at 353. Because the Federal Constitution affords the defendant no greater protection than does the State Constitution in these circumstances, we reach the same conclusion under the Federal Constitution as we do under the State Constitution. *See Victor*, 511 U.S. at 5.

■■■ "We emphasize that courts must exercise the utmost care when instructing a jury as to reasonable doubt." *Van Anh*, 523 F.3d at 59. We reiterate our view that there are few circumstances that would justify adding to the model *Wentworth* charge. *See Aubert*, 120 N.H. at 637-38.

## VII. SENTENCING PHASE REVIEW

The defendant raises several arguments relating to the eligibility and sentence selection phases of the capital murder trial. His assignments of error involve: (1) the exclusion of his custodial statement; (2) the admission of victim impact evidence; (3) the admission of evidence on conditions of confinement and rejection of evidence of and jury instruction on mode of execution; (4) the admission of prior crimes evidence; and (5) the scope of the State's closing argument. As background, we provide an overview of the

defendant's sentencing, identifying the alleged aggravating factors, certain proposed mitigating factors, and the jury's findings.

The State's amended death penalty notice identified four statutory aggravating factors and fourteen non-statutory aggravating factors in support of the requested sentence of death. *See* RSA 630:5, I(b) (2007). The first three statutory aggravating factors focused upon the *mens rea* of "purposely" required for death eligibility, *see* RSA 630:5, IV, VII(a) (2007), alleging:

A. Michael K. Addison, purposely killed Manchester Police Officer Michael L. Briggs; and/or

B. Michael K. Addison purposely inflicted serious bodily injury which resulted in the death of Manchester Police Officer Michael L. Briggs; and/or

C. Michael K. Addison purposely engaged in conduct which:

 i. the defendant knew would create a grave risk of death to a person, other than one of the participants in the offense; and

 ii. resulted in the death of Manchester Police Officer Michael L. Briggs.

*See* RSA 630:5, VII(a). Proof of only one of these alternative statutory aggravating factors was necessary to establish the "purposely" *mens rea* required for death eligibility. *See* RSA 630:5, IV. The fourth statutory aggravating factor relating to death eligibility focused upon the defendant's purpose for committing the crime, alleging that:

Michael K. Addison murdered Manchester Police Officer Michael L. Briggs for the purpose of avoiding or preventing a lawful arrest or effecting an escape from lawful custody.

*See* RSA 630:5, VII(j) (2007). These statutory aggravating factors alleging the defendant's eligibility to receive a death sentence were included in the grand jury indictment.

The fourteen non-statutory aggravating factors pertained to the defendant's prior serious acts of violence, other prior serious criminal behavior, and potential future dangerousness, as well as aspects of the capital murder and the impact of the murder on Officer Briggs's family. The first five alleged non-statutory aggravating factors related to the defendant's criminal conduct from 1996 to 2003:

1. *Other Serious Acts of Violence*: Assault and Battery and Threatening to Commit a Crime. On or about August 10, 1996, in South Boston, Massachusetts, the defendant,

Michael K. Addison, did assault and beat Cheryl Kiser and threaten to commit a crime against her by saying he would kill her. The defendant, Michael K. Addison, pled delinquent to these two offenses on January 5, 1999.

2. *Other Serious Acts of Violence*: Assault with Intent to Kill, Assault and Battery and Possession of a Firearm without a Permit. On or about December 6, 1996, in Dorchester, Massachusetts, the defendant, Michael K. Addison, struck a male victim (M.A.) in the head and then pointed an unlicensed loaded revolver at the victim and pulled the trigger twice. The gun did not fire. The defendant, Michael K. Addison pled guilty and was convicted of these three offenses on July 21, 1997.

3. *Other Serious Acts of Violence*: Armed Robbery and Two Counts of Assault and Battery with a Dangerous Weapon (knife and shod foot). On or about March 20, 1997, in Roxbury, Massachusetts, the defendant, Michael K. Addison, was armed with a dangerous weapon (a knife) and assaulted Tredaine Purdy with intent to rob him, and did rob and steal from the person of Tredaine Purdy a hat, which was the property of Tredaine Purdy. The defendant, Michael K. Addison, also committed two counts of assault and battery upon Tredaine Purdy by means of dangerous weapons, by stabbing Purdy in the back with a knife and kicking Purdy while he was on the ground with his shod foot. The defendant, Michael K. Addison pled guilty and was convicted of these three offenses on December 3, 1997.

4. *Other Serious Criminal Behavior*: False Imprisonment. On or about October 27, 2003, in Londonderry, New Hampshire, the defendant, Michael K. Addison, acting in concert with Mathys Morgan, knowingly confined Brian St. Peter unlawfully as to interfere substantially with his physical movements, by keeping him inside a locked vehicle. The defendant, Michael K. Addison, pled guilty and was convicted of this offense on November 4, 2003.

5. *Other Serious Criminal Behavior*: Probation Violation. On or about October 27, 2003, in Londonderry, New Hampshire, the defendant, Michael K. Addison, violated the terms of his probation by committing the crime of false imprisonment. On August 6, 2004, the defendant,

Michael K. Addison, stipulated to the violation of probation and was found in violation by the Court.

The next five alleged non-statutory aggravating factors related to the three October 2006 non-capital criminal incidents:

6. *Other Serious Criminal Behavior*: Armed Robbery. The defendant, Michael K. Addison, committed armed robbery when he and his accomplices/co-conspirators, including Antoine Bell Rogers, robbed customers of the El Mexicano Restaurant in Manchester, New Hampshire on or about October 10, 2006. A jury convicted Michael K. Addison of this offense on February 27, 2008.

7. *Other Serious Criminal Behavior*: Felon in Possession. The defendant, Michael K. Addison, was a felon in possession of a deadly weapon when he committed the armed robbery of the El Mexicano Restaurant in Manchester, New Hampshire with his accomplices/co-conspirators, including Antoine Bell Rogers, on or about October 10, 2006. A jury convicted Michael K. Addison of this offense on February 27, 2008.

8. *Other Serious Criminal Behavior*: Armed Robbery and Conspiracy to Commit Robbery. The defendant, Michael K. Addison, agreed to rob a store and then committed armed robbery with a firearm when he and his accomplices/co-conspirators, including Antoine Bell Rogers, robbed the 7-Eleven Store in Hudson, New Hampshire on or about October 11, 2006. A jury convicted Michael K. Addison of these offenses on December 19, 2007.

9. *Other Serious Criminal Behavior*: Felon in Possession. The defendant, Michael K. Addison, was a felon in possession of a firearm when he committed the armed robbery of the 7-Eleven Store with his accomplices/co-conspirators, including Antoine Bell Rogers, on or about October 11, 2006, in Hudson, New Hampshire. A jury convicted Michael K. Addison of this offense on December 19, 2007.

10. *Other Serious Criminal Behavior*: Accomplice to Reckless Conduct With a Firearm and Conspiracy to Commit Criminal Threatening. The defendant, Michael K. Addison, was involved in an incident on or about October 15, 2006, where he and his accomplice/co-conspirator Antoine Bell-Rogers agreed to threaten people in a

residence and Bell-Rogers, acting in concert with and aided by the defendant, Michael K. Addison, discharged a firearm outside a residence located at 345 Edward J. Roy Drive in Manchester, New Hampshire. A jury convicted Michael K. Addison of these two offenses on November 29, 2007.

We refer to these ten alleged non-statutory aggravating factors relating to the defendant's prior criminal history as the "prior crimes non-statutory aggravating factors."

Non-statutory aggravating factors eleven and twelve related to aspects of the defendant's conduct with respect to the murder:

11. *Other Serious Criminal Behavior*: Felon in Possession. The defendant, Michael K. Addison, was a felon in possession of a firearm, when he committed the murder of Manchester Police Officer Michael L. Briggs in Manchester, New Hampshire on or about October 16, 2006.

12. *Other Serious Criminal Behavior*: Reckless Conduct. On or about October 16, 2006, the defendant, Michael K. Addison, placed or may have placed another in danger of serious bodily injury by disposing of the firearm he used to murder Manchester Police Officer Michael L. Briggs by leaving it outside in a neighborhood in Manchester, New Hampshire.

The last two alleged non-statutory aggravating factors pertained to the defendant's potential future dangerousness and the impact of the murder upon the family of Officer Briggs:

13. *Future Dangerousness of the Defendant*: The defendant, Michael K. Addison, is likely to commit criminal acts of violence in the future which would be a continuing and serious threat to others in prison. In addition to the charged offense of capital murder and the statutory and non-statutory aggravating factors alleged in this Notice, the defendant, Michael K. Addison, has engaged in a continuing pattern of criminal and violent conduct, has threatened others with violence and has demonstrated low rehabilitative potential.

14. *Victim Impact Evidence*: The defendant caused injury, harm, and loss to the family of Manchester Police Officer

Michael L. Briggs because of the victim's personal characteristics as an individual human being and the impact of the death upon the victim's family. The murder of Officer Michael L. Briggs has caused the Briggs family extreme emotional suffering, and the victim's family has suffered severe and irreparable harm.

The defendant identified twenty-eight mitigating factors, including the circumstances of the crime and his background and character. The only submitted mitigating factors that relate to the issues on appeal were:

(1) If the defendant is not sentenced to death, he will be automatically, as a matter of law, sentenced to life in prison without the possibility of release.

(2) The defendant attempted to plead guilty to Capital Murder but his offer was rejected by the State.

(4) The circumstances of the homicide did not involve torture or protracted cruelty.

(8) During his two years of pre-trial confinement, the defendant has committed no crimes and his behavior has demonstrated his potential to adjust well in a secure prison setting.

At the eligibility phase of trial, the jury considered whether the State had proven the existence of the charged statutory aggravating factors. *See* RSA 630:5, III, IV (2007). At the sentence selection phase of trial, the jury considered, among other things, whether the State had proven the noticed non-statutory aggravating factors, and whether the defendant had proven mitigating factors. *See* RSA 630:5, IV (outlining the parties' respective burdens of proof). Ultimately, the jury unanimously found that the State had proven beyond a reasonable doubt all but two of the eighteen aggravating factors alleged by the State. The two factors that the State failed to prove were: (1) the statutory aggravating factor charging that the defendant "purposely killed" Officer Briggs; and (2) the non-statutory aggravating factor alleging the future dangerousness of the defendant. Regarding the mitigating factors submitted by the defendant, the Special Verdict Form shows that he proved by a preponderance of the evidence sixteen of the twenty-eight factors to the satisfaction of at least one juror. With respect to the mitigating factors set forth above, factor one (life without parole) was found proven, but factors two (plea offer), four (lack of torture or protracted cruelty), and eight (prison adjustment) were not.

The trial court required the State to choose between the two proven *mens rea* statutory aggravating factors for the jury to consider when deciding whether to impose a sentence of death at the close of the sentence

selection phase. The State selected the proven factor that the defendant purposely inflicted serious bodily injury which resulted in Officer Briggs's death, and the court instructed the jury accordingly. Thus, jurors considered fifteen proven aggravating factors and sixteen proven mitigating factors, along with the rest of the evidence, when determining the defendant's sentence. The jury's findings and verdict are recorded on a Special Verdict Form included in Appendix B.

Before addressing the appellate issues, we set forth the evidentiary standard applicable to capital sentencing hearings. RSA 630:5, III provides, in pertinent part:

> When a defendant is found guilty of or pleads guilty to the offense of capital murder, no presentence report shall be prepared. In the sentencing hearing, information may be presented as to matters relating to any of the aggravating or mitigating factors set forth in paragraphs VI and VII, or any other mitigating factor or any other aggravating factor for which notice has been provided under subparagraph I(b). Where information is presented relating to any of the aggravating factors set forth in paragraph VII, information may be presented relating to any other aggravating factor for which notice has been provided under subparagraph I(b). Information presented may include the trial transcript and exhibits if the hearing is held before a jury or judge not present during the trial, or at the trial judge's discretion. Any other information relevant to such mitigating or aggravating factors may be presented by either the state or the defendant, regardless of its admissibility under the rules governing admission of evidence at criminal trials, except that information may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. The state and the defendant shall be permitted to rebut any information received at the hearing and shall be given fair opportunity to present argument as to the adequacy of the information to establish the existence of any of the aggravating or mitigating factors and as to appropriateness in that case of imposing a sentence of death.

RSA 630:5, III. Although RSA 630:5 refers to "information" presented at sentencing rather than "evidence," we use these terms interchangeably.

■ Under the statute, the threshold for admissibility of evidence is whether the information "relat[es] to" or is "relevant to" an aggravating or mitigating factor. Although the New Hampshire Rules of Evidence do not control the admission of evidence in capital sentencing hearings, we

conclude that relevance under RSA 630:5, III is determined by the standard set forth in New Hampshire Rule of Evidence 401. *See United States v. Lujan*, 603 F.3d 850, 854 (10th Cir. 2010) (relevance under Federal Death Penalty Act, 18 U.S.C. §§ 3591 *et seq.* (2006) (FDPA), is the same standard as used by federal courts under Federal Rule of Evidence 401); *United States v. Basham*, 561 F.3d 302, 331-32 (4th Cir. 2009) (same). Thus, under RSA 630:5, III, proffered information is admissible in a capital sentencing hearing if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.H. R. Ev. 401. Notably, the statute presumes that guilt phase evidence constitutes relevant sentencing information because such evidence involves the circumstances of the capital murder itself. *See* RSA 630:5, III; *see also* RSA 630:5, II (2007) ("The [sentencing] hearing shall be conducted . . . [b]efore the jury which determined the defendant's guilt," unless circumstances warrant a separate jury being impaneled.).

■ If the relevance threshold is met, the trial court retains the discretion under RSA 630:5, III to exclude proffered information "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." This standard is similar to New Hampshire Rule of Evidence 403 in that both RSA 630:5, III and Rule 403 allow for the exclusion of relevant evidence only when the probative value is "substantially outweighed" by the identified dangers. *See* N.H. R. Ev. 403; *cf. United States v. Sampson*, 486 F.3d 13, 42 (1st Cir. 2007) (under the FDPA, information may be excluded if its probative value is "outweighed," rather than "substantially outweighed").

■ The standard in RSA 630:5, III differs from the standard in Rule 403, however, in that the Rule allows for the exclusion of evidence if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." N.H. R. Ev. 403. By contrast, RSA 630:5, III identifies only "the danger of unfair prejudice, confusion of the issues, or misleading the jury." We interpret the legislature's decision to not include within RSA 630:5, III considerations such as undue delay, waste of time, or cumulative evidence, as permitting the admission of more relevant capital sentencing information, rather than less. This construction is in keeping with established capital sentencing jurisprudence. *See Jurek v. Texas*, 428 U.S. 262, 276 (1976) ("What is essential is that the jury have before it all possible relevant information about the individual defendant whose fate it must determine."); *Gregg v. Georgia*, 428 U.S. 153, 204 (1976) (In a capital sentencing hearing,

"it [is] desirable for the jury to have as much information before it as possible when it makes the sentencing decision."); *see also Lockett v. Ohio*, 438 U.S. 586, 601-03 (1978) (plurality opinion). As we have previously determined, "in enacting the current death penalty statutory scheme, the legislature intended to incorporate the then-existing jurisprudential background of the United States Supreme Court, and we will interpret the statutory scheme accordingly." *State v. Addison*, 160 N.H. 732, 755 (2010).

We consider the factors bearing upon admission of information under RSA 630:5, III, including relevance, unfair prejudice, and pertinent statutory language, in the context of each of the evidentiary challenges raised by the defendant. In so doing, we are mindful that the sentencing phase of a capital trial fundamentally differs from the guilt phase of a capital trial during which a defendant is presumed innocent until and unless the State proves guilt of the charged capital murder beyond a reasonable doubt. Thus, evidence that would be inadmissible at the guilt phase of a capital trial as irrelevant or unfairly prejudicial may be properly admitted during capital sentencing, at which the jury must evaluate aggravating and mitigating factors bearing upon the defendant's character and the circumstances of the capital murder. *See* RSA 630:5; *see also Tuilaepa v. California*, 512 U.S. 967, 972 (1994); *Payne v. Tennessee*, 501 U.S. 808, 820-21 (1991); *United States v. Fell*, 360 F.3d 135, 143 (2d Cir. 2004); *State v. Johns*, 34 S.W.3d 93, 113 (Mo. 2000).

We review the trial court's evidentiary decisions in a capital sentencing proceeding under our unsustainable exercise of discretion standard. *See State v. Lambert*, 147 N.H. 295, 296 (2001); *see also Sampson*, 486 F.3d at 42 (when considering a defendant's challenges to an evidentiary ruling rendered in a capital sentencing proceeding under the FDPA, appellate court "review[s] adequately preserved objections to rulings admitting or excluding evidence for abuse of discretion"). Accordingly, the defendant bears the burden on appeal to establish that the trial court's evidentiary decision was clearly untenable or unreasonable to the prejudice of his case. *Lambert*, 147 N.H. at 296.

## A. Eligibility Phase Trial

The defendant raises a single claim of error regarding the eligibility phase of sentencing. Specifically, he contends that the trial court erred in denying his motion to admit his previously suppressed custodial statement. We provide an overview of the eligibility phase and then address this appellate argument.

During the eligibility phase of trial, the jury considered only whether the State had proven beyond a reasonable doubt the existence of the statutory

aggravating factors necessary to establish that the defendant was eligible to receive the death penalty. *See* RSA 630:5, III, IV. This phase lasted one day and largely rested upon the evidence presented during the capital murder trial. *See* RSA 630:5, II, III (2007).

Detective Stacy Howe was the only witness to testify at the eligibility phase. He explained that on the night of October 15, 2006, he was investigating the Roy Drive shooting and obtained arrest warrants for the defendant and Bell-Rogers at approximately 12:40 a.m. on October 16. He testified that if Officer Briggs had succeeded in stopping the defendant, he could have been arrested on the outstanding warrant, as well as on charges of having an unlicensed firearm and of being a felon in possession of a firearm. In addition, the parties stipulated that the defendant previously had served prison sentences totaling four years, three months, and twenty-four days.

The court instructed the jury that its task at the eligibility phase was to determine whether the State had proven each of the charged statutory aggravating factors beyond a reasonable doubt and not to decide the sentence. The court identified the four charged statutory aggravating factors at issue in the case, and explained the legal parameters for the jury's determination of these factors. It also informed the jury that "[a]lmost all of the evidence relevant to the four eligibility factors was presented at trial," and, thus, the jurors "may consider any of that evidence in deciding whether the State has proven that the defendant is eligible for the death penalty." The court provided the jury with a Special Findings Form on which to record its findings.

After the parties presented closing arguments, the jury deliberated for approximately four hours and returned findings that the State had proven three of the four charged statutory aggravating factors. Specifically, it found that the defendant: (1) purposely inflicted serious bodily injury that resulted in the death of Officer Briggs; (2) purposely engaged in conduct that he knew would create a grave risk of death to another and that resulted in the death of Officer Briggs; and (3) murdered Officer Briggs for the purpose of avoiding or preventing a lawful arrest or effecting an escape from lawful custody. The completed Special Findings Form is included in Appendix A. The jury's findings rendered the defendant eligible for the death penalty, *see* RSA 630:5, IV, and the trial proceeded to the sentence selection phase.

### 1. Addison's Statement

#### a. Background

Soon after the defendant's arrest on October 16, 2006, he provided a three-hour audio-recorded statement to two Manchester detectives. Nei-

ther party introduced any portion of his statement at the guilt phase of the trial because the trial court had granted the defendant's pretrial motion to suppress. The court ruled that the interrogation was conducted in violation of the defendant's rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), "because he invoked his right to counsel and his request . . . was not scrupulously honored." This ruling related only to the guilt phase of the trial, and the defendant, in anticipation of sentencing, subsequently moved to admit the statement. Following a hearing, the trial court denied the defendant's motion by written order dated November 14, 2008. The procedural context for the ruling, challenged on appeal, is as follows.

Prior to trial, in April 2008, the defendant moved to bifurcate the sentencing hearing. He proposed that the initial phase of sentencing address "only whether the State [was] able to establish 'death eligibility' by proving statutory aggravating factors beyond a reasonable doubt." If the jury found him "death eligible," the defendant proposed "a second hearing in which the jury [would] consider all other aggravating and mitigating evidence before deciding whether to impose a sentence of life in prison without parole or death."

This request for bifurcation was based upon the defendant's concern "that evidence which might be generally relevant to prove non-statutory aggravating factors," such as evidence of character and propensity, was "irrelevant and inadmissible to prove statutory aggravating factors, such as the 'element' of 'purposeful' conduct." He argued that his "constitutional rights [would] be violated if the issue of death eligibility [was] merged with the ultimate decision of whether to impose a life sentence or the death penalty" because "[i]n a non-bifurcated sentencing hearing, victim impact evidence, character evidence, and other irrelevant factors [would] taint the jury's consideration of whether [he] acted 'purposely' and whether he [was] death eligible." (Quotation omitted.)

The defendant contended that support for a bifurcated hearing was found in RSA 630:5, III (2007), which authorizes the trial court to exclude evidence at sentencing if its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." RSA 630:5, III. According to the defendant, at the sentence selection phase the State would "attempt to demonstrate that prior crimes, prior acts of violence and future dangerousness constitute[d] evidence of a character so bad, and propensity so great, that life without parole [was] not a sufficient punishment." Because "[s]uch evidence ha[d] no bearing on the statutory aggravating factors which address mental state at the time of the crime," the defendant argued that "with regard to the statutory aggravating factors, such evidence must be disregarded by the jury because its

probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury." (Quotation omitted.)

The defendant further argued that evidence of prior bad acts lacked probative value on the question of his intent, was "inherently prejudicial and increase[d] the likelihood that a jury [would] decide the case on an improper basis," and would "tend to improperly influence a jury to believe that the homicide was committed purposely." (Quotation omitted.) In addition, he argued that allowing evidence of prior crimes at the eligibility phase would mislead the jury in that it would "appear appropriate for the jury to make its determination regarding 'purposely' by considering evidence of propensity," and cause confusion because "[h]aving heard evidence of prior bad acts, . . . jurors [would] be unable to disregard that evidence when deciding whether the crime was committed 'purposely.'"

The State objected and, following a hearing, the trial court granted the defendant's motion by written order dated July 1, 2008. The court found persuasive that federal courts interpreting the FDPA, "upon which RSA 630:5 is largely modeled, have found that it allows bifurcation and have uniformly granted requests to bifurcate." The trial court expressed its concern "that if all eligibility and [sentence] selection evidence [was] presented together, the jury [would] consider information relating to the non-statutory aggravating factors in deciding whether the statutory aggravators exist, even though such information might not be relevant to eligibility."

During the following month, the parties litigated several evidentiary matters relating to the guilt and the eligibility phases of trial. For instance, the parties sought rulings upon the admissibility of evidence of the October 2006 non-capital crimes the defendant committed in the week preceding the murder, other crimes he had committed during his juvenile and young adult years from 1996-2003, and other uncharged misconduct or conduct purportedly related to his character. In some of his pleadings, the defendant took the position that admitting the challenged evidence in the eligibility phase of trial would run counter to the purpose of bifurcation. For instance, he argued that bifurcation was granted to address the "concern that if the eligibility and sentence selection phases were consolidated, the sentence selection evidence would make it difficult for the jury to rationally and dispassionately make findings on the precisely framed statutory aggravating factors, where much of the supporting evidence surrounds the circumstances of the offense."

Similarly, in objecting to the admission of evidence of the October 2006 non-capital crimes, the defendant asserted in relation to the eligibility phase, that "it [was] not necessary to convey to the jury a broader scope of

criminal activity than the Roy Drive charge, and that evidence of the 7-Eleven and El Mexicano robberies need not be admitted." In support, the defendant referred to the hearing on his motion to bifurcate the sentencing phase at which "the Court expressed its concern that if too much of this detail came into evidence during the first phase of sentencing, [it] would frustrate the primary purpose of bifurcation, which was to insure reasoned and dispassionate consideration of the statutory aggravators."

From mid-October through early November, 2008, the trial court issued several orders ruling that some of the challenged evidence was admissible and excluding other evidence. For example, the court granted the State's request to introduce at the guilt phase evidence of the October 2006 non-capital crimes, with limitations. The court, however, precluded the State from introducing at the eligibility phase evidence of the defendant's 1996-2003 criminal conduct, ruling that under RSA 630:5, III, such evidence was "not relevant to the statutory aggravating factors," had "minimal probative value," and gave rise to "the high danger of unfair prejudice or confusion of the issues." The trial court observed that "[a]dmitting this evidence would also undermine the purpose of bifurcating the sentencing hearing into eligibility and sentencing phases."

With respect to some of its orders on the evidentiary scope of the eligibility phase, the court noted that the State did not intend to introduce certain challenged evidence unless the admission of such evidence became necessary for rebuttal, impeachment, or cross-examination, or unless the defense otherwise opened the door to its admissibility. The court also issued a written order dated November 7, concerning closing arguments in the eligibility phase of sentencing. In that order, the trial court reiterated that it had "bifurcated the sentencing hearing to minimize the risk that the jury would consider any information relating to the non-statutory aggravating factors in deciding whether the statutory aggravators exist." The court explained that it "agreed with the defendant's argument that evidence of character, background, prior crimes or acts of violence, and the impact of the homicide on victims [would] be so unfairly prejudicial and misleading that bifurcation of the sentencing process [was the] only way to insure the proper consideration of such evidence." (Quotation and brackets omitted.)

Shortly thereafter, on November 12, the defendant moved to admit his previously suppressed statement as evidence at the eligibility and sentence selection phases of trial. The defendant argued that, at sentencing, the rules of evidence do not apply and, thus, "[t]he only limiting principles are overriding constitutional considerations (*e.g.*, due process and confrontation), and a balancing test similar to that contemplated under [New Hampshire] Rule [of Evidence] 403." *See* RSA 630:5, III. The defendant,

however, noted that although "RSA 630:5 erects no barrier to the presentation of hearsay evidence otherwise barred by the rules of evidence[,] . . . [o]ne prerequisite to admission of what may otherwise be hearsay is reliability."

According to the defendant, his statement was "highly probative of [his] mental state at the time he shot Officer Briggs, which [was] the chief inquiry in [the eligibility] phase of the proceeding." Although the defendant conceded that if he chose to play part of the audio-tape of his statement, "the State [could] play any of the rest of it," he disagreed that by introducing his statement "he open[ed] the door to any and all conceivable, extrinsic evidence."

In its response, the State did not object to the defendant offering his statement, but argued that its admission was subject to: "reasonable measures by the Court to prevent prejudice to the State from the defendant's tactical decision"; "any information to which the evidentiary door is opened by that choice"; and "the State's statutory right of rebuttal." The State asserted that "if the defendant offer[ed] his self[-]serving statement, the evidence the State [would seek] to admit would specifically contradict the claims he makes . . . about his good character, his knowledge and use of firearms, his . . . remorse, and his account of how the murder happened." According to the State,

> [t]hroughout the confession the defendant insisted that he did not "purposely" shoot Officer Briggs. The interview is replete [with] examples where the defendant specifically tried to convince the detectives that he did not "purposely" shoot [Officer] Briggs and that he did not even know that the police were behind him when he pulled the trigger of the gun. He offered various stories about why he was not the type of person who would "purposely" shoot a police officer. The defense wants the jury to believe the defendant's assertions that he did not act "purposely." It is essential for the jury to understand the full scope of the defendant's lies to the police in which he tried to convince them that he was not the type of person who was a "stone cold killer" or a "cop killer" in order for them to properly evaluate his claim that he would not "purposely" murder a police officer because he was not that type of person.

The State offered numerous examples to "highlight how admitting the suppressed statement would completely undermine the goals of [bifurcation] by opening the door to virtually all of the defendant's past criminal conduct and character." The State argued that it would seek to admit evidence rebutting each of the defendant's claims in his recorded state-

ment, including his assertions that: he was not the type of person who would shoot a police officer; he did not "purposely" murder Officer Briggs because he did not believe in violence; he was not violent; he was inexperienced with guns; and if he pulled the trigger it must have been an accident.

At a hearing on the defendant's motion, the trial court expressed its concern, having listened to the audio-tape, that the statement was not reliable. The court stated, "Even though the rules of evidence don't apply, evidence has got to meet a threshold level of reliability. And . . . you're focusing in on one statement in there — or one aspect of [the defendant's] statement — that he didn't do it on purpose." The court further observed: "But obviously, . . . his confession to the police has so many . . . statements that are contradicted by your own . . . positions that you took at trial or — or what you admit happened. That on their face they're lies." Defense counsel agreed that "[t]here's no question that . . . a great number of statements that [the defendant] made to the police were lies," and that "obviously, the Court as gatekeeper, has to make sure that any evidence — regardless of whom it's introduced by — has a threshold level of reliability." However, defense counsel argued, "In the end, there is some truth to what [the defendant is] saying. He is admitting to being the person who killed Officer Briggs on that day. It is relevant. It is reliable to enough of a degree . . . to meet the threshold of . . . reliability that should attach to this phase."

The trial court denied the defendant's motion with regard to the eligibility phase of sentencing by written order dated November 14, 2008. The court reasoned that the balancing test set forth in RSA 630:5, III authorized it to " 'control the evidence and make assurances that the evidence sought to be presented [was] reliable and fair,' " quoting *United States v. Rodriguez*, 380 F. Supp. 2d 1041, 1054 (D.N.D. 2005), *aff'd*, 581 F.3d 775 (8th Cir. 2009). The court reasoned that "[i]f evidence is not relevant and reliable, it is not probative." The court explained: " 'To determine the probative value or risk of unfair prejudice associated with any information, this court must consider its reliability. Hearsay evidence which is determined to be highly unreliable cannot provide particularly probative support for an aggravating factor and may present a significantly increased risk of unfair prejudice due to its superficial credibility,' " quoting *United States v. Pretlow*, 779 F. Supp. 758, 771 n.7 (D.N.J. 1991) (brackets and ellipsis omitted). The court stated that the defendant's statement contained proven lies:

> [T]he defendant first denied that he was involved in any way in the shooting of Officer Briggs. He blamed Antoine Bell-Rogers. He then told the detectives that he had loaned his red sweatshirt to a

friend of Antoine Bell-Rogers, implying that this other person was the shooter. Later, he admitted shooting someone, although he denied knowing this person was a police officer, but told the detectives that it was an accident because the safety was not engaged and the gun went off when he grabbed it as it fell out of his pocket.

Finding that the defendant's statements to the detectives that he did not act "purposely" were "inadmissible because they [did] not meet even a threshold level of reliability," the trial court concluded that his custodial statement had "minimal probative value of his state of mind when he shot Officer Briggs" and that the "low probative value of these statements [was] substantially outweighed by the danger of unfairly prejudicing the State, confusing the issues and misleading the jury in the eligibility phase." As the trial court stated: "These concerns [were] heightened here because, although the defendant's statements [were] hearsay, he [sought] to introduce them for their truth." The court further stated: "Their admission would also entitle[ ] the State to introduce relevant evidence to rebut the defendant's statements which would result in an undue waste of time."

### b. Appellate Argument

The defendant argues that the trial court erred "in reading RSA 630:5, III as empowering it to make a 'reliability' determination" and "in finding not credible the aspects of the statement the defense sought to introduce." He argues that "if the court correctly interpreted the statute to empower it to exclude evidence on the basis claimed here," the statute would violate his rights under the State and Federal Constitutions. See N.H. CONST. pt. I, arts. 15, 18, 33; U.S. CONST. amends. V, VI, VIII, XIV.

### c. Discussion

We note at the outset that the trial court limited its ruling to the eligibility phase of the sentencing trial, stating that "[i]f the parties wish to admit this evidence in the sentencing phase, they must file separate motions." Despite acknowledging in his brief that the trial court "limited the effect of its ruling to the eligibility phase," the defendant argues that "[t]he logic of the court's ruling . . . would apply equally to the sentence selection phase." However, at oral argument before ·us, the defendant conceded that he did not seek admission of his statement at the sentence selection phase and, thus, limited his argument to the eligibility phase. Accordingly, we review this issue only as to the eligibility phase of sentencing. Because we decide cases on constitutional grounds only when necessary, we first address the defendant's statutory argument. See State v. Wamala, 158 N.H. 583, 592 (2009).

The defendant argues that the trial court exceeded its authority under RSA 630:5, III when it found that his statement was unreliable, because the statute "does not use the word 'reliability' in describing the trial court's evidentiary gate-keeping function." As the State correctly observes, the defendant did not preserve this argument by raising it in the trial court. *See State v. Eaton*, 162 N.H. 190, 195 (2011); *State v. Winward*, 161 N.H. 533, 542 (2011). Nonetheless, even assuming that it was preserved, we conclude that the argument is unavailing.

■ Under the plain language of RSA 630:5, III, information must have probative value to be admissible. Further the statute expressly authorizes the trial court to exclude information that does not satisfy a balancing test: Information "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Because the reliability of sentencing information affects its probative value, *see Pretlow*, 779 F. Supp. at 771 n.7, assessing its reliability is a necessary part of the trial court's function under RSA 630:5, III.

■ We find persuasive the numerous federal cases interpreting analogous language in the Federal Death Penalty Act, 18 U.S.C. §§ 3591 *et seq.* (2006) (FDPA). Section 3593(c) of the FDPA sets forth the evidentiary standard that applies during the sentencing phase of a capital trial, providing in part:

PROOF OF MITIGATING AND AGGRAVATING FACTORS. —

. . . . The defendant may present any information relevant to a mitigating factor. The government may present any information relevant to an aggravating factor for which notice has been provided . . . . *Information is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury.*

18 U.S.C. § 3593(c) (2006) (emphasis added). Federal courts interpreting this provision have held that it "does not eliminate [the] function of the judge as gatekeeper of constitutionally permissible evidence; nor does it alter or eliminate the constitutional baseline for the admissibility of evidence in a criminal trial." *United States v. Fell*, 360 F.3d 135, 145 (2d Cir. 2004) (quotation omitted). "To the contrary, . . . judges continue their role as evidentiary gatekeepers and, pursuant to the balancing test set forth in [the statute], retain the discretion to exclude any type of unreliable or prejudicial evidence that might render a trial fundamentally unfair." *Id.*

(quotation and brackets omitted); *see United States v. Davis*, 609 F.3d 663, 678 (5th Cir. 2010); *see also Oregon v. Guzek*, 546 U.S. 517, 526 (2006) ("The Eighth Amendment does not deprive the State of its authority to set reasonable limits upon the evidence a defendant can submit, and to control the manner in which it is submitted.").

█ The defendant argues that mitigating evidence is not subject to exclusion based upon threshold reliability because, in a capital case, the defendant should be allowed to "introduce any relevant mitigating evidence." *See California v. Brown*, 479 U.S. 538, 541 (1987). The plain language of RSA 630:5, III, however, authorizes the trial court to perform its traditional evidentiary gatekeeping function with respect to both relevant aggravating and mitigating evidence. *See* RSA 630:5, III ("[a]ny . . . information relevant to . . . mitigating *or* aggravating factors . . . may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury" (emphasis added)); *cf. United States v. Fell*, 531 F.3d 197, 219 (2d Cir. 2008) (affirming trial court's exclusion of proffered mitigation evidence, noting that "the FDPA's evidentiary standards do not mean that the defense has *carte blanche* to introduce any and all evidence that it wishes" (quotation omitted)). Accordingly, we conclude that, under RSA 630:5, III, trial courts have discretion to exclude proffered evidence that is demonstrably unreliable. *See State v. Sullivan*, 142 N.H. 399, 402 (1997) (sentencing court properly rejected as unreliable evidence "unsubstantiated, unverified statements" made in a probation report (quotation omitted)); *State v. Taylor*, 139 N.H. 96, 102 (1994) (trial court properly found evidence satisfied requisite level of reliability); *State v. Rodrigue*, 127 N.H. 496, 500 (1985) ("A judge exercises wide discretion in choosing the sources and types of evidence on which to rely in imposing sentence.").

The defendant contends, however, that even if the statute allows the trial court to exclude unreliable evidence, the court "erred in making that finding with regard to the parts of [his] statement[ ] proffered by the defense," arguing:

> In the eligibility phase, the defense sought to introduce [the defendant's] statements denying that, in shooting the gun, he had a purpose to kill or injure anyone. It is true that, in his custodial statement, [he] initially made other denials — of being present and of firing the fatal shot — that later he effectively recanted by admitting to holding the gun at the time of the shooting. However, the defense sought to admit only [the defendant's] final, not-recanted statement denying that he had purposely shot Briggs.

Insofar as [he] did not recant that statement, the court had no sufficient basis to find it so incredible as to be unreliable.

(Citation omitted.)

▆▆▆ In excluding the defendant's statement, the trial court found that it was replete with proven lies, that his statements that he did not act "purposely" did not meet even a threshold level of reliability and had minimal probative value of his state of mind when he shot Officer Briggs, and that these concerns were heightened because the defendant's statements were hearsay offered for their truth. "Hearsay is an out-of-court statement offered in evidence to prove the truth of the matter asserted. In general, such extrajudicial statements, which are not made under oath or subject to cross-examination, are less trustworthy than those made in court." *State v. Cole*, 139 N.H. 246, 249 (1994) (citation omitted); *see* N.H. R. Ev. 801(c).

The value of hearsay evidence rests upon the credibility of the out-of-court asserter. . . . [S]elf-serving statements or conversations between a defendant and third parties subsequent to the commission of the crime are not competent evidence. The rationale underlying this exclusion is that the credibility of the defendant is suspect and his statements are not reliable in light of the defendant's motive to fabricate testimony favorable to his innocence.

*People v. Edwards*, 579 N.E.2d 336, 357-58 (Ill. 1991) (quotation and citations omitted); *see State v. Johnson*, 145 N.H. 647, 649 (2000) (holding that trial court erred by admitting videotaped statement when evidence of declarant's motive to lie was strong).

▆▆▆ "[T]he sentencing court has broad discretion to accept even hearsay evidence at sentencing as long as the court concludes, with proper support, that the information has sufficient indicia of trustworthiness to warrant a finding of [its] probable accuracy." *United States v. Riccio*, 529 F.3d 40, 47 (1st Cir. 2008), *modified on other grounds by United States v. Riccio*, 567 F.3d 39 (1st Cir. 2009). "[W]hen hearsay evidence does not bear the indicia of reliability . . . it may properly be excluded even when offered in mitigation." *Lawlor v. Com.*, 738 S.E.2d 847, 878 (Va. 2013), *cert. denied*, 82 U.S.L.W. 3214 (U.S. Oct. 15, 2013) (No. 13-167).

As defense counsel conceded, "[t]here's no question that there are a great number of statements that [the defendant made] to the police [that] were lies," and that during the defendant's three-hour custodial interview he "sa[id] a lot of things [to the police] that [were] absolutely, positively

untrue." In addition, the trial court found that many of the defendant's statements during his custodial interview by the police were contradicted by positions he later took at trial and his subsequent admissions about the murder. *Cf. Green v. Georgia*, 442 U.S. 95, 97 (1979). We have reviewed the record and conclude that it supports the trial court's determination that, in its entirety, the defendant's out-of-court statement lacked threshold reliability such that its probative value was minimal and substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury at the eligibility phase. *See* RSA 630:5, III.

Accordingly, we hold that the defendant has not established that the trial court's exclusion of his custodial statement at the eligibility phase of sentencing constituted an unsustainable exercise of discretion.

The defendant also raises a number of constitutional challenges to the trial court's ruling in a cursory fashion. He asserts that, to the extent that RSA 630:5, III "allows a trial court to exclude mitigating evidence proffered by a capital defendant in the sentencing phase on the ground that the court finds the evidence not credible," the statute violates his state and federal constitutional rights to: (1) due process; (2) trial by jury; (3) present all proofs favorable; and (4) freedom from cruel and/or unusual punishments. *See* N.H. CONST. pt. I, arts. 15, 18, 33; U.S. CONST. amends. V, VI, VIII, XIV. The defendant presented these constitutional arguments to the trial court in a similarly cursory fashion, which we assume the court rejected even though it did not expressly address them. The defendant's constitutional arguments are presented without adequately developed legal argument apart from his argument under RSA 630:5, III. Accordingly, we conclude that these perfunctory claims do not warrant independent constitutional analysis. *See State v. Ayer*, 154 N.H. 500, 513 (2006); *State v. Chick*, 141 N.H. 503, 504 (1996).

### B. Sentence Selection Phase Trial

The defendant asserts several claims of error regarding the sentence selection phase of the trial. Specifically, he challenges: (1) the admission of victim impact evidence; (2) the admission of evidence of conditions of confinement and rejection of his proposed evidence of and jury instruction on mode of execution; (3) the admission of prior crimes evidence; and (4) the scope of the State's closing argument. We provide an overview of the sentence selection phase and then address his appellate arguments.

At the final phase of trial, the jury's tasks included: first, determining whether the State had proven the noticed non-statutory aggravating factors; second, determining whether the defendant had proven mitigating factors, including those he submitted; and third, determining, based upon consideration of all of the evidence, "whether the aggravating factors found

to exist sufficiently outweigh[ed] any mitigating factor or factors found to exist, or in the absence of mitigating factors, whether the aggravating factors [were] themselves sufficient to justify a sentence of death." RSA 630:5, IV (2007). The sentence selection phase, beginning with preliminary jury instructions, lasted approximately thirteen trial days. More than fifty witnesses testified, including Officer Briggs's widow and other family members, police officers, witnesses to the defendant's prior criminal conduct, experts, and the defendant's family members. Also, numerous exhibits were admitted, including photographs, the defendant's criminal and juvenile history records, and the surveillance video from the 7-Eleven robbery.

After closing arguments, the trial court gave the jury final instructions, explaining the law regarding aggravating and mitigating factors and the imposition of a sentence of death or life imprisonment without possibility of parole. "[D]etermining the existence of an aggravating or mitigating factor," the court instructed, required the jurors "to decide whether the facts and circumstances alleged [were] true, and if so, whether those facts or circumstances [had] aggravating or mitigating value." It instructed the jury that "aggravating or mitigating value" meant that "those facts or circumstances tend to show that the defendant was deserving of a death sentence or a sentence of life without the possibility of parole." The court also instructed that "[a] mitigating factor is a fact about the defendant's life or character or about the circumstances surrounding the murder of Officer Briggs that would suggest in fairness and justice that a sentence of life in prison without possibility of parole is a more appropriate punishment than death."

The court explained the parties' respective burdens of proof, including that the State had the burden of proving beyond a reasonable doubt the existence of the noticed non-statutory aggravating factors and that the defendant had the burden of proving by a preponderance of the evidence the existence of mitigating factors. The court outlined the statutory aggravating factors that the jury had previously found to be proven at the eligibility phase, the noticed non-statutory aggravating factors, and the mitigating factors submitted by the defendant, explaining that the defendant was "not required to assert any mitigating factors, but [had] elected to do so." The court informed the jury that it could rely upon any evidence presented during each of the three phases of the trial when deciding the existence of non-statutory aggravating factors and mitigating factors.

The court also explained that the existence of aggravating factors required a unanimous finding beyond a reasonable doubt, but that "all twelve jurors [did] not have to agree as to the existence of a mitigating factor in order to consider it [during] deliberations." It instructed the jury

that any juror who individually found a mitigating factor to exist by a preponderance of the evidence must consider that mitigating factor in deciding the sentence, regardless of whether other jurors agreed that the particular mitigating factor had been proven, or whether the defense had relied upon that factor during trial. The court further instructed the jury that, of the two alternative *mens rea* statutory aggravating factors found proven at the eligibility phase, it was permitted to consider only one in determining the sentence — that "the defendant purposely inflicted serious bodily injury that resulted in the death of Officer Briggs."

The court next instructed the jury that after determining the existence of both aggravating and mitigating factors, each juror was "required to weigh in [his or her] own mind the proven factors to decide the appropriate sentence." It explained, among other things, that the weighing process consisted of deciding "whether the proven aggravating factors sufficiently outweigh[ed] any proven mitigating factors, or if no mitigating factors [were] found, whether the proven aggravating factors [were] sufficient in themselves to justify a sentence of death." The court explained: "The weighing process you will undertake is not a mechanical process and is more than a numerical counting or tabulation of factors on each side. Rather, you must consider the aggravators and mitigators qualitatively. The difference in the burdens of proof between aggravators and mitigators does not indicate what weight you should give it. Each juror must weigh in value each factor for him or herself." Finally, the court instructed the jurors regarding leniency, including that any individual juror "may decline to impose the death penalty without giving any reason for that decision." After approximately two and one-half days of deliberations, the jury returned a verdict recommending the imposition of the sentence of death.

### 1. Victim Impact Evidence

#### a. Background

Prior to the sentence selection phase of trial, the defendant filed two motions challenging the admission of the victim impact evidence that the State intended to present. In his first motion, the defendant requested that the trial court enter an order "recognizing that 'victim impact evidence' is inadmissible in a New Hampshire capital sentencing hearing before a jury" and striking the State's victim impact non-statutory aggravating factor. The State objected, arguing that the defendant's motion was untimely and his statutory claims were "baseless." Following a hearing, the trial court denied the motion by written order dated November 18, 2008, finding that victim impact evidence is "relevant and admissible under RSA 630:5."

The defendant then moved to limit the State's victim impact witnesses to "immediate family of Officer Briggs" and to limit the scope of the evidence

"to the injury, harm and loss to [his] family." The motion was "grounded in RSA 630:5" as well as the defendant's "rights to due process, full and fair notice of the evidence the State intends to present, a fair trial, and to be protected against punishments that are cruel, unusual, or disproportionate," *see* N.H. CONST. pt. I, arts. 15, 18, 33. He requested that the trial court "exercise [its] gate keeping function and hold a hearing, out of the presence of the jury, to limit the victim impact evidence." Specifically, the defendant argued that the following evidence was inadmissible:

> [T]estimony about Officer Briggs as a child, [his] prior employment as a correctional officer, opinions about the appropriate punishment in this case, including those expressed by Officer Briggs to family members regarding the death penalty, the effect of the trial on the family, Officer Briggs' prior contact with [the defendant], and Officer Briggs' comments regarding the crimes committed the week prior to his murder.

In response to the defendant's motion, the State proposed to limit the victim impact evidence to testimony from Officer Briggs's widow, one of his sons, his parents, and one of his sisters. In addition, the State agreed that it would "conduct its inquiry in standard question-and-answer format, in order to control the subject matter covered and to provide the defendant with an opportunity to make objections and the Court to make rulings thereon." As to the scope of the evidence, the State proposed to limit the areas of inquiry and to introduce through the witnesses "photographs and extremely brief, unnarrated, and unscripted video clips of various aspects of Michael Briggs's life pertinent to the testimony given."

At a hearing on the motion, defense counsel noted that the State had responded to the defendant's objections and that many of his earlier concerns had been resolved. Defense counsel identified the remaining issues as testimony regarding "Officer Briggs as a child; the box of photographs, as well as the videos that the State may introduce; the amount that can be gone into as far as badges and certifications or awards that Officer Briggs has received," and the possibility that one of Officer Briggs's sons might testify.

The trial court reviewed the photographs, video recordings, and pertinent case law and informed counsel that it was going to admit the evidence. In its subsequent written order dated November 26, 2008, the trial court ruled that the evidence the State sought to introduce fell within the parameters of United States Supreme Court precedent and was admissible under RSA 630:5, III (2007). The court found that the evidence "shows Officer Briggs' uniqueness as an individual human being and informs the jury of the specific harm caused by his murder," reasoning that

[t]he devastating effects that Officer Briggs' death had on his family [are] certainly part and parcel of the circumstances of the crime properly presented to the jury at the penalty phase of the trial. Moreover, this evidence provides a quick glimpse of the life which the defendant chose to extinguish. This evidence is highly probative of the harm, injury and loss that Officer Briggs' family feels as a result of his murder and his characteristics as an individual human being. Moreover, it is not so unduly prejudicial that it would render the trial fundamentally unfair in violation of the defendant's due process rights.

(Quotations, citations, and brackets omitted.)

The trial court found that evidence about Officer Briggs's childhood was admissible because "[i]t is probative of the loss and harm that Officer Briggs' parents and siblings have suffered as a result of the murder of their son and brother," disagreeing with the defendant's argument that the probative value of this evidence was diminished because Officer Briggs was an adult when his family experienced his loss. The court reasoned that "[i]t would be difficult for [Officer Briggs's] parents and sibling to convey the magnitude of their loss without giving the jury some background of his childhood." As to evidence that Officer Briggs worked extra shifts as a correctional officer in order to support his family and enable his wife to stay home with their children, and that he received certain awards and recognition of accomplishments, the trial court found that such evidence was admissible "because it shed[ ] light on Officer Briggs' personality and his uniqueness as a human being and the magnitude of his family's loss." (Quotation omitted.)

Regarding the family photographs and video clips, the trial court explained:

Both the photographs and video clips are relevant and probative of Officer Briggs' relationships with his family and illuminate the testimony of his family members about their relationship with Officer Briggs. The video clips show Officer Briggs interacting with his sons and shed light on their relationship; similarly, the photographs depict Officer Briggs' relationship with his family and provide a chronology of his life and therefore provide a quick glimpse of the life which the defendant chose to extinguish. The probative value of the videos and pictures is not substantially outweighed by the danger of unfair prejudice or confusing and/or misleading the jury.

(Quotations and citations omitted.)

The State's case-in-chief at the sentence selection phase of trial lasted six days. Four witnesses offered victim impact evidence: Officer Briggs's widow, Laura Briggs; his sister, Melissa Briggs; and his parents, Mary Ann and Leland Briggs. Laura Briggs described the last day of her husband's life, his memorial service, how she met her husband and their early years together, their two young sons, his work as a corrections officer and as a police officer, and his role as a husband, father, son, and brother. During her testimony she identified twenty family photographs, including one photograph of her sons at the age they were when their father was murdered, and several of her husband with their sons engaged in a variety of activities, including playing at home, hiking, enjoying the beach, visiting a museum, and playing sports. In addition, during her testimony the State showed three video recordings of her husband with their children, one lasting approximately thirty-four seconds, one lasting approximately ninety-three seconds, and one lasting approximately eighteen seconds.

Melissa Briggs described her brother's personal qualities and his close relationship with his siblings. In addition, she testified about her brother as a member of the United States Marine Corps, a father, and an uncle, the annual family vacation at the beach, the events of the day he was shot, and what life is like without him. During the course of her testimony she identified three photographs of herself and her adult siblings and their families together during their summer beach vacations.

Mary Ann Briggs testified about her memories of her son as a child, his close relationship with his sisters, his qualities as a father, and what she misses about him. During the course of her testimony she identified seven photographs, including one of her son as an infant, one of him as a six- or seven-year-old, two of him with his sons at the beach, one of him with his children in her living room, one of him eating at her home on a break from work, and one of him at his sister's wedding.

Leland Briggs testified about his relationship with his son and about the activities they enjoyed as he was growing up. He described his son as a Marine, a police officer, and a father. He testified to what he misses about his son and the effect his son's murder has had on his health. During the course of his testimony he identified six photographs, including one of his son on a tractor on the family farm, two of himself and his son in uniform marching together in parades, one of his son in his Marine uniform, and two of his son in his police uniform.

### b. Appellate Argument

The defendant raises two issues. First, he argues that the trial court erred "in ruling that New Hampshire law authorizes victim impact evidence" at a capital sentencing hearing before a jury. Second, he argues

that "even if victim impact evidence is admissible absent statutory authority, the evidence that the State introduced was unfairly prejudicial in a manner that violated not only RSA 630:5, III, but [his] due process rights under Part I, Article 15 of the New Hampshire Constitution and the Fourteenth Amendment to the Federal Constitution."

### c. Discussion

We first consider the defendant's statutory argument and his assertion that the trial court's evidentiary decision under RSA 630:5, III was an unsustainable exercise of discretion. *See State v. Wamala*, 158 N.H. 583, 592 (2009).

The defendant argues that the trial court erred because victim impact evidence is inadmissible absent explicit statutory authority and RSA 630:5, III "is silent on the subject." Pursuant to RSA 630:5 (2007), "[w]henever the state intends to seek the sentence of death for the offense of capital murder, the attorney for the state . . . shall . . . serve upon the defendant, a notice . . . [s]etting forth the aggravating factors enumerated in paragraph VII . . . *and any other aggravating factors* which the state will seek to prove as the basis for the death penalty." RSA 630:5, I(b) (emphasis added). A separate sentencing hearing must be held. RSA 630:5, II. "In the sentencing hearing, information may be presented as to matters relating to any of the aggravating or mitigating factors set forth in paragraphs VI and VII, or any other mitigating factor *or any other aggravating factor* for which notice has been provided under subparagraph I(b)." RSA 630:5, III (emphasis added). Paragraph VII enumerates ten aggravating factors that "are the only aggravating factors that shall be considered, *unless notice of additional aggravating factors is provided under subparagraph I(b)*." RSA 630:5, VII (emphasis added). Further, the statute provides:

> *Any other information relevant to such* mitigating or *aggravating factors may be presented by* either *the state* or the defendant, regardless of its admissibility under the rules governing admission of evidence at criminal trials, except that information may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.

RSA 630:5, III (emphasis added).

Thus, the statute enumerates aggravating factors that the State may prove and allows the State to present information regarding duly-noticed nonstatutory aggravating factors that are not expressly identified in the statute. According to the plain language of the statute, evidence pertaining

to "any other" non-statutory aggravating factor is admissible if the State has provided proper notice, the information is relevant to the factors, and the danger of unfair prejudice, confusion of the issues, or misleading the jury does not substantially outweigh its probative value.

The defendant correctly observes that "[w]here the capital murder statute is silent with regard to the admission of victim impact evidence, courts have disagreed on whether the evidence is admissible." However, the cases relied upon by the defendant are based upon statutory language that materially differs from the language in RSA 630:5, III. For example, in *State v. Guzek*, 906 P.2d 272 (Or. 1995), *superseded by statute as stated in State v. Moore*, 927 P.2d 1073 (Or. 1996), the state sought to admit victim impact evidence under a statute that required the jury, in considering whether a sentence of death should be imposed, to determine "the extent to which the defendant's character and background and the circumstances of the offense may reduce the defendant's moral culpability or blameworthiness for the crime." *Guzek*, 906 P.2d at 278 (quotation omitted). The court, in precluding victim impact evidence, concluded that the statute allowed only evidence of mitigating circumstances. *Id.*

In *Commonwealth v. Fisher*, 681 A.2d 130 (Pa. 1996), *superseded by statute as stated in Commonwealth v. Tedford*, 960 A.2d 1 (Pa. 2008), the applicable statute also explicitly restricted what evidence could be offered, providing that "[e]vidence of aggravating circumstances shall be limited to those circumstances specified in" the statute. *Fisher*, 681 A.2d at 146. Because victim impact evidence was not enumerated in the statute as an aggravating factor, the court concluded that the statutory scheme precluded the admission of such testimony. *Id.* Likewise, in *Olsen v. State*, 67 P.3d 536 (Wyo. 2003), the court precluded victim impact evidence because the pertinent statute provided that the jury "shall hear evidence as to any matter that the court deems relevant to a determination of the sentence, and shall include matters relating to any of the aggravating or mitigating circumstances enumerated in [the statute]," and victim impact was not included as an aggravating circumstance enumerated in the statute. *Olsen*, 67 P.3d at 595 (emphasis omitted). The court declined to read the general language of the statute as controlling the more specific language contained in the enumerated aggravating circumstances. *Id.* at 598.

As the defendant acknowledges, several jurisdictions have concluded that, if the applicable statutory scheme does not expressly preclude victim impact evidence, such evidence is admissible. For example, in *State v. Bernard*, 608 So. 2d 966 (La. 1992), the applicable statute provided that "[t]he sentencing hearing shall focus on the circumstances of the offense and the character and propensities of the offender." *Bernard*, 608 So. 2d at

967 n.2 (emphasis omitted). In holding that the statute need not explicitly authorize the admission of victim impact evidence, the court stated:

> Since a specific intent murderer either knew or reasonably should have foreseen some of the consequences of his victim's death, this general knowledge at the time of the crime is a fact bearing on the murderer's moral culpability and to that extent is relevant both to the circumstances of the crime and to the murderer's character and propensities.

*Id.* at 971. Thus, the State could introduce "a limited amount of general evidence providing identity to the victim and a limited amount of general evidence demonstrating harm to the victim's survivors." *Id.*

Likewise, in *State v. Nesbit*, 978 S.W.2d 872 (Tenn. 1998), the pertinent statute provided that evidence may be presented in the sentencing proceeding "as to any matter the court deems relevant to the punishment and may include, but not be limited to, the nature and circumstances of the crime." *Nesbit*, 978 S.W.2d at 889. Despite case law that limited evidence regarding aggravating circumstances to those enumerated in the statute, the court concluded that "the impact of the crime on the victim's immediate family is one of those myriad factors encompassed within the statutory language *nature and circumstances of the crime.*" *Id.* at 890. Therefore, victim impact evidence may be introduced provided it is not "so unduly prejudicial that it renders the trial fundamentally unfair." *Id.* at 891 (quotation omitted); *see also Miller v. State*, 913 So. 2d 1148, 1165 (Ala. Crim. App. 2004); *Parrish v. Commonwealth*, 121 S.W.3d 198, 206 (Ky. 2003), *overruled on other grounds by Brown v. Commonwealth*, 313 S.W.3d 577 (Ky. 2010). *But see State v. Carter*, 888 P.2d 629, 651-53 (Utah 1995) (victim impact evidence as a matter of evidentiary law was neither relevant nor probative in a capital sentencing hearing), *superseded by statute as stated in Taylor v. State*, 156 P.3d 739 (Utah 2007).

 We disagree with the defendant's argument that, absent language in RSA 630:5 expressly identifying victim impact evidence as an aggravating factor, such evidence is not permitted. Under such a construction, no aggravating evidence beyond the specific aggravating factors enumerated in the statute would be admissible, thereby rendering superfluous the language allowing "any other aggravating factor for which notice has been provided." RSA 630:5, III; *see State v. Bakunczyk*, 164 N.H. 77, 79 (2012) (it is a well-recognized principle of statutory construction that "the legislature is presumed not to use words that are superfluous"). Accordingly, we hold that pursuant to the plain language of RSA 630:5, which permits the State to present information relating to any other aggravating factors for which notice has been provided, victim impact evidence is

admissible at the sentencing phase of a capital murder trial. *See* RSA 630:5, I(b), III, VII. We affirm the trial court's denial of the defendant's motion to strike the State's victim impact non-statutory aggravating factor.

The defendant next argues that "[t]he victim impact evidence exceeded the scope of what was necessary to afford the jury a 'quick glimpse' of [Officer] Briggs's life and the harm to his family" that resulted from his murder. He asserts that the evidence was "unfairly prejudicial" such that the trial court erred "in admitting this evidence under RSA 630:5, III."

Because *Payne v. Tennessee*, 501 U.S. 808 (1991), often serves as a touchstone for establishing the contours of victim impact evidence at capital sentencing, we begin by examining that decision. In *Payne*, the United States Supreme Court overruled its prior decisions in *Booth v. Maryland*, 482 U.S. 496 (1987), and *South Carolina v. Gathers*, 490 U.S. 805 (1989), to the extent that those decisions held that the Eighth Amendment precludes admission of victim impact evidence and prosecutorial argument on such evidence. *Payne*, 501 U.S. at 827. The Court explained that "it was never held or even suggested in any of our cases preceding *Booth* that the defendant, entitled as he was to individualized consideration, was to receive that consideration wholly apart from the crime which he had committed." *Id.* at 822.

 According to the Court, its misreading of precedent in *Booth* "unfairly weighted the scales in a capital trial" by placing virtually no limits on the relevant mitigating evidence a capital defendant may introduce, while barring the State from "either offering a quick glimpse of the life which a defendant chose to extinguish or demonstrating the loss to the victim's family and to society which has resulted from the defendant's homicide." *Id.* (citation and quotation omitted). As the Court stated, "Justice, though due to the accused, is due to the accuser also. The concept of fairness must not be strained till it is narrowed to a filament. We are to keep the balance true." *Id.* at 827 (quotation omitted).

> We are now of the view that a State may properly conclude that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant. The State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family. By turning the victim into a faceless stranger at the penalty phase of a capital trial, *Booth* deprives the State of the full

> moral force of its evidence and may prevent the jury from having before it all the information necessary to determine the proper punishment for a first-degree murder.

*Id.* at 825 (citations, quotations, and brackets omitted). Thus, the Court held that "if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no *per se* bar." *Id.* at 827. "A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed. There is no reason to treat such evidence differently than other relevant evidence is treated." *Id.*

Although the Court concluded that "the *Booth* Court was wrong in stating that this kind of evidence leads to the arbitrary imposition of the death penalty," it noted that in the event victim impact evidence is introduced "that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." *Id.* at 825. Also, *Payne* left undisturbed the portion of *Booth* that held that "the admission of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence violates the Eighth Amendment" because no such evidence was presented in *Payne*. *Id.* at 830 n.2.

Pursuant to *Payne*, therefore, there is no federal constitutional impediment to the State introducing victim impact evidence during the penalty phase of a capital trial to demonstrate that "the victim is an individual whose death represents a unique loss to society and in particular to his family." *Payne*, 501 U.S. at 825 (quotation omitted). Constitutional concerns arise only when victim impact evidence is "so unduly prejudicial that it renders the trial fundamentally unfair." *Id.* Over the two decades since the Supreme Court's decision, federal and state courts have fleshed out the broad contours of permissible victim impact evidence set forth in *Payne*.

For example, some courts have allowed testimony from a greater number of witnesses than the four immediate family members who testified in this case, and some have allowed testimony from individuals other than family members. *See, e.g., United States v. Nelson*, 347 F.3d 701, 712-13 (8th Cir. 2003) (testimony allowed from three family members, two neighbors, and a teacher); *State v. Knese*, 985 S.W.2d 759, 771-72 (Mo. 1999) (testimony allowed from seven friends and family members); *Deparvine v. State*, 995 So. 2d 351, 378 (Fla. 2008) (testimony admitted from five victim impact witnesses); *United States v. Bolden*, 545 F.3d 609, 626-27 (8th Cir. 2008)

(testimony from sixteen victim impact witnesses, taking up eighty percent of the government's penalty phase case-in-chief, was relevant to establishing the non-statutory victim impact aggravating factor).

Some courts have allowed more photographs than the thirty-six admitted in this case as part of the victim impact evidence. *See, e.g., People v. Zamudio*, 181 P.3d 105, 134 (Cal. 2008) (118 photographs allowed for two victims); *Wheeler v. State*, 4 So. 3d 599, 608 (Fla. 2009) (fifty-four photographs allowed). In addition, some courts have found no error in showing video recordings longer than the three short video recordings shown in this case. *See, e.g., United States v. Wilson*, 493 F. Supp. 2d 491, 505 (E.D.N.Y. 2007) (twenty-minute video); *People v. Kelly*, 171 P.3d 548, 570 (Cal. 2007) (twenty-minute video); *Hicks v. State*, 940 S.W.2d 855, 857 (Ark. 1997) (video almost fourteen minutes long).

Here, in allowing the victim impact evidence proffered by the State, the trial court, citing *Payne*, reasoned that "victim impact evidence is simply another form or method of informing the sentencing authority about the specific harm caused by the crime in question, evidence of a general type long considered by sentencing authorities." (Quotation omitted.) The court noted that "[i]n the wake of *Payne*, 'the vast majority of jurisdictions that have considered the admissibility of victim impact evidence have . . . concluded that such evidence is relevant to determining the appropriate sentence.' " (Quoting *State v. Muhammad*, 678 A.2d 164, 177 (N.J. 1996) (collecting cases)). The trial court concluded that the State's victim impact testimony was admissible within "the parameters of *Payne* . . . and . . . under RSA 630:5, III" because it "shows Officer Briggs' uniqueness as an individual human being and informs the jury of the specific harm caused by his murder," is "highly probative of the harm, injury and loss that Officer Briggs' family feels as a result of his murder and his characteristics as an individual human being," and "is not so unduly prejudicial that it would render the trial fundamentally unfair." (Quotations and brackets omitted.) Further, we note that none of the witnesses offered their opinions about the crime, the defendant, or the sentence. *See Payne*, 501 U.S. at 830 n.2. On this record, we do not conclude that the trial court's ruling was clearly untenable or unreasonable to the prejudice of the defendant's case.

The defendant nonetheless argues that "the content of the evidence rendered it inadmissible." Specifically, he argues that evidence of Officer Briggs as a child, as well as photographs of Officer Briggs's children, including video clips, "contributed to the emotional nature of the presentation," thus "creat[ing] the risk of a death verdict based on emotion rather than a reasoned moral response." (Quotation omitted.) The circumstances

presented in the cases cited by the defendant, however, differ significantly from the scope of victim impact evidence allowed by the trial court in this case.

For example, in *Salazar v. State*, 90 S.W.3d 330 (Tex. Crim. App. 2002), as part of its victim impact evidence the State showed a video recording consisting of

> approximately 140 still photographs, arranged in a chronological montage. Music accompanie[d] the entire seventeen-minute video and include[d] such selections as "Storms in Africa" and "River" by Enya, and conclude[d] with Celine Dion singing, "My Heart Will Go On," from the movie *Titanic*.
>
> Almost half of the approximately 140 photographs depict[ed] the victim's infancy and early childhood. The pictures show[ed] an angelic baby, surrounded by loving parents, grandparents, unidentified relatives, and other small children. Later photographs show[ed] [the victim] as a toddler, playing the piano, frolicking at the beach with other friends, happily riding on a carousel, laughing in a field of bluebonnets, and cuddling with a puppy. The video also include[d] numerous annual school pictures showing [the victim's] progression from a cheerful child to an equally cheerful young man. It catalog[ued] his evident and early prowess as a young soccer player and eventually as a football player. There [was] a picture of him and his date, presumably going to their prom, and more candid shots of the victim and his teen-age buddies.

*Salazar*, 90 S.W.3d at 333. The court concluded that the probative value of much of the video montage was low and the potential for unfair prejudice high, stating:

> Nearly half of the photographs showed [the victim] as an infant, toddler, or small child, but [the defendant] murdered an adult, not a child. He extinguished [the victim's] future, not his past. The probative value of the vast majority of these "infant-growing-into-youth" photographs is *de minimis*. However, their prejudicial effect is enormous because the implicit suggestion is that [the defendant] murdered this angelic infant; he killed this laughing, light-hearted child; he snuffed out the life of . . . the young boy hugging his blond puppy dog.

*Id.* at 337. Although the court noted that "[w]hile the probative value of one or two photographs of an adult murder victim's childhood might not be

substantially outweighed by the risk of unfair prejudice," it concluded that "[the video montage] is very prejudicial both because of its sheer volume, and because of its undue emphasis upon the adult victim's halcyon childhood." *Id.*; *see Conover v. State*, 933 P.2d 904, 921 (Okla. Crim. App. 1997) ("Comments about the victim as a baby, his growing up and his parents' hopes for his future in no way provid[ed] insight into the contemporaneous and prospective circumstances surrounding his death; nor [did] they show how the circumstances surrounding his death have financially, emotionally, psychologically, and physically impacted a member of the victim's immediate family.").

By contrast, in *Wilson v. Sirmons*, 536 F.3d 1064 (10th Cir. 2008), the victim's widow testified that "the victim was especially fond of Christmas holidays because he was raised in a family that did not celebrate Christmas." *Sirmons*, 536 F.3d at 1113. The victim's mother testified that "as a child, a young adult, [the victim] didn't give me any problems. He was maturing into a responsible adult, and an asset to our family and the community. He had long-range plans of being better educated. He had . . . gotten his real estate license, just set plans, hopes and dreams of taking care of his family." *Id.* at 1112 (brackets and quotation omitted). Noting that it had found that "far more inflammatory statements did not render the proceeding fundamentally unfair," the court concluded that "[t]he victim impact statements here contained only a few short references to the victim's childhood. Overall, the statements were very brief, and while a person sitting in the courtroom broke down into tears, there [was] no evidence that either witness exhibited such an emotionally charged display as might be unduly prejudicial." *Id.* at 1113-14 (quotation omitted).

Numerous courts have allowed testimony and photographs of the victim as a child. *See, e.g., United States v. Barnette*, 211 F.3d 803, 818-19 (4th Cir. 2000) (seven members of the victims' families testified about the impact the crime had on their lives, including stories of the victims' childhoods and family experiences), *vacated on other grounds by Barnette v. United States*, 546 U.S. 803 (2005); *Hicks*, 940 S.W.2d at 857 (allowing a fourteen-minute videotape containing approximately 160 photographs, including photographs of the victim as a toddler and various school pictures); *People v. Nelson*, 246 P.3d 301, 317 (Cal. 2011) (five photographs of the victim as a child humanized the victim "as victim impact evidence is designed to do" and did not invite a purely irrational response from the jury or render the trial fundamentally unfair), *cert. denied, Nelson v. California*, 132 S. Ct. 183 (2011); *Cannon v. State*, 961 P.2d 838, 851 (Okla. Crim. App. 1998) (victim's stepfather testified about victim as a three-year-old).

Here, the trial court found that "limited evidence of Officer Briggs' childhood [was] admissible victim impact evidence" because it was "proba-

tive of the loss and harm that Officer Briggs' parents and siblings have suffered as a result of the murder of their son and brother." As the court explained, "[i]t would be difficult for [Officer Briggs's] parents and sibling to convey the magnitude of their loss without giving the jury some background of his childhood." Following Laura Briggs's testimony, the trial court indicated to counsel that it "found the pictures were relevant to show [Officer Briggs's] uniqueness as an individual and the harm done to the family by his absence." Regarding the video recordings, the trial court stated that "it would be very hard to understand the nature of the relationship . . . between the father and the sons without those videos. They're very short, but they certainly showed — were very relevant to the harm done to these boys by not having their father any longer."

■ Both before and during the sentence selection phase of trial, the court took precautions to ensure that the victim impact evidence was not unduly prejudicial to the defendant. As noted above, prior to the jury receiving any victim impact evidence, the court held a hearing and considered the defendant's objections to specific items of proffered evidence. Also, prior to allowing the State to introduce the photographs and video recordings during the witnesses' testimony, the trial court reviewed them and determined that they were admissible. As the evidence was presented at trial, the court observed the jurors, paying attention to their reaction. After the conclusion of the State's victim impact evidence, the court stated to counsel:

> I do want to just comment on the victim impact evidence . . . . [D]efense counsel referenced emotional reactions or tears by the jury. I must say, one of the alternates did cry during Laura Briggs' testimony. I don't think I saw any jurors shed tears except for that during the [victim impact] testimony. . . . Anyway, if they did, it must have been awfully subtle or something because I do watch the jurors for their reactions, and I did not — I didn't really see that. Obviously, from their facial expressions, they were moved by the testimony.

"The trial court is in the best position to gauge the prejudicial impact of particular testimony." *Wamala*, 158 N.H. at 590. Here, the record establishes that the court carefully assessed the impact of the testimony and, thus, ensured that it was not unduly prejudicial to the defendant.

■ Furthermore, as requested by the defendant, in its final charge the trial court instructed the jury as follows regarding the State's victim impact non-statutory aggravating factor: "You may consider the financial, emotional, and psychological [e]ffects of Officer Briggs' death on his family. You

may give this evidence what weight you wish in determining an appropriate punishment, but your consideration is limited to a rational analysis of the evidence rather than simply an emotional response to it." Jurors are presumed to follow the court's instructions. *State v. Yates*, 152 N.H. 245, 252 (2005).

We have reviewed the record and conclude that the glimpse into Officer Briggs's life was not improperly presented to the jury through brief testimony from four immediate family members, a limited number of photographs of the victim and his family members, and three short video recordings, in total under three minutes in duration, of the victim interacting with his sons. We are not persuaded that the probative value of this evidence was substantially outweighed by the danger of unfair prejudice and hold that the trial court did not unsustainably exercise its discretion in admitting the State's victim impact evidence.

The defendant advances a constitutional argument, asserting that the admission of the victim impact evidence in this case amounted to a violation of his due process rights under Part I, Article 15 of the State Constitution and the Fourteenth Amendment to the Federal Constitution. However, we agree with the trial court that the defendant has failed to explain how admission of the State's evidence "amount[ed] to a constitutional violation given [the court's] finding that the testimony . . . [was] consistent with the State's Notice of Intent and admissible under RSA 630:5, III and Supreme Court precedent." *See Payne*, 501 U.S. at 825 (victim impact evidence is constitutionally acceptable so long as it is not "so unduly prejudicial that it renders the trial fundamentally unfair").

### 2. Conditions of Confinement and Mode of Execution

#### a. Background

In August 2008, the State filed a motion to preclude at both phases of sentencing any information regarding the manner in which a sentence of death is carried out in New Hampshire. It argued that such information was irrelevant to the sentencing issues and potentially misleading given that the legislature could change the method in the future. In his responsive pleading, the defendant stated that he did not intend "to introduce evidence regarding death penalty protocols or the means of execution," but requested that the trial court provide a jury instruction on the mode of execution based upon the capital sentencing statute. *See* RSA 630:5, XIII, XIV (2007). Specifically, he asked the court to inform the jury that "the punishment of death is inflicted by lethal injection, or, if lethal injection is impractical, hanging" (mode of execution instruction).

By written order dated November 12, 2008, the court ruled that "neither side may elicit evidence or comment on the method of execution." It also denied the defendant's request for a jury instruction regarding the method of execution, ruling that such an instruction "is unnecessary and potentially inaccurate."

Subsequently, the defendant filed a motion to preclude at sentencing evidence of "any specific future conditions of incarceration regarding a sentence of life in prison without the possibility of parole." He argued that "the manner of imposing a sentence of life in prison without release on parole" would be speculative, irrelevant, and create a substantial risk of confusing or misleading the jury and, thus, its admission would violate his "rights to due process and would invite an unconstitutional risk of arbitrary or capricious imposition of the death penalty in violation of state and federal constitutional limitations." According to the defendant, "perhaps most importantly, the court should bar evidence of the means by which the sentence of life in prison without parole will be carried out because the court has barred evidence of the means of carrying out a sentence of death."

The State objected, arguing that evidence of the future conditions of incarceration was not speculative, was probative of the non-statutory aggravating factor alleging future dangerousness, and constituted rebuttal to two mitigating factors pertaining to the defendant's confinement. The State sought to introduce information on "[t]he nature and conditions of the defendant's post-sentencing confinement" to inform the jury on "the issue of whether and to what extent he poses a danger to others." It asserted that it expected to introduce "testimony . . . as to the defendant's exposure to and interactions with other inmates, his access to instruments with which he possibly could harm others, and the presence or absence of behavior modification measures." With respect to the defendant's prison adjustment mitigating factor, the State argued that because "the defendant will affirmatively place before the jury his behavior while incarcerated to date as a factor that jurors should consider in mitigation," it was entitled to rebut this factor with information related to his conditions of confinement at the State Prison in the past, present, and future. The State pointed out that "at his attorneys' request [the defendant] was placed in a special tier without access to other inmates, and to date he has remained in that unique housing arrangement," and that his "present conditions of incarceration will change upon his sentencing in this case." The State sought to present information explaining "how the environment in which the defendant has conducted himself to date is artificial, how that environment is an inaccurate representation of his future incarceration, and how the circumstances of such will change upon sentencing."

The State also argued that information on future conditions of confinement was not speculative because it "will be based upon established prison rules and guidelines, and will be presented by professional prison administrators and personnel who are well familiar with those protocols." Additionally, the State argued that information on the manner of execution, in the form of the defendant's proposed jury instruction, remained irrelevant as previously found by the trial court.

The trial court denied the defendant's motion by written order dated December 2, 2008. It ruled that information on prison conditions was "highly probative" of whether the defendant will present a future danger within the prison environment and also was relevant to rebut the prison adjustment mitigating factor submitted by the defendant. The court ruled that the information was not speculative because the defendant's expected conditions of confinement were "governed by long-established and predictable rules and procedures that apply to every inmate." The court further explained that its rejection of the defendant's proposed mode of execution instruction did not require it to reject the conditions of confinement evidence because the latter information was relevant while the former was not.

Subsequently, during the sentence selection phase of trial, the State presented information about the custody classification system of the New Hampshire State Prison for men in Concord through the testimony of Richard Gerry, the prison warden. Warden Gerry described the prison's housing alternatives and outlined the classification process under which inmates are placed in variously restrictive environments. He explained that the prison's classification system "drives the correctional system" and that inmate classification "determine[s] where they are housed, [and] what programming and activities . . . they [may] be involved in."

Although the prison maintains five levels of classification, C-1 through C-5, the warden described the three classification levels available to an inmate who is sentenced to life in prison without possibility of parole. Specifically, he testified that an individual convicted of capital murder and sentenced to life imprisonment without possibility of parole could be classified as C-5, C-4, or C-3. C-5 is the maximum custody level and, at the time, more than one hundred C-5 inmates were housed in the Special Housing Unit or "Max Custody Unit" apart from the rest of the prison population. He identified C-4 as the next custody level, in which inmates are housed in the Close Custody Unit; at the time, more than one hundred inmates resided in that unit. The warden described C-3 as the general prison population custody level; of the 1,400 inmates at the prison at that time, approximately 1,000 had C-3 status.

Warden Gerry described the living conditions for C-5, C-4, and C-3 inmates, including some of the privileges available to them. He testified that a C-5 inmate does not share his cell with other inmates and that the items allowed in the inmate's cell are "very restricted." For instance, C-5 inmates are allowed prison issued clothing, their legal materials, recreational paperback books, writing materials, and personal letters. After a period of time of good behavior and a minimum of six months, C-5 inmates may request approval to purchase a "security grade" television with a thirteen-inch screen. While they are in their cells, C-5 inmates are not secured or handcuffed, and they are allowed out of their cells for an hour each day. Whenever a C-5 inmate leaves his cell, his hands are handcuffed behind his back and he is escorted by a prison guard. C-5 inmates take all of their meals inside their individual cells.

The warden also explained how an inmate sentenced to life imprisonment without possibility of parole can achieve a lower security status. He testified that after "at least a year" as a C-5 inmate, an inmate could be reclassified as a C-4 inmate. Unlike C-5 inmates, C-4 inmates share their cells with other inmates and are allowed out of their cells for several hours a day. Also unlike C-5 inmates, C-4 inmates are not handcuffed and escorted when they are allowed outside their cells, and C-4 inmates take their meals at the dining hall.

The warden testified that after a "[m]inimum of six months but probably closer to a year," a C-4 inmate could be reclassified to C-3 status, which he described as medium security. C-3 inmates live in either two-person cells or eight-person "dorm" rooms. Unlike C-5 and C-4 inmates, C-3 inmates are allowed a wider variety of personal property in their cells, such as "warming pots" to heat food, recreational games, radios, and televisions. The warden testified that it is possible for C-3 inmates to spend most of their time outside of their cells: "the only time they would be confined in their cells would be during institutional count times where all inmates are counted at that point in time and then secured for the night . . . ." Like C-4 inmates, C-3 inmates take their meals at the dining hall. Further, Warden Gerry testified about the educational, vocational, and recreational opportunities available to inmates. For instance, while in prison, inmates may obtain a high school equivalency diploma, learn a trade, and play sports, such as basketball.

Finally, the warden explained the defendant's unique housing arrangement. He testified that rather than being housed in the regular section of the Special Housing Unit, the defendant was the only inmate housed on "N Tier." Warden Gerry described N Tier as four individual cells that are separated from the rest of the Special Housing Unit by a "series of two solid doors." The defendant had resided on N Tier since November 2006,

where he had been "completely isolated from the other inmates and staff" and monitored twenty- four hours a day by video camera. The warden explained that the defendant's attorneys requested that he be kept separated from the rest of the prison population. Warden Gerry testified that if the defendant were to be sentenced to life imprisonment without possibility of parole, he would be moved out of N Tier and into the Special Housing Unit with C-5 security status, where he would no longer be monitored by video camera twenty-four hours a day. The warden testified that he was unable to predict whether the defendant would present problematic behavior in the future because he had not been interacting with other people during his confinement on N Tier. He testified that C-5 inmates typically do not present problematic behavior until they interact more with other people in the living conditions of a lower classification status, such as C-4.

In its preliminary and final jury instructions at the sentence selection phase, the trial court instructed the jury that, when considering whether the State had proven the future dangerousness aggravating factor beyond a reasonable doubt, it could consider "any current, past, or future custody classification while the defendant is incarcerated." When the jury returned its findings and sentencing verdict, future dangerousness was the only non-statutory aggravating factor that it found the State failed to prove. The jury also determined that the defendant failed to prove the prison adjustment mitigating factor.

### b. Appellate Argument

The defendant challenges the trial court's December 2 order allowing the State to present, during the sentence selection phase of the trial, testimony regarding the conditions of confinement for inmates sentenced to life imprisonment without possibility of parole. He contends that such evidence was speculative, irrelevant, and "manifestly prejudicial," violating RSA 630:5, III (2007) and his "rights to due process, a fair trial, and a capital sentencing proceeding free of the influence of arbitrary factors, passion, or emotion" protected by the State and Federal Constitutions, see N.H. CONST. pt. I, arts. 15, 18, 33; U.S. CONST. amends. V, VIII, XIV.

The defendant also challenges the trial court's rejection of his proposed mode of execution jury instruction. He contends that "[b]y admitting evidence of the general prison conditions experienced by a hypothetical life without parole inmate, but not evidence of the method of execution, the trial court unsustainably exercised its discretion," thereby violating RSA 630:5, III and his rights under the Due Process Clauses and the Cruel and/or Unusual Punishment Clauses of the State and Federal Constitutions, see N.H. CONST. pt. I, arts. 15, 18, 33; U.S. CONST. amends. V, VIII, XIV.

### c. Discussion

We first consider whether the trial court's decisions under RSA 630:5, III constituted unsustainable exercises of discretion. *See State v. Wamala*, 158 N.H. 583, 592 (2009).

#### 1. Conditions of Confinement

■■■ The defendant contends that the information about conditions of confinement is irrelevant because it has "nothing to do with the crime" and has "no bearing on [his] character." He does not argue, however, that the future dangerousness non-statutory aggravating factor fails to comport with the individualized sentencing command of the Eighth Amendment and its state constitutional analog. *See Simmons v. South Carolina*, 512 U.S. 154, 162 (1994) (plurality opinion) ("This Court has approved the jury's consideration of future dangerousness during the penalty phase of a capital trial, recognizing that a defendant's future dangerousness bears on all sentencing determinations made in our criminal justice system."). Thus, information that relates to future dangerousness as a legitimate aggravating factor is relevant and admissible at capital sentencing. *See* RSA 630:5, III.

■■■ We agree with the trial court that information on conditions of confinement is relevant to the future dangerousness inquiry. "The danger any individual presents is a function not only of that individual, but also of his environment. A person who is dangerous in a halfway house may be significantly less dangerous in a medium security prison, even less dangerous in a maximum security prison, and less dangerous still in a more secure environment." *United States v. Sampson*, 335 F. Supp. 2d 166, 227 (D. Mass. 2004), *aff'd*, 486 F.3d 13 (1st Cir. 2007). Courts have recognized that information about the expected conditions of a defendant's future confinement can be critical to the determination of whether a defendant poses a realistic threat while serving the rest of his natural life in a high security environment. *See, e.g., id.* at 226-27 (evidence regarding federal prison administration and safety and the future assignment and classification of the defendant by the Federal Bureau of Prisons "is valuable to a jury asked to consider whether a defendant is likely to present a danger in a prison setting if incarcerated for life"); *Coble v. State*, 330 S.W.3d 253, 268-69 (Tex. Crim. App. 2010) (the "probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society" focuses upon "the character for violence of the particular individual" as well as "the quantity or quality of the institutional restraints put on that person"); *Lucero v. State*, 246 S.W.3d 86, 97 (Tex. Crim. App. 2008) (allowing testimony "that inmate violence can occur under current prison

conditions" was not an abuse of discretion because it "had some relevance to, and would have aided the jury in determining, appellant's future dangerousness, such as considering whether a life-sentenced appellant, with his history of assaultive behavior, would have opportunities to commit violent acts in prison").

 Here, the trial court allowed information about the prison classification system and conditions of confinement to show, among other things, the extent of the defendant's future exposure to, and interactions with, other inmates and access to instruments that could be used to harm others. In so ruling, the court properly determined that evidence of the defendant's potential exposure to and interactions with other inmates, as well as his opportunity to access potential weapons, bears upon whether he would pose a future danger in a prison setting. Accordingly, we hold that the trial court did not err in finding the evidence of conditions of confinement relevant to future dangerousness.

The trial court also found that evidence of the circumstances of the defendant's N Tier restrictive confinement, and how those circumstances would change if he were sentenced to life imprisonment without possibility of parole, was relevant to rebut the defendant's mitigating factor that "[d]uring his two years of pre-trial confinement, [he] has committed no crimes and his behavior has demonstrated his potential to adjust well in a secure prison setting." *See Skipper v. South Carolina*, 476 U.S. 1, 4-5 (1986) (approving the admission of adjustment to prison evidence as relevant in mitigation of punishment). The defendant fails to explain why evidence of the expected changes to his unique housing arrangement if he were sentenced to life imprisonment without possibility of parole did not constitute fair rebuttal to his prison adjustment mitigating factor. *See* RSA 630:5, III ("[t]he state and the defendant shall be permitted to rebut any information received at the hearing"). His submitted mitigating factor specifically called upon the jury to consider his behavior during his two years of pretrial confinement as evidence of his future ability to adjust safely to the prison environment.

The defendant argues, however, that conditions of confinement evidence lacked probative value or was unfairly prejudicial because it was speculative. He contends that none of the information was specific to him, but instead addressed "the conditions a typical inmate might experience if housed long-term at the New Hampshire State Prison." However, the State presented testimony on the conditions of confinement of inmates sentenced to life imprisonment without possibility of parole, the same sentence the defendant would receive if the jury determined not to impose a sentence of death. Moreover, the trial court ruled that the evidence was not improperly

speculative because "[t]he conditions of incarceration are governed by long-established and predictable rules and procedures that apply to every inmate." The defendant does not challenge this finding. We, therefore, uphold the trial court's determination that evidence of the conditions of confinement was not impermissibly speculative. As the trial court noted, the defendant was free to "cross-examine the State's witnesses or rebut the State's evidence to make his point that the present conditions of incarceration may change if the Legislature amends the statute or prison officials amend the rules."

To the extent that the defendant argues that the conditions of confinement evidence invited the jury to speculate impermissibly about his future conduct, this argument is foreclosed by United States Supreme Court precedent. In *Jurek v. Texas*, 428 U.S. 262 (1976), "seven Justices rejected the claim that it was impossible to predict future behavior and that dangerousness was therefore an invalid consideration in imposing the death penalty." *Barefoot v. Estelle*, 463 U.S. 880, 897 (1983). "It is, of course, not easy to predict future behavior. The fact that such a determination is difficult, however, does not mean that it cannot be made. Indeed, prediction of future criminal conduct is an essential element in many of the decisions rendered throughout our criminal justice system." *Jurek*, 428 U.S. at 274-75.

The defendant also challenges the warden's testimony describing the privileges afforded at the inmate classification levels. He argues that "an inmate's access to cable television, work and educational opportunities, music, and games had no legitimate bearing on [his] character, capacity for future danger, or ability to adjust to prison life." According to the defendant, "[t]hrough the Warden, the State left no doubt that C-3 inmates are afforded numerous comforts and access to varied social and vocational activities."

As the State correctly notes, during trial the defendant did not object to the warden's testimony about the privileges accorded C-5, C-4, and C-3 inmates, and thus "the specific appellate argument that [he] now makes is unpreserved." *See State v. Eaton*, 162 N.H. 190, 195 (2011); *State v. Winward*, 161 N.H. 533, 542 (2011). However, even assuming that this issue was preserved for appeal, we conclude that it lacks merit. Evidence about the privileges afforded to inmates at the various classification levels was relevant to the defendant's future exposure to and interaction with other inmates. The evidence showed the extent to which the defendant would be free from restraint and from direct monitoring by prison staff and

revealed the opportunities he might have to access objects he could use to harm others. This information bore upon the issue of his future dangerousness.

Moreover, the testimony put into context what the State characterized as the "artificially restrictive" N Tier housing environment where the defendant had resided since his confinement at the State Prison. The State was entitled to rebut the mitigating factor submitted by the defendant, which alleged that "[d]uring his two years of pre-trial confinement, [he] has committed no crimes and his behavior has demonstrated his potential to adjust well in a secure prison setting." The warden's testimony regarding privileges extended to inmates in the less restrictive custody levels showed that the defendant's confinement in the N Tier kept him from the usual conditions of prison life during his pretrial confinement.

The defendant also asserts that the warden's testimony about conditions of confinement was unfairly prejudicial because it "portrayed the life of a medium custody inmate at the New Hampshire State Prison as carefree and relaxed." Based upon this characterization of the warden's testimony, the defendant argues that the jury would conclude that imprisonment for life was not "a harsh punishment." We agree with the State, however, that the defendant's characterization of the testimony regarding privileges afforded to inmates is not borne out by the record.

The defendant further relies upon the State's closing argument to illustrate the alleged unfairly prejudicial nature of the warden's prison privileges testimony. The defendant contends that in its closing, the State "invoked [his] ability to watch Alabama football games and play pool with friends if sentenced to life without parole." The defendant does not point to any trial objection to the State's closing remarks. Rather, he asks us to consider the remarks when assessing the prejudicial impact of the prison privileges evidence. Even assuming that the State's closing remarks are pertinent to the admissibility of the challenged conditions of confinement evidence, we conclude that the record does not support the defendant's characterization of them.

In its closing, the State argued:

> Some of you told us in jury selection that a life sentence could be worse than a death sentence. But that's only true if someone feels remorse for what they had done. You saw his behavior. He doesn't — he didn't show any remorse for what he did to Mike Briggs and for the pain that they are going to have to bear for the rest of their lives. He only expressed excitement when Dr. Barr talked to him about his violent criminal history just a few days before we started this trial.

> The cold reality is in this case that if you sentence him to life in prison, he is not going to spend one moment in that prison feeling bad for what he has done here. You know that if he can't express any emotion when he sees the raw emotion of the pain that he has caused in this courtroom, there's no way he's going to spend one moment thinking about the pain and devastation that he had caused here if you sentence him to life.

> He will spend more time in that prison thinking about the next Alabama football game on his cable television or bragging to his criminal buddies about how he popped a cop while they're playing pool or playing cards than he will ever spend thinking about the pain and the trauma, the real pain that he has caused here. A life sentence doesn't do justice in this case. It just doesn't do justice.

In context, the State's closing statements regarding the privileges the defendant may have in prison, such as watching a football game, was not an argument that a sentence of life in prison without parole would be unjust because his prison life would be "carefree and relaxed." Rather, the prosecutor was directing the jury's attention to evidence of the defendant's lack of remorse. In particular, the prosecutor pointed to the casual attitude he expressed during an interview with Dr. William Barr, a neuro-psychologist who conducted an examination of the defendant. Dr. Barr testified that the defendant told him that their interview "better be done by middle of the afternoon because he was interested in a particular football game involving the Alabama Crimson Tide."

■ In short, the defendant's unfair prejudice argument is unavailing. Unfair prejudice does not exist simply because the contested evidence may increase the likelihood that a defendant will receive a sentence of death. *See Barefoot*, 463 U.S. at 905-06 (recognizing that the fact that psychiatric testimony "increased the likelihood that petitioner would be sentenced to death" did not render that "evidence inadmissible, any more than it would with respect to other relevant evidence against any defendant in a criminal case"); *see also United States v. Pinillos-Prieto*, 419 F.3d 61, 72 (1st Cir. 2005) ("Virtually all evidence is prejudicial — if the truth be told, that is almost always why the proponent seeks to introduce it — but it is only *unfair* prejudice against which the law protects." (quotation omitted)). Rather, unfair prejudice must have "an undue tendency to induce a decision against the defendant on some improper basis, commonly one that is emotionally charged." *State v. Town*, 163 N.H. 790, 796 (2012) (quotation omitted).

Accordingly, we hold that the defendant has failed to demonstrate that the trial court's decision under RSA 630:5, III to admit evidence of

conditions of confinement as probative of the future dangerousness aggravating factor and the prison adjustment mitigating factor was clearly untenable or unreasonable to the prejudice of his case. To the extent the defendant argues that the State presented the conditions of confinement testimony in an impermissible manner, his argument was not preserved for appellate review. As the State points out, he did not make any such contemporaneous objection to the warden's testimony during the sentence selection phase of trial. *See Eaton*, 162 N.H. at 195; *Winward*, 161 N.H. at 542.

The defendant does, however, present an appellate argument resting upon a contemporaneous trial objection that he made regarding the testimony of Officer Briggs's mother. Thus, we review this preserved argument. The defendant argues that the mother's victim impact testimony improperly emphasized aspects of the conditions of confinement that the warden explained. He characterizes a portion of her testimony as "lament-[ing] that her son would not enjoy the privileges available to a C-3 inmate such as Addison." According to the defendant, the evidence was admitted without any limitation of its use because the trial court erroneously rejected his proposed limiting instruction to the jury.

Officer Briggs's mother presented victim impact testimony later on the same day that the warden testified. During the course of her testimony, the prosecutor asked her, "How has Mike's death impacted you and your family?" to which she responded:

> I just think about all the things that Mike can't do. He can't play baseball. He can't play basketball. He can't play pool. He can't watch TV on a big screen. He can't listen to his music. He has two little boys. Those little boys he'll never watch grow up. He'll never see his children graduate from college or go on with their life, get married, or see their children and Mike wanted to see this so much in his life. He loved his family, just as I love my family.

Defense counsel subsequently objected to this portion of her testimony, arguing that it exceeded the permissible scope of victim impact evidence. Defense counsel contended that the mother's testimony regarding the activities that her son could no longer do, such as read, watch a "big screen" television, and play basketball, improperly compared "the privileges that the warden had testified to that [the defendant] would be able to earn in prison." Thus, defense counsel argued, her testimony improperly provided information on her "opinion" as a victim "on the punishment of the defendant."

The trial court disagreed with the defendant's characterization of the mother's victim impact testimony as somehow "listing . . . things that the

defendant would be allowed to do in prison." While ruling that the challenged testimony did not "cross any line," the trial court asked what relief the defendant was seeking. The defendant requested that the court provide the jury with a limiting instruction and did not ask for any testimony to be stricken. The defendant subsequently submitted the following limiting instruction for the court to consider as part of the final jury charge:

> You have heard testimony about the possible conditions of the defendant's future confinement should you sentence him to serve life in prison without the possibility of parole. The purpose of this testimony was to educate you, in general, about what the prison is like, how inmates may advance through the system, and what inmates at each level of confinement are permitted to do. You may only consider this testimony insofar as it may relate to the defendant's potential future dangerousness in prison. The testimony was not offered for any other reason and you cannot consider it for any other reason. Specifically, you cannot base your conclusion on the appropriateness of a life without parole sentence or a death sentence, in any part, on whether the defendant may personally be afforded educational, recreational or vocational opportunities in the future.

The court declined to provide this instruction to the jury.

We are not persuaded by the defendant's challenge to the court's rejection of his proposed instruction. "Whether or not a particular jury instruction is necessary, the scope and wording of jury instructions, and the response to a question from the jury are all within the sound discretion of the trial court, and we review the trial court's decisions on these matters for an unsustainable exercise of discretion." *State v. Littlefield*, 152 N.H. 331, 334 (2005) (citations omitted).

The record supports the trial court's conclusion that the mother was not comparing the privileges that her son could no longer enjoy to the privileges available to a C-3 inmate as described by the warden. Moreover, the defendant's proposed instruction conflicts with the permissible scope of the conditions of confinement evidence set forth in the court's December 2 order; the proposed instruction would have limited the jury's consideration of the evidence to only the future dangerousness aggravating factor, rather than permitting the jury to also consider it when evaluating the prison adjustment mitigating factor. Accordingly, we reject the defendant's arguments regarding the victim impact testimony of Officer Briggs's mother and the proposed limiting instruction.

## 2. Mode of Execution

The defendant next contends that the trial court erroneously excluded evidence of, and denied his proposed jury instruction regarding, the mode by which he would be executed if sentenced to death. He argues that their relevance is directly tied to the relevance of conditions of confinement evidence: "If mode of execution evidence is not relevant, neither is evidence of an inmate's future conditions of confinement," such as "the number of cable channels a life without parole inmate may watch."

As a preliminary matter, we agree with the State that any appellate claim of *evidentiary* error was not preserved. The record demonstrates that when responding to the State's motion to preclude evidence on the manner of execution, the defendant expressly agreed not to seek "to introduce evidence regarding death penalty protocols or the means of execution." Instead, the defendant requested a mode of execution instruction pursuant to the statutory language of RSA 630:5, XIII and XIV. Thereafter, the court issued an order that precluded both the State and the defendant from introducing mode of execution evidence and that rejected the defendant's proposed mode of execution instruction. In a subsequent motion, the defendant referred to this order but did not seek to introduce *evidence* on mode of execution. Therefore, any appellate claim of evidentiary error was waived. *See Eaton*, 162 N.H. at 195; *Winward*, 161 N.H. at 542.

We also agree with the State that the trial court did not err in refusing to provide the requested mode of execution instruction. In its December 2 order, the court ruled that "[t]he method of execution prescribed by statute is not relevant to any aggravating or mitigating factor while evidence of future conditions of incarceration is highly probative of [the State's alleged future dangerousness non-statutory aggravating factor] and to rebut the defendant's proposed [mitigating factor] concerning his behavior in prison to this point."

■■ On appeal, the defendant does not present any persuasive argument establishing that the mode of execution instruction was related to matters raised by the aggravating factors and/or mitigating factors of the case. *See* RSA 630:5, III; *see also Fuller v. Dretke*, 161 Fed. Appx. 413, 416 (5th Cir. 2006) ("The method used in executing prisoners, though it may turn some jurors against the death penalty, does not have any relevance as to whether [the defendant] would be dangerous in the future, whether he acted deliberately, or to any mitigating circumstance of the crime or [his] character."); *Jackson v. State*, 684 So. 2d 1213, 1238 (Miss. 1996) ("the method of execution is of no concern to the jury"). Although capital defendants are constitutionally entitled to offer wide-ranging information in mitigation at the sentence selection phase of trial, the trial court properly

recognized that this right is not unfettered. *See McCleskey v. Kemp*, 481 U.S. 279, 304 (1987); *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality opinion); *see also United States v. Fell*, 531 F.3d 197, 219 (2d Cir. 2008).

Finally, regarding his constitutional arguments, the defendant avers that the trial court's decision to admit the conditions of confinement information and reject the proposed mode of execution instruction: (1) violated his rights to due process under Part I, Article 15 of the State Constitution and the Fourteenth Amendment to the Federal Constitution; (2) implicated his right to be free from punishments that are cruel and/or unusual; and (3) violated his rights to more enhanced protection under the Due Process and Cruel or Unusual Punishment Clauses of the State Constitution. *See* N.H. CONST. pt. I, arts. 15, 18, 33; U.S. CONST. amends. V, VIII, XIV.

The trial court rejected the defendant's constitutional arguments regarding the conditions of confinement information because he "failed to explain how, if this evidence is admissible under RSA 630:5, III, the admission of this evidence would amount to a constitutional violation." *See State v. Chick*, 141 N.H. 503, 504 (1996). The record supports the trial court's ruling. Additionally, we note that the defendant did not argue in his pertinent pleadings in the trial court that the State Constitution affords him greater protection than does the Federal Constitution. *See State v. Matton*, 163 N.H. 411, 415 (2012) (because the defendant did not raise the constitutional argument before the trial court, it was not preserved for appellate review). In any event, the defendant's constitutional arguments on appeal are presented without adequately developed legal argument apart from his argument under RSA 630:5, III. Accordingly, we conclude that these perfunctory claims do not warrant independent constitutional analysis. *See State v. Ayer*, 154 N.H. 500, 513 (2006); *Chick*, 141 N.H. at 504.

### 3. Prior Crimes

#### a. Background

In November 2008, before the sentence selection phase of trial, the defendant filed a motion *in limine* requesting that the trial court limit the State's evidence about the ten prior crimes non-statutory aggravating factors to the certified records of the convictions. The first five prior crimes non-statutory aggravating factors relate to the crimes that the defendant committed between 1996 and 2003: (1) his assaulting his mother and his threatening to kill her in August 1996; (2) his pointing a loaded gun at a fellow high school student and twice pulling the trigger in December 1996; (3) his stabbing and kicking a person in March 1997; (4) his participating in the false imprisonment of a person in October 2003; and (5) his probation

violation arising out of the false imprisonment conviction.[1] The remaining five relate to the crimes that the defendant committed in the week preceding the capital murder in October 2006: (6) the El Mexicano Restaurant armed robbery on October 10; (7) the defendant's unlawful possession of a deadly weapon during that robbery; (8) the 7-Eleven convenience store armed robbery on October 11; (9) the defendant's unlawful possession of a firearm during that robbery; and (10) the Roy Drive shooting on October 15.

In his motion *in limine*, the defendant argued that his proposed limitation would prevent "unfair prejudice" that would arise from witness testimony. He also sought to exclude the testimony of victims of the prior crimes, arguing that such victim impact testimony would fall outside the scope of the aggravating factors identified in the death penalty notice. Finally, regarding the 1996-2003 offenses, he asserted: "What [the defendant] has pled guilty to has been proven beyond a reasonable doubt, but additional facts have not, and several 'trials within a trial' would be necessary to challenge the additional facts."

The State objected, arguing that witness testimony and related exhibits were necessary to: (1) prove the factual circumstances of the prior crimes nonstatutory aggravating factors beyond a reasonable doubt; (2) show the strength of the proof against the defendant and the nature of the crimes in order to "inform the jury's unanimous threshold decision of whether the State has proven particular aggravators beyond a reasonable doubt and thus can be considered in sentencing"; and (3) "inform the decision of individual jurors as to what weight to assign proven aggravators." Finally, the State disagreed with the defendant's "trial within a trial" argument, asserting that jurors should have as much relevant information as possible in order to determine the sentence.

On November 20, the day before the sentence selection phase began, the trial court conducted a hearing on the admissibility of prior crimes evidence. The defendant argued that the convictions established that the crimes were proven beyond a reasonable doubt and that the guilt phase evidence relating to the October 2006 non-capital crimes was sufficient to establish the circumstances of these crimes. The State countered that no evidence of the 1996-2003 offenses had been presented to the jury during the guilt phase, and that the jury had not yet been asked to determine the circumstances of the October 2006 crimes beyond a reasonable doubt. It stated that it intended to call two to four witnesses for each of the seven

---

[1] We refer, as do the parties in their briefs, to the legal disposition of the defendant's prior unlawful conduct as convictions, even though the defendant pleaded delinquent to the assault of his mother and pleaded guilty as a youthful offender to the gun incident in high school.

separate criminal episodes to explain the prior crimes non-statutory aggravating factors and to assist the jury in deciding how much weight to give to each.

By written order dated November 25, 2008, the trial court ruled that the probative value of evidence explaining the facts and circumstances underlying the prior crimes was not substantially outweighed by the danger of unfair prejudice, confusing the issues, or misleading the jury. *See* RSA 630:5, III (2007). The court ruled that the State could present prior crimes evidence through the testimony of "victims of the crimes, investigating officers, and/or witnesses who can testify about physical evidence related to the crime." It noted that the State had represented that it intended to call four or fewer witnesses for each of the seven criminal episodes and precluded the State from presenting victim impact statements regarding the prior offenses.

Less than one week later, on December 1, the trial court conducted, outside the presence of the jury, a hearing on the defendant's motion, during which the defendant again argued against the admission of any further testimonial evidence supplementing the guilt phase evidence about the October 2006 crimes. Among his specific objections were challenges to the admission of certain anticipated testimony of Kyarra Davis and Laura Hussey, both of whom witnessed events surrounding the Roy Drive shooting. In particular, the defendant objected to Davis's expected testimony that, just prior to the shooting, the defendant told her that he intended to kill her father, Bruce Edwards, as well as the expected testimony of Davis and Hussey that both saw the defendant in possession of a gun at the Central Street apartment on the evening of the shooting. The trial court overruled the defendant's objections and reaffirmed its November 25 written order.

The State called several witnesses to testify about six of the seven criminal episodes underlying the prior crimes non-statutory aggravating factors. First, Boston police officers Thomas Garneau and Daniel Moroney testified about the defendant's assault on his mother, Cheryl Kiser, in August 1996. They testified that Kiser told them that her teenage son had grabbed her arm and threatened to kill her. She also stated that he told her, "You can't beat me down, dog bitch," and that he left her apartment and began throwing rocks at her window. The police located the defendant outside Kiser's residence and arrested him. He was sixteen years old at the time and pleaded delinquent to charges of assault and battery and issuing threats.

Second, three witnesses testified about the December 1996 gun incident: Manual Andrade, who was the victim of the crime, Boston police officer Jerome Pitts, and Marc Dupre, a forensic expert. Andrade testified that

while in school, he heard a person behind him say, "Some Cape Verdean is going to get shot today." When Andrade turned around, the defendant pointed a gun at his face and pulled the trigger twice, but the gun did not discharge. A fight ensued, and Officer Pitts, who was a school security officer at the time, responded to the scene. Officer Pitts testified that he located the gun on school grounds and discovered that it was loaded with two bullets. The defendant pleaded guilty to charges of armed assault with intent to murder, possession of a firearm, possession of ammunition, and assault and battery. Dupre testified about his forensic examination of the gun and the two bullets, concluding that the gun was capable of being discharged.

Third, two witnesses testified about the stabbing incident that occurred in March 1997: Boston police officer Diane Lezama and Boston police detective Jeremiah Benton. Officer Lezama testified that pursuant to a 911 call, she responded to the residence of Tredaine Purdy, who told her that he had been assaulted. She noticed a wound on Purdy's hip and Purdy said that one of the assailants had stabbed him. Detective Benton interviewed Purdy and learned that, when walking near a local high school, Purdy encountered four teenagers; one took his hat and a fight ensued. When Purdy ran away, the group chased him, caught him, and repeatedly punched and kicked him. The defendant stabbed Purdy during this physical assault. The defendant pleaded guilty to armed robbery and two counts of assault and battery by means of a dangerous weapon.

Fourth, two witnesses testified about the false imprisonment incident that occurred in October 2003: Gerald Briles, one of the victims, and Londonderry police officer Kim Bernard. Briles testified that he and a friend, Brian St. Peters, went to the residence of Mathys Morgan to discuss a debt that Briles owed Morgan. The defendant and Morgan were at the residence, and they demanded payment from Briles, showing him a gun. Briles testified that he was afraid when he saw the gun and that his "heart [was] racing." Briles told the defendant and Morgan that his wallet was in his car, which had been impounded, and the four men traveled to Londonderry to find the car. At the impound lot, the defendant and Morgan allowed Briles to leave the vehicle in order to retrieve his wallet from his car and threatened to harm him and St. Peters if Briles made any "mistakes." While St. Peters remained locked in the car, Briles ran to the closest house for help, and the resident called the police. Sergeant Bernard, the responding officer, testified that she took Briles's statement and then located the car in which the defendant and Morgan were holding St. Peters. The defendant pleaded guilty to false imprisonment. This conviction also resulted in a probation violation report, which the defendant stipulated as true.

The witnesses who testified about these 1996-2003 crimes referred to various exhibits during their direct testimony, including the gun used during the December 1996 crime, police photograph arrays from which victims identified the defendant as the perpetrator, and certified court records documenting the convictions. Additionally, Mark Zanini, the Boston prosecutor who had pursued criminal charges for both the gun and the stabbing incidents, testified about the charges, the defendant's plea colloquy at court, the resulting convictions, and the sentences. The defendant's Massachusetts probation officer testified about the probation violation.

The State also presented additional evidence regarding the three October 2006 non-capital crimes. First, two witnesses testified about the El Mexicano Restaurant armed robbery: Jose Rodriguez and Alexander Paz, both victims of the crime. Rodriguez, the owner of the restaurant, testified that when the defendant and Bell-Rogers came into his restaurant, Bell-Rogers walked over to the cash register and the defendant positioned himself near a billiards table. When Rodriguez approached, Bell-Rogers pointed a gun at Rodriguez, demanded all of his possessions, and fired a single shot into the floor between Rodriguez's legs. Rodriguez relinquished his watch and his gold necklace but was unable to remove a bracelet from his wrist. Bell-Rogers fired the gun a second time over Rodriguez's head, demanding the bracelet. Rodriguez remembered that he told the gunman that he could not remove the bracelet and then lowered his head because he thought that Bell-Rogers was going to shoot him. Paz, a customer in the restaurant, testified that, during the robbery, the defendant threatened him with a utility knife and demanded money. He testified that he was afraid and gave the defendant several items, including approximately $300 in cash.

Second, regarding the 7-Eleven convenience store armed robbery, the State introduced the surveillance video recording as a full exhibit; during the guilt phase of the trial the video recording had been played for the jury, but the video itself had not been admitted into evidence.

Third, five witnesses testified about the Roy Drive shooting: Laura Hussey, Kyarra Davis, Dale Swist, Frank Swist, and Henry Aliberti. Hussey was an acquaintance of Paul Birely and accompanied him to a local club and to Shipley's Central Street apartment on the evening of the shooting. She also drove Birely back to the apartment complex before the shooting occurred. Hussey testified that she saw the defendant, Bell-Rogers, and Birely beat up Edwards at the club and that she later saw the defendant holding a gun in Shipley's bedroom at the Central Street apartment.

The testimony of Kyarra Davis, the daughter of Bruce Edwards, was presented by way of a transcript from the prior non-capital felony trial.

Davis testified that on the night of the shooting, she saw the defendant in possession of a gun on two occasions at the Central Street apartment: first, she saw it in his possession before he went to the local club that evening; and second, she saw it in his waistband when he returned from the club. Davis also recalled that before the shooting, she and the defendant were outside the Central Street apartment in the back of the building, where he indicated that he was going to kill Edwards. Later, when she was in Hussey's car driving by the Roy Drive apartment complex, Davis saw Edwards and Angela Swist's brother standing on a balcony. Before the shooting occurred, Swist and Shipley drove Davis to a nearby gas station, and Davis recalled that after the shooting, when the group had returned to the Central Street apartment, the defendant said that they had shot at the balcony.

Dale Swist, Angela Swist's brother, testified that earlier in the evening he had been at a local club where Edwards told him that three men had "jumped" him. When he returned to his apartment at Roy Drive, he and his sister argued over the telephone about Davis. He recalled hearing a person in the background say, "You're dead anyways." When the telephone call concluded, Dale picked up an aluminum baseball bat for protection and went onto the porch. Within a few minutes, Dale saw Bell-Rogers emerge from behind a parked car and start shooting at his apartment. Dale hit the balcony railing with the baseball bat, trying to make Bell-Rogers think that he was returning fire and then he ran from the apartment to chase Bell-Rogers.

Frank Swist, Angela Swist's father, testified that he was sleeping in his bedroom when he was awakened by a gunshot. He recalled that a second shot made his bed shake. While crawling on his hands and knees in the hallway, he heard several more gunshots. He saw Edwards come out of the apartment bathroom and Dale go outside with a baseball bat. The police arrived within minutes. Frank Swist testified that he was "[s]hocked, to say the least" during the shooting.

Henry Aliberti, also a resident of the apartment complex, testified that when he returned home after a weekend away, he learned of the shooting from television news reports. After discovering a bullet hole in his living room wall, Aliberti called the police, and the investigating officer found a bullet lodged in the apartment floor. Aliberti testified that it was "pretty shocking" and "unnerving, initially" to learn that a bullet had penetrated his apartment while he was away, because he expected his home to be a secure and safe place.

The witnesses for the October 2006 non-capital crimes also referred to a number of exhibits during their testimony, including Bell-Rogers's gun and several photographs of the El Mexicano Restaurant and Roy Drive crime

scenes that the police officers had discussed during their guilt phase testimony. Further, the State presented certified copies of the defendant's convictions for the three October 2006 non-capital crimes through the testimony of Karen Gorham, an assistant attorney general for the State of New Hampshire who was part of the prosecution team for all three trials. Gorham testified about the length of testimony and the number of witnesses who testified at each trial, the resulting convictions, and the defendant's acquittal of the charge of felon in possession in connection with the Roy Drive shooting. She also explained that the defendant would not receive sentences for these convictions until the conclusion of the capital murder trial and testified about the maximum sentence that the defendant could face for each conviction.

The defendant did not object to the State's presentation of this evidence as exceeding the bounds of the trial court's November 25 or December 1 rulings. When the jury returned its sentencing verdict, the jury found that the State had proven the ten prior crimes non-statutory aggravating factors.

### b. Appellate Argument

The defendant raises two challenges to the trial court's decisions regarding the prior crimes evidence. First, he argues that the trial court should have limited the prior crimes evidence at the sentence selection phase of trial to the certified records of his convictions and the guilt phase trial evidence. He contends that the prior crimes evidence permitted by the trial court was unfairly prejudicial and "created an unacceptable risk of a death sentence unduly influenced by evidence of other crimes [he] committed." According to the defendant, the trial court's evidentiary decision violated RSA 630:5, III and "the Due Process and Cruel and Unusual Punishment Clauses of the State and Federal Constitutions." See N.H. CONST. pt. I, arts. 15, 18, 33; U.S. CONST. amends. VIII, XIV.

Second, the defendant argues that the trial court erred by admitting the testimony of Hussey and Davis that he possessed a gun at the Central Street apartment because that allegation was not included in the State's notice of intent to seek the death penalty. He argues that "[a]bsent a nexus to an aggravating factor, the uncharged incident of felon in possession of a firearm was inadmissible under RSA 630:5, III" and "also implicate[d] arbitrariness and fairness concerns addressed by the Due Process and Cruel and Unusual Punishment Clauses of the State and Federal Constitutions." See N.H. CONST. pt. I, arts. 15, 18, 33; U.S. CONST. amends. V, VIII, XIV. We note that at the December 1 hearing the trial court rejected several of the defendant's specific objections to the witness testimony that

he does not appeal, such as the State's presentation of the testimony of Kyarra Davis through a transcript from the prior felony trial, rather than by live testimony.

### c. Discussion

We first consider the defendant's argument that each of the trial court's evidentiary decisions under RSA 630:5, III was an unsustainable exercise of discretion. *See State v. Wamala*, 158 N.H. 583, 592 (2009). In reviewing the trial court's rulings on the prior crimes evidence, we consider the December 1 bench ruling in tandem with the court's November 25 written order.

The capital sentencing statute is silent as to the sources or types of proof that the State may present regarding aggravating factors identified in a death penalty notice. Accordingly, a wide range of relevant prior crimes evidence may be admitted at sentencing, provided that the probative value of the evidence is not substantially outweighed by the dangers identified in RSA 630:5, III. *Cf. Payne v. Tennessee*, 501 U.S. 808, 820-21 (1991) ("the sentencing authority has always been free to consider a wide range of relevant material"); *State v. Kimball*, 140 N.H. 150, 151 (1995) ("[a] trial court has broad discretion in choosing the sources and types of evidence on which to rely in imposing sentence" (quotation omitted)). Further, evidence that would be unfairly prejudicial at the guilt phase of a capital trial, such as a defendant's prior criminal conduct, may be properly admitted during the sentence selection phase of a capital trial given that, at that phase, the jury's task involves evaluating the defendant's character and the circumstances of the capital murder. *See* RSA 630:5 (2007); *Tuilaepa v. California*, 512 U.S. 967, 972 (1994); *United States v. Fell*, 360 F.3d 135, 143 (2d Cir. 2004); *State v. Johns*, 34 S.W.3d 93, 113 (Mo. 2001).

### 1. Testimonial Evidence and Related Exhibits

In challenging the trial court's refusal to limit the prior crimes evidence to the certified records of his convictions and the guilt phase evidence, the defendant does not challenge the relevance of the evidence admitted. Instead, he contends that the probative value of the testimonial and exhibit evidence was substantially outweighed by its unfairly prejudicial impact.

Regarding probative value, the trial court ruled as follows:

> Given the State's burden of proof and the weighing process the jury must undergo, the State is entitled to present some evidence to establish the information alleged in the aggravators, i.e., the offenses for which he was convicted as well as the facts underlying

these crimes. Testimony about the facts and circumstances of the prior offenses is highly relevant to proving beyond a reasonable doubt that they in fact occurred. The capital jury may not, for example, find that a court document is adequate to prove the conviction beyond a reasonable doubt.

More importantly, the jury must be given sufficient information to determine the weight to afford to each proven aggravator. Without sufficient information of the underlying acts, the jury may not be able to fairly weigh these aggravators against established mitigators. The defendant will present extensive evidence in support of his mitigating factors and the State should be allowed to admit evidence to explain the nature and severity of the aggravating offenses.

(Citations omitted.) The defendant argues that the probative value of the challenged evidence was slight, given that he did not dispute that he committed the prior crimes and that the court records of his convictions as well as the guilt phase evidence were sufficient to establish their severity.

The State bore the burden at the sentence selection phase of trial to prove beyond a reasonable doubt the existence of the non-statutory aggravating factors, and the jury's task included assessing whether proven aggravating factors justified the imposition of the death penalty. *See* RSA 630:5, III, IV. The trial court's ruling recognized that the significance of the prior crimes non-statutory aggravating factors depended upon the facts and circumstances underlying the prior crimes and not just upon the fact of conviction. The jury was instructed to assess, among other things, whether the facts or circumstances identified in the amended death penalty notice had aggravating value; that is, whether they tended to show that the defendant was deserving of a death sentence.[2] Furthermore, the court explained in its instructions that in order to determine whether proven aggravating factors justified a death sentence, each juror was required to render a qualitative judgment when evaluating the weight to accord to each proven aggravating factor.

Regarding the 1996-2003 crimes, the defendant acknowledged that the jury had not heard any evidence describing his criminal conduct underlying these convictions and that he expected the State to call some of the victims

---

[2] In line with the final jury instructions, the Special Verdict Form set forth the following: "Instructions: Mark with an 'X' PROVEN or NOT PROVEN for each of the following aggravating factors. 'Proven' means that the jury unanimously agrees that the State has proven beyond a reasonable doubt that *the facts or circumstances alleged are true and that those facts or circumstances tend to show that the death sentence is appropriate.*" (Emphasis added.)

of these crimes to testify. The trial court determined that, even though the defendant stated that he would not challenge the validity of the actual convictions, the jury should have an explanation of these crimes so that it could properly evaluate the defendant's criminal conduct. At the November 20 hearing, the court illustrated the probative value of explanatory evidence using an example of two hypothetical armed robbery convictions: one in which a defendant pretended to have a gun and the other in which a defendant used an actual gun. As the trial court noted, evidence about the circumstances of the crimes would show that the second defendant created "a much more dangerous situation." We conclude that the trial court sustainably exercised its discretion in ruling that evidence regarding the facts and circumstances of the 1996-2003 crimes would assist the jury in evaluating the defendant's conduct.

Regarding the October 2006 non-capital crimes, as discussed in Part VI.A (Guilt Phase Review-Rule 404(b) Prior Crimes Evidence) of this opinion, the evidence presented to the jury during the guilt phase was limited pursuant to New Hampshire Rule of Evidence 404(b). Indeed, during the December 1 hearing, the defendant acknowledged that the jury had not heard any direct evidence of what happened during the armed robbery of the El Mexicano Restaurant. Similarly, the expected testimony about the Roy Drive shooting included aspects of the crime that the jury had not yet heard, such as the testimony of three residents who were present during the shooting. Also, the admission of the surveillance video recording of the 7-Eleven robbery enabled the jury to review it for sentencing purposes. While some of the anticipated evidence may have overlapped portions of the guilt phase evidence, the trial court acted well within its discretion under RSA 630:5, III in ruling that the evidence was highly probative of the nature and severity of the defendant's criminal conduct, and, therefore, relevant to the jury's assessment of the prior crimes non-statutory aggravating factors.

It is significant that, consistent with Rule 404(b), the State had been precluded during the guilt phase of the trial from presenting evidence concerning the October 2006 non-capital crimes for the purpose of establishing the defendant's bad character or criminal propensity. *See Fell*, 360 F.3d at 143 ("Facts relevant to sentencing are far more diffuse than matters relevant to guilt for a particular crime. Adjudications of guilt are deliberately cabined to focus on the particulars of the criminal conduct at issue and to avoid inquiries into tangential matters that may bear on the defendant's character."). In contrast, the defendant's character was directly at issue in the sentence selection phase of the trial. *See Tuilaepa*, 512 U.S. at 972 (the objective of sentence selection at a capital sentencing is to make "an individualized determination on the basis of the character of the individual

and the circumstances of the crime" (quotation and emphasis omitted)); *Johns*, 34 S.W.3d at 113 ("A separate punishment phase exists in capital cases to permit the presentation of a wide range of evidence about the defendant's past character and conduct, while avoiding the possibility of placing prejudicial or irrelevant evidence in front of the jury before the determination of guilt or innocence."); *State v. Parker*, 886 S.W.2d 908, 924 (Mo. 1994) (evidence detailing the circumstances of prior convictions submitted as non-statutory aggravating factors is admissible at the sentence selection phase of a capital trial as relevant to the defendant's character).

The defendant briefly refers to exhibits that the witnesses discussed during their testimony, but makes no specific argument about them. Our analysis applies with equal force to those exhibits. *See Parker*, 886 S.W.2d at 924 (photographs of prior crimes were admissible at capital sentencing hearing because they were used to help the jury understand the circumstances of the prior crimes).

■■■ The trial court properly recognized that the State has considerable latitude in presenting its case to meet its burden under RSA 630:5, and that testimony concerning the defendant's prior criminal conduct would provide the jury with important information to assist it in discharging its solemn responsibility under the law. *See United States v. Sampson*, 486 F.3d 13, 44 (1st Cir. 2007). Given the jury's responsibility to evaluate the alleged aggravating factors and the State's high burden of proof, we hold that the trial court was justified in ascribing high probative value to witness testimony and related exhibits that explained the facts and circumstances of each crime identified in the prior crimes non-statutory aggravating factors. *See* RSA 630:5, III.

Our holding is consistent with numerous decisions in other jurisdictions. As the Supreme Court of Pennsylvania explained:

> Sentencing has long been regarded as having at its core a function of character analysis, and the central idea of the present sentencing statute is to allow a jury to take into account such relevant information, bearing upon a defendant's character and record, as is applicable to the task of considering the enumerated aggravating circumstances. Consideration of prior "convictions" was not intended to be a meaningless and abstract ritual, but rather a process through which a jury would gain considerable insight into a defendant's character. The nature of an offense, as ascertained through examination of the circumstances concomitant to its commission, has much bearing upon the character of a defendant, and, indeed, without reference to those facts and circumstances,

consideration of "convictions" would be a hollow process, yielding far less information about a defendant's character than is relevant.

*Com. v. Flor*, 998 A.2d 606, 622-23 (Pa. 2010) (quotation omitted), *cert. denied*, 131 S. Ct. 2102 (2011); *see, e.g., Sampson*, 486 F.3d at 44; *People v. Karis*, 758 P.2d 1189, 1204-05 (Cal. 1988); *People v. Dunlap*, 975 P.2d 723, 745 (Colo. 1999); *Cox v. State*, 819 So. 2d 705, 716-17 (Fla. 2002); *People v. Ballard*, 794 N.E.2d 788, 815 (Ill. 2002); *State v. Kleypas*, 40 P.3d 139, 264 (Kan. 2001), *overruled on other grounds by Kansas v. Marsh*, 548 U.S. 163 (2006); *State v. Allen*, 913 So. 2d 788, 803 (La. 2005); *Parker*, 886 S.W.2d at 924; *Emil v. State*, 784 P.2d 956, 961 (Nev. 1989); *State v. Valentine*, 591 S.E.2d 846, 858 (N.C. 2003); *State v. Bennett*, 632 S.E.2d 281, 287 (S.C. 2006).

The defendant relies upon five cases to support his argument that the State's presentation of prior crimes evidence should have been limited to certified copies of the previous convictions. *See State v. Pandeli*, 161 P.3d 557, 565 (Ariz. 2007); *State v. Lee*, 559 P.2d 657, 661 (Ariz. 1976); *Brewer v. State*, 650 P.2d 54, 63 (Okla. Crim. App. 1982); *State v. Odom*, 137 S.W.3d 572, 580-83 (Tenn. 2004); *State v. Clark*, 24 P.3d 1006, 1031-32 (Wash. 2001). However, these cases either were decided in the context of a capital sentencing statute that is materially different from RSA 630:5, or do not set forth reasoning that we find persuasive.

The defendant nonetheless argues that the prior crimes evidence created an unacceptable risk that the jury would be unduly influenced by his criminal history. He identifies three aspects of the prior crimes evidence as giving rise to unfair prejudice: its volume; its content; and the manner in which the State used it.

The trial court limited the amount and content of the prior crimes evidence. In its initial written order, the court approved the State's representation that: "The testimony will be given by four or fewer witnesses for each offense, who will be victims of the crimes, investigating officers, and/or witnesses who can testify about physical evidence related to the crime." The court precluded the State from presenting evidence of "impact statements by victims of prior crimes," while allowing the State to elicit testimony from the prior victims concerning "how they felt when the crime was occurring." During the December 1 hearing, the State identified the witnesses whom it intended to call relating to the October 2006 non-capital prior crimes, including five witnesses regarding the Roy Drive shooting. The court approved the State's use of these witnesses.

The defendant first argues that the sheer volume of the challenged evidence made his prior crimes a "central feature" at sentencing and "thus

increas[ed] the risk of a verdict based on considerations aside from the capital murder [he] committed." To illustrate the volume of evidence that the trial court's ruling permitted, the defendant focuses upon 349 pages of transcript during the sentence selection phase of trial, which comprise the testimony of eighteen witnesses, and related exhibits that were introduced by the State.

Several courts have expressed concerns about the volume of prior crimes evidence admitted during a capital sentencing proceeding. The Supreme Court of South Carolina recognized that the trial court's decision as to the extent of prior crimes evidence should "prevent a capital sentencing proceeding from transmuting into a sentencing referendum on all of the defendant's prior crimes." *Bennett*, 632 S.E.2d at 287. The Supreme Court of Louisiana observed that "there can be a point when the sheer magnitude and detail of the [prior crimes] evidence, although highly probative, impermissibly shifts the jury's focus away from its primary function of determining the appropriate sentence for this offense and this offender" to "the defendant's involvement in another unrelated crime." *State v. Smith*, 793 So. 2d 1199, 1209, 1210 (La. 2001). Similarly, the Supreme Court of Missouri cautioned against the penalty phase in a capital proceeding "result[ing] in a 'mini-trial' of prior offenses." *Johns*, 34 S.W.3d at 113. The Supreme Court of Florida examined whether the details of prior crimes evidence had been emphasized "to the level of rendering the prior offenses a central feature of the penalty phase." *Cox*, 819 So. 2d at 716-17.

Here, the trial court permitted the State to introduce one exhibit for the 7-Eleven crime, the testimony of five witnesses for the Roy Drive crime, and no more than four witnesses for each of the other crimes. This evidence, including related exhibits, covered seven distinct criminal episodes involving different locations, different victims, different eyewitnesses, and different investigating officers. Taking into account the challenged 349 pages of transcript during the sentence selection phase of trial — together with the challenged 168 pages of direct testimony on the October 2006 prior crimes presented during the guilt phase of the trial — the totality of the prior crimes evidence presented by the State for consideration at sentencing comprised approximately 500 pages of an estimated 5,400 pages of testimony transcript covering all three phases of the trial.

■ The defendant has not demonstrated that this evidence was excessive. The trial court focused upon providing the jury with sufficient information to evaluate the existence and qualitative weight of each of the prior crimes nonstatutory aggravating factors. Further, the sum total of evidence identified by the defendant constituted approximately two days of testimony in a three-phase trial that lasted approximately two months. On

this record, we cannot conclude that the extent of the prior crimes evidence created an undue risk of diverting the jury's focus from its primary function of determining the sentence based upon the character of the defendant and the circumstances of the capital murder. *See Johns*, 34 S.W.3d at 113 (rejecting defendant's claim that twenty-one witnesses in the penalty phase "was over the top," reasoning that there were eight prior crimes and the "quantity of evidence was directly related to the seriousness of [the defendant's] actions after the [capital murder]"). Neither did the admitted evidence transform the sentencing phase into a referendum on all of the defendant's prior crimes. *See Bennett*, 632 S.E.2d at 287.

With respect to the content of the prior crimes evidence, the defendant identifies several instances when witnesses testified about their emotional reactions to the prior crimes. The defendant does not argue that such testimony was irrelevant or lacked probative value concerning the relative seriousness of his prior criminal conduct as reflective of his character. Rather, he complains that the testimony allowed the jury to consider "the impact of those crimes on their victims" as a "potential sentencing factor in the capital case."

The trial court ruled in its November 25 written order that the State could not present victim impact testimony on prior crimes, but that it could elicit testimony from the witnesses about how they felt as the crimes were occurring. Thus, the court determined that such testimony had probative value as tending to show the gravity of the crimes committed by the defendant. The testimony that the defendant challenges on appeal is fully consistent with this order.

In several instances, the witness briefly responded to a single question about how that witness felt while the crime was occurring. For example, at the conclusion of direct examination, the State asked Alexander Paz "how did you feel" when the defendant was robbing him at knifepoint, to which the witness responded, "I was afraid." Other witnesses also briefly related the feelings that they experienced at the time the crime was occurring. Gerald Briles, for instance, testified that when the defendant or his friend showed Briles a gun during their confrontation, Briles was scared and his "heart [was] racing." Although Henry Aliberti was not present in his apartment during the Roy Drive shooting, he described how he felt when he first returned to his apartment and saw evidence of the shooting. Consistent with the trial court's order, none of the witnesses testified about any harm that they sustained as a result of the crimes. *Cf. Payne*, 501 U.S. at 825-26 (referring to victim impact evidence as "evidence of the specific harm caused by the defendant").

■ We conclude that the trial court did not err in determining that the witnesses' emotional reaction testimony was probative of the severity of the prior crimes. The court sustainably exercised its discretion under RSA 630:5, III when it ruled that the probative value of such testimony was not substantially outweighed by the danger of unfair prejudice. Accordingly, we reject the defendant's argument that the content of the prior crimes evidence gave rise to unfair prejudice because witness testimony somehow interjected into under the case a "potential sentencing factor" distinct from the prior crimes non-statutory aggravating factors.

■ The defendant nevertheless faults the trial court for allowing the State to "choose from any category of acceptable witnesses." He relies upon decisions in other jurisdictions that he claims limit such testimonial evidence to one or two witnesses consisting of a law enforcement officer, a victim, or an eyewitness. *See, e.g., Rodriguez v. State*, 753 So. 2d 29, 44-45 (Fla. 2000); *Finney v. State*, 660 So. 2d 674, 683 (Fla. 1995); *Allen*, 913 So. 2d at 807-08; *Smith*, 793 So. 2d at 1209-10. The Supreme Court of Florida cautioned against the danger of unfair prejudice associated with live testimony of victims of prior violent crimes, such as the risk of overly emotional testimony or of unduly focusing the jury's attention upon prior convictions, *see Finney*, 660 So. 2d at 683-84; the Supreme Court of Louisiana limited evidence of prior convictions to documents certifying the fact of conviction and to the testimony of the victim or of any eyewitness to the crime, *see Smith*, 793 So. 2d at 1209-10. Both courts were concerned that the prior crimes evidence would become a feature of the sentencing phase and shift the jury's focus away from its task of determining the sentence for the capital offense. While we agree that this is a legitimate concern for the trial court to consider, we decline to impose a specific limit upon the number and type of witnesses who may testify about a defendant's prior crimes at capital sentencing.

Our statutory scheme does not impose such a restriction. We can neither ignore the plain language of the legislation nor add words that the legislature did not see fit to include. *State v. Addison*, 160 N.H. 732, 754 (2010). The trial court retains the discretion to admit various sources and types of relevant prior crimes evidence at sentencing within the boundaries set forth under RSA 630:5, III. *Cf. Williams v. New York*, 337 U.S. 241, 246 (1949); *State v. Breest*, 116 N.H. 734, 755 (1976). The record in this case shows that the trial court considered the risks of unfair prejudice regarding the number and type of prior crimes witnesses and, as discussed above, sustainably exercised its discretion in establishing limits on the prior crimes evidence.

The defendant also contends that the manner in which the State referenced the prior crimes evidence during its closing argument in the sentence selection phase of trial "increased the potential abuse of the other crimes evidence." The defendant argues that the State "in closing, specifically invoked the harm Addison wrought on each victim." The State's remarks, however, were fully consistent with the court's November 25 written order allowing the State to present testimony from the witnesses about how they felt as the crimes were occurring, evidence that we have determined was probative of the prior crimes non-statutory aggravating factors. Accordingly, we reject the defendant's argument that the manner in which the State used the prior crimes evidence supports a conclusion that the court unsustainably exercised its discretion in permitting the testimonial and exhibit evidence.

In sum, we hold that the defendant has failed to demonstrate that the trial court's decision under RSA 630:5, III to admit the prior crimes evidence was clearly untenable or unreasonable to the prejudice of his case.

We note that on appeal the defendant asserts a number of constitutional challenges in a cursory fashion including: (1) the prior crimes evidence as presented and argued was so prejudicial that it violated his rights to due process under Part I, Article 15 of the State Constitution and the Fourteenth Amendment to the Federal Constitution; (2) the prior crimes evidence implicated his rights to be free from punishments that are cruel and/or unusual; and (3) the State Constitution provides him with enhanced protection under the Due Process and Cruel or Unusual Punishment Clauses. *See* N.H. CONST. pt. I, arts. 15, 18, 33; U.S. CONST. amends. V, VIII, XIV. The defendant presented his constitutional arguments in a similarly cursory fashion to the trial court, which, we assume, the court rejected even though it did not expressly address them. Further, the defendant did not argue to the trial court that the State Constitution affords him greater protection than the Federal Constitution in the context of evaluating the admissibility of the prior crimes evidence during the sentence selection phase of trial. Thus, this argument was not preserved for appellate review. *See State v. Matton*, 163 N.H. 411, 415 (2012) (because the defendant did not raise the constitutional argument before the trial court, it was not preserved for appellate review). In any event, the defendant's constitutional arguments on appeal are presented without adequately developed legal argument apart from his argument under RSA 630:5, III. Accordingly, we conclude that these claims do not warrant independent constitutional analysis. *See State v. Ayer*, 154 N.H. 500, 513 (2006); *State v. Chick*, 141 N.H. 503, 504 (1996).

### 2. Gun Possession Testimony

Next, the defendant challenges the admission of testimony by Laura Hussey and Kyarra Davis that he possessed a gun at the Central Street apartment before the Roy Drive shooting. He contends that "[t]he admission of this evidence violated RSA 630:5, III, in that it constituted evidence that was prejudicial and not relevant to prove an enumerated aggravating factor." Before addressing his argument, we set forth the procedural context.

At the December 1 hearing, the defendant objected to Davis testifying that, while at the Central Street apartment, the defendant told her that he intended to kill Edwards and that she saw him there with a gun. He also objected to Hussey testifying that she saw the defendant in possession of a gun at the Central Street apartment on the evening of the shooting. He argued to the trial court that Davis's expected testimony would comprise "evidence about the Roy Drive incident that goes beyond the incident and that goes beyond the aggravators . . . in the State's notice." That evidence, he contended, suggested that he was an accomplice to attempted murder and engaged in a conspiracy with Bell-Rogers to murder Edwards, crimes for which he was never indicted and that the State did not include in its death penalty notice. With respect to Hussey's testimony, the defendant argued that, during the guilt phase of the trial, the jury already had heard Paul Birely's testimony that the defendant possessed the gun at the Central Street apartment on the evening of the shooting. He argued that additional testimony of his gun possession, in conjunction with further witness testimony about the Roy Drive shooting, gave rise to "the risk for prejudicial impact" in that the jury may conclude that he "did more than he was charged with, that perhaps he even fired the gun." The defendant requested that the court instruct the jury "that [he] was charged with being a felon in possession at Edward J. Roy Drive, [and] that he was acquitted by a jury of that charge."

In response, the State argued that the challenged testimony was directly tied to the conspiracy to commit criminal threatening and reckless conduct alleged in the non-statutory aggravating factor concerning the Roy Drive shooting. It argued that the serious nature of the defendant's threat toward Edwards went to the weight that the jury should accord that factor. The State also argued that further testimony about the defendant's gun possession at the Central Street apartment would corroborate Birely's guilt phase testimony and was probative for the same reasons as the evidence of his intent to kill.

With regard to the defendant's assertion that the testimony would cause the jury to speculate that it was he, and not Bell-Rogers, who fired the gun at Roy Drive, the State observed that the jury had "already been instructed

by th[e] Court that [the defendant] was acquitted of that charge." The State also informed the court that it intended to introduce evidence that the charge of which the defendant was acquitted involved being a felon in possession of a firearm at Roy Drive; it did not concern being a felon in possession of a firearm at Central Street.

The trial court ruled from the bench at the December 1 hearing that the facts and circumstances of the prior crimes were relevant to proving that those crimes occurred and would assist the jury in determining the weight to afford the prior crimes non-statutory aggravating factors. The court also concluded that the proffered testimony was not unduly prejudicial. On appeal, the defendant contends that the State offered the gun possession testimony only to corroborate Birely's guilt phase testimony and that the State did not argue that such testimony was relevant to an aggravating factor. His characterization of the State's argument, however, is not supported by the record.

██ The defendant's armed presence at Central Street was relevant to establishing the Roy Drive shooting non-statutory aggravating factor. The record demonstrates that the State argued to the trial court that the challenged gun possession evidence related to this specific aggravating factor. During the December 1 hearing, the State expressly argued that the challenged gun possession testimony, along with Davis's testimony as to the defendant's intent to kill Edwards, "goes to the weight of the aggravator. It goes directly to proving conspiracy to commit criminal threatening, to the reckless conduct." Accordingly, the testimony of Davis and Hussey was specifically introduced to prove one of the State's duly-noticed non-statutory aggravating factors.

The defendant points out that before the sentence selection phase of the trial, the court struck an aggravating factor alleging that the defendant was a felon in possession of a firearm when he was involved in the Roy Drive shooting, and the State did not seek to amend the notice to include his alleged gun possession at the Central Street apartment. It is true that after the State submitted its initial death penalty notice, the defendant was acquitted of the felon in possession charge based upon his alleged possession of a firearm at the Roy Drive location, and, thus, the court struck the related aggravating factor. The challenged testimony of Davis and Hussey, however, related to his gun possession at the Central Street apartment shortly before he and Bell-Rogers departed for Roy Drive, where Bell-Rogers discharged it. Such testimony was relevant to the non-statutory aggravating factor charging that the defendant agreed with Bell-Rogers to threaten people at the Roy Drive residence and that he aided Bell-Rogers who discharged a firearm.

We also reject the defendant's argument that the gun possession testimony was unfairly prejudicial. At defense counsel's request, the trial court instructed the jury at the sentence selection phase as follows:

> Members of the jury, you've just heard testimony by one of the witnesses who testified in the trial regarding the events at Edward J. Roy Drive. As far as those events went, the defendant was convicted of accomplice to reckless conduct with a firearm and conspiracy to commit criminal threatening. He also had been charged with being a felon in possession of a firearm at Edward J. Roy Drive. He was acquitted of that charge. That is to say, the jury did not find that the State had proven beyond a reasonable doubt that the defendant had possessed a firearm at Edward J. Roy Drive.

The trial court had similarly instructed the jury during the guilt phase of the trial. Moreover, as outlined in Part VI.A (Guilt Phase Review-Rule 404(b) Prior Crimes Evidence) of this opinion, the jury heard evidence during the guilt phase that the defendant possessed Bell-Rogers's firearm at the Central Street apartment just prior to the Roy Drive shooting.

Accordingly, we hold that the defendant has not established that the trial court erroneously admitted evidence that was not relevant to a duly-noticed non-statutory aggravating factor, or that it unsustainably exercised its discretion in deciding that the probative value of the testimony was not substantially outweighed by any danger of unfair prejudice. *See* RSA 630:5, III. Our conclusion necessarily resolves the defendant's constitutional argument — to the extent it was preserved — that "the improperly-admitted evidence had the potential to introduce an arbitrary factor into the sentence process" in violation of his rights under the State and Federal Constitutions, *see* N.H. CONST. pt. I, arts. 15, 18, 33; U.S. CONST. amends. V, VIII, XIV.

### 4. Closing Argument

#### a. Background

At the conclusion of the sentence selection phase of trial, the parties presented closing arguments and the defendant challenges four aspects of the State's closing. We provide an overview of the parties' opening statements in the sentence selection phase of the trial as context for the prosecutor's closing remarks that are challenged on appeal.

In his opening, the defendant asserted, through counsel, that the evidence previously presented to the jury demonstrated that he did not commit "the very worst kind of murder." He emphasized the jury's finding

at the conclusion of the eligibility phase of trial that the State had not proven that he purposely killed Officer Briggs, and he asserted that the evidence to be presented would demonstrate that he was "not the very worst kind of murderer." Although acknowledging that he had committed the violent crimes identified in the non-statutory aggravating factors, the defendant stated, through counsel, that he accepted responsibility for the choices that he had made as an adult. The defendant argued that reasons existed for exercising compassion and mercy, such as the circumstances of his childhood. He asserted that the acts of violence that he had committed during his lifetime were connected to his background, and he asked the jury to consider his plea offer "to give up every right" regarding the capital murder charge in exchange for a sentence of life imprisonment without possibility of parole. Ultimately, the defendant asked the jury to "stop short of putting another human being to death."

The State began its opening statement by focusing upon the defendant's criminal history and asserting that his actions became "increasingly violent." It argued that despite his convictions and periods of incarceration, the defendant remained "undeterred," with his criminal choices culminating in the killing of a police officer — a "public guardian" and "the person who embodies the very protection the law affords us." The prosecutor further asserted that neither the defendant's childhood, nor any other circumstances, mitigated against the imposition of a death sentence. According to the prosecutor, the defendant's plea offer did not show that he had "accepted full responsibility for the murder of Officer Briggs" but "was really more about him trying to cut his losses." The prosecutor concluded that "the defendant does not deserve life . . . because for this crime committed by this defendant and especially for this victim and all the victims in the Briggs' family," a death sentence would be the most fair and just punishment.

After opening statements, the parties presented evidence for the sentence selection phase over the course of approximately thirteen trial days, during which more than fifty witnesses testified and numerous exhibits were admitted. At the conclusion of the evidence, the parties made their closing arguments, with the State arguing first, followed by the defendant. See RSA 630:5, III (2007). During the closing arguments, the parties discussed the evidence presented during all three phases of the capital trial through hundreds of exhibits and the testimony of nearly one hundred witnesses, addressing more than forty separate aggravating and mitigating factors.

### b. Appellate Argument

The defendant argues that the State: (1) improperly urged the jury to impose a death sentence to deter possible future offenders from murdering police officers; (2) improperly commented upon the exercise of his constitutional rights; (3) misused the victim impact evidence when responding to the proposed mitigating factor relating to the lack of torture or protracted suffering of Officer Briggs; and (4) improperly minimized a sentence of life imprisonment without possibility of parole as an alternative to a death sentence. According to the defendant, these errors, standing alone and cumulatively, violated the due process guarantees of the State and Federal Constitutions. *See* N.H. CONST. pt. I, art. 15; U.S. CONST. amends. V, XIV. As to his third and fourth arguments, the defendant acknowledges that he did not contemporaneously object at trial to the prosecutor's statements. He invites us to review them for plain error. *See* SUP. CT. R. 16-A (plain error standard).

### c. Discussion

We first address the defendant's arguments under the State Constitution and rely upon federal law only to aid our analysis. *See State v. Ball*, 124 N.H. 226, 231-33 (1983).

RSA 630:5, III provides parameters for closing argument at the sentencing phase of a capital trial. It states, in pertinent part:

> The state and the defendant shall be permitted to rebut any information received at the hearing and shall be given fair opportunity to present argument as to the adequacy of the information to establish the existence of any of the aggravating or mitigating factors and as to appropriateness in that case of imposing a sentence of death. The state shall open and the defendant shall conclude the argument to the jury.

RSA 630:5, III. This statute affords broad latitude to both parties to present argument regarding the existence of aggravating and mitigating factors, and regarding whether the imposition of a death sentence is warranted. *See State v. Thomas*, 514 S.E.2d 486, 514 (N.C. 1999). Therefore, just as the defendant may strenuously advocate his case for a sentence of life imprisonment, so too may the prosecutor forcefully argue for the imposition of a sentence of death. *Cf. Gregg v. Georgia*, 428 U.S. 153, 203 (1976) ("We think that the Georgia court wisely has chosen . . . to approve open and far-ranging argument.").

To evaluate the merits of the defendant's constitutional challenges here, we apply our established standard for reviewing the propriety

of a prosecutor's closing argument. *See State v. Ellsworth*, 151 N.H. 152, 154 (2004); *see also State v. Stowe*, 162 N.H. 464, 473 (2011) ("[c]ertain improper comments made by a prosecutor during closing statements may implicate a criminal defendant's due process rights"). We recognize that the focus of a prosecutor's summation at a capital sentencing trial differs significantly from that at a trial in which a jury determines only whether the State has proven the defendant's guilt beyond a reasonable doubt. During the sentencing phase of a capital trial, the jury already has determined the defendant's guilt of capital murder, and, therefore, the presumption of innocence no longer applies. Accordingly, prosecutorial advocacy that may be impermissible at the guilt phase of a capital trial may be permissible at the sentencing phase. *State v. Guevara*, 506 S.E.2d 711, 721 (N.C. 1998) ("the foci of the arguments in the two phases are significantly different, and rhetoric that might be prejudicially improper in the guilt phase is acceptable in the sentencing phase"); *Com. v. Abu-Jamal*, 720 A.2d 79, 116 (Pa. 1998) ("At the penalty hearing, where the presumption of innocence no longer has application, the prosecutor is granted greater latitude in presenting an impassioned plea for a sentence of death.").

Under New Hampshire law, "[a] prosecutor has great latitude in closing argument to both summarize and discuss the evidence presented to the jury and to urge the jury to draw inferences of guilt from the evidence." *Stowe*, 162 N.H. at 473 (quotation omitted); *State v. Vandebogart*, 139 N.H. 145, 160 (1994); *see State v. Merritt*, 143 N.H. 714, 720-21 (1999) (applying same standard under Federal Constitution). However, because the ultimate issue in the sentencing phase of a capital trial is not the defendant's criminal culpability, the propriety of the prosecutor's closing remarks during the sentencing phase must be considered in light of the State's responsibility to persuade the jury in accord with the death penalty notice that aggravating factors exist beyond a reasonable doubt that warrant the imposition of a sentence of death. *See* RSA 630:5, III, IV (2007); *see also Guevara*, 506 S.E.2d at 721 (counsel is afforded wide latitude in presenting closing argument to a capital sentencing jury and "may argue all of the evidence which has been presented as well as reasonable inferences which arise therefrom").

We first must determine whether the challenged remarks amounted to improper advocacy. *See Ellsworth*, 151 N.H. at 155; *see also State v. Gaiolas*, 116 N.H. 216, 217-18 (1976) (due process is not implicated where prosecutorial comment does not transgress "the bounds of legitimate advocacy"). If the statements were improper, we then determine whether the error requires reversal of the verdict. The latter determination involves balancing three factors: "(1) whether the prosecutor's misconduct was

isolated and/or deliberate; (2) whether the trial court gave a strong and explicit cautionary instruction; and (3) whether any prejudice surviving the court's instruction likely could have affected the outcome of the case." *Ellsworth*, 151 N.H. at 155 (citing *United States v. Rodriguez*, 215 F.3d 110, 122 (1st Cir. 2000)); *cf. State v. Parker*, 142 N.H. 319, 322 (1997) (citing federal standard for reviewing a defendant's due process challenge to the State's closing argument).

 To assess whether the State advanced an improper argument, we consider the challenged remarks in the context of the case. *See Stowe*, 162 N.H. at 473; *Gaiolas*, 116 N.H. at 217; *see also Donnelly v. DeChristoforo*, 416 U.S. 637, 645 (1974). For instance, viewed in context, challenged remarks may constitute a fair response to a position advanced by defense counsel. *See State v. Cote*, 143 N.H. 368, 375 (1999) (challenged prosecutorial remarks were akin to a legal argument and were a permissible response to the defendant's closing argument); *State v. Boetti*, 142 N.H. 255, 262 (1997) (trial court has latitude to permit counsel to respond to opposing counsel's closing argument); *see also United States v. Robinson*, 485 U.S. 25, 31-33 (1988) (no constitutional violation where prosecutor's reference in closing argument to defendant's opportunity to testify is fair response to claim made by defendant or his counsel).

 Although prosecutors may present their cases zealously, this latitude has limits:

> [W]hile a prosecutor "may strike hard blows, he is not at liberty to strike foul ones." This maxim is particularly relevant to closing arguments, for such arguments come at an especially delicate point in the trial process and represent the parties' last, best chance to marshal the evidence and persuade the jurors of its import.

*Ellsworth*, 151 N.H. at 155 (quoting *United. States v. Taylor*, 54 F.3d 967, 976 (1st Cir. 1995)); *see State v. Williams*, 510 S.E.2d 626, 642 (N.C. 1999). At the same time, "a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." *Donnelly*, 416 U.S. at 646-47; *see Com. v. Rollins*, 738 A.2d 435, 449 (Pa. 1999) ("oratorical flair" is permissible in closing argument at capital sentencing). Ultimately, determining the propriety of a prosecutor's comments involves balancing "a prosecutor's broad license to fashion argument with the need to ensure that a defendant's rights are not compromised in the process." *Boetti*, 142 N.H. at 260.

Further, we will not overturn the trial court's ruling as to whether improper prosecutorial remarks warrant a mistrial or other remedial action absent an unsustainable exercise of discretion. *Id.* at 261; *see State v. Demond-Surace*, 162 N.H. 17, 23 (2011) (the trial court is in the best position to gauge any prejudicial effect the prosecutor's closing remarks may have had on the jury). Therefore, to show that the trial court's decision is not sustainable, the defendant must demonstrate that it was clearly untenable or unreasonable to the prejudice of his case. *State v. Sanchez*, 152 N.H. 625, 628 (2005).

### 1. General Deterrence

The defendant first argues that during its closing argument the State presented a general deterrence argument in violation of "the constitutional principle that, to avoid arbitrariness, juries must focus on the circumstances of the crime and the character of the offender in determining sentence." He describes several remarks made by the prosecutor as "seek[ing] to persuade jurors that they should return a capital verdict in order to prevent the commission of similar future capital crimes by other prospective offenders." (Quotations omitted.) According to the defendant, although the prosecutor's comments were consistent with the trial court's written order dated December 15, 2008, in which the court outlined boundaries of permissible argument, the court erroneously permitted the State to make what was, in effect, a general deterrence argument.

Before the sentence selection phase concluded, the State sought a ruling allowing it to present closing argument on the subject of general deterrence in the specific context of the murder of a police officer acting in the line of duty. The defendant objected, arguing that the proposed general deterrence argument "is beyond the bounds of legitimate closing, and has the potential to induce a verdict based on inappropriate factors." The court denied the State's request by written order dated December 15, 2008. It concluded that "[a] general deterrence argument is contrary to the individualized sentencing considerations outlined in RSA 630:5" and it limited the jury's consideration, and, thus, the State's closing argument, to the aggravating factors and mitigating factors at issue in the case. The court also ruled: "Notwithstanding the preclusion of a general deterrence argument, the State is permitted to comment upon Officer Briggs' role as a police officer, and the policy reasons for making the murder of an on-duty police officer a capital offense. Such argument focuses on the particular circumstances of this crime, consistent with the parameters of RSA 630:5."

At the commencement of the State's closing argument, the prosecutor stated:

The reason we are all here today is because the defendant chose to take the life of a police officer. Each and every one of us rely on the police to protect us, to keep us safe, and to help us in our worst and most desperate moments. The police are our public guardians. They stand between us and criminals like him. The work that they do every day is what allows the rest of us to enjoy our families, our safety, and our freedom. They are our peace keepers.

Murdering a police officer is the ultimate crime because it tears — that crime tears at the very fabric of our society. Even the defendant's own witnesses, Dr. Leonard and Tracy Litchutt told you how essential the police were in helping make the inner-city streets of Boston safer. Even a criminal like Gerald Briles turns to the police when he has no place else to go.

If we let criminals like this defendant kill the police without the most serious consequences we can hand out under our law, who will be safe and who will protect us? That is why we are here today. That is why the State of New Hampshire is asking you to sentence the defendant Michael Addison to death.

The prosecutor then commented on Officer Briggs's role as a police officer:

Mike Briggs embodied all the values that we want in a police officer. He was honest. He was dedicated. He was caring. To protect and serve; that's what Mike Briggs chose to do with his life. He chose to serve as a marine when he served his country. He chose to serve as a corrections officer. And he chose to serve our State as a Manchester Police Officer.

You heard how he liked to be on the bike patrol. He liked to be on that bike patrol because it brought him closer to the people and closer to the community. You heard how he would stop if somebody had broken down on the side of the road. He would stop to fix their tire. And you heard how he ran into a burning building to save peoples' lives. And most of all, you know from having sat through all the evidence in this case that Mike Briggs chose to spend the last fifteen minutes of his life taking a dangerous weapon like this out of the hands of a violent criminal like him. Mike Briggs gave everything to do his duty to try to keep this city safe. He did that even though he knew he had to go out there and take on a criminal like him that was just as willing to take everything that Mike Briggs had.

I ask you today to let your verdict speak of his sacrifice. Let it speak of the fact that Mike Briggs risked and ultimately had his

life stolen from him, his family, and from this city by that man, a very dangerous criminal. He was murdered going out there to protect us, our community, and our State.

Shortly thereafter, the prosecutor referred to the legislature's decision to classify the killing of a police officer acting in the line of duty as ranking among the worst kinds of murders:

> In his opening statement, defense counsel told you that this was not a case for the death penalty because he is not among the worst of the worst, and this murder is not among the worst murders. Nothing could be farther from the truth here. You said that he was the worst of the worst when you found him eligible for the death penalty. Our elected representatives said so when they made a law that said murdering a police officer in the line of duty is eligible for the most serious punishment under our law, and his actions say so.

The defendant characterizes these aspects of the State's closing argument as impermissible general deterrence argument.

As the defendant recognizes, many jurisdictions have approved general deterrence arguments at capital sentencing proceedings. *See, e.g., Davis v. Kemp*, 829 F.2d 1522, 1527-28 (11th Cir. 1987); *Greene v. State*, 146 S.W.3d 871, 879-80 (Ark. 2004); *Fleming v. State*, 458 S.E.2d 638, 639 (Ga. 1995); *State v. Amrine*, 741 S.W.2d 665, 669 (Mo. 1987); *Blake v. State*, 121 P.3d 567, 578 (Nev. 2005); *State v. Allen*, 687 S.E.2d 21, 24 (S.C. 2009); *Payne v. Commonwealth*, 357 S.E.2d 500, 505 (Va. 1987). Others have concluded that general deterrence arguments are improper. *See, e.g., State v. Golphin*, 533 S.E.2d 168, 236 (N.C. 2000); *Walker v. State*, 841 P.2d 1159, 1163 (Okla. Crim. App. 1992); *State v. Cauthern*, 967 S.W.2d 726, 737 (Tenn. 1998). We need not weigh in on the matter, however, because we do not read the State's remarks as advancing a general deterrence argument.

Among the closing remarks quoted above, the defendant especially focuses upon a rhetorical question that the prosecutor posed to the jury: "If we let criminals like this defendant kill the police without the most serious consequences we can hand out under our law, who will be safe and who will protect us?" He contends that this statement "impl[ied] that the jury, with its verdict, has the power to deter future, similar crimes" and that without a death sentence, other criminals like the defendant would be "emboldened to kill police officers, which will, in turn, leave the community unprotected." Viewing the rhetorical question and other remarks in context, rather than in isolation, we disagree with the defendant's characterization of the prosecutor's statements as pressing a general deterrence argument.

The prosecutor tried to explain why the defendant's murder of an on-duty police officer for the purpose of evading arrest was especially egregious and particularly worthy of the imposition of a death sentence. She discussed the role of the police as "public guardians" and "peace keepers" who protect the community at large and argued that "murdering a police officer is the ultimate crime that tears at the very fabric of our society." In this context, the prosecutor asked the rhetorical question that the defendant characterizes as an implied general deterrence argument. The tenor of the query, however, at most suggested that persons may be less inclined to enter the law enforcement profession if the killing of a police officer in order to evade arrest is not judged to be the most serious of offenses, deserving of the death penalty. To the extent that the rhetorical question could be understood as presenting a general deterrence argument, we do not infer that the jury in fact understood it as such. Indeed, in context, the prosecutor posed the rhetorical question as part of the State's argument that encouraged the jury to focus upon the seriousness of the capital murder of Officer Briggs.

The prosecutor's remarks before and after the rhetorical question, as quoted above, underscored her point regarding the egregious nature of the murder. The prosecutor reviewed the particular attributes of Officer Briggs as a valuable police officer who had served the community. She also reminded the jury of the findings it made in rendering its death eligible verdict and of the legislature's judgment that a murderer of a police officer acting in the line of duty should be eligible for "the most serious punishment" under the law. In short, the challenged statements called for the imposition of the death penalty not for the purpose of deterrence, but because murdering an on-duty police officer for the purpose of evading arrest justifies the most severe penalty.

The prosecutor's remarks are similar to prosecutorial statements that other courts have held do not constitute general deterrence arguments. For example, in *State v. Guevara*, the prosecutor argued:

> State's exhibit number 9, it is not pleasant to look at it. And I know undoubtedly you feel that you've seen it enough, but that's the way [the murder victim] was left and his plea was answered. You see unless the killing of a law enforcement officer is dealt with the utmost seriousness, then the disrespect for law and order that is inherent in that despicable act is encouraged.

*Guevara*, 506 S.E.2d at 721. The Supreme Court of North Carolina concluded that this statement, viewed in context, did not constitute a general deterrence argument, but properly "focused the jury's attention on the seriousness of the crime and the importance of the jury's duty." *Id.* In

a subsequent case, that court also concluded that the following advocacy regarding the gravity of murdering a police officer did not amount to a general deterrence argument:

These two defendants deserve the death penalty for what they did, for their motives, for their actions. Someone has got to tell people like these two defendants, "We absolutely will not tolerate this any longer." If you don't tell that to these two defendants, nobody else will. We can't rely on the next bad case. We can't rely on the next jury to send that message to people who have no regard for your way of life, for your state, for your law enforcement officers.

*Golphin*, 533 S.E.2d at 237.

■■■ We likewise conclude that the prosecutor's remarks, viewed in context, sought to persuade the jury of the gravity of the defendant's murder of a police officer acting in the line of duty and did not advance a general deterrence argument. Accordingly, we hold that the defendant has failed to demonstrate that the trial court's decision to allow the State's closing argument was clearly untenable or unreasonable to the prejudice of his case.

### 2. Exercise of Defendant's Constitutional Rights

The defendant next argues that the State impermissibly commented upon his constitutional rights by "ask[ing] the jury to measure his culpability by reference to the extent of his procedural rights." According to the defendant, the prosecutor's remarks communicated the message that "the greater the procedural rights the law grants to a criminal defendant, the more egregious the defendant's crime and thus the more severe the appropriate punishment." He contends that the trial court erred in denying his motion for a mistrial and that the "curative" instruction given by the court was inadequate to remove the taint from the sentencing hearing.

During its closing argument, the State referred to certain constitutional rights and protections afforded to the defendant during the capital trial:

Now some of you may think, I don't want to be like him, or two wrongs don't make a right. But you cannot even compare what he did to Officer Briggs to the process that has gone on in this courtroom. What has gone on in this courtroom has been about the fair administration of justice and the rule of law. Applying the laws of our[ ] state in this courtroom; that's what your duty is as a juror.

Throughout this process, his constitutional rights have been honored. He has been represented by three very competent and able attorneys. He has had the chance to question every witness. He has had the opportunity to put forth any relevant mitigating evidence that he wants you to hear. And he was even involved in the process of selecting each of you to fairly sit and consider this case on this jury.

In contrast, on October 16th the defendant put a bullet into Mike Briggs' head when Mike didn't even see it coming. If the defendant had given Mike Briggs even a fraction of the due process that he has rightly received in this trial —

At this point the defendant objected to the State's remarks as improperly arguing to the jury that he is more deserving of the death penalty because he exercised his constitutional rights and because he was advised by counsel to do so. He moved for a mistrial or, in the alternative, for the court to provide an immediate instruction to the jury foreclosing it from considering his exercise of his constitutional rights. The trial court disagreed with the defendant's characterization of the State's argument and denied his motion for a mistrial. In so doing, it ruled that the prosecutor was making the point that while the jury's sentencing task was a difficult one, the imposition of a sentence of death pursuant to the legal process was not comparable to the defendant's actions in taking the life of Officer Briggs. It agreed, however, to provide an instruction to the jury, which the defendant accepted. The court instructed the jury as follows:

Members of the jury, the defendant, as you know, has certain constitutional rights. Among them is the right to a jury trial. And because the defendant has exercised his right to a jury trial has no bearing on your decision as to the appropriate sentence of this defendant . . . .

The State then continued its closing argument as follows:

Mike Briggs should be — should have been given a chance in that alley. Mike Briggs, how he was treated, was completely unfair. You know that. Even though he had different choices that he could have made in that alley, Mike Briggs was not given any due process in that alley.

■ Considering the challenged remarks in context, we see no basis for disturbing the trial court's judgment regarding the substance of the prosecutor's argument. Immediately prior to her challenged remarks, the

prosecutor called upon the jurors to remember the assurances that each had given during jury selection to keep an open mind, to be fair to both parties, and to uphold and apply the law fairly. She also reminded the jurors that each had stated that if the aggravating evidence outweighed the mitigating evidence, he or she could impose the death penalty. It was at that point that the prosecutor addressed the hesitancy that some jurors may have to impose a death sentence based upon the notion that "two wrongs don't make a right." Thus, the prosecutor referred to the defendant's constitutional rights to explain that a death sentence imposed upon him would be based upon the fair administration of justice and the rule of law. The prosecutor neither denigrated the defendant's decision to exercise his constitutional rights nor otherwise conveyed to the jury that the defendant deserved the death penalty because he exercised those rights. We, therefore, reject the defendant's argument that the prosecutor invited the jury to determine the penalty by assessing the extent to which the defendant had exercised his constitutional rights.

Several courts have concluded that similar prosecutorial remarks did not constitute improper commentary about a defendant's constitutional rights. For example, in *Burgess v. State*, a prosecutor argued: "No matter what happened . . . [the defendant has] had the opportunity to have lawyers represent him in this case. We have been in an orderly process." *Burgess v. State*, 827 So. 2d 134, 167 (Ala. Crim. App. 1998). The court concluded that these remarks constituted a permissible comment on the fact that the defendant had exercised his right to counsel as a reminder that, unlike the victim, "[the defendant's] fate was to be determined by the rule of law and the judicial system." *Id.* Also, in *People v. Ervine*, a prosecutor commented that the defendant was "his own Judge, jury, and executioner" and that the victim neither received "due process" nor had the benefit of "two lawyers comin[g] into this courtroom with a Judge to make sure everything's right, give you appropriate instructions, have a jury decide it." *People v. Ervine*, 220 P.3d 820, 869 (Cal. 2009). The court held that the prosecutor's remarks were permissible "since the argument did not urge the jury to return a death verdict *because* defendant exercised his constitutional rights and did not suggest that defendant should be given a greater penalty *because* he had a trial." *Id.* (quotation omitted).

Similarly, in *State v. Garcell*, a prosecutor commented: "[T]his man did not care about [the victim's] rights. He violated her rights. He is big on rights now. He wants his right to a trial, his right to two very good lawyers, his right to due process, to the presumption of innocence, to reasonable doubt." *State v. Garcell*, 678 S.E.2d 618, 650 (N.C. 2009). The court concluded that the prosecutor permissibly encouraged the jury to consider that the victim had rights as a human being that the defendant had

disregarded and that the defendant was concerned about his own rights instead. *Id.* Also, in *Commonwealth v. Carson*, a prosecutor argued: "But when you do think about this case and think about the circumstances under which [the victim] was shot you may consider the fact that [the victim did] not have 12 people sitting in judgment that night in a nice orderly courtroom, with a record being taken and a fair-minded, impartial Judge and the representation of a very, very competent defense attorney and the fact of the United States and Pennsylvania constitutions. [The victim] didn't have that when he was gunned down." *Com. v. Carson*, 913 A.2d 220, 269-70 (Pa. 2006). The court concluded that the prosecutor's remarks were permissible because the State "reminded the jury that, thanks to procedural safeguards, imposing the death penalty was not the same as killing someone on a street corner and that life in prison is not comparable to death." *Id.* at 270.

 The defendant relies upon two decisions of the Supreme Court of Mississippi to support his argument that the prosecutor's remarks in this case were improper. *See Walker v. State*, 913 So. 2d 198, 241 (Miss. 2005); *Shell v. State*, 554 So. 2d 887, 900 (Miss. 1989), *rev'd on other grounds sub nom. Shell v. Mississippi*, 498 U.S. 1 (1990). In *Walker*, the prosecutor's comments during closing argument at capital sentencing compared the legal process afforded the defendant with the defendant's conduct in illegally taking the life of the victim. *Walker*, 913 So. 2d at 241. The court concluded that the content of the remarks did not taint the sentencing proceeding in part because they did not include any specific reference to due process or to constitutional rights. *Id.* at 242. As the defendant here points out, the State in this case did refer to specific constitutional rights and to "due process." Nonetheless, we review the prosecutor's remarks in context when evaluating whether the remarks improperly called upon the jury to draw a negative inference from the defendant's exercise of his constitutional rights and to base its penalty decision upon that inference. Here, we conclude that the trial court sustainably exercised its discretion in ruling that the prosecutor did not do so. *Cf. Robinson*, 485 U.S. at 31 (holding that the prosecutor's statement during closing at a criminal trial that the defendant could have taken the stand to explain himself "did not in the light of the comments by defense counsel infringe upon [the defendant's] Fifth Amendment rights"). To the extent that *Walker* can be read as prohibiting any reference by the State in closing to due process or other specific constitutional rights of the defendant, we do not find the case persuasive and decline to follow it.

In *Shell*, the defendant challenged the prosecutor's comment made during closing argument at the guilt phase that the defendant was "clothed

in the full protection of the Constitution of the United States and he has got what [the murder victim] never got. And that is a jury of twelve good people to decide his fate." *Shell*, 554 So. 2d at 900. The court expressed its disapproval of any prosecutorial comments regarding "a defendant's exercise of specific constitutional rights" and noted its state precedent "condemn[ing] attempts by the prosecution to penalize a defendant for the exercise of a constitutional right." *Id.* It stated: "The use of these various improper arguments creates an *unfair inference of guilt.*" *Id.* (emphasis added). The comment in *Shell* was made during closing argument at the *guilt* phase of the trial when the defendant was presumed innocent under the law. At that stage of a capital proceeding, reference to a defendant's exercise of constitutional rights may well invite an unfair inference of guilt. *Cf. Ellsworth*, 151 N.H. at 155 ("Comment either by a prosecutor or the court which may be construed as an unfavorable reference to the failure of a defendant to testify is a violation of the defendant's constitutional right against self-incrimination."). In contrast, the remarks in this case were made after the jury had found the defendant both guilty of capital murder and eligible for the death penalty and did not invite any improper negative inference from the defendant's exercise of his constitutional rights.

Accordingly, we conclude that the defendant has failed to establish that the denial of his motion for mistrial was clearly untenable or unreasonable to the prejudice of his case.

### 3. Victim Impact

The defendant argues that the State misused the victim impact evidence when refuting his mitigating factor relating to lack of torture or protracted cruelty. He characterizes the prosecutor's argument as asking the jury to find him to be a "worse person" based upon the "torture" he inflicted on Officer Briggs's survivors. According to the defendant, the prosecutor misused victim impact evidence in contravention of constitutional principles outlined in *Payne v. Tennessee*, 501 U.S. 808 (1991). He asks us to review the prosecutor's remarks for plain error.

Under the plain error rule, we may consider errors not raised before the trial court. *State v. Guay*, 164 N.H. 696, 703 (2013); *see United States v. Davis*, 609 F.3d 663, 677 (5th Cir. 2010). "A plain error that affects substantial rights may be considered even though it was not brought to the attention of the trial court or the supreme court." SUP. CT. R. 16-A. The rule should be used sparingly, its use limited to those circumstances in which a miscarriage of justice would otherwise result. *Guay*, 164 N.H. at 704. Our plain error rule sets forth four requirements: (1) there must be an error; (2) the error must be plain; (3) the error must affect substantial rights; and (4) the error must seriously affect the fairness, integrity, or public reputation

of the judicial proceedings. *Id.* The State argues that the defendant's challenge fails under the first prong of the plain error analysis, and we agree.

In responding to the defendant's mitigating factor that "[t]he circumstances of the homicide did not involve torture or protracted cruelty," the prosecutor stated:

> The defendant may have dropped Officer Briggs to the ground immediately when he put a bullet in his head, but it doesn't ring true that the circumstances and the impact of this crime don't involve protracted cruelty.
>
> John Breckinridge still patrolled the streets of that alley when he watched his partner take a bullet to his head. Laura Briggs has to raise her family now, her sons, as a single parent. And Brian and Mitchell, there will never be another holiday that passes where they don't think of their father. And you saw Lee Briggs. You don't think that he is tortured every day when he thinks about his son?

Relying solely upon *Payne*, the defendant contends that these statements comprise plain error. According to the defendant, "[W]hile the admission of powerful victim impact evidence may heighten the chance of a death sentence by increasing the jury's estimation of the harm done by the crime, such evidence should not heighten the chance of a death sentence by making the defendant seem a worse person."

▉▉▉▉ The defendant's proposed mitigating factor asked the jury to consider that his crime could have been more egregious had he caused Officer Briggs's death by acts of torture or protracted cruelty. The prosecutor's argument disputed that such a proposed mitigating factor warranted any mitigating value by redirecting the jurors to the circumstances of the crime that the defendant actually committed. The prosecutor expressly focused upon "the circumstances and the impact of this crime," by highlighting the testimony of Officer Breckinridge and Officer Briggs's family. We disagree with the defendant's characterization of the prosecutor's remarks as asking the jury to rely upon victim impact evidence to find him to be a "worse person" due to the extent and quality of the suffering of Officer Briggs's survivors.

The defendant points to no case in the country other than *Payne* to support his argument. As noted in Part VII.B.1 (Sentence Selection Phase Trial-Victim Impact Evidence) of this opinion, the United States Supreme Court has held:

We are now of the view that a State may properly conclude that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant. The State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family.

*Payne*, 501 U.S. at 825 (quotation and brackets omitted); *see* RSA 630:5, III; *Ball v. State*, 699 A.2d 1170, 1193-94 (Md. 1997) (noting that *Payne* "suggests that victim impact evidence may be used both to assess the harm caused by the defendant's actions . . . and to counteract mitigating evidence"). We are not persuaded that the prosecutor's argument contravened the precepts of *Payne*.

Accordingly, we hold that the defendant has failed to establish that the prosecutor's remarks fell outside the bounds of permissible closing argument, and, thus, his challenge fails under the first prong of plain error analysis. *See Guay*, 164 N.H. at 703-04.

### 4. Minimizing a Sentence of Life Without Possibility of Parole

The defendant argues that the State improperly minimized the severity of a sentence of life imprisonment without possibility of parole. Specifically, he identifies two portions of the State's closing argument in which the prosecutor made statements to the effect that if the jury imposed a life sentence, it would be granting the defendant "a pass" for the murder of Officer Briggs. He characterizes the prosecutor's remarks as advancing an impermissible "free pass" argument calculated to appeal to the passion and emotion of the jury because the remarks communicated that choosing a sentence of life imprisonment without possibility of parole would constitute a personal affront to Officer Briggs and his survivors. Again, the defendant asks us to review the prosecutor's remarks for plain error. *See id.* The State argues that the defendant's challenge fails under the first prong of plain error analysis, and, again, we agree.

Early in her closing, the prosecutor made the following statements:

And you now know that he was facing almost a life sentence when he murdered Officer Mike Briggs. He was and is facing thirty-one-and-a-half to sixty-three years in prison just for the crimes that he committed before he murdered Officer Mike Briggs. And

with his criminal history, there is little doubt that the judge is going to give him this time, regardless of what happens in this trial. If the defendant is facing essentially what amounts to a life sentence before he is punished for the murder of Officer Mike Briggs facing this time, how is life without parole adequate here? That's another reason why this case is deserving of the death penalty.

He made the choice to take Officer Briggs from us to avoid being held fully accountable for the crimes he committed before this murder. And now he wants you to give him practically the very same sentence that he was facing just on the crimes he committed before the murder. If you sentence him to life without parole he essentially gets a pass on killing Mike Briggs because he is basically going to do close to life anyway for the crimes that he committed before this murder. How can that be fair? How can that be just? This cold-blooded murder cannot be an afterthought. The life that Mike Briggs lived and had snatched from him and his loved ones is worth more than a few tacked on years.

Let's just be blunt about this. In light of the sentences he is facing for the crimes he committed before the murder, what are the consequences for the murder if he does not receive the death penalty? A career criminal like the defendant cannot be given a pass for murdering a police officer. That would be a grave injustice; a very grave injustice.

Later in her closing, the prosecutor remarked as follows:

That so-called [plea] offer is an insult to Officer Briggs and to the other police officers who every day put their lives on the line to protect us against dangerous felons who have nothing to lose. That plea offer was hollow because he was already facing essentially a life sentence. That's before he will be punished for the murder of Officer Briggs, and in this case, to treat Mike Briggs' life as an add-on is to trivialize his life and to trivialize the cold-hearted murder that the defendant committed when he put a bullet in Mike Briggs' head. Don't accept that. Mike Briggs' life — his life is worth more than that.

Viewed in context, the prosecutor's statements center on whether a sentence of life imprisonment without possibility of parole would be just and on whether the defendant's plea offer for the capital murder had any mitigating value. The prosecutor argued that because the court likely would impose a lengthy prison term for the three non-capital crimes, a life

imprisonment sentence for the capital murder would amount to "an afterthought," "a few tacked on years," "a pass" for the murder of Officer Briggs, and an "add-on" to the punishment for other prior crimes, which would "trivialize" the life of Officer Briggs. These remarks were based upon the evidence presented during the sentence selection phase of trial as to the maximum sentences the defendant could receive for the three non-capital crimes he committed in October 2006. Specifically, Karen Gorham, one of the prosecutors in the prior felony trials, testified that the defendant had not yet been sentenced for the three non-capital crimes because he requested that the trial court postpone sentencing until the capital proceedings were complete. She then testified as to the sentencing range for each of the convictions and stated that "[t]he maximum for the total would be thirty-one-and-a-half to sixty-three years [in prison] plus the one year in jail on the misdemeanor." Based upon this evidence, the prosecutor argued in closing that the defendant likely would receive the equivalent of a life imprisonment sentence for the non-capital crimes, and, therefore, the jury should impose a sentence of death as an additional sentence for the additional crime of capital murder.

The challenged remarks also offered rebuttal to certain of the defendant's submitted mitigating factors. For example, as outlined in Part VII (Sentencing Phase Review) of this opinion, the defendant asked the jury to consider that he "attempted to plead guilty to Capital Murder but his offer was rejected by the State," as facts "tend[ing] to show that a life sentence is appropriate or sufficient to do justice in this case." To negate the proffered mitigating value of these facts, the prosecutor focused the jury's attention upon the potential sentences for the defendant's convictions on the three non-capital crimes.

The prosecutor's argument is similar to arguments found to have been permissible by the United States Court of Appeals for the Eighth Circuit. In *Rodden v. Delo*, the defendant murdered a man and a woman during the same criminal episode and was convicted of the murders in separate proceedings. *Rodden v. Delo*, 143 F.3d 441, 444 (8th Cir. 1998). For the murder of the man, he received a sentence of life in prison without probation or parole for fifty years. *Id.* During the sentencing phase for the murder of the woman, the prosecutor argued, among other things: "Now, if [the defendant] killed two people and he got fifty years in prison without parole for killing one person, does he get the murder of the second person free? Another fifty years without parole means nothing . . . . Should he not be punished for the murder of [the woman]?" *Id.* at 446. Ultimately, the defendant was sentenced to death for that murder, and the federal court rejected his challenge to the prosecutor's closing argument. *Id.* at 445. It concluded:

In context, the prosecutor's statements about the second murder being free urged the jury to impose additional punishment for the additional crime. And in commenting that another jury had convicted [the defendant] of killing [the man], the prosecutor did not suggest the outcome of the [first] murder trial should control the jury's decision in the [second] murder case. Rather, the prosecutor merely pointed out that [the defendant] was a multiple killer. The jury could properly consider [the defendant's] earlier crimes in deciding whether to sentence him to death.

*Id.* at 447.

■■■ As in *Rodden*, the prosecutor's argument here rested upon the evidence and did not invite a sentencing verdict based upon emotion. Rather, the State urged the jury to consider the likely sentence that the defendant would serve for the non-capital crimes and to impose a sentence of death to hold him accountable for the capital murder.

The defendant relies upon *People v. Kuntu* to argue that the prosecutor's remarks constitute reversible error. *See People v. Kuntu*, 752 N.E.2d 380 (Ill. 2001). We are not persuaded. In *Kuntu*, the defendant intentionally set fire to a residential apartment building, killing seven people, and was convicted of capital murder for all seven deaths in a single proceeding. *Id.* at 386, 390. The prosecutor argued to the sentencing jury, among other things: "The law in Illinois is that if you kill two people you go to jail for life without parole. He killed seven people. If you do not sentence him to death that will be giving him five freebies." *Id.* at 403 (emphasis omitted).

The Supreme Court of Illinois characterized the prosecutor's argument as communicating the message that "because two murders result in a minimum sentence of life imprisonment, a defendant who commits more than two must be sentenced to death or be deemed to have received one or more 'freebies,' 'free dead people,' or 'murders for free.'" *Id.* It concluded that such argument constitutes "an inflammatory statement with no basis in either law or fact [and] it is tantamount to the conclusion that, as a matter of law, a person who kills more than two persons should be sentenced to death." *Id.*

Unlike *Kuntu*, the prosecutor here did not convey to the jurors that they were legally bound to impose the death penalty given the maximum sentences that the defendant could receive for the non-capital crimes. Nor did the prosecutor convey to the jurors that they were prohibited from considering the submitted mitigating factors. Accordingly, we hold that the defendant has failed to establish that the prosecutor's remarks fell outside the bounds of permissible closing argument. Because the defendant has

failed to establish trial court error, his challenge fails under the first prong of plain error analysis. *See Guay*, 164 N.H. at 703-04.

In sum, we conclude that the defendant has failed to establish that any of the challenged remarks made by the prosecutor during closing argument at the sentence selection phase of trial amounted to improper advocacy in violation of his due process rights under the State Constitution. *See* N.H. CONST. pt. I, art. 15. The defendant makes identical arguments under the Federal Due Process Clause, without engaging in a separate analysis. *See* U.S. CONST. amends. V, XIV. Nor does he argue that the due process protections under the State and Federal Constitutions differ in this context. We conclude that the Federal Constitution affords the defendant no greater protection than does the State Constitution under these circumstances, and, accordingly, we reach the same conclusion under the Federal Constitution. *See State v. Hill*, 146 N.H. 568, 576 (2001); *Stowe*, 162 N.H. at 470.

## VIII. CONSTITUTIONAL AND STATUTORY REVIEW

Well in advance of trial, the defendant filed numerous motions challenging the constitutionality of New Hampshire's death penalty statute or otherwise seeking to preclude the imposition of the death penalty. The trial court denied all of his motions. On appeal, the defendant asserts the following constitutional and statutory claims: (1) the capital sentencing statute both facially and as applied violates our State Constitution; (2) the statutory aggravating factors fail to perform the constitutionally required narrowing function for the class of murderers who are eligible for the death penalty; (3) the burdens of proof in the capital sentencing statute violate due process; (4) the inapplicability of the rules of evidence at capital sentencing under the statute violates separation of powers and due process; (5) the risk of racial discrimination renders the death penalty unconstitutional; (6) "death qualifying" the jury prior to the guilt phase of trial violates his right to a fair and impartial jury and to due process; and (7) the non-statutory aggravating factors violate provisions of the State and Federal Constitutions regarding separation of powers, grand jury indictments, and duplicative factors. The defendant also asserts that the trial court erroneously denied his post-verdict request for discovery which he sought during the pendency of this appeal.

### A. Death Penalty Challenge Under State Constitution

The defendant argues that the death penalty statute on its face, and as applied in this case, violates the New Hampshire Constitution. *See* RSA 630:1 (2007) (amended 2011); RSA 630:5 (2007). We address each argument in turn.

### 1. Facial Challenge

#### a. Background

Approximately one year prior to trial, the defendant sought an order from the trial court barring the death penalty, arguing that the capital sentencing statute facially violates the State Constitution's "cruel or unusual punishments" clause of Part I, Article 33 and the "true design of all punishments" clause of Part I, Article 18. He argued that the decision of the Supreme Judicial Court of Massachusetts in *District Attorney for the Suffolk District v. Watson*, 411 N.E.2d 1274 (Mass. 1980), which held that capital punishment violated the "cruel or unusual punishments" clause of that commonwealth's constitution, was "persuasive" because it interpreted language identical to that in the New Hampshire Constitution. The defendant contended that "the reasoning behind the Massachusetts opinion — that the death penalty offends contemporary standards of decency — holds even more true today than in 1980." He further argued that "New Hampshire has a longstanding tradition of affording greater protection to individual liberties under its state constitution, and capital punishment is inconsistent with that tradition." Finally, the defendant argued that the "true design of all punishments" clause "commands that punishments 'reform' instead of 'exterminate,' " and, thus, "bars the death penalty as a punishment in contemporary society."

The State objected and, by written order dated September 18, 2007, the trial court denied the defendant's motion, ruling that RSA 630:1 and :5 are not facially unconstitutional. The court concluded that "the framers did not consider the death penalty to be cruel or unusual punishment," as evidenced by the text of the State Constitution and "by then existing societal norms." The court rejected the defendant's argument that Part I, Article 18 and/or Part I, Article 33 provide more protection than the Eighth Amendment to the Federal Constitution, as well as his argument that capital punishment offends general community standards of decency in this state. Finally, the court declined to follow *Watson* because: (1) the *Watson* court "did not employ general principles of construction when determining whether a statute is unconstitutional"; (2) the *Watson* court "did not apply objective criteria in its standard of decency analysis"; and (3) "the reaction of the Massachusetts citizens and legislature to the [*Watson*] ruling was swift and resounding, demonstrating that the [court's] opinion did not represent that of the electorate."

Following his conviction for capital murder and the imposition of a sentence of death, the defendant renewed his motion, contending that "based on regional and international developments," the death penalty constitutes "cruel, unusual and disproportionate punishment under the

state and federal constitutions." In support, the defendant pointed to several "additional events [that had] transpired," including that "New Hampshire considered forming a commission to study the death penalty." By written order dated March 19, 2009, the trial court denied his motion because it could not find "sufficient objective evidence, either by way of national legislative trends or scientific/sociological studies, to overcome the presumption that New Hampshire's capital murder sentencing scheme is constitutional."

### b. Appellate Argument

The defendant argues that the State Constitution affords greater protection than does the Eighth Amendment to the Federal Constitution, requiring us to invalidate the death penalty in this state. The defendant does not challenge the death penalty under the Eighth Amendment. *See Gregg v. Georgia*, 428 U.S. 153 (1976) (death penalty is not *per se* cruel and unusual punishment).

### c. Discussion

Part I, Article 33 of the State Constitution provides that "no magistrate, or court of law, shall demand excessive bail or sureties, impose excessive fines, or inflict cruel or unusual punishments." N.H. CONST. pt. I, art. 33. The defendant argues that because Article 33 prohibits punishments that are "cruel *or* unusual," we ought to interpret it as affording greater protection than the Eighth Amendment's prohibition against punishments that are "cruel *and* unusual." In support, the defendant points to jurisdictions that have attributed significance to the use of the disjunctive. *See People v. Carmony*, 127 Cal. App. 4th 1066, 1085 (Ct. App. 2005); *Armstrong v. Harris*, 773 So. 2d 7, 17 (Fla. 2000); *State v. Mitchell*, 577 N.W.2d 481, 488, 490 (Minn. 1998); *People v. Bullock*, 485 N.W.2d 866, 872 n.11. (Mich. 1992). Other jurisdictions, however, find that the use of the disjunctive has no substantive significance. *See State v. Kido*, 654 P.2d 1351, 1353 n.3 (Haw. Ct. App. 1982); *State v. Kleypas*, 40 P.3d 139, 240-41 (Kan. 2001), *overruled on other grounds by Kansas v. Marsh*, 548 U.S. 163 (2006); *Thomas v. State*, 634 A.2d 1, 10 n.5 (Md. 1993). We need not decide this issue because, even assuming Part I, Article 33 affords greater protection than does the Eighth Amendment, application of settled principles for construing our State Constitution leads us to reject the defendant's facial challenge under Part I, Article 33.

"Reviewing the history of the constitution and its amendments is often instructive, and in so doing, it is the court's duty to place itself as nearly as possible in the situation of the parties at the time the instrument

was made, that it may gather their intention from the language used, viewed in light of the surrounding circumstances." *Petition of Below*, 151 N.H. 135, 139 (2004) (quotation and ellipsis omitted). "[T]he language used . . . by the people in the great paramount law which controls the legislature as well as the people, is to be always understood and explained in that sense in which it was used at the time when the constitution and the laws were adopted." *Id.* (quotation omitted).

The trial court's order denying the defendant's facial challenge explains that "[w]hen the State Constitution was adopted in 1784, the death penalty was mandated for the crimes of treason, murder, rape, carnal knowledge between men, bestiality, burglary, arson of a dwelling and robbery." *See* An Act for the punishment of certain Crimes, Laws 1792, *reprinted in* 5 LAWS OF NEW HAMPSHIRE 596-99 (Henry Metcalf ed. 1916). Thus, at the time Article 33 was adopted, the death penalty was accepted by the framers as a suitable punishment for certain crimes. This is reflected in the text of the New Hampshire Constitution, as adopted in 1784 and continuing in effect to this day, which includes specific references to capital punishment. Part I, Article 16 provides, "No subject shall be liable to be tried, after an acquittal, for the same crime or offense. Nor shall the legislature make any law that shall subject any person to a *capital punishment* . . . without trial by jury." N.H. CONST. pt. I, art. 16 (emphasis added). Part II, Article 4 authorizes the legislature to establish courts for trying cases "whether the same be criminal or civil, or whether the crimes be *capital, or not capital*." N.H. CONST. pt. II, art. 4 (emphasis added). Also, Part I, Article 15 provides that "[n]o subject shall be . . . *deprived of his life*, liberty, or estate, but by the judgment of his peers, or the law of the land." N.H. CONST. pt. I, art. 15 (emphasis added).

 Given that, at the time the State Constitution was adopted, capital punishment was a sanctioned penalty for specified crimes and that the plain language of the constitution anticipates its use, the framers could not have considered capital punishment to be "cruel or unusual." We agree with the trial court that "[l]ooking at the language of the New Hampshire Constitution and the circumstances of its adoption, the framers undoubtedly anticipated that the death penalty would be imposed for many crimes."

The defendant next argues that "Part I, Article 18's 'true design' clause, which has no analog in the Federal Constitution, supports the conclusion that the death penalty violates the New Hampshire Constitution." Part I, Article 18 provides:

> All penalties ought to be proportioned to the nature of the offense. No wise legislature will affix the same punishment to the crimes of theft, forgery, and the like, which they do to those of murder

and treason. Where the same undistinguishing severity is exerted against all offenses, the people are led to forget the real distinction in the crimes themselves, and to commit the most flagrant with as little compunction as they do the lightest offenses. For the same reason a multitude of sanguinary laws is both impolitic and unjust. The true design of all punishments being to reform, not to exterminate mankind.

N.H. CONST. pt. I, art. 18. According to the defendant, "[i]n declaring that the 'true design of all punishments [is] to reform, not to exterminate mankind,' that clause reveals at a minimum a tension between the death penalty and the constitutional value therein expressed." The defendant observes that, "the design of the death penalty, of course, is to exterminate, not reform, the person subjected to it."

[106] We have "never held that article 18 invalidates a capital punishment statute." *State v. Farrow*, 118 N.H. 296, 305 (1978). Rather, "[a]ssuming the article's concern extends beyond the improper application of capital punishment, it forbids only gross disproportionality between offense and penalty." *State v. Elbert*, 125 N.H. 1, 15 (1984) (citation omitted). Regardless of whether Article 18 provides greater protection in a capital murder case than does the Eighth Amendment, its protection does not render RSA 630:1 and :5 facially unconstitutional.

The defendant concedes that if he "had to demonstrate that the death penalty was cruel or unusual in the late eighteenth century, he could not prevail." He contends, however, that "a punishment not regarded as cruel or unusual at one time could, with the passage of more than two hundred years, become cruel or unusual," and that "the inquiry into the current state of the 'evolving standards of decency that mark the progress of a maturing society' supports the conclusion that the death penalty violates the New Hampshire Constitution." (Citation omitted.) The "evolving standards of decency" inquiry is employed in Eighth Amendment analysis, *see Trop v. Dulles*, 356 U.S. 86, 101 (1958) (plurality opinion), and we have never determined whether this inquiry is applicable to our State Constitution. *See State v. Evans*, 127 N.H. 501, 504 (1985) (Eighth Amendment decisions provide a "useful backdrop for analysis of the defendant's rights under New Hampshire law"). However, even assuming, without deciding, that an inquiry into "evolving standards of decency" should inform our consideration of whether the death penalty is prohibited by our State Constitution, we are not persuaded by the defendant's arguments.

The defendant points to the fact that "since 1869 New Hampshire has sentenced sixteen men to die and executed twelve[,] . . . with the last

execution occurring a little more than seventy years ago, in 1939." (Quotation omitted.) He argues that "[s]o long a period of disuse has removed the death penalty from the list of constitutionally-acceptable punishments." The fact that the death penalty is "infrequently sought and even more infrequently carried out," however, does not render the death penalty statute facially unconstitutional. *United States v. Sampson*, 486 F.3d 13, 23 (1st Cir. 2007).

"[T]he proper body to set the parameters of punishment for a given crime is the body that defines the crime — the legislature." *Farrow*, 118 N.H. at 305; *see Atkins v. Virginia*, 536 U.S. 304, 312 (2002) ("the clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures" (quotation omitted)). "[I]n assessing a punishment selected by a democratically elected legislature against the constitutional measure, we presume its validity." *State v. Deflorio*, 128 N.H. 309, 316 (1986) (quotation omitted). "[A] heavy burden rests on those who would attack the judgment of the representatives of the people." *Id.* (quotation omitted).

Following the United States Supreme Court's 1976 decision in *Gregg v. Georgia*, the New Hampshire legislature enacted a new statutory scheme establishing the procedure to be followed in capital murder cases. *See* Laws 1977, 440:2. The legislature has subsequently amended these statutes several times. In 1986, the method of execution was changed to lethal injection. *See* Laws 1986, 82:1. The amendment's legislative history suggests that the reason for this change was to make capital punishment more likely to be imposed in this state: "If we are going to have a death penalty we should be prepared to use it and this bill provides for the most humane and effective means of accomplishing what is unfortunately a necessary part of our state law." *See* N.H.S. JOUR. 599 (1986).

In 1988, the legislature extended capital punishment to the crimes of the murder of a probation or parole officer, and murder by a defendant who is already serving a sentence of life without parole. *See* Laws 1988, 69:1. In 1990, the legislature extended capital punishment to the crimes of murder in connection with aggravated felonious sexual assault, and murder committed during certain drug offenses. *See* Laws 1990, 199:1. In 1994, the legislature further extended it to include the murder of a judicial officer. *See* Laws 1994, 128:1, :2.

The legislature has narrowed the application of the death penalty only once. In 2005, the legislature prohibited capital punishment for defendants younger than eighteen at the time of the offense. *See* Laws 2005, 35:1. This change followed the Supreme Court's decision that the execution of a defendant who was under the age of eighteen when the crime was

committed violated the Federal Constitution. *See Roper v. Simmons*, 543 U.S. 551 (2005). Legislative history indicates that this amendment was designed to make New Hampshire law consistent with federal constitutional requirements. *See* N.H.S. JOUR. 724 (2005).

In 2000, a bill to repeal the death penalty passed both houses of the legislature, but the Governor vetoed it. *See* N.H.H.R. JOUR. 948-49 (2000). In her veto message, the Governor described the protections afforded under the statute as "designed to make the carrying out of the death penalty extraordinarily difficult" and concluded that it was "in the best interests of the people of this state . . . [that] our capital murder statute should remain the law in New Hampshire." *Id.* Subsequent attempts to repeal the death penalty failed to gain a majority vote in both houses of the legislature. *See* N.H.H.R. JOUR. 455 (2007) (bill seeking to repeal the death penalty voted inexpedient to legislate); N.H.S. JOUR. 524-27 (2009) (bill amended by senate judiciary committee to remove repeal provisions and tabled in senate).

In 2009, a Commission to Study the Death Penalty in New Hampshire (commission) was created to assess the practical implications of the death penalty and make recommendations to the legislature. *See* Laws 2009, ch. 284; FINAL REPORT OF THE COMMISSION TO STUDY THE DEATH PENALTY IN NEW HAMPSHIRE (December 1, 2010) (FINAL REPORT). The commission was comprised of twenty-two members appointed variously by the Speaker of the House, the President of the Senate, the Governor, the public defender, the bar association, the association of counties, the association of criminal defense lawyers, the association of chiefs of police, the attorney general, and police associations. FINAL REPORT at 7-8. The commission's duties included studying "[w]hether the death penalty in New Hampshire is consistent with evolving societal standards of decency." *Id.* at 7. In 2010, the majority report concluded:

> New Hampshire's capital murder statutes are consistent with evolving standards of decency because, in this state, the death penalty has consistently been accepted by the democratic process, the statutes are written to cover only a narrow category of murders, the procedures are designed to provide the defendant the most protection from a wrongful conviction or death sentence, and the penalty is applied sparingly to only the most clear cases where the defendant is eligible for the death penalty.

*Id.* at 23. Most recently, in 2011, the legislature extended the death penalty to those who, during the commission of a burglary, murder a person "licensed or privileged to be within an occupied structure." RSA 630:1, I(g) (Supp. 2012).

 As the trial court found, "[g]iven how frequently the death penalty has been debated, and how consistently the representative branches of government have upheld it, . . . capital punishment does not offend general community standards of decency in this State." We agree with the trial court that "[t]he legislative history of capital punishment in this State demonstrates that a consensus has not been reached that capital punishment is cruel or unusual." We presume the validity of "a punishment selected by a democratically elected legislature" and conclude that the defendant has not met the "heavy burden [that] rests on those who would attack the judgment of the representatives of the people." *Deflorio*, 128 N.H. at 316 (quotation omitted). Accordingly, we hold that the defendant has not established that the death penalty statute facially violates Part I, Article 18 or Part I, Article 33 of the State Constitution.

### 2. As Applied Challenge

#### a. Background

After the eligibility phase of sentencing, the defendant moved to bar the imposition of the death penalty based upon the jury's finding that the State failed to prove the statutory aggravating factor charging that he "purposely killed" Officer Briggs. He argued that the imposition of a sentence of death for committing a "non-purposeful murder" violates his "rights to due process, fundamental fairness, and to be protected against punishments that are cruel, unusual or disproportionate" under the State and Federal Constitutions. *See* N.H. CONST. pt. I, arts. 15, 18, 33; U.S. CONST. amends. V, VIII, XIV. Although he acknowledged that United States Supreme Court precedent establishes that the Eighth Amendment does not preclude a death sentence for a defendant who did not have a specific intent to kill, *see Tison v. Arizona*, 481 U.S. 137 (1987), the defendant sought to preserve his federal constitutional argument "for later review, or in the event federal law changes to his benefit." He argued that under the State Constitution, "the fundamental fairness clause of part I, article 15; the proportionality clause of part I, article 18; and the cruel or unusual punishments clause of part I, article 33" provide him with greater protections than the Federal Constitution. The defendant also argued that the "mental state aggravators" found by the jury pursuant to RSA 630:5, VII(a)(2) and (3) failed to "meaningfully narrow the class of murder[er]s who should be sentenced to death."

The State objected and, by written order dated December 29, 2008, the trial court denied the defendant's motion. In so doing, it ruled that: (1) in the event that the defendant believes that federal law has changed in a way that affects its prior orders, he "may file an appropriate motion" for the

court's consideration; (2) he failed to develop his argument under Part I, Article 15 of the State Constitution; (3) he failed to present new evidence or argument warranting reconsideration of its earlier rulings rejecting his arguments under Part I, Articles 18 and 33 of the State Constitution; and (4) the challenged aggravating factors adequately narrowed the class of defendants eligible for the death penalty.

Following the jury's recommendation of a sentence of death, the defendant moved to set aside that verdict based upon the jury's findings that the State failed to prove both that he had a purpose to kill Officer Briggs and that he posed a threat of future dangerousness. He argued that given these jury findings, the death sentence as applied in this case violates the State Constitution. The State objected and, by written order dated March 19, 2009, the trial court denied the defendant's motion, rejecting his argument that the imposition of the death penalty in this case was inconsistent with sentencing objectives under the New Hampshire Constitution.

### b. Appellate Argument

The defendant's argument consists of three parts. First, he contends that the imposition of the death penalty in this case contravenes the State Constitution because the State failed to prove the statutory aggravating factor charging that he had a specific intent to kill Officer Briggs. Second, he argues that because the State also failed to prove the future dangerousness non-statutory aggravating factor, the penalty of death in this case serves only a retributive purpose, which he alleges is an impermissible sentencing goal under our State Constitution. Third, he asserts that the two eligibility statutory aggravating factors found by the jury regarding his mental state did not "perform the constitutionally-essential function" of distinguishing capital murderers who are death eligible from those who are not. *See* RSA 630:5, VII(a)(2), (3). This last point, regarding the statute's narrowing function, encompasses a separate appellate argument that we address and reject in Part VIII.B (Constitutional and Statutory Review-Statutory Aggravating Factors (Narrowing Function)) of this opinion.

### c. Discussion

The defendant does not raise any argument under the Federal Constitution and acknowledges that the Supreme Court: (1) "has held that the Eighth Amendment is not violated by the imposition of the death penalty on defendants who lacked a purpose to kill," *see Tison*, 481 U.S. at 157; and (2) "recognizes retribution as a legitimate goal of punishment," *see Gregg*, 428 U.S. at 183-84. Instead, he asserts that his right to due process under Part I, Article 15, the "true design" clause of Part I, Article 18, and the "cruel or

unusual punishments" clause of Part I, Article 33 of the State Constitution are more protective than the Federal Constitution. The defendant's legal analysis, however, is based only upon our Article 18 precedent, and so we limit our analysis accordingly. We conclude that regardless of whether Part I, Article 18 provides greater protection than does the Eighth Amendment, its protections do not render the death penalty statute unconstitutional as applied to the defendant.

The defendant contends that a person should not be subject to the death penalty under the State Constitution when the State has failed to prove that the actor had a purpose to kill, the most culpable mental state under New Hampshire law. Citing RSA 630:1-a (2007), which defines first-degree murder, he argues: "[T]he difference between acting purposely and acting knowingly is so large that only with the addition of an element to the knowing murder will the law treat that murder as equal in culpability of a purposeful murder unaccompanied by any additional crime. [Thus,] New Hampshire law must regard a defendant's lack of a purpose to kill as indicative of substantially lower culpability than would be the case if the defendant had had a purpose to kill," thereby precluding the imposition of a sentence of death under our State Constitution. We are not persuaded.

 The legislature has established that the *mens rea* necessary to render a capital murderer eligible for the death penalty may be satisfied by proof that the defendant:

> (1) purposely killed the victim; [or]
>
> (2) purposely inflicted serious bodily injury which resulted in the death of the victim; [or]
>
> (3) purposely engaged in conduct which . . . the defendant knew would create a grave risk of death to a person, other than one of the participants in the offense; and . . . resulted in the death of the victim.

RSA 630:5, VII(a). Thus, under the plain language of the statute, defendants who commit capital murder with any one of the three "purposely" mental states identified in RSA 630:5, VII(a) are equally culpable under the law. Accordingly, a defendant who knowingly kills a police officer acting in the line of duty, who does so for the purpose of avoiding or preventing a lawful arrest, and who acts with a specific intent either to inflict serious bodily injury or to engage in conduct knowing it created a grave risk of death, is subject to the death penalty even if the defendant did not have the specific intent to kill the officer. *See* RSA 630:1, I(a); RSA 630:5, IV, VII(a), (j); *see also* RSA 626:2, II(a), (b) (2007) (defining "purposely" and "know-

ingly"); *State v. Holmes*, 154 N.H. 723, 725 (2007) ("the Criminal Code generally uses the term 'purposely' in place of specific intent").

 Our capital sentencing scheme reflects the legislature's judgment that the most egregious murderers who warrant the most severe sentence under our law are not restricted to those who harbor a specific intent to kill. The Supreme Court has endorsed the constitutionality of this legislative approach:

> A narrow focus on the question of whether or not a given defendant "intended to kill" . . . is a highly unsatisfactory means of definitively distinguishing the most culpable and dangerous of murderers. Many who intend to, and do, kill are not criminally liable at all — those who act in self-defense or with other justification or excuse. Other intentional homicides, though criminal, are often felt undeserving of the death penalty — those that are the result of provocation. On the other hand, some nonintentional murderers may be among the most dangerous and inhumane of all — the person who tortures another not caring whether the victim lives or dies, or the robber who shoots someone in the course of the robbery, utterly indifferent to the fact that the desire to rob may have the unintended consequence of killing the victim as well as taking the victim's property. This reckless indifference to the value of human life may be every bit as shocking to the moral sense as an "intent to kill."

*Tison*, 481 U.S. at 157. Moreover, our legislature's decision to classify the type of murder committed by the defendant as one warranting a death sentence reflects its judgment that

> [t]he murder of a law enforcement officer engaged in the performance of his official duties differs in kind and not merely in degree from other murders. When in the performance of his duties, a law enforcement officer is the representative of the public and a symbol of the rule of law. The murder of a law enforcement officer engaged in the performance of his duties in the truest sense strikes a blow at the entire public — the body politic — and is a direct attack upon the rule of law which must prevail if our society as we know it is to survive.

*State v. Polke*, 638 S.E.2d 189, 196 (N.C. 2006) (quotation and emphasis omitted).

 The legislature has determined that the magnitude of the crime committed by the defendant warrants the most severe penalty under

our law, and the defendant has failed to present any convincing legal authority to establish that this legislative judgment is prohibited under our State Constitution. *See Duquette v. Warden, N.H. State Prison*, 154 N.H. 737, 745 (2007) (court will not declare legislative act unconstitutional "except upon inescapable grounds"); *Deflorio*, 128 N.H. at 316 (court presumes the validity of the sentence selected by the legislature, and the challenging party bears a heavy burden to establish that the legislation is unconstitutional).

The defendant next points to "the jury's failure to find that [he] posed a threat of future danger in prison" as showing that his sentence of death was based upon retribution. According to the defendant, "in the absence of a statement that retribution constitutes a constitutionally permissible purpose of punishment under the New Hampshire Constitution, [his] execution would serve no sanctioned purpose." Regardless of whether retribution is a recognized goal of sentencing, we conclude that the defendant fails to establish that the jury's sentencing verdict, rendered pursuant to the capital sentencing scheme, does not meet legitimate goals of sentencing.

 Although our precedent expresses the goals of sentencing in a variety of ways, under our State Constitution both punishment and deterrence are legitimate goals of sentencing. *See State v. Henderson*, 154 N.H. 95, 97 (2006); *Evans*, 127 N.H. at 505; *State v. Wentworth*, 118 N.H. 832, 842 (1978); *State v. Burroughs*, 113 N.H. 21, 24 (1973). We have stated:

> The real purpose of all sentencing is to reduce crime. This theoretically can be done by rehabilitating the individual defendant so he will not offend again. Another way is to punish the individual defendant in the hope that he will be deterred from repeating his crime. Moreover, by punishing the individual defendant others may be deterred from committing crimes. Whichever sentence is thought to be likely to reduce the most crime is the proper sentence to impose.
>
> ... [Part I, Article 18] recognizes deterrence as a valid purpose of sentencing; the implication is that reform will result from the deterrent effect of punishment. General deterrence is also recognized in other language in the article when it states that if the same "severity is exerted against all offenses, the people are led ... to commit the most flagrant with as little compunction as they do the lightest offenses." Rehabilitation, which in the modern sense of the word includes counseling and training, is not a constitutional requirement.

*Wentworth*, 118 N.H. at 842; *see also State v. Darcy*, 121 N.H. 220, 225-26 (1981).

The legislature has authorized the imposition of a death sentence for the commission of capital murder without proof of a defendant's potential future dangerousness. *See* RSA 630:5, IV, VII. Here, the State identified as a *non-statutory* aggravating factor the defendant's potential future dangerousness, which the jury determined was not proved. Nevertheless, in the legislature's judgment, the commission of capital murder, along with two requisite statutory aggravating factors, which do not require an evaluation of a defendant's future dangerousness, warrants a sentence of death. *See* RSA 630:5, I, IV. Imposing the most severe sentence under the circumstances of this case comports, in part, with the goal of reducing crime by deterring others from such conduct. *See Wentworth*, 118 N.H. at 842. It also accords with fostering "public confidence in the system of justice" by ensuring that "the seriousness of the crime [will not] be unduly depreciated." *Darcy*, 121 N.H. at 225-26.

We note that, pursuant to the capital sentencing scheme, the sentencing jury also assessed the individual characteristics of the defendant and the particular circumstances of the crime. *See State v. Fraser*, 120 N.H. 117, 122 (1980) (not all persons convicted of a particular crime must receive the same sentence — even if crimes were identical, defendants may not be). As the trial court observed, in addition to the guilt phase verdict and eligibility phase findings, the jury's findings regarding the non-statutory aggravating factors show that it determined that the murder of Officer Briggs represented "the culmination of consistent violent conduct" committed by the defendant. We agree with the trial court that the jury's sentencing verdict met the constitutional objectives of "punish[ing] the defendant for his conduct" and "deter[ring] others from similar conduct."

Accordingly, we hold that the defendant has not demonstrated that the death penalty statute, as applied in his case, violates Part I, Article 18 of the State Constitution. As the defendant presents no independent analysis under either Part I, Article 15 or Part I, Article 33, none is warranted. *See State v. Chick*, 141 N.H. 503, 504 (1996). In any event, to the extent that the defendant asserts Article 15 and Article 33 arguments, we reject them for the same reasons set forth in our Article 18 analysis. *See Wentworth*, 118 N.H. at 843. Finally, we agree with the State that the defendant failed to preserve an independent due process argument under Part I, Article 15. *See Chick*, 141 N.H. at 504.

*B. Statutory Aggravating Factors (Narrowing Function)*

*1. Background*

In August 2007, the defendant moved to strike a statutory aggravating factor identified in the death penalty notice that charged: "Michael K.

Addison purposely inflicted serious bodily injury which resulted in the death of Manchester Police Officer Michael L. Briggs." *See* RSA 630:5, VII(a)(2) (2007) (hereinafter "serious bodily injury factor"). He argued that this factor required proof of only "first degree assault . . . with the additional circumstance that death resulted," and, thus, was "less egregious than" capital murder conduct. Therefore, he argued, the serious bodily injury factor failed to narrow the class of capital murderers eligible for the death penalty, and a death sentence based upon that factor would violate his rights under the State and Federal Constitutions. *See* N.H. CONST. pt. I, arts. 15, 18, 33; U.S. CONST. amends. V, VIII, XIV.

The State objected, arguing that the capital sentencing scheme satisfies the constitutional mandate of narrowing the class of death-eligible murders because RSA 630:1 enumerates six types of capital murder that all require "knowing" conduct. RSA 630:1 (2007); *see* RSA 630:1, I(g) (Supp. 2012) (statute amended in 2011 to add seventh type of capital murder). The State also argued that the serious bodily injury factor under RSA 630:5, VII(a)(2) further narrows the death-eligible class by requiring proof that the defendant acted "purposely," the most stringent mental state. After a hearing, the trial court denied the defendant's motion by written order dated January 11, 2008. Relying upon *Tuilaepa v. California*, 512 U.S. 967, 971-72 (1994), and *Lowenfield v. Phelps*, 484 U.S. 231, 244-45 (1988), the court ruled that the definition of capital murder under RSA 630:1 itself performs the narrowing function required by the Federal Constitution. In addition, the court agreed with the State that the serious bodily injury aggravating factor 'further narrows the class of death-eligible defendants who "knowingly" kill a police officer acting in the line of duty. The trial court reasoned that "not every defendant who knowingly kills a police officer will have done so with the heightened intent to inflict serious bodily injury."

The defendant subsequently moved to strike another statutory aggravating factor identified in the death penalty notice: "Michael K. Addison purposely engaged in conduct which . . . the defendant knew would create a grave risk of death to a person, other than one of the participants in the offense; and [which] resulted in the death of Manchester Police Officer Michael L. Briggs." *See* RSA 630:5, VII(a)(3) (2007) (hereinafter "grave risk of death factor"). The defendant argued that if the jury found that he knowingly killed Officer Briggs by shooting him in the head, then "he necessarily knew that in so doing, he created a grave risk of death to Officer Briggs." Therefore, he reasoned, to "elevate this murder to a more aggravated level" and achieve the intended narrowing function, the grave risk of death factor must rest upon "some risk-creating conduct above and beyond the capital murder." Accordingly, he requested that the court either

strike this factor or instruct the jury that the conduct supporting the grave risk of death factor must differ from the conduct underlying the capital murder. Without such an instruction, he argued, the jury's consideration of the grave risk of death factor would violate his rights under the State and Federal Constitutions. *See* N.H. CONST. pt. I, arts. 15, 18, 33; U.S. CONST. amends. V, VIII, XIV.

The State objected. Noting "the substantively different *mens rea* requirements for the guilt phase charge and for the challenged aggravator," the State argued that the "more directed intent" of "purposely" required for the aggravating factor "not only ensures that it can never be duplicative to the capital charge — either on its face or as applied — but also correctly narrows the class of criminal defendants who may be eligible for a sentence of death." Additionally, the State contended that the proposed jury instruction was an incorrect statement of the law.

The trial court denied the defendant's motion by written order dated August 13, 2008. The court first referred to its earlier order in which it "found that any duplication between statutory aggravators and the capital murder indictment would not violate the State or Federal Constitution because [the statutory] definition of capital murder itself performs the constitutionally required narrowing function." In addition, the court again agreed with the State that the grave risk of death aggravating factor under RSA 630:5, VII(a)(3) further narrows the class of death-eligible defendants who "knowingly" kill a police officer acting in the line of duty; it reasoned that "not every defendant who knowingly kills a police officer will purposely engage in that conduct, knowing that it would cause a grave risk of death to that officer."

Following the defendant's conviction for capital murder, the trial court instructed the jury regarding the statutory aggravating factors during the eligibility phase of sentencing. The jury returned its eligibility decision on a Special Findings Form, which is included in Appendix A. As pertinent here, it found that the State had proved both the serious bodily injury and the grave risk of death factors, but had not proved the third noticed aggravating factor charging that the defendant purposely killed Officer Briggs. *See* RSA 630:5, VII(a)(1)-(3) (2007).

The defendant then moved to bar the imposition of the death penalty. He again argued that the serious bodily injury and grave risk of death factors failed to narrow the class of murderers who should be sentenced to death. The defendant urged the court to reconsider its prior orders in light of the "changed circumstances call[ing] for a fact-specific, as applied, constitutional challenge." The defendant based his argument upon the purportedly more protective nature of our State Constitution.

The State objected, and the trial court denied the defendant's motion by written order dated December 27, 2008. Consistent with its earlier orders, the court ruled that the heightened mental state required for death eligibility under both challenged factors narrowed the class of capital murderers convicted of knowingly causing the death of a police officer acting in the line of duty.

The trial court required the State to choose between the proven serious bodily injury factor and the proven grave risk of death factor for the jury's consideration in deciding whether to impose a sentence of death at the sentence selection phase of trial. The State selected the serious bodily injury factor, and the court instructed the jury accordingly.

### 2. Appellate Argument

The defendant argues that the trial court erred by denying his motions to strike the serious bodily injury and grave risk of death statutory aggravating factors, by failing to provide the jury with his proposed jury instructions regarding both factors, and by denying his motion to bar the imposition of the death penalty. *See* RSA 630:5, VII(a)(2), (3). He argues that the challenged factors did not operate to further narrow the pool of capital murderers under the facts and circumstances of this case: "In this case, there is no difference between the conduct for knowing murder and 'purpose to inflict serious injury' or 'grave risk of death.' Thus, the latter findings did not narrow, as the New Hampshire statute requires." In the absence of his proposed instructions, the defendant argues, the eligibility phase findings violate the capital sentencing statute, and the resulting death sentence violates his rights to due process and to be free from cruel and/or unusual punishment under the State and Federal Constitutions, N.H. CONST. pt. I, arts. 15, 18, 33; U.S. CONST. amends. V, VIII, XIV.

### 3. Discussion

We first address the defendant's arguments under the State Constitution and rely upon federal law only to aid our analysis. *See State v. Ball*, 124 N.H. 226, 231-33 (1983).

In *State v. Addison*, 160 N.H. 732, 741-47 (2010), we set forth the jurisprudential history of the current capital sentencing scheme which was enacted after *Furman v. Georgia* was decided by the United States Supreme Court. In *Furman*, the Court struck down state statutes that left the decision to impose the death penalty to the uncontrolled discretion of a judge or jury as violating the Eighth and Fourteenth Amendments to the United States Constitution. *Furman v. Georgia*, 408 U.S. 238 (1972) (*per curiam*); *see Zant v. Stephens*, 462 U.S. 862, 874 (1983); *Addison*, 160 N.H.

at 741-42. To satisfy the Federal Constitution, a capital sentencing statute that gives a sentencing body discretion to impose capital punishment must contain clear and objective standards that suitably direct and channel that discretion and make the process for imposing a death sentence rationally reviewable. *See Arave v. Creech*, 507 U.S. 463, 470-71 (1993); *Lewis v. Jeffers*, 497 U.S. 764, 774 (1990); *Gregg v. Georgia*, 428 U.S. 153, 206-07 (1976). Such a circumscribed legislative framework "protect[s] defendants against the arbitrary and capricious, or wanton and freakish, imposition of the death penalty in accord with the Eighth and Fourteenth Amendments." *Addison*, 160 N.H. at 764-65 (citing *Gregg*, 428 U.S. at 199; *Proffitt v. Florida*, 428 U.S. 242, 258 (1976) (plurality opinion)).

 Since *Furman*, Eighth Amendment precedent "address[es] two different aspects of the capital decisionmaking process: the eligibility decision and the selection decision." *Tuilaepa*, 512 U.S. at 971; *see Zant*, 462 U.S. at 878. "To render a defendant eligible for the death penalty in a homicide case, . . . the trier of fact must convict the defendant of murder and find one 'aggravating circumstance' (or its equivalent) at either the guilt or penalty phase." *Tuilaepa*, 512 U.S. at 971-72. "By doing so, the jury narrows the class of persons eligible for the death penalty according to an objective legislative definition." *Lowenfield*, 484 U.S. at 244-45. Thus, a constitutional statute establishes "a threshold below which the [death] penalty cannot be imposed" with "rational criteria that narrow the decisionmaker's judgment as to whether the circumstances of a particular defendant's case meet the threshold." *Romano v. Oklahoma*, 512 U.S. 1, 6-7 (1994) (quotation omitted); *see Lewis*, 497 U.S. at 774. The capital sentencing scheme must, therefore, " 'genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.' " *Romano*, 512 U.S. at 7 (quoting *Zant*, 462 U.S. at 877); *see Gregg*, 428 U.S. at 197 (a constitutional state statute provides a principled basis "for distinguishing the few cases in which the death penalty is imposed from the many cases in which it is not").

 At the sentence selection phase, "the sentencer determines whether a defendant eligible for the death penalty should in fact receive that sentence." *Tuilaepa*, 512 U.S. at 972. "What is important at the selection stage is an *individualized* determination on the basis of the character of the individual and the circumstances of the crime." *Id.* (quotation omitted); *see Romano*, 512 U.S. at 7; *Zant*, 462 U.S. at 878. "To this end, States cannot limit the sentencer's consideration of any relevant circumstance that could cause it to decline to impose the [death] penalty. In this respect, the State cannot channel the sentencer's discretion, but must

allow it to consider any relevant information offered by the defendant." *Romano*, 512 U.S. at 7 (quotation omitted).

■■■ The defendant here challenges the death eligibility component of our statutory scheme — specifically, the statutory aggravating factors under RSA 630:5, VII(a)(2) and (3). The Supreme Court has underscored that the use of aggravating factors "is not an end in itself, but a means of genuinely narrowing the class of death-eligible persons and thereby channeling the jury's discretion." *Lowenfield*, 484 U.S. at 244. The aggravating circumstance that narrows the class of death-eligible murderers "may be contained in the definition of the crime or in a separate sentencing factor (or in both)." *Tuilaepa*, 512 U.S. at 972. Thus, "the narrowing function required for a regime of capital punishment may be provided" either by the legislature narrowing the definition of capital offenses "so that the jury finding of guilt responds to this concern," or by the legislature "more broadly defin[ing] capital offenses and provid[ing] for narrowing by jury findings of aggravating circumstances at the penalty phase." *Lowenfield*, 484 U.S. at 246; *see, e.g., Jurek v. Texas*, 428 U.S. 262, 276 (1976) ("By narrowing its definition of capital murder, Texas has essentially said that there must be at least one statutory aggravating circumstance in a first-degree murder case before a death sentence may even be considered."); *Brecheen v. Reynolds*, 41 F.3d 1343, 1359 (10th Cir. 1994) (reviewing differing functions of aggravating circumstances under various state statutes). Moreover, to perform the required narrowing function, the death-eligible aggravating circumstance identified by state statute "may not apply to every defendant convicted of a murder [but] . . . must apply only to a subclass of defendants convicted of murder"; it also "may not be unconstitutionally vague." *Tuilaepa*, 512 U.S. at 972.

States have latitude in enacting capital sentencing schemes that satisfy these constitutional requirements, and the Supreme Court has affirmed the constitutionality of various state capital sentencing schemes. *See Tuilaepa*, 512 U.S. at 974-75 (reviewing cases); *Lowenfield*, 484 U.S. at 244-45 (same); *Addison*, 160 N.H. at 742-46 (same). In New Hampshire, the commission of capital murder, *see* RSA 630:1, in conjunction with the existence of two statutory aggravating factors, *see* RSA 630:5, I, IV, VII (2007), renders a defendant eligible to receive a sentence of death. *See Addison*, 160 N.H. at 768-69.

First, the State must prove beyond a reasonable doubt to a unanimous jury that the defendant committed "the offense of capital murder" as defined in RSA 630:1. RSA 630:5, I; *see* RSA 630:1, III. That statute limits "capital murder" to several specific types of murder, including one that is distinguished by the victim's status as a law enforcement officer acting in

the line of duty. RSA 630:1, I(a). Second, the State must prove beyond a reasonable doubt to a unanimous jury the existence of two statutory aggravating factors. RSA 630:5, IV; *see Addison*, 160 N.H. at 768-69. One factor must be among those listed in RSA 630:5, VII(a), while the second must be among those listed in RSA 630:5, VII(b)-(j). RSA 630:5, IV. The factors in the first category comprise three variants of purposeful conduct. RSA 630:5, VII(a). The factors identified in the second category generally pertain to the circumstances of the crime, the background of the defendant, or the victim's status. RSA 630:5, VII(b)-(j). If the jury makes findings that render the defendant eligible to receive a sentence of death, the jurors then determine whether to impose that sentence by considering all of the sentencing evidence, including proven aggravating factors and proven mitigating factors. *See* RSA 630:5, III, IV (2007); *Addison*, 160 N.H. at 763; *see also* RSA 630:5, IV ("The jury, regardless of its findings with respect to aggravating and mitigating factors, is never required to impose a death sentence and the jury shall be so instructed.").

The defendant argues that his death sentence is constitutionally infirm because the legislature intended that the aggravating factors under RSA 630:5, VII(a) perform a further narrowing of the class of capital murderers, but that such narrowing did not occur in this case. He does not argue, however, that either the serious bodily injury factor or the grave risk of death factor is facially vague or overbroad. Rather, he contends that it is *the application* of the challenged factors *to the facts and circumstances of this case* that demonstrates that they fail to perform the required narrowing function. In so arguing, he focuses upon *the particular manner* in which he murdered Officer Briggs: by shooting him in the head at close range. The defendant contends that "[w]here the jury has convicted [him] of a knowing murder based on a gunshot wound to the head, its additional finding that [he], by the same conduct, had a purpose to inflict serious bodily injury, is superfluous." Additionally, he contends that "where the jury has found [him] guilty of knowingly killing the victim, a finding that he created a 'grave risk of death' to the same victim, by virtue of the same conduct, served no legitimate narrowing function." For the eligibility phase findings to be meaningfully distinct from the capital murder conviction in this case, the defendant argues, they must have been based upon conduct distinct from that which underlies the capital murder conviction.

The defendant's argument, however, runs counter to the trial court's ruling that RSA 630:1, I(a) by itself accomplished the constitutionally required narrowing function in this case. *Furman* and its progeny demonstrate that the constitutionally required narrowing function can be satisfied by a state statute that contains objective criteria distinguishing

between those murderers who are death eligible and those who are not. If a state statute satisfies the constitutional requirement of distinguishing death-eligible murderers as more culpable than other murderers, the sentencing body's findings in a specific case — as guided by that constitutional statute — necessarily perform the requisite narrowing function. *See Tuilaepa*, 512 U.S. at 972-73 (the aggravating circumstance which narrows the class of death-eligible murderers "may be contained in the definition of the crime or in a separate sentencing factor (or in both)," and the jury's "eligibility decision fits the crime within a defined classification"); *Lowenfield*, 484 U.S. at 246 ("Here, the 'narrowing function' was performed by the jury at the guilt phase when it found defendant guilty of three counts of murder under the [statutory] provision that 'the offender has a specific intent to kill or to inflict great bodily harm upon more than one person.' "); *Zant*, 462 U.S. at 878 ("statutory aggravating circumstances play a constitutionally necessary function at the stage of legislative definition: they circumscribe the class of persons eligible for the death penalty").

The narrowing function analysis does not, as the defendant suggests, extend beyond an assessment of the language of the state statute when the challenged statutory provisions are not vague or overbroad. *See, e.g., Arave*, 507 U.S. at 471 (court first examines the statutory language to determine whether the aggravating circumstance is vague and thus fails to provide any guidance to the sentencer); *Lewis*, 497 U.S. at 777-78 (noting appellate court's decision that the statutory aggravating circumstance effectively channeled sentencer's discretion by clear and objective standards and thus was not facially vague, and holding, alternatively, that the state court construed the provision in a constitutionally narrow fashion); *Walton v. Arizona*, 497 U.S. 639, 654 (1990), *overruled in part on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002) ("When a federal court is asked to review a state court's application of an individual statutory aggravating or mitigating circumstance in a particular case, it must first determine whether the statutory language defining the circumstance is itself too vague to provide any guidance to the sentencer."); *cf. Maynard v. Cartwright*, 486 U.S. 356, 363-64 (1988) (holding that aggravating circumstance of "especially heinous" murder did not perform the constitutionally required narrowing function because an ordinary person could believe that it described every unjustified, intentional murder and no limiting construction was provided by the court); *Godfrey v. Georgia*, 446 U.S. 420, 432-33 (1980) (plurality opinion) (death sentence was constitutionally infirm because the statutory aggravating factor was vague in that it could be construed to incorporate all murderers and the record did not show that the state had adopted and applied an adequate limiting construction).

 Here, the trial court determined that the definition of capital murder under RSA 630:1, I(a) performed the constitutionally required narrowing function. This conclusion is supported by Supreme Court precedent. *See Tuilaepa*, 512 U.S. at 971-72; *Lowenfield*, 484 U.S. at 246. Indeed, once the defendant was found guilty of capital murder under RSA 630:1, I(a) for knowingly killing a law enforcement officer acting in the line of duty, he was set apart from the general class of defendants convicted of murder, and placed into a subset of murderers who may be punished by death. *See* RSA 630:1, III. Thus, we conclude that the defendant's capital murder conviction under RSA 630:1, I(a) achieved the narrowing function required by both the State and Federal Constitutions. *See Tuilaepa*, 512 U.S. at 972; *Lowenfield*, 484 U.S. at 246; *Jurek*, 428 U.S. at 276.

Nevertheless, the defendant argues that the imposition of the death sentence is constitutionally prohibited in this case. He contends that where "narrowing is required by statute, but in a given case does not occur . . . the resulting death sentence violate[s] the statute, as well as the State and Federal Due Process Clauses and prohibitions against cruel and unusual punishments." According to the defendant, "If a state statute requires additional narrowing, but the narrowing does not serve its intended function under the facts of a specific case, the scheme sanctions death sentences that are arbitrary and unfair, in the sense that some defendants are death-eligible even where the required narrowing has failed." Assuming, without deciding, that the legal premise of the defendant's claim is sound, we reject his argument. We conclude that the proven serious bodily injury statutory aggravating factor considered by the jury in its sentence selection deliberations performed the additional narrowing function set forth in the statute. Accordingly, we need not consider whether the grave risk of death statutory aggravating factor, which was found by the jury but was not part of the sentence selection deliberations, also performed a narrowing function in this case.

 As the trial court concluded, the plain language of RSA 630:5, VII(a)(2) distinguishes capital murderers who cause the death of another with the purpose to inflict serious bodily injury from those who cause death only knowingly — that is, without specific intent. "Purposely" is a heightened mental state as compared to "knowingly," *see* RSA 626:2, II, III (2007), and is defined as follows: "A person acts purposely with respect to a material element of an offense when his conscious object is to cause the result or engage in the conduct that comprises the element." RSA 626:2, II(a); *see State v. Holmes*, 154 N.H. 723, 725 (2007) ("the Criminal Code generally uses the term 'purposely' in place of specific intent"); *State v. Ayer*, 136 N.H. 191, 194 (1992) ("specific intent commonly refers to a special

mental element above and beyond that required with respect to the criminal act itself"). "Knowingly" is defined as follows: "A person acts knowingly with respect to conduct or to a circumstance that is a material element of an offense when he is aware that his conduct is of such nature or that such circumstances exist." RSA 626:2, II(b); *see State v. Glenn*, 160 N.H. 480, 486 (2010) ("A person acts knowingly when he is aware that it is practically certain that his conduct will cause a prohibited result." (quotation omitted)). Therefore, it is the heightened mental state required by the serious bodily injury statutory aggravating factor that serves to additionally narrow the class of capital murderers who knowingly kill a police officer acting in the line of duty. *See Arave*, 507 U.S. at 475-76, 477-78 (under the statutory scheme, the statutory aggravating circumstance narrowed the entire class of first-degree murderers to "the subclass of defendants who kill without feeling or sympathy as more deserving of death," by focusing upon a defendant's state of mind).

Under our statutory scheme, when the jury convicted the defendant of capital murder, it determined that he shot Officer Briggs with the awareness that it was practically certain his death would result. In rendering its verdict, the jury was not required to determine whether the defendant harbored a conscious object or specific intent to inflict serious bodily injury. Only at the eligibility phase was the jury required to determine whether the defendant acted purposely when he shot Officer Briggs. Accordingly, once the jury determined that the defendant acted with the purpose to cause serious bodily injury, the defendant was further set apart from those defendants who commit capital murder knowingly.

The defendant contends that "[c]ourts addressing the distinction between intent to kill and intent to seriously injure, based on the same conduct toward the same victim, have discerned no meaningful difference." *See, e.g., State v. Murray*, 757 A.2d 578, 584 (Conn. 2000); *State v. Young*, 159 N.H. 332, 343 (2009); *State v. Ramsey*, 1 A.3d 796, 804 (N.J. Super. Ct. App. Div. 2010); *State v. Warren*, 5 P.3d 1115, 1117 (Or. Ct. App. 2000); *Com. v. Anderson*, 650 A.2d 20, 24 (Pa. 1994). However, these cases, at most, illustrate that the *specific intent to kill* a person subsumes the *specific intent to cause serious bodily injury* to the same victim with the same conduct. They do not establish the proposition that a defendant's conviction for killing a person with the lesser mental state of "knowingly" necessarily subsumes the specific intent to cause serious bodily injury. Here, the guilty verdict under RSA 630:1, I(a) did not require the jury to find that the defendant had a specific intent to kill or seriously injure Officer Briggs.

Because the serious bodily injury factor performed a further narrowing function under our sentencing scheme, we hold that the defendant has failed to establish that the trial court erred in denying his motion to strike

that factor.[3] To the extent that the defendant's "as applied" argument challenges the comparative proportionality of his sentence, *see Arave*, 507 U.S. at 476-77; *Walton*, 497 U.S. at 655-56, he may raise it in the context of the next phase of this appeal. *See* RSA 630:5, XI(c) (2007); *Addison*, 160 N.H. at 780.

The defendant also argues that the trial court erred in declining to adopt his proposed jury instructions. We review the trial court's decision to deny proposed jury instructions under the unsustainable exercise of discretion standard. *See State v. Davidson*, 163 N.H. 462, 472 (2012). Again, we limit our review to the proposed instruction relating to the serious bodily injury factor; the grave risk of death factor was not submitted to the jury for its consideration during its sentence selection deliberations.

With respect to the serious bodily injury factor, the trial court instructed the jury at the eligibility phase that, to find the defendant eligible for a sentence of death it had to find that "the defendant purposely inflicted serious bodily injury that resulted in the death of Officer Briggs. 'Serious bodily injury' means any harm to the body that causes severe, permanent, or protracted loss of, or impairment to the health or of the function of any part of the body." The defendant's proposed instruction, however, stated, in part: "It is not enough that the defendant knew the injury he inflicted was practically certain to cause death. You must find he specifically intended to cause a fatal injury."

The defendant argues that his proposed instruction would have required the jury to distinguish the *conduct* supporting the aggravating factor from that which established the capital murder conviction. As previously explained, however, the serious bodily injury factor required the jury to evaluate whether the defendant had a conscious object or specific intent to seriously injure Officer Briggs; the jury was not required to render findings based upon conduct that is distinct from the capital murder conduct. In short, the defendant has failed to establish that such an instruction was required under our statutory scheme, or that the trial court's failure to adopt the defendant's proposed instruction was clearly untenable or unreasonable to the prejudice of his case. *See id.* Accordingly, we hold that the defendant has not demonstrated that the imposition of a death sentence based upon the eligibility finding under RSA 630:5, VII(a)(2) violates the State Constitution. *See* N.H. CONST. pt. I, arts. 15, 18, 33.

With respect to his motion to strike the serious bodily injury statutory aggravating factor and his proposed jury instruction, the defendant makes

---

[3] Even if we assume the grave risk of death factor did not perform any narrowing function, its submission to the jury at the eligibility phase was not reversible error. As discussed in the text of this opinion, no constitutional violation would have resulted in light of the jury's findings under RSA 630:1, I(a) and RSA 630:5, VII(a)(2).

identical arguments under both the State and the Federal Constitutions. He does not argue that in this context the protections under the State and Federal Constitutions differ. *See* N.H. CONST. pt. I, arts. 15, 18, 33; U.S. CONST. amends. V, VIII, XIV. Because the Federal Constitution affords the defendant no greater protection than does the State Constitution in these circumstances, we reach the same conclusion under the Federal Constitution as we do under the State Constitution. *See Tuilaepa*, 512 U.S. at 972; *Lowenfield*, 484 U.S. at 246. With respect to his motion to bar the imposition of the death penalty, we conclude that to the extent that the defendant argues that the State Constitution provides greater protection than the Federal Constitution regarding the narrowing function analysis, his argument is cursory, and, thus, does not warrant appellate review. *See State v Ayer*, 154 N.H. 500, 513 (2006).

### C. Statutory Burdens of Proof

#### 1. Background

In June 2007, the defendant filed two motions challenging the constitutionality of RSA 630:5, III (2007) and RSA 630:5, IV (2007) regarding burdens of proof for components of the capital sentencing process. RSA 630:5, III provides in pertinent part: "The burden of establishing the existence of any mitigating factor is on the defendant, and is not satisfied unless established by a preponderance of the evidence." RSA 630:5, IV provides, in pertinent part, that if the State has proven at least two statutory aggravating factors required for death eligibility,

> the jury shall then consider whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist, or in the absence of mitigating factors, whether the aggravating factors are themselves sufficient to justify a sentence of death. Based upon this consideration, if the jury concludes that the aggravating factors outweigh the mitigating factors or that the aggravating factors, in the absence of any mitigating factors, are themselves sufficient to justify a death sentence, the jury, by unanimous vote only, may recommend that a sentence of death be imposed rather than a sentence of life imprisonment without possibility of parole.

RSA 630:5, IV.

In his first motion, the defendant asserted a facial challenge to RSA 630:5, III based upon its requirement that a capital defendant prove mitigating factors by a preponderance of the evidence, instead of by a lower burden of proof. He claimed that the statute violated several provisions of

the New Hampshire Constitution, including his right to due process as protected by Part I, Article 15. The State objected and, following a hearing, the trial court denied the defendant's motion by written order dated October 1, 2007.

The trial court rejected the defendant's due process argument, concluding that the death penalty statute contains many procedural safeguards, the probable value of additional safeguards is low, and mitigating factors proven by a preponderance of the evidence ensure that death penalty decisions are based upon accurate and non-speculative information.

In his second motion, the defendant asserted a facial challenge to RSA 630:5, IV under the State Constitution based upon the fact that the statute does not require the jury to find that aggravating factors outweigh mitigating factors beyond a reasonable doubt. He claimed that the statute fails to provide adequate guidance to the jurors as to the weighing process and thus violates, among other things, his right to due process as protected by Part I, Article 15. The State objected and, following a hearing, the trial court denied the defendant's motion by written order dated October 1, 2007.

In rejecting the defendant's state constitutional claim that procedural due process requires imposing the reasonable doubt standard upon the weighing process, the trial court determined that the defendant was "already protected in numerous ways from an erroneous sentence." It identified various protections afforded capital defendants under RSA 630:5 (2007), concluding that "it is unlikely that applying the reasonable doubt standard would provide more protection to the defendant against an erroneous weighing of the crime and the defendant's background and character than what is already provided by the statute." The court concluded that "imposing the reasonable doubt standard upon the weighing process may confuse the jury, as [that] standard is ill equipped to describe the jury's moral task."

### 2. Appellate Argument

The defendant argues that the death penalty statute violates his right to due process under the State Constitution by imposing too high a burden of proof on a defendant's constitutional right to have jurors consider mitigating evidence, thereby precluding the jury from considering mitigating factors that it finds are present by "an equal probability." *See* RSA 630:5, III. He also argues that the death penalty statute violates due process under the State and Federal Constitutions by permitting the jury to impose death if aggravating factors "sufficiently outweigh" mitigating factors, without requiring that jurors be convinced beyond a reasonable doubt. *See* RSA 630:5, IV. According to the defendant, "[t]he combined effect of these

two flaws is that the statute imposes too high a burden on the defendant regarding mitigation and too low a burden on the State with regard to the weighing process," and requires jurors to ignore important evidence that failed to reach the preponderance standard and to ignore their own reasonable doubts in deciding whether a defendant should be put to death.

### 3. Discussion

#### a. Standard for Proving Mitigating Factors Under RSA 630:5, III

The defendant first argues that the Due Process Clause of the State Constitution requires that a capital defendant be permitted to prove mitigating factors by a lower burden of proof than preponderance of the evidence, such as by demonstrating "a 50/50 chance" or presenting "some evidence." Because the defendant's argument rests solely upon the State Constitution, we base our decision upon it alone and refer to federal law only to aid our analysis. *See State v. Ball*, 124 N.H. 226, 231-33 (1983).

The defendant acknowledges that the United States Supreme Court has held that the Eighth and Fourteenth Amendments to the Federal Constitution are not violated by requiring a defendant to prove mitigating circumstances by a preponderance of the evidence. *See Walton v. Arizona*, 497 U.S. 639, 649-51 (1990), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002). The Supreme Court noted in *Walton* that it had previously "refused to countenance state-imposed restrictions on what mitigating circumstances may be considered in deciding whether to impose the death penalty." *Id.* at 649; *see Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality opinion). The Court stated, however, that "it does not follow . . . that a State is precluded from specifying how mitigating circumstances are to be proved." *Walton*, 497 U.S. at 649. The Court explained that due process is not offended by requiring a defendant to prove an affirmative defense by a preponderance of the evidence or even beyond a reasonable doubt, so long as the State retains the ultimate burden to prove the elements of the crime. *Id.* at 650. Similarly, at the sentence selection phase of a capital trial, the Court held that "[s]o long as a State's method of allocating the burdens of proof does not lessen the State's burden . . . to prove the existence of aggravating circumstances, a defendant's constitutional rights are not violated by placing on him the burden of proving mitigating circumstances sufficiently substantial to call for leniency." *Id.* Here, as the trial court observed in denying the defendant's motion on this issue, "[a]ll state court decisions both following and preceding *Walton* have come to the same conclusion, based on both the federal constitution and their own state constitutions."

The defendant does not argue that imposing *any* burden of proof on him at the sentence selection phase of his capital trial is unconstitutional. Rather, he argues that RSA 630:5, III "imposes an unconstitutionally high burden on [him] to prove mitigating factors." The defendant observes that "[w]hen determining whether a statutory burden of proof satisfies the due process requirement [we] first ask[ ] whether the challenged procedure concerns a constitutionally protected interest, and if so, whether the procedure at issue affords the requisite safeguards." (Quotations omitted.) The defendant asserts that because "the capital sentencing process directly affects [his] constitutionally protected interest in his life," the first part of the due process test is met. He then turns to the "larger inquiry" of "whether the burden imposed on [him] to prove mitigating factors by a preponderance of the evidence is consistent with the safeguards required by due process in a capital sentence selection proceeding."

■ Our due process analysis balances the following three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*State v. Lavoie*, 155 N.H. 477, 483 (2007) (quotation omitted).

We agree with the defendant that under the first factor, the significant private interest at stake in this case is indisputable — the potential deprivation of life. However, that the private interest is "critical" is not, by itself, dispositive. *In re Eduardo L.*, 136 N.H. 678, 687 (1993).

Thus, we turn to the second factor, the risk of an erroneous deprivation of the defendant's interest through the procedures that apply to the jury's determination whether to recommend a sentence of death. Our death penalty statute contains several procedural safeguards designed to protect a defendant against an erroneous deprivation of his or her life. For example, at the guilt phase of a capital trial, the jury must find, unanimously and beyond a reasonable doubt, that the State has proven all of the elements of the crime of capital murder as narrowly defined in the statute. *See* RSA 630:1 (2007) (amended 2011). Once a defendant's guilt has been established, the jury must then address whether the defendant is eligible for the death penalty. The jury must find, unanimously and beyond a reasonable doubt, that the State has proven at least two statutory aggravating factors. RSA 630:5, III, IV, VII (2007). In addition, the jury is

required to return special findings identifying any statutory aggravating factors the existence of which it unanimously finds beyond a reasonable doubt. RSA 630:5, IV. If the jury finds that the State has met its burden and that a defendant is eligible for a death sentence, the jury then considers whether any non-statutory aggravating factors set forth in the State's notice of intent to seek the death penalty exist. *Id.* The State must prove any non-statutory aggravating factors beyond a reasonable doubt to a unanimous jury. RSA 630:5, III, IV.

The range of mitigating evidence that the jury may consider is broad. *See* RSA 630:5, III, IV, VI(i) (2007) (the defendant may introduce "[o]ther factors in [his] background or character [that] mitigate against imposition of the death sentence"). The defendant may present any information relevant to mitigating factors and such information may only be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." RSA 630:5, III. Although the defendant must establish the existence of mitigating factors by a preponderance of the evidence, only one juror need find that the defendant has met his burden before that juror may consider the mitigating evidence. RSA 630:5, III, IV. The jury must consider all of the sentencing evidence presented. RSA 630:5, IV. The jury is specifically instructed that, regardless of its findings during sentencing and regardless of the outcome of the process of weighing the aggravating factors and mitigating factors, it is never required to impose the death penalty. RSA 630:5, IV. Even if a defendant presents no mitigating evidence, a jury may decline to recommend a death sentence because it finds that the aggravating factors have not been proven beyond a reasonable doubt or that the proven aggravating factors are not sufficient to justify death. If the jury fails to reach a unanimous decision within a "reasonable time," a sentence of life imprisonment without possibility of parole is automatically imposed. RSA 630:5, IX (2007).

Given these procedural safeguards, the value of "additional or substitute procedural safeguards" asserted by the defendant, such as allowing the jury to weigh mitigating factors he has proved by "a 50/50 chance" or "some evidence," is minimal. Since the preponderance of the evidence standard "simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence," *In re Winship*, 397 U.S. 358, 371 (1970) (Harlan, J. concurring), evidence that fails to meet this standard is at least as likely to be false as it is true. *See* 2 G. DIX ET AL., MCCORMICK ON EVIDENCE § 339, at 484 (6th ed. 2006) (proof by preponderance of the evidence is "proof which leads the jury to find that the existence of the contested fact is more probable than its nonexistence"). As

the trial court explained, "[t]his standard does not prevent the defendant from submitting all relevant mitigating evidence to the jury, but merely requires the jury to weigh only that evidence which it finds more likely true than not." *See People v. Tenneson*, 788 P.2d 786, 799 (Colo. 1990) ("It is for the jury to decide whether the 'facts' that the defendant asserts in mitigation are true and, if so, whether they are to be regarded as mitigating factors."); *see also State v. Watson*, 586 P.2d 1253, 1259 (Ariz. 1978) ("When the issue of guilt is settled and only the question of punishment remains, due process is not offended by requiring the already guilty defendant to carry the burden of showing why he should receive leniency.").

We balance the minimal benefit of the additional procedural safeguards asserted by the defendant against the governmental interest at stake. We agree with the trial court's reasoning that "[t]he State has an interest in ensuring that death penalty decisions are based upon accurate and non-speculative information, which produce a reasoned moral response to the defendant's background, character, and crime." (Quotation omitted.) *See Tuilaepa v. California*, 512 U.S. 967, 973 (1994) ("The State must ensure that the process is neutral and principled so as to guard against bias or caprice in the sentencing decision."); *Zant v. Stephens*, 462 U.S. 862, 879 (1983) ("What is important at the sentence selection stage is an *individualized* determination on the basis of the character of the individual and the circumstances of the crime.").

On balance, weighing the risk of an erroneous deprivation of the defendant's life through the procedures used against the government's interest in a sentencing decision based upon "accurate and non-speculative information," we hold that the defendant's right to due process under Part I, Article 15 of the State Constitution is not violated by requiring him to prove mitigating factors by a preponderance of the evidence.

The defendant argues, however, that "even if *Walton* represents a valid interpretation of the Federal Constitution, the *Walton* Court's explanation of the minimal federal constitutional standard reveals that the New Hampshire Legislature codified a federal capital sentencing procedure without considering the more protective features of the New Hampshire Constitution." The defendant cites cases in which we have found greater due process protections under our State Constitution than under the Federal Constitution. *See, e.g., State v. Veale*, 158 N.H. 632, 638-39 (2009) (holding that reputation alone is a sufficient interest to require state due process protection and rejecting the federal "stigma-plus" approach); *State v. Laurie*, 139 N.H. 325, 330 (1995) (requiring State to demonstrate, beyond a reasonable doubt, that undisclosed exculpatory evidence would not have affected the verdict); *State v. Phinney*, 117 N.H. 145, 147 (1977) (adopting

beyond a reasonable doubt standard in determining the voluntariness of confessions). The State responds by citing other cases in which we have found equivalent due process protections under both the State and Federal Constitutions. *See, e.g., State v. Lopez*, 156 N.H. 193, 199 (2007) (appointment of counsel for defendants mounting collateral attacks on their plea-based convictions); *State v. Cook*, 125 N.H. 452, 457, 459-60 (1984) (use of uncounseled prior convictions for purposes of habitual offender law and right to counsel at a hearing to determine habitual offender status).

These cases illuminate our interpretation of our State Constitution's protections; however, they do not control our analysis of what process is due in this case. *See Ball*, 124 N.H. at 233 ("when this court cites federal or other State court opinions in construing provisions of the New Hampshire Constitution or statutes, we rely on those precedents merely for guidance and do not consider our results bound by those decisions"). Rather, we look to our jurisprudence concerning the burdens properly allocated to criminal defendants. We have held that statutes that require defendants to prove affirmative defenses do not violate the State Constitution. For example, in *State v. Little*, 121 N.H. 765 (1981), we held that the legislature could properly require a defendant to establish the defense of entrapment by a preponderance of the evidence without violating any constitutional guarantee, "[b]ecause the burden of proving all the elements of the crime charged beyond a reasonable doubt remain[ed] with the State." *Little*, 121 N.H. at 772. Also, in *State v. Blair*, 143 N.H. 669 (1999), we held that placing upon the defendant the burden to prove an insanity defense by clear and convincing evidence did not violate Part I, Article 15 of the State Constitution. *Blair*, 143 N.H. at 674.

The legislature's allocation of the burdens of proof in RSA 630:5, III does not lessen the State's burden to convict the defendant of capital murder, or to prove, beyond a reasonable doubt, at least two aggravating factors required to establish the defendant's eligibility for a death sentence, or to prove any properly noticed non-statutory aggravating circumstances at the sentence selection phase of trial. Thus, to place upon the defendant the burden of proving mitigating factors by a preponderance of the evidence in support of his appeal for leniency — that is, to limit jurors' weighing to those mitigating factors that the defendant has shown to be more likely true than not — "violates no constitutional guarantee." *Little*, 121 N.H. at 772. Accordingly, the New Hampshire Constitution affords the defendant no greater protection in these circumstances than does the Federal Constitution. *See Walton*, 497 U.S. at 649-51.

*b. Standard for Weighing Proven Factors Under RSA 630:5, IV*

The defendant next argues that RSA 630:5, IV violates due process under the State and Federal Constitutions because "it does not require, as a prerequisite to the imposition of death, that aggravating factors outweigh the mitigating factors beyond a reasonable doubt." *See* N.H. CONST. pt. I, art. 15; U.S. CONST. amend. XIV. We first address the defendant's claim under the State Constitution and rely upon federal law only to aid our analysis. *See Ball*, 124 N.H. at 231-33.

Pursuant to RSA 630:5, IV, if the jury unanimously determines that the State has proven two of the required aggravating factors beyond a reasonable doubt, thereby making the defendant eligible for the death penalty, it must consider and make special findings as to properly noticed non-statutory aggravating factors and any mitigating factors presented by the defendant. The jury

> shall then consider whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist, or in the absence of mitigating factors, whether the aggra- vating factors are themselves sufficient to justify a sentence of death. Based upon this consideration, if the jury concludes that the aggravating factors outweigh the mitigating factors or that the aggravating factors, in the absence of any mitigating factors, are themselves sufficient to justify a death sentence, the jury, by unanimous vote only, may recommend that a sentence of death be imposed rather than a sentence of life imprisonment without possibility of parole.

RSA 630:5, IV.

The defendant argues: "Although the jury is never required to impose a death sentence, it must reach a sentencing decision by weighing aggravat- ing factors against mitigating factors. Thus, what it means for the aggravating factors to 'sufficiently outweigh' the mitigating factors effec- tively determines when a defendant will be sentenced to die." He asserts that "[w]hen this Court considers the burden of proof required by due process and fundamental fairness, it evaluates the importance of the decision, the interests of the litigants and society, and the risks of an error" and that "[e]xamination of these issues, along with the standard due process analysis, . . . demonstrates that a death sentence should only be upheld where jurors have found beyond a reasonable doubt that the aggravating factors outweighed the mitigating factors, and that death is the appropriate sentence."

Because the State does not argue otherwise, we assume, without deciding, that the statutory weighing process implicates procedural due process protections. Accordingly, we apply our traditional three-pronged analysis which requires balancing: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *Lavoie*, 155 N.H. at 483. Also as set forth above, under the first factor the significant private interest at stake in this case is indisputable — the potential deprivation of life. However, that the private interest is "critical" is not, by itself, dispositive. *Eduardo L.*, 136 N.H. at 687.

As to the second factor — the risk of an erroneous death sentence through the procedures that apply to a determination of that sentence — the defendant argues that in the absence of the beyond a reasonable doubt standard, "jurors are left to decide whether aggravating factors 'sufficiently outweigh' mitigating factors" and that "[a]ny interpretation of that phrase leads to an unacceptable risk of error and unfairness" because such standard is "inadequate" and "undefined." The Supreme Court has expressly rejected this argument, concluding that "a State enjoys a range of discretion in imposing the death penalty, including the manner in which aggravating and mitigating circumstances are to be weighed." *Kansas v. Marsh*, 548 U.S. 163, 174 (2006). "Indeed, the sentencer may be given unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty." *Tuilaepa*, 512 U.S. at 979-80 (quotation omitted).

The defendant acknowledges that the Supreme Court has held that under the Federal Constitution "specific standards for balancing aggravating against mitigating circumstances are not constitutionally required." *Zant*, 462 U.S. at 875-76 n.13; *see Marsh*, 548 U.S. at 175. As the trial court stated in its order denying the defendant's motion on this issue, "Most state courts have rejected arguments that the reasonable doubt burden of proof should apply to weighing aggravating and mitigating factors." In support of his argument, the defendant relies upon *State v. Biegenwald*, 524 A.2d 130 (N.J. 1987), and *Tenneson*, 788 P.2d 786. Both decisions, however, were based upon state statutes, not the state constitution. *See Biegenwald*, 524 A.2d at 151, 155-56; *Tenneson*, 788 P.2d at 792 n.9, 795.

The defendant cites *United States v. Gabrion*, 648 F.3d 307 (6th Cir. 2011), as the sole federal decision supporting his argument. However,

after the defendant filed his brief, the United States Court of Appeals for the Sixth Circuit vacated its decision in *Gabrion* and reheard the case. In its *en banc* decision, the Sixth Circuit now agrees with all other federal courts of appeals that have considered the issue that the weighing process is not a factual issue that the jury must decide beyond a reasonable doubt, but a moral judgment involving a process of assigning weight to competing interests or factors in order to determine the sentence itself, within a range for which the defendant is already eligible. *United States v. Gabrion*, 719 F.3d 511, 532-33 (6th Cir. 2013) (*en banc*); *see, e.g., United States v. Runyon*, 707 F.3d 475, 516 (4th Cir. 2013); *United States v. Fields*, 516 F.3d 923, 950 (10th Cir. 2008); *United States v. Mitchell*, 502 F.3d 931, 993-94 (9th Cir. 2007); *United States v. Sampson*, 486 F.3d 13, 31-32 (1st Cir. 2007); *United States v. Fields*, 483 F.3d 313, 345-46 (5th Cir. 2007); *United States v. Purkey*, 428 F.3d 738, 749-50 (8th Cir. 2005).

▮▮▮ These federal courts of appeals have decided uniformly that the weighing process is neither a "fact" nor an element of the charged offense. *See, e.g., Sampson*, 486 F.3d at 32; *Ford v. Strickland*, 696 F.2d 804, 818 (11th Cir. 1983) (*en banc*) ("The aggravating and mitigating circumstances are not facts or elements of the crime. Rather, they channel and restrict the sentencer's discretion in a structured way after guilt has been fixed."). Instead, federal courts have held that the weighing process is a "highly subjective, largely moral judgment regarding the punishment that a particular person deserves." *United States v. Barrett*, 496 F.3d 1079, 1107 (10th Cir. 2007) (quotations omitted). As the United States Court of Appeals for the Eighth Circuit explained: "[I]t makes no sense to speak of the weighing process . . . as an elemental fact . . . . [I]t is . . . the lens through which the jury must focus the facts that it has found to produce an individualized determination regarding whether the defendant should be sentenced to death, to life imprisonment without the possibility of release or some other lesser sentence." *Purkey*, 428 F.3d at 750 (citation and quotation omitted).

▮▮▮ As the trial court found, "Weighing aggravating and mitigating circumstances is an evaluative process different from determining whether a fact, such as an element of a crime or an aggravating factor, exists with a defined degree of certitude." "Unlike the determination of guilt or innocence, which turns largely on an evaluation of objective facts, the question whether death is the appropriate sentence requires a profoundly moral evaluation of the defendant's character and crime." *Satterwhite v. Texas*, 486 U.S. 249, 261 (1988) (Marshall, J., concurring).

 We agree that the weighing process is a means to an end, not an end in itself. *See Marsh*, 548 U.S. at 179. It is the "measured, normative process in which a jury is constitutionally tasked to engage when deciding the appropriate sentence for a capital defendant." *Id.* at 180. The decision regarding whether a capital defendant lives or dies is a moral judgment. *See Gabrion*, 719 F.3d at 533. Thus, "[w]hile the existence of an aggravating or mitigating circumstance is a fact susceptible to proof under a reasonable doubt or preponderance standard, the relative *weight* is not." *Ford*, 696 F.2d at 818 (citations omitted); *see Sampson*, 486 F.3d at 32 ("The outcome of the weighing process is not an objective truth that is susceptible to (further) proof by either party."); *see also Lavoie*, 155 N.H. at 482 (the concept of the burden of proof embodied in the State Constitution's Due Process Clause applies to factual determinations).

 We agree with the defendant that the need to avoid error in a decision to sentence a capital defendant to death is paramount. We conclude that the statutory standard for the weighing process, along with the other statutory protections, accomplishes this. Accordingly, we hold that the requirement in RSA 630:5, IV that the jury find that aggravating factors "sufficiently outweigh" mitigating factors does not violate Part I, Article 15 of the State Constitution.

As the State correctly observes, the defendant did not preserve his due process argument under the Federal Constitution by raising it in the trial court. *See State v. Eaton*, 162 N.H. 190, 195 (2011); *State v. Winward*, 161 N.H. 533, 542 (2011). Even assuming that his federal due process claim was preserved for appellate review, it is unavailing. The Supreme Court has held under the Federal Constitution that specific standards for balancing aggravating against mitigating circumstances are not constitutionally required. *See Marsh*, 548 U.S. at 171-75; *Tuilaepa*, 512 U.S. at 979-80; *Zant*, 462 U.S. at 875-76 n.13; *see also Medina v. California*, 505 U.S. 437, 445 (1992) (in federal due process analysis of a state criminal procedure, the state procedure will stand unless it "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental" (quotation omitted)).

### D. Inapplicability of Rules of Evidence

#### 1. Background

In 2007, the defendant filed two motions challenging the facial constitutionality of RSA 630:5, III (2007). In his first motion the defendant argued that because the statute provides that the rules of evidence do not apply at capital sentencing, the legislature has "strip[ped] from the judiciary its inherent authority to control proceedings uniquely within the realm of the

judiciary," thereby violating the Separation of Powers Clause of the State Constitution. *See* N.H. CONST. pt. I, art. 37, pt. II, art. 73-a. The State objected, and, following a hearing, the trial court denied the defendant's motion by written order dated October 10, 2007. The trial court viewed RSA 630:5, III as consistent with New Hampshire Rule of Evidence 1101(d)(3), which deems the rules of evidence inapplicable to "sentencing" generally. In addition, the court found that "[l]oosening the rules of evidence is consistent with the nature of the sentencing hearing and facilitates its goals, whether in a death penalty case or otherwise," and that under RSA 630:5, III, "the judge, as gatekeeper, still has the authority to control the evidence and make assurances that the evidence sought to be presented is reliable and fair." (Quotations and brackets omitted.)

In his second motion, the defendant argued that the inapplicability of the rules of evidence at capital sentencing allows the admission of unreliable evidence, which violates "his state constitutional rights to due process and a fair trial, and against cruel, unusual, or disproportionate punishments." *See* N.H. CONST. pt. I, arts. 15, 18, 33. The State objected, and, following a hearing, the trial court denied his motion by written order dated October 10, 2007. Following established federal and state precedent, the trial court ruled that "[t]he rules of evidence are generally ill-suited to the purposes of sentencing," and that "[i]n capital sentencing proceedings, [the] relaxed evidentiary standard promotes constitutional procedural safeguards which benefit the defendant." It concluded: "[S]uspending the rules of evidence during the sentencing hearing benefits the defendant by placing minimal restraints on the mitigating or rebuttal evidence he might seek to introduce. Moreover, the judge's inherent authority to exclude irrelevant and unreliable information, combined with evidentiary safeguards contained in RSA 630:5, III, protects the defendant against speculative, prejudicial and otherwise unconstitutional evidence."

### 2. Appellate Argument

The defendant argues that the provision in RSA 630:5, III that makes the rules of evidence for criminal trials inapplicable at capital sentencing facially violates the Separation of Powers and Due Process Clauses of the State Constitution. *See* N.H. CONST. pt. I, arts. 15, 37, pt. II, art. 73-a. He first contends that the trial court erred in relying upon Rule 1101(d)(3), which provides that the rules of evidence do not apply to "sentencing," to reject his separation of powers claim. The defendant asserts that because Rule 1101(d)(3) does not mention capital murder and the term "sentencing" as used in the Rule refers to "sentences imposed by judges," "statutory construction principles do not support extending its reach to jury trials." Regarding due process, the defendant argues that because the rules of

evidence "play a critical role in insuring fairness and reliability," the inapplicability of the rules to capital sentencing, "the most significant criminal proceeding a court can conduct," leads to the introduction of unreliable evidence.

### 3. Discussion

Because the defendant's arguments rest solely upon the State Constitution, we base our decision upon it alone and refer to federal law only to aid our analysis. *See State v. Ball*, 124 N.H. 226, 231-33 (1983).

The statutory provision at issue provides that at sentencing: "Any other information relevant to . . . mitigating or aggravating factors may be presented by either the state or the defendant, regardless of its admissibility under the rules governing admission of evidence at criminal trials, except that information may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." RSA 630:5, III. This provision applies to new evidence presented by the parties during sentencing, not to the evidence already admitted during the guilt phase of the capital trial that also is considered by the sentencing jury. *See* RSA 630:5, II, III (2007).

### a. Separation of Powers

 The defendant first argues that "the Legislature's decision to suspend the rules of evidence" in the sentencing phase of a capital trial violates the Separation of Powers Clause of the State Constitution. Part I, Article 37 provides:

> In the government of this state, the three essential powers thereof, to wit, the legislative, executive, and judicial, ought to be kept as separate from, and independent of, each other, as the nature of a free government will admit, or as is consistent with that chain of connection that binds the whole fabric of the constitution in one indissoluble bond of union and amity.

N.H. CONST. pt. I, art. 37. This provision "contemplates no absolute fixation and rigidity of powers between the three great departments of government." *Petition of S. N.H. Med. Ctr.*, 164 N.H. 319, 327 (2012) (quotation omitted). "Instead, it expressly recognizes that, as a practical matter, there must be some overlapping among the three branches of government and that the erection of impenetrable barriers among them is not required." *Id.* (quotations omitted). "Accordingly, the doctrine of separation of powers is violated only when one branch usurps an *essential* power of another." *State v. Martin*, 164 N.H. 687, 691 (2013) (quotation and brackets omitted).

"When the actions of one branch of government defeat or materially impair the inherent functions of another branch, such actions are unconstitutional." *Id.* (quotation omitted).

 The defendant's argument assumes that it is the exclusive province of the judiciary to adopt or modify a rule of evidence. *See* N.H. CONST. pt. II, art. 73-a ("The chief justice of the supreme court . . . shall, with the concurrence of a majority of the supreme court justices, make rules governing the administration of all courts in the state and the practice and procedure to be followed in all such courts."). However, we have recognized that "our authority to make evidentiary rules [is] coextensive with the legislature's." *Petition of S. N.H. Med. Ctr.*, 164 N.H. at 329. Indeed, the New Hampshire Rules of Evidence expressly provide that the legislature can limit the application of the Rules. Rule of Evidence 1101(b) provides: "These rules apply generally to all civil and criminal proceedings unless otherwise provided by the constitution or statutes of the State of New Hampshire or these rules." RSA 630:5, III, in turn, states, in part, that relevant evidence may be presented at capital sentencing "regardless of its admissibility under the rules governing admission of evidence at criminal trials." The statute, thus, "simply creates an exception for a particular type of proceeding from the general principle that the rules of evidence apply, an action that the legislature is expressly allowed to take" under Rule 1101(b). *State v. Ploof*, 162 N.H. 609, 625 (2011).

To the extent that the defendant argues that making the rules of evidence inapplicable to the sentencing phase of a capital trial defeats or materially impairs one of the judiciary's inherent functions, we disagree. *See Petition of S. N.H. Med. Ctr.*, 164 N.H. at 327. The defendant contends that by rendering the rules of evidence inapplicable to capital sentencing, the legislature "has eliminated the most important tool in controlling the flow of information" in such proceedings. Assuming that "controlling the flow of information" in a capital sentencing is an inherent judicial function, it is not impaired by RSA 630:5, III.

 Although the rules of evidence do not apply to capital sentencing, RSA 630:5, III expressly provides that evidence must be relevant to aggravating or mitigating factors and provides that the trial court may exclude such evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Under this plain language, the trial court retains its traditional role as gatekeeper of the evidence to be considered by the fact finder. *See United States v. Fell*, 360 F.3d 135, 145 (2d Cir. 2004); *see also State v. Rodrigue*, 127 N.H. 496, 500 (1985) (judge exercises wide discretion in choosing sources and types of evidence upon which to rely in imposing

sentence). Thus, the legislature has not "impaire[d] the inherent functions" of the judicial branch. *Petition of S. N.H. Med. Ctr.*, 164 N.H. at 327.

 We also reject the defendant's argument that the term "sentencing" within Rule 1101(d)(3) refers only to sentencing imposed by judges, not juries. Rule 1101(d) states: "The rules (other than with respect to privileges) do not apply in the following situations: . . . sentencing, or granting or revoking probation . . . ." N.H. R. Ev. 1101(d)(3). The plain meaning of the term "sentencing" refers to a judicial proceeding in which the penalty is determined and does not specify whether a judge or a jury must make the determination. *See, e.g.*, BLACK'S LAW DICTIONARY 1486 (9th ed. 2009) (various definitions of "sentencing"); *id.* 1223 (5th ed. 1979) ("sentencing" includes "[t]he postconviction stage of the criminal justice process in which the defendant is brought before the court for imposition of sentence. Usually a trial judge imposes sentence, but in some jurisdictions sentencing is performed by jury or by sentencing councils."). The hearing conducted under RSA 630:5 (2007) following a finding of guilt for the offense of capital murder is "a separate sentencing hearing to determine the punishment to be imposed." RSA 630:5, II. We conclude that the term "sentencing" in Rule 1101(d)(3) includes the penalty phase of a capital trial.

 Accordingly, we hold that the inapplicability of the rules of evidence at capital sentencing pursuant to RSA 630:5, III does not violate the Separation of Powers Clause of Part I, Article 37 of the State Constitution. As the defendant presents no independent argument under Part II, Article 73-a, no analysis is warranted. *See State v. Chick*, 141 N.H. 503, 504 (1996).

### b. Due Process

The defendant next asserts that the inapplicability of the rules of evidence at capital sentencing violates due process under the State Constitution. *See* N.H. CONST. pt. I, art. 15. According to the defendant, "[w]hile this Court has not addressed the precise issue presented here, it has afforded defendants enhanced Due Process protection under Part I, Article 15."

Our due process analysis balances the following three factors: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest. *See State v. Lavoie*, 155 N.H. 477, 483 (2007).

The significant private interest at stake in this case is indisputable — the potential deprivation of life. The State agrees with the defendant that this

interest is obviously substantial. However, that the private interest is "critical" is not, by itself, dispositive. *In re Eduardo L.*, 136 N.H. 678, 687 (1993). Thus, we turn to the second factor, the risk of an erroneous deprivation of the defendant's interest through the procedures that apply.

With regard to the second factor, the defendant argues that "[b]ecause the rules of evidence play a critical role in insuring fairness and reliability, the elimination of those rules in a capital sentencing trial threatens the 'private interest' by leading to the introduction of more unreliable evidence." We reject this premise, just as the United States Courts of Appeals for the Second, Fourth, Fifth, Eighth, and Ninth Circuits have rejected similar arguments when addressing challenges to the Federal Death Penalty Act, 18 U.S.C. §§ 3591 *et seq.* (2006) (FDPA). *See United States v. Mitchell*, 502 F.3d 931, 979-80 (9th Cir. 2007); *United States v. Fulks*, 454 F.3d 410, 438 (4th Cir. 2006); *United States v. Lee*, 374 F.3d 637, 648 (8th Cir. 2004); *Fell*, 360 F.3d at 143-46; *United States v. Jones*, 132 F.3d 232, 242 (5th Cir. 1998). We agree with these courts that "the admission of more rather than less evidence during the penalty phase [of a capital case] increases reliability by providing full and complete information about the defendant and allowing for an individualized inquiry into the appropriate sentence for the offense." *Lee*, 374 F.3d at 648.

Moreover, under RSA 630:5, III, the trial court must exclude evidence that is not relevant to an aggravating or mitigating factor, and may exclude otherwise relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." As we have explained, by its express terms, RSA 630:5, III retains the traditional discretionary function of the judge as gatekeeper of the evidence. Accordingly, "judges continue their role as evidentiary gatekeepers and, pursuant to the balancing test set forth in [the statute], retain the discretion to exclude any type of unreliable or prejudicial evidence that might render a trial fundamentally unfair"; at the same time the relaxation of the rules of evidence "helps to accomplish the individualized sentencing required by the constitution." *Fell*, 360 F.3d at 145-46.

Finally, we weigh the risk of erroneous deprivation of the defendant's life against the government's interest in the procedures used. Here, RSA 630:5, III serves the State's significant interest in ensuring that "the sentencing body [has] full and complete information about the defendant." *Fell*, 360 F.3d at 143; *see Jurek v. Texas*, 428 U.S. 262, 276 (1976) (it is "essential . . . that the jury have before it all possible relevant information about the individual defendant whose fate it must determine"); *Gregg v.*

*Georgia*, 428 U.S. 153, 204 (1976) ("We think it desirable for the jury to have as much information before it as possible when it makes the sentencing decision."). In light of this significant state interest, we weigh this factor heavily. *See Ploof*, 162 N.H. at 624.

 Accordingly, we hold that the inapplicability of the rules of evidence at capital sentencing pursuant to RSA 630:5, III does not violate due process under Part I, Article 15 of the State Constitution.

### E. Impact of Race in Capital Sentencing

#### 1. Background

In January 2008, nine months before trial, the defendant moved to bar the imposition of the death penalty because, among other things, "[e]xtensive research has demonstrated that in cases of an alleged murder of a white victim by a black defendant," as in this case, "it is impossible to guarantee that race will not play a role in the decision of whether or not the defendant is sentenced to die." He argued that the statistical evidence demonstrated that race would inevitably play a role in the jury's decision in his case, and that such statistical evidence of racial bias "is sufficient evidence of inequality to prove a constitutional violation" of Part I, Article 2 of the New Hampshire Constitution. Although the defendant acknowledged that the United States Supreme Court rejected such an argument under the Federal Equal Protection Clause in *McCleskey v. Kemp*, 481 U.S. 279 (1987), he argued nonetheless that "current data" demonstrates that *McCleskey* is "flawed and should not be applied to this case." He further argued that *McCleskey* is inapplicable to his state equal protection claim because "[t]he standard of review used in *McCleskey* is not consistent with the language and original intent" of Part I, Article 2 of the State Constitution.

The State objected, and, in April 2008, the trial court heard six days of expert testimony on this motion and several other defense challenges to the death penalty, including a motion regarding the "death qualification" process during jury selection, which we address in Part VIII.F (Constitutional and Statutory Review-Death-Qualified Jury) of this opinion. Four defense experts and two experts for the State testified. The defendant's experts were: William Bowers, Ph.D., Wanda Foglia, Ph.D., Mahzarin Banaji, Ph.D., and Samuel Sommers, Ph.D. Drs. Bowers and Foglia testified about the findings of the Capital Jury Project (CJP) and other research examining the impact of race and death qualification on the capital decision-making process. Dr. Banaji testified about the Implicit Association Test (IAT) and other studies regarding implicit racial bias. Dr. Sommers rebutted the State's witnesses and discussed his own mock jury research.

Two experts testified for the State: Ebbe Ebbesen, Ph.D. and Rogers Elliott, Ph.D. Dr. Ebbesen criticized all of the expert evidence presented by the defendant; Dr. Elliott specifically criticized the CJP and mock jury studies.

The trial court denied the defendant's motion by written order dated June 5, 2008. The court ruled that the research the defendant presented had fundamental shortcomings that undermined the reliability of the research results. It found that it was "very difficult" to replicate in a laboratory setting "the unique nature of a capital murder trial, during which a jury decides whether the defendant committed the charged murder and, if so, whether he should live or die." Additionally, the court found that "[b]ecause of the particularized nature of the sentencing decision and the innumerable factors the jury may consider, it is also very difficult to isolate the ultimate bases for a capital jury's decision." The trial court found it particularly troublesome that none of the studies upon which the defendant relied "concerned New Hampshire jurors, trials or capital procedures."

Ultimately, the trial court concluded — as had been acknowledged by the defendant's rebuttal expert — that, at most, the defendant's evidence proved only that "there is a *risk* that racial bias affects capital [jury] decision making," including the decision-making in his case. (Emphasis added.) The trial court determined that the defendant's evidence did not conclusively prove that racial bias, in fact, has such an effect upon capital jury decision-making. The court concluded that while "[u]ndoubtedly racism, both implicit and explicit, exists, as [do] . . . many other types of prejudices," this "does not mean that persons who may be the subject of a particular bias should not be held accountable for their actions in the same way that others are." Observing that "courts implement safeguards to ensure that each defendant is tried by a fair and impartial jury which renders its decision based on evidence presented without bias, fear or sympathy," the court identified some of the procedural safeguards it intended to implement: it would "extensively *voir dire* potential jurors about racial biases, instruct the jurors not to let race influence their decisions, and have the jurors certify that their decisions are not based on race, but on permissible, relevant considerations."

We summarize the social science research presented by the defendant and the trial court's specific findings, and provide citation to the studies addressed by the trial court.

### a. Capital Jury Project (CJP)

The CJP is a study consisting of in-depth interviews of 1,198 jurors from fourteen states who served on 353 capital cases. The CJP chose between eight and fourteen capital trials in each state and then interviewed

randomly-chosen jurors from each trial. The interviews were conducted between 1991 and 1998 and concerned capital trials that took place between 1986 and 1995. The CJP included only trials that went to the penalty phase; 43% of the trials resulted in a sentence of life imprisonment, and 57% of the trials resulted in a death sentence.

The CJP asked the jurors both structured and open-ended questions and made findings based upon their responses. The structured questions designated responses for the jurors to select, such as "yes/no" or "agree/disagree." The open-ended questions asked jurors for narrative answers.

The CJP found that the race of jurors influenced their decision during the penalty phase of a capital case. Specifically, in cases in which the defendant was black, the victim was white, and five or more white males were on the jury, 63% of juries voted for the death penalty. *See* Bowers & a., *Death Sentencing in Black and White: An Empirical Analysis of the Role of Jurors' Race and Jury Racial Composition*, 3 U. PA. J. CONST. L. 171, 191-96 (2001). By contrast, in cases where the defendant was black, the victim was white, and one black male was on the jury, only 37% of juries voted for the death penalty. *See id.* According to Dr. Foglia, having one black male on the jury "substantially decreased the chances of the death penalty. When there . . . were no black males on a jury seventy-two percent of the cases resulted in a death penalty, when [there was] just one black male it went down to thirty-seven-and-a-half percent." The CJP also found that black male jurors were more likely to believe that a defendant was remorseful and were less likely to believe that the defendant would be dangerous in the future. Bowers & Foglia, *Still Singularly Agonizing: Law's Failure to Purge Arbitrariness from Capital Sentencing*, 39 CRIM. L. BULL. 51, 77-80 (2003).

Based upon the jurors' responses, the study contained seven conclusions about the decision-making processes of capital juries: (1) jurors make premature sentencing decisions; (2) jury selection fails to remove those jurors who automatically vote for the death penalty and thereby creates jury bias; (3) jurors fail to understand jury instructions; (4) jurors erroneously believe that the death penalty is mandatory; (5) jurors fail to understand the jury's primary responsibility for the defendant's sentence; (6) jurors underestimate alternatives to a death sentence; and (7) race improperly influences jurors' decisions during the penalty phase. *See generally* Bowers, *The Capital Jury Project: Rationale, Design, and Preview of Early Findings*, 70 IND. L. J. 1043, 1085-1101 (1995). The CJP determined that these conclusions reflected constitutional problems inherent in capital punishment occurring in each of the fourteen states in the study. *See* Bowers & Foglia, *supra* at 55.

The trial court found that the CJP's results were "weakened by methodological flaws." Specifically, the court observed that "most jurors were interviewed approximately two years after the capital trials in which they had served, and some interviews took place up to five years later, calling into question the reliability of their information." Additionally, the court observed that because the CJP primarily relies upon self-reporting by jurors of their thoughts and mental states, the CJP's results depended upon the honesty and self-awareness of the interviewees. The trial court also found that the CJP "suffers from sampling problems," and the court questioned whether the CJP samples were representative. The trial court observed that the CJP data is at least ten years old and that the CJP did not use or analyze data (if any exists) from New Hampshire. The court noted as well that because the defendant's experts refused to disclose the raw data upon which the CJP results were based, the data was not subject to scrutiny and cross-examination, which led the court to conclude that it could not give the data "the weight the defense argues it deserves."

The trial court was particularly critical of the CJP's conclusion that the race of jurors affects the outcome of capital cases:

> First, the CJP based this conclusion on interviews with jurors from only 72 trials. Of these, only 19 had juries with five or more white male jurors, and only 21 had juries with only one black male juror. One cannot draw statistically significant conclusions from such small sample sizes. . . . Further, the CJP made no effort to examine the underlying evidence from those trials and thereby determine whether the strength of the evidence, not the race of the jurors, caused the outcome of the trials.

(Citations omitted.) Based upon these flaws, the court did not credit the CJP's conclusions concerning the effect of the racial composition of jurors upon the outcome of a capital case.

### b. Implicit Association Test (IAT)

The IAT is a computer program developed by Dr. Banaji to measure the time that it takes for a person to make associations. The general theory of the IAT is that the speed with which a person makes an association reveals that person's implicit preferences or biases. Implicit bias refers to the unconscious prejudices that a person may not report or of which he or she may not be aware. The data before the trial court specifically concerned the IAT that purports to measure racial bias (Race IAT), in which Race IAT participants access the Race IAT on a website for "Project Implicit" and categorize words and images.

Dr. Banaji testified about results drawn from a Race IAT database of approximately "six million tests," including 1,000 people from New Hampshire. Dr. Banaji testified that, nationally, 88% of white participants and 50% of black participants prefer white individuals over black individuals. According to Dr. Banaji, New Hampshire participants have a slightly higher preference for white individuals than the national average. One unpublished dissertation has linked Race IAT scores with the sentences imposed by mock jurors on black and white defendants. Other studies show that the IAT predicts behavior in the fields of employment, medical and mental health treatment, and voting. Dr. Sommers testified that he was not aware of any published studies linking the IAT to jury decisions in capital jury trials. Dr. Banaji opined that because of the studies showing that the IAT may predict future behavior and the large percentage of New Hampshire participants in the Race IAT demonstrating an implicit bias against black individuals, it would be "extremely hard" for a black defendant to be tried by a fair and impartial jury in New Hampshire.

The trial court concluded that the IAT "has not been shown to be an effective measure of implicit bias that would necessarily affect capital decision making." The court observed that only one unpublished dissertation has linked Race IAT scores with the individual decisions of mock jurors, and that "no studies have examined the IAT in jury deliberations in real trials." The court found that few studies have examined implicit bias and "its effect on group decisionmaking in any context." The court noted that "a meta-analysis of 103 IAT studies on behavioral outcomes showed an average correlation of .27, meaning that the IAT has only a 'moderate' predictive validity," and that one of the State's experts had testified that the Race IAT showed a predictive validity of only between .1 and .2. The trial court observed that the IAT does not account for either "the impact of the deliberative process" on decision-making or the use of "procedural safeguards to counter implicit racial bias."

### c. Mock Jury Studies

A mock jury study is a controlled experiment in which researchers use subjects to test a hypothesis about jury behavior. By controlling for all variables aside from the hypothesized cause, researchers seek to determine what causes a particular outcome in jury trials.

In one study, researchers showed four groups of mock jurors a video recording of a capital murder trial; the video recording shown to each group differed with regard to the race of the defendant and the victim. Lynch, *Stereotypes, prejudice, and life and death decision-making: Lessons from laypersons in an experimental setting, in* FROM LYNCH MOBS TO THE KILLING STATES: RACE AND THE DEATH PENALTY 191-95 (C. Ogletree & A.

Sarat, eds., 2006). The researchers found that mock jurors, faced with the same facts, were more likely to sentence a black defendant to death than they were to sentence a white defendant to death. *Id.* at 194. The researchers found that mock jurors were most likely to impose the death penalty on a black defendant who killed a white victim. *Id.*

Another study concluded that white mock jurors are more likely to convict a black defendant when race is not "salient" in the trial. Sommers & Ellsworth, *White Juror Bias: An Investigation of Prejudice Against Black Defendants in the American Courtroom*, 7 PSYCHOL. PUB. POL'Y & L. 201, 220-22 (2001). "Salience" in this context means that the facts of the crime raise racial issues. *Id.* at 216. For instance, in the study, mock jurors were presented with a written trial summary of an interracial battery case. *Id.* at 214. The summary for half of the jurors concerned a white defendant and a black victim; the summary for the other half concerned a black defendant and a white victim. *Id.* The defendant was a high school basketball player charged with attacking a teammate in the locker room. *Id.* at 216. "The racial content of the trial was also varied so that half of the mock jurors read a race-salient version and half read a non-race-salient version . . . . Race was made salient in the trial summary through the testimony of a defense witness about the defendant's minority status on his high school basketball team." *Id.* at 214-15. The researchers found that the white jurors were more likely to discriminate against the black defendant in cases without salient racial issues than in cases when race was made salient. *Id.* at 220. They theorized that this was so because the racial content of the trial activated a motivation to appear nonprejudiced. *Id.*

The trial court found that mock jury studies "suffer from flaws that weaken their reliability." The court observed that their "major disadvantage" is that they study mock juries rather than real juries. The court found that mock jurors are usually college students and are usually not as representative of the overall population as are real juries. The court noted that it was "virtually impossible to simulate a real criminal trial, especially a capital trial, for study in a laboratory setting." In a real trial, jurors are subject to *voir dire* and repeated jury instructions, and they observe opening and closing arguments and direct and cross-examinations. By contrast, in a mock trial, jurors read a summary of the facts of a trial or watch an abbreviated video recording. Mock jurors rarely deliberate together as real jurors do. The trial court found it significant that mock jurors know that, unlike real jurors, they are not responsible for an actual person's fate. The court stated: "This is especially troubling in a capital case, where the stakes of the trial, and the responsibility of the jurors, are enormous." The court found that because mock juries do not deliberate collectively, "many mock jury studies are flawed because they test indi-

vidual decisions prior to group deliberation, and assume that an individual, pre-deliberation vote is predictive of a final vote."

The court concluded that "[s]everal of these general weaknesses have particular application to mock jury studies concerning the impact of race." The court also found that most mock jury studies "did not include or measure procedures that are taken in death penalty cases to prevent juror bias from affecting decision making." The trial court observed that studies that included such procedures found them to be effective in reducing racial bias.

### d. Archival Studies

Defense experts also testified about the findings of archival studies, which examined the records of numerous death penalty cases for racial bias. This method is often associated with Dr. David Baldus, who authored a well-known study of Georgia's capital punishment system. *See McCleskey*, 481 U.S. at 296. The trial court noted that from 1972 until 2001, at least seventy archival studies have been conducted, studying capital punishment in the federal system as well as in twenty-seven states, citing Baldus *& a.*, *Racial Discrimination and the Death Penalty in the Post-Furman Era: An Empirical and Legal Overview, with Recent Findings from Philadelphia*, 83 CORNELL L. REV. 1638, 1742-45 (1997-1998), and Baldus & Woodworth, *Race Discrimination in the Administration of the Death Penalty: An Overview of the Empirical Evidence with Special Emphasis on the Post-1990 Research*, 39 CRIM. L. BULL. 194, 215-24 (2003). A majority of these studies conclude that the race of the defendant has no effect upon the outcome of capital cases, but that the race of the victim is statistically significant. Most of these studies also conclude that a black defendant accused of killing a white victim is most at risk of being charged with capital murder and of being sentenced to death.

The trial court found that archival studies "suffer from a fundamental problem that an unrecorded variable may have caused or contributed to the racial disparities." The court observed that "[m]any unrecorded variables affect a jury's verdict," such as the demeanor of the defendant, the credibility of witnesses, and the presence in the courtroom of members of the victim's family. The court concluded that although archival studies may show that there is a correlation between race and a jury's verdict, they do not show that the two (race and jury decision) are causally related.

In addition to its findings on the defendant's statistical evidence, the trial court followed *McCleskey* as established Supreme Court precedent in rejecting the defendant's state constitutional equal protection claim. In doing so, the trial court also rejected the defendant's argument that Part I, Article 2 generally provides more protection than the Federal Equal

Protection Clause. The court declined to find that "a race-based equal protection claim under the State Constitution can be proven merely [upon] a showing of a discriminatory impact, rather than discriminatory purpose."

### 2. Appellate Argument

The defendant argues that because there exists "an unacceptably high risk of racial discrimination in the administration of the death penalty," its imposition violates his equal protection rights under the State and Federal Constitutions. *See* N.H. CONST. pt. I, art. 2; U.S. CONST. amend XIV. He contends that the trial court erred in denying his motion to bar the imposition of the death penalty because "social science research in the almost twenty-five years since *McCleskey* has undermined its holding." With regard to his state constitutional claim, he argues that "Part I, Article 2 . . . may afford greater protection than its federal counterpart," by prohibiting "discrimination which can be proven only statistically." In addition, the defendant challenges certain of the trial court's findings regarding his social science research evidence. He argues, for instance, that the trial court "overstated the significance of a number of the methodological limitations, and thus unduly discounted the probative weight of the conclusions reached through the use of those methodologies."

### 3. Discussion

The trial court rejected the defendant's social science research evidence as fundamentally flawed for several carefully explained reasons. Even if we assume for purposes of this appeal, that the research presented statistically valid findings, and that these findings demonstrate "a risk that the factor of race entered into some capital sentencing decisions," *McCleskey*, 481 U.S. at 291 n.7 (emphasis omitted), the defendant's argument nonetheless fails on the merits. Putting aside the trial court's specific factual findings concerning the social science research upon which the defendant relied, we conclude that the general statistics that the defendant presented were insufficient to establish a violation of either the State or Federal Equal Protection Clause in this case.

Because *McCleskey* is central to our analysis of the defendant's arguments, we begin by examining that decision. The petitioner in *McCleskey*, a black man, was convicted of two counts of armed robbery and one count of murder; the murder victim was a white police officer. *McCleskey*, 481 U.S. at 283. The jury recommended the death penalty on the murder charge, which the trial court imposed. *Id.* at 285. In a petition for a writ of habeas corpus, the petitioner argued that the Georgia capital sentencing process was administered in a racially discriminatory manner in violation of the Eighth and Fourteenth Amendments to the United States Constitution. *Id.* at 286.

To support his claim, he proffered a statistical study performed by Professor David Baldus and others (the Baldus study). The Baldus study examined more than 2,000 murder cases in Georgia in the 1970s and purported "to show a disparity in the imposition of the death sentence in Georgia based on the race of the murder victim and, to a lesser extent, the race of the defendant." *McCleskey*, 481 U.S. at 286. "The raw numbers collected by Professor Baldus indicate[d] that defendants charged with killing white persons received the death penalty in 11% of the cases, but defendants charged with killing blacks received the death penalty in only 1% of the cases." *Id.* When Professor Baldus divided the cases according to the combination of the race of the defendant and the race of the victim, he found that "the death penalty was assessed in 22% of the cases involving black defendants and white victims; 8% of the cases involving white defendants and white victims; 1% of the cases involving black defendants and black victims; and 3% of the cases involving white defendants and black victims." *Id.* After accounting for numerous variables that could have explained these disparities on non-racial grounds, the Baldus study found that defendants charged with killing white victims were 4.3 times as likely to receive a death sentence as defendants charged with killing black victims; black defendants were 1.1 times as likely to receive a death sentence as other defendants. *Id.* at 287.

After an extensive evidentiary hearing, the federal district court concluded that the statistics offered by the petitioner failed to prove a *prima facie* case of racial discrimination, in part because it found the Baldus study to be flawed in several respects. *Id.* at 288-89.

On appeal, the United States Court of Appeals for the Eleventh Circuit assumed the validity of the Baldus study — *i.e.*, that it "showed that systematic and substantial disparities existed in the penalties imposed upon homicide defendants in Georgia based on [the] race of the homicide victim, that the disparities existed at a less substantial rate in death sentencing based on [the] race of defendants, and that the factors of race of the victim and defendant were at work in [the Georgia county in which the defendant was convicted]." *Id.* at 289 (quotation omitted). "Even assuming the study's validity," the Eleventh Circuit found, however, that the Baldus study was insufficient to demonstrate discriminatory intent in violation of the Fourteenth Amendment. *Id.*

The Supreme Court agreed with the Eleventh Circuit. *Id.* at 292. Like the Eleventh Circuit, the Supreme Court assumed that the Baldus study was statistically valid. *Id.* at 291 n.7. However, the Court stated that it did not assume that the study showed "that racial considerations actually enter into any sentencing decisions in Georgia." *Id.* The Court reasoned that "[e]ven a sophisticated multiple-regression analysis such as the Baldus

study can only demonstrate a *risk* that the factor of race entered into some capital sentencing decisions and a necessarily lesser risk that race entered into any particular sentencing decision." *Id.* The Court noted that to prove an equal protection violation, the petitioner had to show "the existence of purposeful discrimination" — "that the decisionmakers in *his* case acted with discriminatory purpose." *Id.* at 292 (quotation omitted). The Court held that the petitioner's proof, which consisted solely of the Baldus study, was insufficient to do so. *Id.* at 293-97.

 The Court specifically rejected the petitioner's claim that the Baldus study compelled an inference that his sentence rested upon purposeful discrimination. *Id.* The Court held that although general statistics may prove intent to discriminate in other contexts, such as in cases brought under Title VII of the Civil Rights Act of 1964, they do not suffice in the context of a capital sentencing decision. *Id.* at 294-95. The Court stated that "the nature of the capital sentencing decision, and the relationship of the statistics to that decision, are fundamentally different from the corresponding elements in . . . Title VII cases." *Id.* at 294. The Court explained that it would be improper to apply to a capital sentencing decision an inference drawn from general statistics because each capital jury is "unique in its composition" and reaches its verdict by considering "innumerable factors that vary according to the characteristics of the individual defendant and the facts of the particular capital offense." *Id.* The Court reasoned that "[b]ecause discretion is essential to the criminal justice process, the Court would demand exceptionally clear proof before [it] would infer that the discretion has been abused," and held that the Baldus study did not constitute such "exceptionally clear proof." *Id.* at 297.

Nonetheless, the defendant contends that *McCleskey* is no longer sound law because "social science research in the almost twenty-five years since *McCleskey* has undermined its holding." He contends that "[t]he results of that research reveal that racial bias continues to prejudice the administration of capital punishment." Specifically, he argues that: "(1) the evidence shows that the outcome of a capital sentencing trial is greatly dependent on the race of the jurors, the defendant, and the victim; (2) the procedural protections, such as *voir dire*, on which the *McCleskey* Court relied to eliminate racial bias in capital sentencing have failed to do so; and (3) the *McCleskey* opinion fails to account for conscious and unconscious racial bias on the part of jurors." In short, although acknowledging that *McCleskey* is the controlling Supreme Court case interpreting the Federal Equal Protection Clause under these circumstances, he argues that we should not apply it here because social science research has "undermined" its holding. He further contends that *McCleskey* should not dispose of his state claim

because neither the text of Part I, Article 2 of the State Constitution, as amended in 1974, nor the statements accompanying the 1974 amendments, reflect an intent to deny relief to claimants whose only proof of discrimination is statistical.

We first address the defendant's arguments under the State Constitution and rely upon federal law only to aid our analysis. *See State v. Ball*, 124 N.H. 226, 231-33 (1983). Part I, Article 2 states:

> All men have certain natural, essential, and inherent rights — among which are, the enjoying and defending life and liberty; acquiring, possessing, and protecting, property; and, in a word, of seeking and obtaining happiness. Equality of rights under the law shall not be denied or abridged by this state on account of race, creed, color, sex or national origin.

N.H. CONST. pt. I, art 2.

 The defendant argues, in effect, that to prevail upon his equal protection claim under the State Constitution, he need not meet the burden of proof set forth in *McCleskey*. As we have noted, in *McCleskey*, the Supreme Court held that, to prevail upon his federal equal protection claim, the petitioner had to prove "purposeful discrimination" — *i.e.*, that the decision-makers in *his* case acted with discriminatory intent. *McCleskey*, 481 U.S. at 292. Under *McCleskey*, "systemic statistics," such as those proffered by the defendant, are insufficient, by themselves, to prove racially discriminatory intent. *United States v. Bin Laden*, 126 F. Supp. 2d 256, 260 (S.D.N.Y. 2000); *see United States v. Sampson*, 275 F. Supp. 2d 49, 93-94 (D. Mass. 2003), *aff'd*, 486 F.3d 13 (1st Cir. 2007). The logical corollary to the defendant's argument is that to prevail upon his state equal protection claim, either: (1) he is not required to prove discriminatory intent; or (2) if he is required to prove discriminatory intent, he may do so by relying upon the type of general statistical evidence the *McCleskey* Court found insufficient.

To the extent that the defendant asserts that a claimant need not prove discriminatory intent in order to prevail upon a discrimination claim under the State Equal Protection Clause, his assertion is contrary to our prior cases in the selective enforcement context. Although the defendant has not alleged selective enforcement, the legal underpinnings of such claims are analogous to his discrimination claim here.

 "We have held, in accordance with the United States Supreme Court, that the equal protection guarantee" in the State Constitution "is 'essentially a direction that all persons similarly situated should be treated alike.'" *In re Sandra H.*, 150 N.H. 634, 637 (2004) (quoting *Cleburne v.*

*Cleburne Living Center, Inc.*, 473 U.S. 432, 439 (1985)). When an equal protection challenge alleges that a law is discriminatorily enforced, we have consistently held that proof of "conscious intentional discrimination" is required to establish a violation of equal protection under the State Constitution. *State v. Hofland*, 151 N.H. 322, 325 (2004) (quotation omitted); *see Anderson v. Motorsports Holdings*, 155 N.H. 491, 499 (2007); *Bacon v. Town of Enfield*, 150 N.H. 468, 473-74 (2004); *Pope v. Little Boar's Head Dist.*, 145 N.H. 531, 535 (2000); *Alexander v. Town of Hampstead*, 129 N.H. 278, 283 (1987); *State v. Monahan*, 125 N.H. 17, 26 (1984); *State v. Pinsince*, 105 N.H. 38, 41 (1963). Accordingly, in cases in which a litigant claims an equal protection violation arising out of discrimination, we, like the Supreme Court, require a defendant to prove "the existence of purposeful discrimination" by showing that "the decisionmakers in *his* case acted with discriminatory purpose." *McCleskey*, 481 U.S. at 292 (quotation omitted). Thus, the defendant must show "discriminatory intent" to prove discrimination.

With regard to his assertion that under the State Constitution general statistics suffice as a matter of law to prove discriminatory intent, the defendant offers no developed legal argument. Rather, he merely observes that in the trial court he "reviewed at some length statements of the framers of Part I, Article 2, as ratified in 1974," and that the trial court rejected his analysis. He does not set forth the statements upon which he relied in the trial court. Nor does he explain why any such statements support his argument that the New Hampshire Constitution allows general statistical evidence in discrimination claims, or why the trial court's rejection of his analysis was incorrect. Under these circumstances, the defendant's argument is not adequately developed for our review. *See State v. Chick*, 141 N.H. 503, 504 (1996).

The defendant also contends that we have previously indicated that the State Equal Protection Clause "may afford greater protection than its federal counterpart." In support of this assertion, he relies solely upon the following excerpt from *In re Certain Scholarship Funds*, 133 N.H. 227, 229-30 (1990):

> To the extent that we look to the United States Supreme Court for guidance in approaching these difficult issues, we borrow only the analytical framework of the Court's decisions in our interpretation of part I, article 2 of the New Hampshire Constitution, and as such, we are not tied to present or future federal pronouncements on the issue.

(Quotation omitted.) The defendant's reliance upon this passage is misplaced. This statement was not a pronouncement that the State Equal

Protection Clause affords greater protection than does its federal counterpart in every case. Rather, it was a general explanation regarding the limited extent of our reliance upon federal cases when interpreting state constitutional provisions.

 Having rejected the defendant's assertion that he need not meet the burden of proof identified in *McCleskey* to prevail upon his state constitutional claim, we next analyze whether, as he contends, the premise of *McCleskey* is no longer sound. We consider this argument only insofar as it bears upon whether *McCleskey* ought to inform our state constitutional analysis. *See Rodriguez de Quijas v. Shearson/Am. Exp.*, 490 U.S. 477, 484 (1989) (when the Supreme Court has decided an issue of federal law, lower courts must follow the case that directly controls, leaving to the Supreme Court the prerogative of overruling its own decisions); *State v. Melvin*, 150 N.H. 134, 140 (2003) ("When interpreting federal law, . . . we are bound by the United States Supreme Court's current explication of it.").

 The defendant contends that the holding of *McCleskey* has been "undermined" by social science research, yet he does not cite any case that has adopted this position. Indeed, "[s]ince *McCleskey*, no court has allowed a claim" of the kind alleged by the defendant here. *Evans v. State*, 914 A.2d 25, 66 (Md. 2006). Courts in capital cases uniformly "accept the reasoning in *McCleskey* concerning the failure of general statistics to establish a statewide Equal Protection . . . violation and instead require a defendant to assert some specific discriminatory intent in [his] case." *Id.* (citing cases); *see, e.g., Com. v. Rios*, 920 A.2d 790, 822 (Pa. 2007) ("[N]either this Court nor the United States Supreme Court will permit generalized allegations of discrimination or statistics showing a disproportionate application of the death penalty to members of certain groups to invalidate such sentences on constitutional grounds."); *Bell v. State*, 938 S.W.2d 35, 51 (Tex. Crim. App. 1996) (*en banc*) ("Like *McCleskey*, appellant relies solely on studies suggesting disparities in sentencing due to the race of the victim and defendant and only adds references to Texas studies allegedly showing results similar to those from the Georgia study [in *McCleskey*]. . . . Appellant's reliance on these studies is insufficient to support any inference that any of the decision makers in his case acted with discriminatory intent.").

We find *Evans* instructive. The defendant in *Evans* was convicted of first-degree murder and sentenced to death. *Evans*, 914 A.2d at 33. He challenged the trial court's decision to deny his motion to re-open a 1995 post-conviction proceeding to present the claim that "systemic statewide racial and geographic discrimination rendered his sentence unconstitutional." *Id.* (quotation omitted). To support his assertion, the defendant

relied upon a 2003 study of capital sentencing in Maryland, which he argued showed "that the death penalty is implemented throughout [Maryland] in a racially and geographically biased and arbitrary manner, in violation of the Federal and State Constitutional guarantees of equal protection of the law." *Id.* at 47-48. The Court of Appeals of Maryland stated that "[t]his type of attack is directly addressed by *McCleskey*." *Id.* at 65. Observing that "no court has allowed a claim of this kind," the court decided that "[t]he result in Maryland should be no different than the consensus around the country" and that the defendant's general statistics did not entitle him to the re-opening of the 1995 post-conviction case. *Id.* at 66, 67.

We also find *Sampson* informative. In that case, the defendant moved to dismiss death penalty charges against him on the ground that the Federal Death Penalty Act, 18 U.S.C. §§ 3591 *et seq.* (2006) (FDPA) operates in an unconstitutional manner. *Sampson*, 275 F. Supp. 2d at 87. The defendant argued that the death penalty was "sought on the invidious basis of race and on the irrational basis of geography." *Id.* at 87. To support this argument, he relied upon statistical studies conducted by the United States Department of Justice and upon Professor Baldus's interpretation of these studies. *Id.* at 89-90. Professor Baldus opined that the studies showed that "there is a significant risk of racial unfairness and geographic arbitrariness in the administration of the federal death penalty," and that "the U.S. Attorney charging and Department of Justice authorization rates are much higher in white-victim cases than they are in minority-victim cases." *Id.* at 90.

Citing *McCleskey*, the court in *Sampson* ruled that this evidence was "not adequate to prove purposeful discrimination." *Id.* at 93. The court rejected the defendant's attempts to distinguish *McCleskey* on the ground that, unlike the statistical study in *McCleskey*, the studies upon which he relied were "*individualized* statistical stud[ies]." *Id.* (quotation omitted). The court observed that "the difficulty of using a systemic study to establish purposeful discrimination by various individuals was only one reason that the Supreme Court rejected the use of statistics to demonstrate discriminatory intent." *Id.* at 94. Other reasons included the numerous factors that enter into decisions in death penalty cases, "the impropriety of . . . requiring prosecutors to defend their decisions to seek death penalties," and "the need for discretion in the criminal justice process." *Id.* (quotation omitted). In light of these considerations, the court concluded that "the statistics proffered by the defendant [were] insufficient to establish purposeful discrimination by the Attorney General." *Id.*

Notably, since *McCleskey* was decided, federal courts have rejected the use of the CJP data and studies to establish that the FDPA is "unconstitutional because its penalty phase scheme . . . [cannot] be applied approp-

riately by jurors." *Riel v. Ayers*, No. CIV S-01-0507 LKK KJM, 2008 WL 1734786, at *15 (E.D. Cal. Apr. 14, 2008) (collecting cases); *see United States v. Green*, No. 5:06CR-19-R, 2008 WL 4000901, at *1 (W.D. Ky. Aug. 26, 2008) (observing that no court has adopted CJP's findings as its own); *United States v. Cheever*, 423 F. Supp. 2d 1181, 1214 (D. Kan. 2006) (rejecting CJP data and studies). In fact, "[t]he few decisions crediting statistical studies to overturn the FDPA or state capital sentencing laws were overturned on appeal." *Riel*, 2008 WL 17347386, at *15.

 Accordingly, the federal and state cases decided after *McCleskey* do not support the defendant's assertion that the premise of *McCleskey* is no longer sound. Having determined that the defendant must meet the same burden of proof under *McCleskey* to prevail on his state equal protection claim, we next consider whether he has done so. A defendant "who alleges an equal protection violation has the burden of proving the existence of purposeful discrimination." *McCleskey*, 481 U.S. at 292 (quotation omitted). "A corollary to this principle is that a criminal defendant must prove that the purposeful discrimination had a discriminatory effect on him." *Id.* (quotation omitted). Thus, the defendant "must prove that the decisionmakers in *his* case acted with discriminatory purpose." *Id.* The defendant has not offered any "evidence specific to his own case that would support an inference that racial considerations played a part in his sentence." *Id.* at 292-93. Nor does the record support such an inference.

Furthermore, we note that the trial court found in its June 5, 2008 order that the mock jury studies presented by the defendant's experts were flawed in part because most of these studies "did not include or measure procedures that are taken in death penalty cases to prevent juror bias from affecting decision making. Those that did, showed them effective." For example, in one study, "some white mock jurors were given a *voir dire* questionnaire that included questions concerning racial bias, and others received a questionnaire without such questions. Those jurors who were *voir dired* about racial bias were less likely to vote to convict a black defendant than those who were not." Sommers & Ellsworth, *How Much Do We Really Know About Race and Juries? A Review of Social Science Theory and Research*, 78 CHI.-KENT L. REV. 997, 1026-27 (2003).

The trial court indicated in its order that it would implement several procedural safeguards to ensure that the defendant would be tried by a fair and impartial jury including, specifically, "extensive *voir dire* of potential jurors about racial biases." As set forth in Part V (Venue and Jury Selection Review) of this opinion, the jury selection process in this case included lengthy *voir dire* of prospective jurors based upon information each individual provided, under oath, on a forty-one page questionnaire. The

questionnaire, modeled largely after the defendant's proposed form, contained numerous questions concerning the potential effects of racial discrimination including: "Do you think the race of defendants or victims affects the outcomes of cases in the criminal justice system?"; "Have you, a member of your family or a close friend, ever been subjected to . . . labels or stereotypes based on racial or ethnic heritage?"; "Has anyone ever acted in a way that you thought showed prejudice of any sort at all against you?"; "Have you ever seen or witnessed behavior that seemed to you to be an example of racial prejudice?"; "If you are white: please describe the contact you have had with people who are African American in your neighborhood, at work, or socially"; "What is your opinion about inter-racial marriage or relationships?"; "The defendant, Michael Addison, is African-American. Does this fact in any way affect your ability to be impartial in this case? Please examine your conscience carefully"; "You may hear testimony from African American or Hispanic witnesses. Would you tend to find their testimony less credible than a Caucasian witness?"; "The victim in this case is Caucasian. Does the fact that he is Caucasian and the defendant is African American in any way affect your ability to be fair and impartial?"

Prospective jurors provided various answers and explanatory responses to these questions, and the record shows that the trial court and counsel used the completed forms during the jury selection process. The defendant did not raise any objection to the seated jury; thus, he did not object based upon potential racial bias or lack of impartiality. Having reviewed the completed questionnaires of the deliberating jurors, we observe that the individual responses do not suggest that racial considerations might play a role in the deliberating process. Further, the record shows that the jury selected its own foreperson, and, as the State points out, the record establishes that the foreperson selected was male and was black.

As an additional safeguard, the court's charge to the jury at the conclusion of the sentence selection phase included the following instruction:

> In considering whether the death sentence is appropriate, you must not consider the race, color, religio[us] beliefs, or national origin of either the defendant or the victim. You are not to return a sentence of death unless you would return a sentence of death for the crime in question without regard to race, color, religious beliefs, or national origin of either the defendant or the victim.
>
> To emphasize the importance of this consideration, section six of the special verdict form contains a certification statement. Each juror should carefully read the statement and sign your name in the appropriate place if the statement accurately reflects the manner in which each of you reach your individual decision.

The record reflects that each juror signed his or her name to the certification section of the Special Verdict Form.

Moreover, the social science research upon which the defendant relies in this case suffers from the same flaws as the Baldus study considered in *McCleskey*. Like the Baldus study, the defendant's evidence does not constitute "exceptionally clear proof" of discrimination that would compel an inference that any of the decision-makers in *this* case acted with discriminatory purpose. *McCleskey*, 481 U.S. at 297.

In sum, consistent with *McCleskey*, we hold that the defendant's social science research is insufficient to establish his claim of purposeful racial discrimination under the State Equal Protection Clause. We note that the defendant's motion to bar the imposition of the death penalty was grounded upon Part I, Article 2 of the State Constitution. Thus, to the extent that the defendant raises a federal equal protection claim on appeal, it is waived. *See State v. Eaton*, 162 N.H. 190, 195 (2011); *State v. Winward*, 161 N.H. 533, 542 (2011). In any event, because the Federal Constitution affords the defendant no greater protection than does the State Constitution in these circumstances, we reach the same conclusion under the Federal Constitution as we do under the State Constitution. *See McCleskey*, 481 U.S. at 297; *see also Rodriguez de Quijas*, 490 U.S. at 484; *Melvin*, 150 N.H. at 140.

*F. Death-Qualified Jury*

*1. Background*

In January 2008, nine months before trial, the defendant filed two motions to bar the death penalty, arguing that "death qualifying" the jury before the guilt phase of the trial violated his rights under the State Constitution. The first motion was grounded in his right to a fair and impartial jury under Part I, Article 35 of the State Constitution, and the second was based upon his rights to, among other things, procedural due process under Part I, Article 15 of the State Constitution. A "death-qualified" jury refers to the result of a jury selection process during which "prospective jurors have been excluded for cause in light of their inability to set aside their views about the death penalty that would prevent or substantially impair the performance of their duties as jurors in accordance with their instructions and their oath." *Buchanan v. Kentucky*, 483 U.S. 402, 407 n.6 (1987) (quotation and brackets omitted) (citing *Wainwright v. Witt*, 469 U.S. 412, 424 (1985)).

In his first motion, the defendant argued that RSA 630:5 (2007) violates Part I, Article 35 of the New Hampshire Constitution because it requires a capital defendant to stand trial before a "death-qualified" jury that is

"biased toward finding [him] guilty of capital murder," rather than allowing for death qualification after conviction and before sentencing. Although he acknowledged that the United States Supreme Court in *Lockhart v. McCree*, 476 U.S. 162, 165 (1986), rejected such a claim under the Sixth and Fourteenth Amendments to the Federal Constitution, the defendant contended that Part I, Article 35 is more protective of his right to be tried by an impartial jury than is the Federal Constitution.

The State objected, and, as discussed in Part VIII.E (Constitutional and Statutory Review-Impact of Race in Capital Sentencing) of this opinion, the trial court conducted a hearing in April 2008 during which it heard six days of expert testimony on several of the defendant's motions seeking to bar the death penalty. As earlier described, several experts for the defense and for the State testified, and regarding death qualification, the defendant presented evidence on the Capital Jury Project (CJP) and Mock Jury Studies. Drs. William Bowers and Wanda Foglia, among other experts, testified about the findings of the CJP and other research methods concerning the impact of death qualification on the capital decision-making process; the State's expert, Dr. Rogers Elliott, criticized the CJP and Mock Jury Studies. We will not repeat the social science summary discussed in Part VIII.E, but generally provide here some of the conclusions reached by Mock Jury Studies and the CJP, as explained by the trial court.

Some mock jury research purports to demonstrate that death qualification results in a jury more prone both to convict and to impose a death sentence. *See* Allen *et al., Impact of Juror Attitudes about the Death Penalty on Juror Evaluations of Guilt and Punishment: A Meta-Analysis*, 22 LAW & HUM. BEHAV. 715, 722-25 (1998); *see also* Haney, *On the Selection of Capital Juries: The Biasing Effects of the Death-Qualification Process*, 8 LAW & HUM. BEHAV. 121, 129 (1984). Other mock jury studies have concluded that death-qualified jurors have attitudes about law and order and society that differ from those of the general population. *See* Haney *et al., "Modern" Death Qualification: New Data on Its Biasing Effects*, 18 LAW & HUM. BEHAV. 619, 628-31 (1994).

The CJP findings include that death qualification yields a disproportionately guilt-prone and death-prone jury in two ways: (1) it "over excludes" by barring jurors who would be able to impose the death penalty despite reservations; and (2) it "under-excludes" by failing to dismiss "automatic death penalty" jurors who would not give effect to mitigation in making their sentencing decisions. Consequently, according to the CJP, individuals who are "more prosecution-oriented" are over-represented on capital juries relative to both the population at large and to "correctly selected" capital juries. The CJP concluded that the death qualification process prejudices the jury against the defendant in that following this process, "jurors are

more punitive, see fewer problems with the death penalty, and are less likely to see evidence as mitigating and [are] more likely to see it as aggravating."

In a written order dated June 5, 2008, the trial court denied the defendant's motion. In doing so, the court concluded that it was "not persuaded that the research presented by the defendant on death qualification overcomes the methodological flaws that concerned the Supreme Court in [McCree]." It discounted the social science data for many of the same reasons that it did when denying the defendant's motion to bar imposition of the death penalty premised upon race. For instance, the trial court underscored the flaw underlying mock jury studies in that it was "virtually impossible" to simulate in a laboratory setting a real capital trial in which jurors are subject to voir dire and repeated jury instructions, and also observe opening and closing arguments, and direct and cross-examinations. The court also noted that after performing his own meta-analysis, Dr. Elliott "found a low correlation between death qualification and jury verdicts, and death penalty attitudes and jury verdicts," and that "death penalty attitudes have a tenuous relationship to predeliberation votes, and that predeliberation votes do not predict final jury verdicts."

The trial court further noted that the Supreme Court has criticized the value of certain social science studies submitted by the defendant to "predict[ ] the behavior of actual jurors" in that "actual jurors [are] sworn under oath to apply the law to the facts of an actual case involving the fate of an actual capital defendant." McCree, 476 U.S. at 171. The Court in McCree also questioned the significance of the 1984 Haney study, noting that, standing alone, the effects on prospective jurors of voir dire questioning about their attitudes toward the death penalty would not present a federal constitutional violation. Id. at 169-70 nn.6, 7.

Regarding the CJP, the trial court found that although "[t]he CJP methodology addresses some of the [McCree] criticisms because the CJP used actual jurors from many different states who deliberated on real capital trials," "the methodology of the CJP creates its own problems." For example, most jurors were interviewed approximately two years after the capital trials in which they served, and some interviews took place up to five years later, "calling into question the reliability of their information."

Nevertheless, the trial court followed the analytical framework of the Supreme Court, which assumed for the purpose of its decision that the social science studies were "both methodologically valid and adequate to establish that 'death qualification' in fact produces juries somewhat more 'conviction-prone' than 'non-death-qualified' juries." McCree, 476 U.S. at 173. The trial court then observed that "[t]he precise issue raised by the defendant in this motion was raised in [McCree]," in which the Supreme

Court held that "death qualifying" the jury "does not violate a defendant's rights under the Sixth or Fourteenth Amendments of the Federal Constitution to have his guilt or innocence determined by an impartial jury selected from a fair cross-section of the community." Further, the trial court rejected the defendant's argument that Part I, Article 35 provides broader protection than the Sixth Amendment.

In his second motion the defendant argued, among other things, that the process of "death qualifying" the jury violates the Due Process Clause of the State Constitution. He argued that social science "research and scholarly articles have established that death qualification results in juries slanted toward the prosecution, which, by definition, creates the risk of an unjust finding on either the capital murder charge, or the sentence." He asserted that "the potential for [the] erroneous deprivation [of his life] amply justif[ied] [the] additional time, expense, or burden" of "selecting separate juries for the two phases of the trial."

The State objected, and by written order dated June 6, 2008, the trial court denied the defendant's motion, concluding that although the private interest affected was substantial, the risk of an erroneous deprivation of the defendant's life resulting from death qualification was "minimal" given the procedural protections afforded capital defendants, and that the State had a strong interest in having a single jury for both the guilt and sentencing phases of the capital trial.

### 2. Appellate Argument

The defendant argues that the process of "death qualifying" the guilt phase jury violated both his right to an impartial jury guaranteed by Part I, Article 35 and his Part I, Article 15 right to due process under the New Hampshire Constitution. He contends that the process of questioning prospective jurors about their views as to punishment unfairly conditioned them to view the defendant as guilty, yielding a more "conviction-prone jury." The defendant does not argue that any of the individual jurors who decided his case lacked impartiality.

### 3. Discussion

Because the defendant's arguments rest solely upon the State Constitution, we base our decision upon it alone and refer to federal law only to aid our analysis. See State v. Ball, 124 N.H. 226, 231-33 (1983). As did the trial court, we will assume, without deciding, that the research upon which the defendant relies is "both methodologically valid and adequate to establish that 'death qualification' in fact produces juries somewhat more 'conviction-prone' than 'non-death-qualified juries.' " McCree, 476 U.S. at 173.

 The capital sentencing statute requires that the trial on a capital murder charge and the corresponding capital sentencing hearing following a conviction be conducted by the same jury, unless circumstances warrant a separate jury being impaneled. *See* RSA 630:5, II, III. The Supreme Court has upheld a similar statute under the Federal Constitution. *See McCree*, 476 U.S. at 180. Although the defendant concedes "the necessity for death-qualification prior to the sentencing phase," he argues that there is no need for death qualification before the guilt phase. He contends that "[b]ecause death-qualified jurors are not as impartial as possible with regard to the guilt-phase, it therefore follows that the use of death-qualified jurors in that phase violates [Part I, Article 35 of] the New Hampshire Constitution." Similarly, regarding due process, he contends that "death qualified juries have a pro-prosecution slant in the guilt phase," "reasonable alternatives exist," and the State has failed to demonstrate "any compelling interest in having a death-qualified jury deliberate in the guilt phase."

 In *McCree*, the Supreme Court held that the Federal Constitution "[does not] prohibit the removal for cause, prior to the guilt phase of a bifurcated capital trial, of prospective jurors whose opposition to the death penalty is so strong that it would prevent or substantially impair the performance of their duties as jurors in the sentencing phase." *Id.* The defendant in *McCree* had been charged with capital felony murder. *Id.* at 166. In accordance with state law, the trial judge at *voir dire* removed for cause, over the defendant's objections, eight prospective jurors who stated that they could not under any circumstances vote to impose the death penalty. *Id.* The jury convicted the defendant of capital murder, but rejected the State's request for the death penalty, sentencing him to life imprisonment without possibility of parole. *Id.*

 The defendant in *McCree* argued that his rights under the Sixth and Fourteenth Amendments to be tried by an impartial jury were violated because the jury that convicted him was death-qualified. *Id.* at 167. The Supreme Court disagreed:

> [The defendant's] "impartiality" argument apparently is based on the theory that, because all individual jurors are to some extent predisposed towards one result or another, a constitutionally impartial *jury* can be constructed only by "balancing" the various predispositions of the individual *jurors*. Thus, according to [the defendant], when the State "tips the scales" by excluding prospective jurors with a particular viewpoint, an impermissibly partial jury results. We have consistently rejected this view of jury impartiality.... [A]n impartial *jury* consists of nothing more than *jurors* who will conscientiously apply the law and find the facts.

. . . .

In our view, it is simply not possible to define jury impartiality, for constitutional purposes, by reference to some hypothetical mix of individual viewpoints. Prospective jurors come from many different backgrounds, and have many different attitudes and predispositions. But the Constitution presupposes that a jury selected from a fair cross section of the community is impartial, regardless of the mix of individual viewpoints actually represented on the jury, so long as the jurors can conscientiously and properly carry out their sworn duty to apply the law to the facts of the particular case.

*Id.* at 177-78, 183-84 (quotation omitted). As the Court stated, "[i]t is important to remember that not all who oppose the death penalty are subject to removal for cause in capital cases; those who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law." *Id.* at 176. Although the dissent suggested that the State's interest in submitting the penalty issue to a jury capable of imposing capital punishment could be accommodated by using one jury to decide guilt and another to decide punishment, *id.* at 203-04 (Marshall, J., dissenting), the majority concluded that a state has an "entirely proper interest" in obtaining a single jury to decide all of the issues in a capital case for both the guilt and sentencing phases of trial, *id.* at 180.

In *Buchanan*, the Supreme Court again considered a challenge to death qualifying a capital jury in advance of the guilt phase. *Buchanan*, 483 U.S. at 413. The petitioner argued that his right to an impartial jury was violated because the jury was death-qualified in his joint trial with a co-defendant in which the death penalty was sought only against the co-defendant. *Id.* The Court found the petitioner's claim to be "no more persuasive" than the claim it had addressed in *McCree*. *Id.* at 420. The Supreme Court later held that a capital defendant is constitutionally entitled to exclude jurors who would automatically vote to impose a death penalty. *Morgan v. Illinois*, 504 U.S. 719, 721, 729 (1992). Thus, just as a juror who in no case would vote for capital punishment is not an impartial juror, likewise, a juror who would automatically vote for the death penalty in every case must be removed for cause. *Id.* at 728-29.

■■■ Since *McCree* was decided, "no court that has considered the issue has found death qualification to violate the federal, or respective state constitution," *People v. Hale*, 661 N.Y.S.2d 457, 486 (Sup. Ct. 1997), and the defendant has not cited any state or federal case that supports his

argument. The defendant asserts, however, that Part I, Article 35 is more protective of his right to be tried by an impartial jury than is the analogous provision under the Federal Constitution. To support this assertion, he relies upon the difference in language between Part I, Article 35 and the Sixth Amendment to the Federal Constitution. Part I, Article 35 states in part: "It is the right of every citizen to be tried by judges as impartial as the lot of humanity will admit." N.H. CONST. pt. I, art. 35. Although this text refers only to judges, we have long applied it to jurors. *See State v. Prevost*, 105 N.H. 90, 92 (1963). The Sixth Amendment mandates in part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury." U.S. CONST. amend. VI.

The defendant contends that because Part I, Article 35 requires "as much impartiality as practically possible," the standard for impartiality under Part I, Article 35 is more demanding than that under the Sixth Amendment. He argues: "Part I, Article 35 thus sets the standard as high as it can reasonably be set. In requiring just impartiality, the Sixth Amendment demands less, amounting only to a convenient or adequate degree of impartiality." We disagree.

Despite the difference in language between Part I, Article 35 and the Sixth Amendment, we apply the same standard for determining impartiality under the State Constitution that is applied under the Federal Constitution. We have stated that we believe that the "principles" under the State and Federal Constitutions with respect to the right to a fair and impartial jury "are the same." *State v. Weir*, 138 N.H. 671, 673 (1994); *see State v. Smart*, 136 N.H. 639, 646 (1993). Indeed, we have explicitly adopted the federal standard for determining whether a juror is impartial as set forth in Supreme Court precedent. *See State v. Laaman*, 114 N.H. 794, 800 (1974) (citing *Irvin v. Dowd*, 366 U.S. 717, 723 (1961)). Under both the State and Federal Constitutions, a juror is deemed "impartial" if he or she "can lay aside his [or her] impression or opinion and render a verdict based on the evidence presented in court." *Laaman*, 114 N.H. at 800; *see Irvin*, 366 U.S. at 723. Moreover, language identical to that of Part I, Article 35 has been used to describe the impartiality required by the Federal Constitution. *See United States v. Mine Workers*, 330 U.S. 258, 308 (1947) (Frankfurter, J., concurring); *State v. Papasavvas*, 751 A.2d 40, 57 (N.J.), *corrected on other grounds*, 753 A.2d 1148 (N.J. 2000).

We conclude that Part I, Article 35 of the State Constitution and the Sixth Amendment to the Federal Constitution afford equivalent protection of a criminal defendant's right to be tried by an impartial jury. In a capital murder case, "the proper standard for determining when a prospective juror may be excused for cause because of his or her views on

capital punishment" is "whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright*, 469 U.S. at 424. This rule applies to a bifurcated procedure in a capital trial. *Adams v. Texas*, 448 U.S. 38, 45 (1980). "[T]he quest is for jurors who will conscientiously apply the law and the facts. That is what an 'impartial' jury consists of." *Wainwright*, 469 U.S. at 423. "[T]he question whether a venireman is biased has traditionally been determined through *voir dire* culminating in a finding by the trial judge concerning the venireman's state of mind." *Id.* at 428. "Death qualification" as part of the *voir dire* process is "carefully designed to serve the State's concededly legitimate interest in obtaining a single jury that can properly and impartially apply the law to the facts of the case at both the guilt and sentencing phases of a capital trial." *McCree*, 476 U.S. at 175-76.

Accordingly, we decline to adopt the defendant's position that "death qualifying" a single jury for a capital trial constitutes a *per se* violation of his right to a fair and impartial jury under Part I, Article 35 of the State Constitution.

The defendant also argues that "reasonable alternatives" to "death qualifying" a single jury before the guilt phase of trial exist, such as empaneling two juries: a non-death-qualified jury to hear the guilt phase and a separate, death-qualified jury to hear the sentencing phase. The defendant grounds his challenge in procedural due process. Our due process analysis balances the following factors: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used and the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest. *State v. Lavoie*, 155 N.H. 477, 483 (2007).

Under the first factor, the significant private interest at stake in this case is indisputable — the potential deprivation of life. However, as noted above, that the private interest is "critical" is not, by itself, dispositive. *In re Eduardo L.*, 136 N.H. 678, 687 (1993).

Thus, we turn to the second factor, the risk of an erroneous deprivation of the defendant's interest through the procedures that apply. We disagree with the defendant that the process of "death qualifying" a single jury before the guilt phase of a capital trial inadequately protects his interest in life against erroneous deprivation. As the trial court stated in its order on this issue, "[n]umerous . . . procedural safeguards exist to protect the defendant from juror bias and an erroneous deprivation of his life, such as a jury venire representative of the community, sequestered individual *voir dire* to ferret out the jurors' biases, and the defendant's large number of peremptory challenges." All of these safeguards were employed in this case.

As set forth in Part V (Venue and Jury Selection Review) of this opinion, the jury selection process in this case was extensive and thorough. It included individual, sequestered *voir dire* of prospective jurors during which the court explained the phases of a death penalty case, including weighing aggravating and mitigating factors to determine whether a sentence of death or life imprisonment without possibility of parole should be imposed. The court also asked each prospective juror whether there was any reason that he or she could not be a fair and impartial juror. In addition, counsel for both parties asked probing questions on, among other topics, each individual's views on the potential sentence. In response to such questioning, the trial court excused a number of prospective jurors because they expressed views about the imposition of the death penalty that reflected an inability to follow the law on this issue. In addition, the trial court allowed the defendant twenty-four peremptory challenges, four more than he was statutorily entitled to receive. *See* RSA 606:3, I (2001).

 With respect to the third factor in the analysis — the government's interest in "death qualifying" a single jury for a capital trial — the State's interest in a single jury "goes well beyond considerations of administrative convenience or expense." *People v. Fields*, 673 P.2d 680, 694 (Cal. 1983). Courts have identified a number of valid reasons for requiring a single jury to determine both guilt or innocence and the proper sentence in a capital case, including: (1) the issues before the jury at both phases of the trial are interwoven and require consideration of similar evidence; (2) the jury hearing the guilt phase of trial may harbor residual doubts, despite having been persuaded of guilt beyond a reasonable doubt, and may take those residual doubts into account at the sentencing phase of trial; and (3) the use of repetitive trials for the benefit of two juries is not likely to be fair to either party. *See State v. Fry*, 126 P.3d 516, 523 (N.M. 2005) (citing cases); *see also Buchanan*, 483 U.S. at 417; *McCree*, 476 U.S. at 175-76; *Blount v. State*, 511 A.2d 1030, 1038 (Del. 1986); *State v. Hughes*, 721 P.2d 902, 908 (Wash. 1986) *(en banc)*. In light of these legitimate and significant state interests, we weigh this factor heavily. *See State v. Ploof*, 162 N.H. 609, 624 (2011).

 After balancing the three factors, we conclude that "death quali-fying" a single jury before the guilt phase of trial did not violate the defendant's rights to due process under Part I, Article 15 of the State Constitution.

We note that both of the defendant's motions to bar the death penalty were grounded in the State Constitution. Thus, to the extent that the defendant raises federal constitutional claims on appeal, we deem them waived. *See State v. Eaton*, 162 N.H. 190, 195 (2011); *State v. Winward*, 161

N.H. 533, 542 (2011). In any event, because the Federal Constitution affords the defendant no greater protection than does the State Constitution in these circumstances, we reach the same conclusions under the Federal Constitution as we do under the State Constitution. *See McCree*, 476 U.S. at 165, 180-84.

### G. Non-Statutory Aggravating Factors (Separation of Powers; Grand Jury Indictment; Duplicative Factors)

Before trial, the defendant filed three motions concerning the State's alleged non-statutory aggravating factors. In one motion he argued that the legislature impermissibly delegated authority to the Attorney General to select and allege non-statutory aggravating factors, in violation of the Separation of Powers Clause of the State Constitution. In a second motion he argued that, among other things, the State's failure to include its alleged non-statutory aggravating factors in the grand jury indictment violated his rights under the State and Federal Constitutions. In a third motion he argued that the State's alleged non-statutory aggravating factors were duplicative, in violation of his rights under the State and Federal Constitutions.

### 1. Separation of Powers

#### a. Background

In August 2007, the defendant sought "a declaration that the legislature's delegation of authority to [the] Attorney General to select and allege non-statutory aggravating factors violates [the] separation of powers [doctrine]," as set forth in Part I, Article 37 of the State Constitution. The defendant acknowledged that federal courts "have routinely upheld statutes that permit the prosecution to choose non-statutory aggravating factors," rejecting "separation of powers challenges under the federal constitution." He argued, however, that under New Hampshire case law, "to satisfy the constitution, the enabling legislation, itself, must enumerate the principles that guide the executive's action." According to the defendant, "RSA 630:5, I(b) represents an unlawful delegation of authority to the executive because it does not contain guidelines, or lay down basic standards to govern, the enumeration of non-statutory aggravating factors."

The State objected, and, following a hearing, the trial court denied the motion by written order dated October 29, 2007. The court noted that federal courts consistently have concluded that the prosecution's statutory authority to identify non-statutory aggravating factors does not violate the federal separation of powers doctrine but that such courts "are split as to

whether this power is a permissible delegation of legislative power, or not a delegation of legislative power at all." The trial court reasoned that, as in non-capital cases where prosecutors present "relevant information concerning the defendant's history and circumstances of the crime" to persuade the sentencing court to impose a certain sentence, "[t]he State's selection and use of non-statutory aggravating factors serves the same function in a death penalty sentencing hearing." Thus, it agreed with courts that hold that no delegation of legislative power has occurred when a capital sentencing statute permits the State to select and use non-statutory aggravating factors to argue for a death sentence. Following federal authority, the trial court also ruled that "even if this power were a delegation of legislative power . . . such a delegation does not violate the separation of powers doctrine."

### b. Appellate Argument

The defendant argues that the death penalty statute, which provides that the State may include non-statutory aggravating factors in its notice of intent to seek the death penalty, violates the Separation of Powers Clause of the State Constitution. N.H. CONST. pt. I, art. 37. He contends that a delegation of authority has occurred "when the Legislature allows the State to select [non-statutory aggravating] factors" because these factors significantly affect the weighing process. He further contends that in the absence of express guiding criteria in the statute, such legislation constitutes an impermissible delegation of legislative authority.

### c. Discussion

Because the defendant's arguments rest solely upon the State Constitution, we base our decision upon it alone, and refer to federal law only to aid our analysis. *See State v. Ball*, 124 N.H. 226, 231-33 (1983). Part I, Article 37 provides:

> In the government of this state, the three essential powers thereof, to wit, the legislative, executive, and judicial, ought to be kept as separate from, and independent of, each other, as the nature of a free government will admit, or as is consistent with that chain of connection that binds the whole fabric of the constitution in one indissoluble bond of union and amity.

N.H. CONST. pt. I, art. 37. "Part I, Article 37 is a 'provision of interrelation,'" which "'contemplates no absolute fixation and rigidity of powers between the three great departments of government.'" *New Hampshire Health Care Assoc. v. Governor*, 161 N.H. 378, 386 (2011) (quoting *Ferretti*

*v. Jackson*, 88 N.H. 296, 299 (1936)). "[W]e have recognized . . . that the three branches of government, while distinct, must move in concert whenever possible, as the practical and efficient operation of government is not served by the erection of impenetrable barriers between the branches." *State v. Martin*, 164 N.H. 687, 691 (2013) (quotations and ellipsis omitted). "Accordingly, the doctrine of separation of powers is violated only when one branch usurps an *essential* power of another." *Id.* (quotation and brackets omitted). "When the actions of one branch of government defeat or materially impair the inherent functions of another branch, such actions are unconstitutional." *Id.* (quotation omitted).

The defendant concedes that federal courts have routinely held that authorizing the prosecution to define non-statutory aggravating factors under federal death penalty statutes does not violate the federal separation of powers doctrine. Some courts conclude that the power to define non-statutory aggravating factors is a permissible delegation of legislative power. *See, e.g., United States v. Paul*, 217 F.3d 989, 1003 (8th Cir. 2000); *United States v. Jones*, 132 F.3d 232, 239-40 (5th Cir. 1998). Other courts conclude that the prosecutor's exercise of this power is an executive function and therefore does not involve a delegation of legislative power. *See, e.g., United States v. Higgs*, 353 F.3d 281, 321 (4th Cir. 2003); *United States v. Sampson*, 275 F. Supp. 2d 49, 98-102 (D. Mass. 2003), *aff'd*, 486 F.3d 13 (1st Cir. 2007); *United States v. Pitera*, 795 F. Supp. 546, 560-63 (E.D.N.Y. 1992).

We first address the defendant's argument that RSA 630:5, I(b) constitutes a delegation of legislative power. The statute provides: "Whenever the state intends to seek the sentence of death for the offense of capital murder, *the attorney for the state*, before trial or acceptance by the court of a plea of guilty, *shall file with the court and serve upon the defendant, a notice . . .* [s]etting forth the aggravating factors enumerated in paragraph VII of this section and *any other aggravating factors which the state will seek to prove as the basis for the death penalty.*" RSA 630:5, I(b) (emphasis added).

In determining whether the prosecutor is exercising legislative power or an executive function under this provision, we examine the role of non-statutory aggravating factors in the statutory procedure. Under the statute, the jury first determines whether a defendant has committed capital murder. *See* RSA 630:1 (2007) (amended 2011). Once the defendant is found guilty, the jury then decides whether the defendant is eligible for the death penalty. In order for the defendant to be eligible for a sentence of death, the State must prove beyond a reasonable doubt one of the three statutory aggravators requiring purposeful conduct set forth in RSA 630:5, VII(a) (2007), and at least one of the other statutory aggravating factors set forth in RSA 630:5, VII(b)-(j). *See* RSA 630:5, IV (2007). Only if these

criteria are satisfied does the jury then turn to non-statutory aggravators and "consider whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist, or in the absence of mitigating factors, whether the aggravating factors are themselves sufficient to justify a sentence of death." *Id.*

"Determining the criteria that define who is eligible for a sentence of death, by defining the substantive crime and the additional factors that make a person who commits that crime eligible for the death penalty, is a legislative function." *Sampson*, 275 F. Supp. 2d at 100. Accordingly, the legislature "may not delegate to the executive branch the authority to enlarge the class of people who are eligible for a . . . death sentence, by allowing the Executive to either define new substantive crimes or to add to the gateway mental states and statutory aggravating factors set forth in the [statute]." *Id.*

However, unlike statutory aggravating factors, non-statutory aggravating factors relate solely to the individualized determination of whether a death sentence is justified for a defendant who has, based upon proven statutory aggravating factors, been found eligible for the death penalty. *Id.*; *see also Zant v. Stephens*, 462 U.S. 862, 879 (1983) ("What is important at the selection stage is an *individualized* determination on the basis of the character of the individual and the circumstances of the crime.").

At the time of the defendant's crime, the statute identified six types of capital murder and required that the jury unanimously find beyond a reasonable doubt at least two statutory aggravating factors. RSA 630:1, I; RSA 630:5, I, III, IV, VII (2007). "Only after the selection of those critical, legislatively-defined factors is made is the prosecution afforded discretion to argue that additional nonstatutory aggravators combine with the statutory aggravators to outweigh any mitigating factors that have been submitted for consideration, thus assisting the jury in its task of determining whether a death-eligible defendant should indeed receive that maximum sentence." *Higgs*, 353 F.3d at 321; *see United States v. Davis*, 904 F. Supp. 554, 558 (E.D. La. 1995) ("[I]t is the statutory aggravating factors, which are defined by Congress and *not* delegated, that set the mandatory minimum requirements for the jury to consider the death penalty."). "[T]he nonstatutory aggravating factors are simply a means to provide the jury with *additional* information about the defendant, just as a defendant is free to provide with regard to information in mitigation. In that sense, the government (and the defense) are engaging in advocacy, not legislation." *Davis*, 904 F. Supp. at 559 (quotation omitted).

In this case, the non-statutory aggravating factors identified in the State's notice of intent to seek the death penalty included the defendant's prior convictions or involvement in acts of "other serious criminal behavior," the defendant's future dangerousness, and the impact of the crime on Officer Briggs's family. Because the finding of a non-statutory aggravating factor is not a prerequisite to imposing a death sentence, "in alleging a non-statutory aggravating factor, the prosecutor is not 'making law' by creating any substantive obligation, criminalizing any conduct, or increasing the maximum penalty to which a particular defendant is exposed." *Sampson*, 275 F. Supp. 2d at 100. Rather, when the State selects non-statutory aggravating factors to argue for a death sentence, it is exercising one of "the Executive's traditional function[s]" of "seeking to persuade the court . . . that the sentence that it advocates is the most appropriate sanction." *Id.* at 101.

In most criminal cases, "both the prosecution and defense routinely cite and argue factors that they think are relevant to the court's sentencing decision." *Pitera*, 795 F. Supp. at 561; *see also United States v. Einspahr*, 35 F.3d 505, 507 (10th Cir. 1994) ("Criminal sentencing exists at a nexus where legislative, judicial and executive prerogatives intersect."). "The prosecution, in engaging in such advocacy, exercises discretion derived from the executive's enforcement powers, not from any delegated legislative powers." *Pitera*, 795 F. Supp. at 561. "In identifying non-statutory aggravating factors . . . the prosecution plays virtually the same role in a capital sentencing proceeding as it does in a non-capital one. It brings relevant facts to the sentencer's attention and urges it to reach a particular result." *Id.* at 562 (citation and parenthetical omitted); *see Sampson*, 275 F. Supp. 2d at 100-01 (the purpose of nonstatutory aggravating factors is to allow the State to advocate "concerning the propriety of the death penalty in a particular case"). "In a capital case, this advocacy will, in no small part, reflect the prosecution's considered judgment as to why the case was a 'proper occasion' for serving a death penalty notice in the first place: an enforcement, not a legislative, decision." *Pitera*, 795 F. Supp. at 562.

Thus, when identifying non-statutory aggravating factors that bear on the jury's decision whether to impose the death penalty on the defendant, the prosecutor is performing its traditional function as the State's advocate. "The attorney general is the chief law enforcement officer for the State," *Bussiere v. Cunningham, Warden*, 132 N.H. 747, 755 (1990), whose "powers . . . are broad and numerous." *State v. Swift*, 101 N.H. 340, 342 (1958); *see Bokowsky v. State*, 111 N.H. 57, 58 (1971). "The authority to define nonstatutory aggravating factors falls squarely within the Execu-

tive's broad prosecutorial discretion, much like the power to decide whether to prosecute an individual for a particular crime." *Jones*, 132 F.3d at 239.

Accordingly, we hold that because the use of non-statutory aggravating factors serves only to individualize the sentencing determination after the defendant has been found guilty and eligible for the death penalty, the authority to select and allege non-statutory aggravating factors pursuant to RSA 630:5, I(b) is not a delegation of legislative power in violation of the Separation of Powers Clause in Part I, Article 37 of the State Constitution.

### 2. Grand Jury Indictment

#### a. Background

In August 2007, the defendant moved to strike the non-statutory aggravating factors arguing, among other things, that the State's failure to include them in the grand jury indictment violates his right under the State Constitution to have the grand jury determine all facts that may subject him to enhanced punishment. *See* N.H. CONST. pt. I, art. 15. The State objected, and the trial court denied the motion by written order dated December 20, 2007.

The trial court stated that we had interpreted the Supreme Court's decision in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), "to require indictment of all facts that might increase a penalty beyond the statutory maximum in this state." *See State v. Ouellette*, 145 N.H. 489, 491 (2000). *But see State v. Marshall*, 162 N.H. 657, 664-65 (2011) (recognizing that we erred when we stated in *Ouellette* that the United States Supreme Court held in *Apprendi* that sentencing factors, other than prior convictions, had to be fully alleged in an indictment). The court ruled, however, that the "*Apprendi/Ouellette* analysis" does not apply to non-statutory aggravating factors. It reasoned that unlike statutory aggravating factors that must be found proven for a defendant to be eligible for the death penalty, non-statutory aggravating factors "serve to assist the jury in determining whether the death penalty is appropriate for a death eligible defendant." The court concluded that non-statutory aggravating factors neither "increase the penalty for a crime beyond the prescribed statutory maximum" nor "allow the imposition of a more severe sentence than could have been imposed without it." Accordingly, the trial court ruled that Part I, Article 15 does not require the State to submit the alleged non-statutory aggravating factors to the grand jury.

#### b. Appellate Argument

The defendant asserts that "the State's failure to present the non-statutory aggravating factors to the grand jury rendered them invalid." He

"invokes the state constitutional right to grand jury indictment under Part I, Article 15," and what he characterizes as "this Court's recognition that Part I, Article 15 provides enhanced due process protection to individual rights, especially where the penalty is severe," to "advocat[e] for a rule that requires the presentation of non-statutory aggravating factors to the grand jury."

### c. Discussion

Because the defendant's argument rests solely upon the State Constitution, we base our decision upon it alone and refer to federal law only to aid our analysis. *See State v. Ball*, 124 N.H. 226, 231-33 (1983).

Part I, Article 15 of the New Hampshire Constitution provides in part: "No subject shall be held to answer for any crime, or offense, until the same is fully and plainly, substantially and formally, described to him . . . ." N.H. CONST. pt. I, art. 15. "We have interpreted Part I, Article 15 as safeguarding the right to indictment by a grand jury for any offense punishable by imprisonment for more than one year . . . ." *State v. LeBaron*, 148 N.H. 226, 230 (2002) (quotation and ellipsis omitted). For an indictment to be sufficient under Part I, Article 15, it must "give the defendant enough information to allow him to prepare for trial, and it must include all of the elements which constitute the offense charged." *Id.* at 230-31 (quotation omitted).

In the context of capital sentencing under the Federal Death Penalty Act, 18 U.S.C. §§ 3591 *et seq.* (2006) (FDPA), federal courts of appeals uniformly agree that, under the Federal Constitution, *statutory* aggravating factors are the functional equivalent of offense elements and must be alleged in the grand jury indictment. *See, e.g., United States v. Sampson*, 486 F.3d 13, 21 (1st Cir. 2007). Federal courts of appeals also agree that, under the Federal Constitution, *non-statutory* aggravating factors are not the functional equivalent of offense elements and, therefore, need not be alleged in the indictment. *See United States v. Lighty*, 616 F.3d 321, 367-68 (4th Cir. 2010); *United States v. Fell*, 531 F.3d 197, 237-38 (2d Cir. 2008); *Mitchell*, 502 F.3d at 979; *United States v. Brown*, 441 F.3d 1330, 1368 (11th Cir. 2006); *United States v. Purkey*, 428 F.3d 738, 749-50 (8th Cir. 2005); *United States v. Bourgeois*, 423 F.3d 501, 507-08 (5th Cir. 2005).

Federal courts distinguish between statutory and non-statutory aggravating factors based upon their role in capital sentencing. Under the FDPA, a defendant is not eligible for the death penalty unless the sentencing jury finds that the defendant had the requisite intent and "that the Government has proved beyond a reasonable doubt at least one of the statutory aggravating factors." *Jones v. United States*, 527 U.S. 373, 376-77 (1999).

Once a defendant becomes "death eligible," the jury must then make a sentence selection decision, in which it "consider[s] all of the aggravating and mitigating factors and determine[s] whether the former outweigh[ ] the latter (or, if there are no mitigating factors, whether the aggravating factors alone are sufficient to warrant a death sentence)." *Id.* at 377. "The Supreme Court's distinction between eligibility and selection has led lower courts to conclude that only those factors which comprise death eligibility — intent and statutory aggravation — must be included in the indictment because those factors must be found before imposition of the maximum authorized penalty." *Fell*, 531 F.3d at 238. "The non-statutory aggravating factors, although relevant to determining whether a jury decides to impose the death penalty, do not make a defendant statutorily eligible for any sentence that could not be otherwise imposed in their absence. They are neither sufficient nor necessary under the FDPA for a sentence of death." *Brown*, 441 F.3d at 1368 (quotation and emphasis omitted); *accord Purkey*, 428 F.3d at 749.

[180] Federal courts so holding have relied upon the Supreme Court's decisions in *Apprendi*, 530 U.S. 466, and *Ring v. Arizona*, 536 U.S. 584 (2002). In *Apprendi*, the defendant pleaded guilty to second-degree possession of a firearm, which was punishable by a term of imprisonment of between five and ten years. *Apprendi*, 530 U.S. at 468, 469-70. However, he was sentenced to twelve years of imprisonment under a statute that authorized an enhanced sentence of between ten and twenty years if the sentencing judge found, by a preponderance of the evidence, that the crime was motivated by racial bias. *Id.* at 468-69, 471. The Supreme Court reversed, holding that under the Due Process Clause of the Fourteenth Amendment to the Federal Constitution, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490; *see Alleyne v. United States*, 133 S. Ct. 2151, 2155 (2013).

In *Ring*, decided two years after *Apprendi*, the Supreme Court considered Arizona's capital sentencing scheme under which a trial judge alone determined the presence or absence of statutory aggravating factors. *Ring*, 536 U.S. at 588. The Court noted that in a prior case, *Walton v. Arizona*, 497 U.S. 639, 649 (1990) (plurality opinion), it had ruled that the Arizona scheme was constitutional because the additional facts found by the trial judge were "sentencing considerations" and did not constitute elements of the charged offense. *Ring*, 536 U.S. at 588. In *Ring*, the Court overruled *Walton*, holding that the Sixth Amendment to the Federal Constitution mandates that "[c]apital defendants, no less than noncapital

defendants, . . . are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." *Id.* at 588-89. The Court stated:

> If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact — no matter how the State labels it — must be found by a jury beyond a reasonable doubt. A defendant may not be exposed to a penalty *exceeding* the maximum he would receive if punished according to the facts reflected in the jury verdict alone.

*Id.* at 602 (quotation, citation, brackets, and ellipsis omitted). "Because Arizona's enumerated aggravating factors operate as the functional equivalent of an element of a greater offense," the Court held that the Sixth Amendment requires that they be found by a jury. *Id.* at 609 (quotation omitted).

Although neither *Apprendi* nor *Ring* concerned the Indictment Clause of the Fifth Amendment, federal courts of appeals have held that their reasoning applies in the context of an Indictment Clause challenge in a capital case. *See United States v. Robinson*, 367 F.3d 278, 284 (5th Cir. 2004); *see, e.g., United States v. Allen*, 406 F.3d 940, 942-43 (8th Cir. 2005) (*en banc*); *Higgs*, 353 F.3d at 297. Applying the reasoning of *Apprendi* and *Ring*, federal courts of appeals thus have concluded that statutory aggravating factors must be alleged in the indictment because they alone increase the penalty for the charged crime from life imprisonment to death. *See Higgs*, 353 F.3d at 298. By contrast, non-statutory aggravating factors do not increase the potential penalty for the charged crime because the jury does not consider them until it has determined that the defendant is eligible for the death penalty. *See id.* at 298-99; *Bourgeois*, 423 F.3d at 507-08; *cf. Alleyne*, 133 S. Ct. at 2163 (distinguishing between fact finding that increases mandatory minimum sentences, which must be submitted to a jury, and those facts that affect sentencing discretion, which do not need to be submitted to a jury under the Sixth Amendment).

Because our capital sentencing statute is similar to the FDPA, we find these federal decisions persuasive. Under our statute, for a defendant to be eligible for a death sentence, a unanimous jury must find beyond a reasonable doubt both that he possessed one of three purposeful mental states enumerated under RSA 630:5, VII(a), and that at least one of the statutory aggravating factors set forth in RSA 630:5, VII(b)-(j) exists. *See* RSA 630:5, IV. Only then does the jury "consider whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist, or in the absence of mitigating factors, whether the

aggravating factors are themselves sufficient to justify a sentence of death." *Id.* Accordingly, under our statute, as under the FDPA, only the statutory aggravating factors — which the State did set forth in the grand jury indictment in this case — determine whether a defendant is eligible for a death sentence. The non-statutory aggravating factors do not serve this purpose.

The defendant argues that we should not rely upon federal cases because Part I, Article 15 affords enhanced protection to a criminal defendant under these circumstances. We rejected a similar argument in *State v. Melvin*, 150 N.H. 134, 141 (2003). The defendant in *Melvin* pleaded guilty to fifteen counts of aggravated felonious sexual assault and one count of felony indecent exposure. *Melvin*, 150 N.H. at 135. Because he had two prior convictions for aggravated felonious sexual assault, the trial court sentenced him to life imprisonment without possibility of parole. *Id.* The defendant argued that reversal was required because the State failed to set forth the prior convictions in the indictments. *Id.* at 140. We disagreed. *Id.* at 140-41. We explained that although we had previously held that due process required the State to *prove* the prior convictions used to enhance a defendant's sentence to life imprisonment without possibility of parole, we had not held that due process requires the State to *plead* the prior convictions or to prove them to a *jury*. *Id.* at 140. We also specifically rejected the defendant's argument that the severity of his sentence justified heightened protection under Part I, Article 15 of the State Constitution. *Id.* at 141. We explained that the rule that the State need not allege a defendant's prior convictions used to enhance his sentence applies even when the conviction of the subsequent offense carries a heavy penalty. *Id.*

The defendant argues that *Melvin* is distinguishable because of "the role of non-statutory aggravating factors in a capital murder weighing scheme." He argues that "[b]ecause non-statutory aggravating factors are in the 'same pot' as the statutory aggravating factors at the stage of sentence selection, they weigh heavily in the jury's decision to impose a death sentence." He contends that if one non-statutory aggravating factor "tips the scale in favor of a death sentence," then it has "converted into a death sentence one which would have otherwise been life without parole." We disagree that this characterization of the import of non-statutory aggravators requires that we reach a conclusion here different from the conclusion we reached in *Melvin*.

Moreover, we note that "[i]t is . . . an open question whether, under the State Constitution, any fact, other than a prior conviction, that increases the penalty for a crime beyond the prescribed statutory maximum must be alleged in an indictment." *Marshall*, 162 N.H. at 665. The

defendant does not advance any argument on this issue. Accordingly, we hold that the defendant has not established that the State was constitutionally required to present the non-statutory aggravating factors to the grand jury under Part I, Article 15 of the State Constitution.

Although the defendant states, in passing, that he "arguably" has a similar due process right under the Fourteenth Amendment to the Federal Constitution, he does not adequately develop this argument for appellate review. *See State v. Chick*, 141 N.H. 503, 504 (1996). Moreover, he concedes that he does not rely upon the Fifth Amendment to the Federal Constitution because "the Fifth Amendment right to a grand jury indictment is not applicable to a state court defendant." *See McDonald v. City of Chicago, Ill.*, 130 S. Ct. 3020, 3035 n.13 (2010).

### 3. Duplicative Factors

#### a. Background

In April 2008, the defendant moved to strike certain of the State's alleged non-statutory aggravating factors as unconstitutionally duplicative. He argued: "The use of duplicative factors artificially inflates the prospective number of aggravating factors, which, in turn, unfairly increases the likelihood that the jury will find more aggravating factors. In turn, this skews the weighing process in favor of aggravating factors." He claimed that "[t]he State's practice of 'double-counting' non-statutory aggravating factors" violates his "rights to due process, a fair trial, and to be protected against cruel, unusual, or disproportionate punishments" under the State and Federal Constitutions. *See* N.H. CONST. pt. I, arts. 15, 18, 33; U.S. CONST. amends. V, VIII, XIV. ·

The State objected. Following a hearing, the trial court, by written order dated August 6, 2008, granted the motion as to one non-statutory aggravating factor because it referred to criminal conduct of which the defendant had been acquitted. The court otherwise denied the motion.

At the close of the sentence selection phase of trial, the court explained to the jury the process to follow when weighing aggravating and mitigating factors. The court instructed that each juror was "required to weigh in [his or her] own mind these proven factors to decide the appropriate sentence." It explained that the weighing process consists of "decid[ing] whether the proven aggravating factors sufficiently outweigh any proven mitigating factors, or if no mitigating factors are found, whether the proven aggravating factors are sufficient in themselves to justify a sentence of death." The court also instructed the jurors that: "The weighing process you will undertake is not a mechanical process and is more than a numerical counting or tabulation of factors on each side. Rather, you must consider

the aggravators and mitigators qualitatively. The difference in the burdens of proof between aggravators and mitigators does not indicate what weight you should give [them]. Each juror must weigh in value each factor for him or herself." Ultimately, as set forth in Part VII (Sentencing Phase Review) of this opinion, the jurors considered fifteen proven aggravating factors and sixteen proven mitigating factors in determining the defendant's sentence.

### b. Appellate Argument

The defendant argues that certain prior crimes non-statutory aggravating factors were impermissibly duplicative. He first points to three pairs of factors, each of which relate to the same criminal incident (factors 4 and 5, factors 6 and 7, factors 8 and 9). He also challenges three factors that allege his felon status relating to separate criminal incidents (factors 7, 9, and 11).

The first pair of challenged aggravating factors, which relate to the 2003 false imprisonment incident, allege:

4. *Other Serious Criminal Behavior*: False Imprisonment. On or about October 27, 2003, in Londonderry, New Hampshire, the defendant, Michael K. Addison, acting in concert with Mathys Morgan, knowingly confined Brian St. Peter unlawfully as to interfere substantially with his physical movements, by keeping him inside a locked vehicle. The defendant, Michael K. Addison, pled guilty and was convicted of this offense on November 4, 2003.

5. *Other Serious Criminal Behavior*: Probation Violation. On or about October 27, 2003, in Londonderry, New Hampshire, the defendant, Michael K. Addison, violated the terms of his probation by committing the crime of false imprisonment. On August 6, 2004, the defendant, Michael K. Addison, stipulated to the violation of probation and was found in violation by the Court.

The second pair of challenged aggravating factors relate to the 2006 El Mexicano Restaurant robbery and allege:

6. *Other Serious Criminal Behavior*: Armed Robbery. The defendant, Michael K. Addison, committed armed robbery when he and his accomplices/co-conspirators, including Antoine Bell Rogers, robbed customers of the El Mexicano Restaurant in Manchester, New Hampshire on or about October 10, 2006. A jury convicted Michael K. Addison of this offense on February 27, 2008.

7. *Other Serious Criminal Behavior*: Felon in Possession. The defendant, Michael K. Addison, was a felon in

possession of a deadly weapon when he committed the armed robbery of the El Mexicano Restaurant in Manchester, New Hampshire with his accomplices/co-conspirators, including Antoine Bell Rogers, on or about October 10, 2006. A jury convicted Michael K. Addison of this offense on February 27, 2008.

The third pair of challenged aggravating factors relate to the 2006 7-Eleven convenience store robbery and allege:

8. *Other Serious Criminal Behavior*: Armed Robbery and Conspiracy to Commit Robbery. The defendant, Michael K. Addison, agreed to rob a store and then committed armed robbery with a firearm when he and his accomplices/co-conspirators, including Antoine Bell Rogers, robbed the 7-Eleven Store in Hudson, New Hampshire on or about October 11, 2006. A jury convicted Michael K. Addison of these offenses on December 19, 2007.

9. *Other Serious Criminal Behavior*: Felon in Possession. The defendant, Michael K. Addison, was a felon in possession of a firearm when he committed the armed robbery of the 7-Eleven Store with his accomplices/co-conspirators, including Antoine Bell Rogers, on or about October 11, 2006, in Hudson, New Hampshire. A jury convicted Michael K. Addison of this offense on December 19, 2007.

The defendant argues that within each pairing, "the jury's finding of one factor, under the circumstances of the case, necessarily proved the other" and, thus, they were impermissibly duplicative.

Additionally, the defendant asserts that "unconstitutional duplication arose because the State invoked [his] status as a felon to support" factors seven, nine, and eleven. Factors seven and nine are set forth above. Factor eleven alleged:

11. *Other Serious Criminal Behavior*: Felon in Possession. The defendant, Michael K. Addison, was a felon in possession of a firearm, when he committed the murder of Manchester Police Officer Michael L. Briggs in Manchester, New Hampshire on or about October 16, 2006.

The defendant does not argue that any of the challenged non-statutory aggravating factors was legally invalid. Rather, relying primarily upon law developed by the United States Court of Appeals for the Tenth Circuit, *see*

*United States v. McCullah*, 76 F.3d 1087, 1111-12 (10th Cir. 1996), the defendant contends that allowing the State to proceed with duplicative aggravating factors violated "[his] rights to due process and to be protected against cruel and unusual punishments" under the State and Federal Constitutions. *See* N.H. CONST. pt. I, arts. 15, 18, 33; U.S. CONST. amends. V, VIII, XIV.

### c. Discussion

We first address the defendant's arguments under the State Constitution and rely upon federal law only to aid our analysis. *State v. Ball*, 124 N.H. 226, 231-33 (1983). The concern some courts have expressed regarding duplicative aggravating factors is that when a sentencing body is asked, in essence, to weigh the same factor twice, "[s]uch double counting of aggravating factors, especially under a weighing scheme, has a tendency to skew the weighing process and creates the risk that the death sentence will be imposed arbitrarily and thus, unconstitutionally." *McCullah*, 76 F.3d at 1111; *see Allen v. Woodford*, 395 F.3d 979, 1012-13 (9th Cir. 2005); *United States v. Tipton*, 90 F.3d 861, 898-99 (4th Cir. 1996). Both federal and state courts are divided as to whether duplicative aggravators raise constitutional concerns.

We need not decide this issue, however, because the trial court's instructions to the jury at the conclusion of the sentence selection phase of trial eliminated any risk that the weighing process would be impermissibly skewed. *See Jones v. United States*, 527 U.S. 373, 399-400 (1999) (plurality opinion) ("Moreover, any risk that the weighing process would be skewed was eliminated by the District Court's instruction that the jury should not simply count the number of aggravating and mitigating factors and reach a decision based on which number is greater [but rather] should consider the weight and value of each factor." (quotation omitted)); *Fell*, 531 F.3d at 236 ("Moreover, although we find no constitutional error in the submission of the aggravating factors, assuming we were to conclude otherwise, any such error would not have affected the fairness of the proceedings in light of the district court's instructions to the jury.").

As the State points out, the jury was instructed that: (1) the process of weighing aggravating and mitigating factors "is not a mechanical process and is more than a numerical counting or tabulation of factors on each side"; (2) the jurors must "consider the aggravators and mitigators qualitatively"; and (3) "[e]ach juror must weigh in value each factor for him or herself." The instructions are similar to those given in *Jones* and *Fell* — instructions that the Supreme Court and the United States Court of Appeals for the Second Circuit concluded eliminated any risk that the weighing process would be skewed by the jury's consideration of allegedly

duplicative aggravating factors. *See Jones*, 527 U.S. at 399-400; *Fell*, 531 F.3d at 236; *cf. Davis v. Executive Director of Dept. of Corrections*, 100 F.3d 750, 774 (10th Cir. 1996) (finding harmless error based upon "[a]n instruction that the weighing process is not simply a mathematical exercise, but instead requires critical evaluation of the factors"). As the Second Circuit has explained: "The [trial] court instructed the jurors not to simply count the number of aggravating factors in reference to the mitigators, but to 'consider the weight and value of each.' Thus, the jury would have known going into deliberations that, in reaching the verdict, it should make a qualitative assessment of the aggravating and mitigating evidence as a whole, rather than focusing on the number of factors on each side of the scale." *Fell*, 531 F.3d at 236. Similarly, here, the trial court's instructions required the jurors to qualitatively weigh proven aggravating and mitigating factors, rather than focusing simply on the number of factors on each side.

Accordingly, we hold that the defendant has failed to establish that the submission of the challenged non-statutory aggravating factors gave rise to a constitutional violation under Part I, Articles 15, 18, or 33 of the State Constitution. Because the Federal Constitution affords the defendant no greater protection than does the State Constitution in these circumstances, we reach the same conclusion under the Federal Constitution as we do under the State Constitution. *See Jones*, 527 U.S. at 398-400.

### H. Post-Verdict Request for Discovery

In December 2010, while this appeal was pending, the defendant filed a motion for partial remand to seek additional discovery and proceedings. We granted his motion in part, and, on remand, the trial court considered the defendant's post-verdict motion for discovery. After a hearing, the trial court denied the defendant's request for discovery by written order dated May 18, 2011. The defendant now challenges aspects of the trial court's order and requests that we vacate his death sentence and remand for a new sentencing phase trial.

#### 1. Background

##### a. Prosecutorial Discretion

Before trial, in January 2008, the defendant filed a motion to bar the imposition of the death penalty on the ground that then Attorney General Kelly Ayotte's decision to seek the death penalty was not a meaningful exercise of prosecutorial discretion guided by standards intended to prevent arbitrariness. He argued that Attorney General Ayotte's decision to seek the death penalty was arbitrary and violated his right to due process

under the State and Federal Constitutions because "[t]he decision was made just hours after the victim's death, without consideration of any mitigating evidence, without reference to any guidelines and without an objective comparison to other murder cases over the last 30 years." The defendant also moved for discovery, seeking, among other things, information about any standards or procedures used to guide the attorney general's determination whether to seek a sentence of death and the names of "[a]ll persons, whether or not members of the New Hampshire Attorney General's Office[ ], who were involved in or who were consulted, in connection with the October 17, 2006 decision to seek the death penalty in this case." The State objected to both motions. It argued that the defendant's allegations did not state a claim of selective prosecution as a matter of law or otherwise establish that he was entitled to the relief he requested.

Following a hearing, the trial court by written order dated February 19, 2008, denied without prejudice the defendant's motion for discovery. It ruled that the request was premature because the prosecutor's charging decision carried a "presumption of regularity," the defendant's due process claim was a novel one, and while a hearing had been scheduled for the underlying motion to bar the imposition of the death penalty, the substance of the issue had not yet been resolved. The court subsequently denied the defendant's motion to bar by written order dated August 13, 2008, ruling that the timing of the attorney general's announcement did not make the decision to seek the death penalty premature or improper. It reasoned, in part, that by statute, "the murder of a police officer in the line of duty is a capital offense" and that this fact, combined with "the circumstances of Officer Briggs' murder and the defendant's background known at the time, [brought] the Attorney General's announcement well within her broad discretion." The defendant does not appeal either trial court order.

### b. Plea Offer Mitigating Factor

Subsequently, approximately four months before trial, the defendant sent a letter to the State offering to plead guilty to capital murder "in exchange for a recommendation of a sentence of life in prison without the possibility of parole." He also offered to "withdraw all pending motions and forego all appeals of any felony convictions" and to withhold "any arguments or evidence at sentencing on those cases." In the letter, the defendant stated that he sought to resolve the case by plea because "the trials of the other pending felonies [we]re completed and the court ha[d] heard most of the pretrial motions that raise purely legal issues," and the

parties "[we]re faced with at least another eight to nine months of intense litigation in pretrial motions and the trial of the Capital Murder charge itself."

The State declined the defendant's offer by letter dated July 28, 2008. It stated: "Based on the circumstances surrounding Mr. Addison's murder of Officer Briggs, including the crime spree he engaged in preceding the murder, the seriousness of his prior criminal history and the impact this crime has had on Michael Briggs' family, the Manchester Police Department and the State, we believe that the death penalty is the appropriate sentence in this case." The letter was signed by Attorney General Ayotte.

Thereafter, in August 2008, the defendant filed a motion requesting that the trial court instruct the jury in the sentence selection phase of trial that "it may consider as a mitigating factor the fact that four months prior to trial [he] offered to plead guilty to Capital Murder with a sentence of life in prison without the possibility of release and that the prosecution rejected that offer." The defendant argued that this information was relevant mitigating evidence because it showed "[h]is willingness to accept responsibility for the crime, to spare the victims and the State the burden of trial, and to, literally, give up everything except his own life." The defendant's May 2008 plea offer letter and the State's July 2008 response letter were appended to his motion.

In response, the State indicated that it did not oppose the defendant's motion provided that the trial court allow it to present to the jury rebuttal information and argument "placing the plea offer in its proper context," which included its July 2008 response letter. Specifically, the State sought to present "information that reasonably suggests other motives behind the offer and with fair argument that asks the jurors to consider alternative inferences to draw from the offer." The State argued that "it is critical that the jury accurately understand the procedural circumstances of the case at the time the offer was made" in that "[a]t the time he made this offer, the defendant had already failed multiple times in his quest to bar the imposition of the death penalty and he was facing the potential imposition of a lengthy prison sentence for his role in the armed robberies and shooting leading up to the murder." The State also contended that the jury "should be informed, through stipulation or otherwise, that nothing . . . prohibited [the defendant] from pleading guilty without condition as to a particular sentence recommendation."

The trial court granted both the defendant's motion and the State's request to present the proffered rebuttal evidence and argument. The defendant does not challenge that order on appeal.

Later, during the sentence selection phase of trial, the defendant sought to introduce into evidence a stipulation signed by the parties, to which the

defendant's May 2008 plea offer letter and the State's July 2008 response letter were attached. The stipulation stated that these "letters reflect the communication between the parties regarding the plea offer in this case." Defense counsel asked the court to "notify the jury that [the parties] made the stipulation and the letters are in the record"; he informed the court that it "seems unnecessary" to read the letters to the jury. The court admitted the exhibit into evidence and, after the jury entered the courtroom, it read the parties' stipulation to the jury. The court reminded the jury of the defendant's plea offer mitigating factor and stated "these letters are all the documents that relate to that."

Subsequently, during the State's rebuttal, the court read another stipulation to the jury:

> [T]he parties stipulate that, prior to May 20th, 2008, the defendant's attorneys, on his behalf, filed twenty-six separate motions submitted in twenty-one separate written submissions to the trial court challenging the constitutionality of New Hampshire's capital murder statute, seeking to prevent the State from presenting aggravating factors to the jury and otherwise seeking to preclude the jury from considering the death penalty. The trial court had denied all of these motions as of January 11th, 2008.
>
> The parties further stipulate that the defendant . . . at any time during the pendency of this case could have pleaded guilty to capital murder without condition and proceeded to trial on the issue of sentence only.

After the close of evidence, the State, during its closing argument, asserted that the defendant's offer to plead guilty did not constitute a mitigating factor because it did not represent an acceptance of responsibility. The State argued in part:

> He only offered to plead guilty in exchange for a life sentence after he lost his challenges to the death penalty. He only offered to plead guilty after he was convicted by three different juries of multiple crimes for his role in the El Mexicano robbery, the 7-Eleven robbery, and the shooting at Edward J. Roy Drive. And he only made that offer after he was facing thirty-one-and-a-half to sixty-three years in prison for those convictions even before we went to trial on this murder. It was not an offer to accept responsibility. He didn't make that offer to spare the victims of this crime further pain and trauma. It was an offer to advance his own interests, to avoid responsibility, to get away with murder. And if you have any doubt that those convictions motivated him to make that offer, when you're back in your deliberations, look at

the letter from his lawyers making that offer to us. . . . That plea offer was hollow because he was already facing essentially a life sentence.

The State did not make any reference to its July 2008 response letter declining the plea offer.

During the final jury charge, the trial court instructed the jury that the defendant alleged, among others, the following mitigating factor: "[T]he defendant attempted to plead guilty to capital murder but his offer was rejected by the State." When the jury returned its findings and verdict at the end of the sentence selection phase, it found that the defendant had not proved the plea offer mitigating factor.

### c. Post-Verdict Request for Discovery

In December 2010, the defendant filed a motion in this court requesting "a partial remand for additional discovery and proceedings regarding new evidence which should be made part of the record for this appeal." The "new evidence" to which the defendant referred consisted of publicly disclosed e-mail messages that former Attorney General and current United States Senator Kelly Ayotte exchanged with political consultant Robert Varsalone in the fall of 2006 relating to her then-potential United States Senate campaign. The defendant attached to his motion copies of e-mail messages that the State had provided to him at his request in May 2010. One e-mail exchange shows the following: On October 27, 2006, Varsalone sent an e-mail message to Attorney General Ayotte with the subject line "Get ready to run . . ." in which Varsalone discussed the campaign efforts of certain candidates; Attorney General Ayotte's reply stated, "Have you been following the last 2 Weeks. A police officer was klilled [sic] and I hannounced [sic] that I would seek the death penalty?" Varsalone responded: "I know, I read about it. Where does AG Ayotte stand on the Death Penalty? BY THE SWITCH." In November 2006, Varsalone and Attorney General Ayotte exchanged additional e-mail messages about her potential senate campaign; however, none mentioned the decision to seek the death penalty.

In his motion for partial remand, the defendant stated that "[a]lthough final conclusions should not be drawn until there is further investigation," the e-mail messages between Varsalone and Attorney General Ayotte "indicate that personal or political goals may have influenced Ayotte's decision to seek death for Addison." The defendant outlined three grounds justifying his discovery request: the "new email evidence would have been relevant to rebut the State's explanation for rejecting Addison's [plea] offer"; it was relevant "to the pending statutory review by this court to

determine whether the sentence of death was imposed under the influence of an arbitrary factor," *see* RSA 630:5, XI(a) (2007); and it should have been disclosed by the State in relation to his prior motion to bar the death penalty on the ground that the attorney general's decision was not a meaningful exercise of prosecutorial discretion. He sought a partial remand to seek additional discovery and an order from the trial court making the new information part of the record. The defendant attached to his motion a copy of the post-verdict motion for discovery that he sought to file with the trial court.

Over the State's objection, we granted the defendant's motion, stating that "[t]he case is remanded to the trial court for the purpose of ruling upon the defendant's 'Post-Verdict Motion for Discovery,' a copy of which is attached to the motion for partial remand, and for such other proceedings as the trial court deems appropriate." Our order also stated that we "express[ed] no opinion as to whether the post-verdict motion for discovery should be granted."

Thereafter, the defendant filed the post-verdict motion in the trial court, requesting "discovery from the State for the reasons set forth in his Motion for Partial Remand filed at the Supreme Court." He specifically sought "any information or evidence which might tend to show that Ayotte considered or was influenced by any factor not listed in her letter of July 28, 2008 rejecting [his] plea offer." In addition, the defendant sought "all evidence or communications in any way relating to the decision to seek the death penalty" and "any information which might tend to indicate that Ayotte's personal political career was a consideration or factor to any extent in her decision to seek [the] death [penalty] at any stage of this case." The State objected, arguing that none of the defendant's arguments based upon the e-mail messages gave rise to any need for further discovery.

The defendant filed a responsive pleading, clarifying his reasons for seeking discovery regarding Attorney General Ayotte's motivations for seeking the death penalty in this case. First, he argued that by submitting the July 2008 letter authored by Attorney General Ayotte at sentencing as rebuttal evidence to his plea offer mitigating factor, the State became obligated to disclose the e-mail messages. Second, he argued that the State should have provided the e-mail messages and related materials when he first requested discovery regarding his motion to bar the imposition of the death penalty for lack of a meaningful exercise of prosecutorial discretion. He emphasized that he had "sought discovery identifying everyone involved in the decision to seek death" and "specifically requested discovery regarding any persons consulted outside of the Attorney General's Office in connection with the decision." Third, he argued that the e-mail messages and related discovery were relevant to, and must be made part of the

record for, our independent review of the death sentence for the influence of arbitrary factors under RSA 630:5, XI(a). According to the defendant, he "should be allowed to make a record regarding the exercise of prosecutorial discretion because it is well recognized that such decisions may result in the arbitrary imposition of the death penalty."

After conducting a hearing in April 2011, the trial court denied the defendant's motion for additional discovery in an order dated May 18, 2011. It ruled that evidence tending to show that Attorney General Ayotte was motivated by political ambition when seeking the death penalty was not relevant to rebut the reasons identified by the State in its July 2008 letter for rejecting the defendant's plea offer. Reviewing the capital trial record, the court found that the July 2008 letter "serve[d] as a summary of the State's arguments as to why the defendant's offer to plead guilty was not mitigating," and that "Ayotte's letter was admitted as it related to the defendant's, not Ayotte's, state of mind." The court also ruled that the July 2008 letter would not have been admissible to prove Attorney General Ayotte's motivations for seeking the death penalty because such reasons would not have been relevant to rebut the plea offer mitigating factor.

The trial court further ruled that evidence tending to show that Attorney General Ayotte was motivated by political ambition when seeking the death penalty was not relevant to buttress arguments that the defendant made in his pretrial motion to bar the death penalty. Although the defendant had "conced[ed] that he [was] not claiming selective prosecution," the court nonetheless found that the e-mail messages did not "constitute clear evidence that Ayotte acted with the requisite discriminatory or vindictive motive sufficient to overcome the presumption of regularity surrounding prosecutorial charging decisions." The trial court specifically observed that "[c]ourts have held that a prosecutor's political ambitions do not rise to the level of unconstitutional conduct or even a conflict of interest." *See, e.g., Dick v. Scroggy,* 882 F.2d 192, 196-97 (6th Cir. 1989); *People v. Vasquez,* 137 P.3d 199, 209 (Cal. 2006).

Finally, the trial court ruled that evidence tending to show that Attorney General Ayotte was motivated by political ambition when seeking the death penalty was not relevant to our statutory review under RSA 630:5, XI(a). *See* RSA 630:5, XI(a) (supreme court must review "[w]hether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor"). Based upon the plain language of the statute, the trial court rejected the defendant's argument that review under this provision encompasses the attorney general's subjective reasons for charging him with capital murder and seeking the death penalty. It concluded that the

statutory review "is concerned with whether the jury arbitrarily decided to impose the death penalty, not with whether Ayotte arbitrarily charged the defendant with capital murder."

Accordingly, the trial court ruled that the defendant's discovery request was "not reasonably calculated to lead to the discovery of evidence admissible to the issues he raises."

### 2. Appellate Argument

The defendant argues that the State violated his due process rights by withholding exculpatory evidence regarding its decision to reject his plea offer. According to the defendant, the State made Attorney General Ayotte's reasons for seeking the death penalty an issue in this case by introducing her July 2008 response letter into evidence to rebut his plea offer mitigating factor. Thus, he contends that "documentary evidence of her political motivations was discoverable, material and relevant," and the State was constitutionally required to disclose such evidence to the defense for its use in addressing the State's rebuttal evidence; namely, the July 2008 letter. The defendant concludes that "[u]nder the unique circumstances of this case, this Court must find that the State failed to disclose material, exculpatory evidence" in violation of the State and Federal Constitutions, and as a result, "must vacate [his] sentence and remand this case for a new sentencing phase trial." See N.H. CONST. pt. I, art. 15; U.S. CONST. amends. V, XIV.

### 3. Discussion

We first address the defendant's claim under the State Constitution and rely upon federal law only to aid our analysis. See State v. Ball, 124 N.H. 226, 231-33 (1983). Part I, Article 15 of the New Hampshire Constitution imposes upon the prosecutor the "duty to disclose evidence favorable to the accused where the evidence is material either to guilt or to punishment." State v. Shepherd, 159 N.H. 163, 169 (2009) (quotation omitted). "Generally, to secure a new trial, a defendant must prove that the prosecution withheld evidence that is favorable and material." State v. Etienne, 163 N.H. 57, 88 (2011) (quotation omitted). Here, if the defendant establishes that the prosecution knowingly withheld favorable evidence, the burden shifts to the State to prove beyond a reasonable doubt that the omitted evidence would not have affected the sentence. See State v. Laurie, 139 N.H. 325, 330 (1995); cf. Etienne, 163 N.H. at 88. Otherwise, the defendant retains the burden to prove materiality. Etienne, 163 N.H. at 89.

The defendant bears the initial burden of proving that the evidence allegedly withheld was "favorable." Shepherd, 159 N.H. at 170. "Favorable

evidence is that which is admissible, likely to lead to the discovery of admissible evidence, or otherwise relevant to the preparation or presentation of the defense." *Id.* (quotation omitted). Favorable evidence may include impeachment evidence. *Id.*; *see United States v. Bagley*, 473 U.S. 667, 676 (1985). In the context of discovery requests, the information sought is material to guilt or punishment if it is reasonably calculated to lead to the discovery of admissible evidence. *See State v. Dukette*, 127 N.H. 540, 548-49 (1986).

[189] The State contends that the defendant's assertion that he is entitled to a new sentencing trial on the basis of an alleged discovery violation relating to the plea offer mitigating factor is not preserved for appellate review, and we agree. It is a long-standing rule that parties may not have judicial review of matters not raised in the forum of trial. *See State v. Eaton*, 162 N.H. 190, 195 (2011). It is the burden of the appealing party, here the defendant, to demonstrate that he raised his issues before the trial court. *State v. Winward*, 161 N.H. 533, 542 (2011).

The purportedly favorable, withheld evidence identified by the defendant on appeal as entitling him to a new sentencing trial is the e-mail exchange between Varsalone and Attorney General Ayotte. Before the trial court, however, the defendant relied upon the e-mail exchange only to seek discovery of materials that might tend to show that Ayotte's decision to seek the death penalty was politically motivated. Other than his discovery request, he did not seek any relief from the trial court based upon the alleged favorable or exculpatory nature of the e-mail exchange itself.

Indeed, during the April 2011 hearing, the trial court asked the defendant what relief he intended to seek in the event discovery produced the type of information he was seeking. Through defense counsel, the defendant stated that he might renew his prior unsuccessful challenge to the State's exercise of prosecutorial discretion, seek relief based upon "arbitrariness in connection with the mitigating factor," or bring a motion for a new sentencing hearing. Although defense counsel noted the trial court's authority under our remand order to conduct "such other proceedings [as it] deem[ed] appropriate," he told the trial court during the hearing that the discovery materials he sought might form the basis of a *future* motion for a new sentencing hearing. Because the defendant failed to request relief stemming from the e-mail exchange that he already had in his possession, he waived the issue of whether the State failed to disclose that e-mail exchange as favorable or exculpatory evidence in relation to the plea offer mitigating factor. *See State v. Larose*, 157 N.H. 28, 39 (2008) (declining to consider argument that trial court deprived defendant of due

process when it denied his motion for additional discovery because the defendant failed to demonstrate that he preserved this argument for appellate review).

In his reply brief, the defendant argues that "[i]n the alternative, if this Court determines that a lesser remedy is appropriate, it may remand the case with an order that the trial court permit [him] to conduct additional discovery and thereafter pursue claims for a new sentencing hearing or to bar the death penalty." Assuming that this request was preserved and has not been waived, we reject his argument on the merits.

The defendant argues that the State made former Attorney General Ayotte's political motivation for seeking the death penalty a relevant issue at the sentence selection phase of trial. The defendant acknowledges that "a prosecutor's motivation is not generally an issue of consequence at trial" and that "considered in the abstract, evidence of the Attorney General's political motivation does not tend to prove [his] alleged mitigating factors." He contends, however, that Attorney General Ayotte's motivation, and, thus, the e-mail messages, became relevant to his plea offer mitigating factor because the July 2008 response letter purported to set forth Attorney General Ayotte's reasons for rejecting his offer to plead guilty. He argues that he could have used the e-mail evidence to show that the letter "did not tell the whole story" — that Attorney General Ayotte "had undisclosed political motivations beyond the explanation given in her letter for rejecting [the defendant's] offer." According to the defendant, "[a] juror, aware of that information, would have been less inclined to trust the evidence the State offered in opposition to the mitigating factor," and "[a]bsent that trust, the same juror would have been more inclined to find proven [his] proposed mitigating factor."

The trial court expressly rejected the foundation of the defendant's appellate argument. Based upon the capital trial record, the court ruled that Attorney General Ayotte's July 2008 response letter was neither proffered nor used by the State to present her reasons or motivations for seeking a death sentence for the jury to consider when evaluating the plea offer mitigating factor. The court found that the record established that "the parties appear to have understood that the letter would serve as a summary of the State's arguments as to why the defendant's offer to plead guilty was not mitigating," and that rebuttal of the plea offer mitigating factor exclusively focused upon what the State viewed as the defendant's self-interested motivation for offering to plead guilty. The court found that "[Ayotte's] motivations for rejecting the plea offer were simply not part of the discussion." The court further ruled that even if the State had sought to use the letter to prove Attorney General Ayotte's motivations for seeking the death penalty, the letter's reflection of that motivation "is not of

consequence, or material, to whether the defendant's offer to plead guilty was a mitigating factor"; that is, "whether the defendant's offer demonstrated his remorse and acceptance of responsibility."

The trial court's decision is supported by the record. The defendant attached to his motion regarding his plea offer mitigator both his May 2008 plea offer letter and the State's July 2008 letter declining that offer. In the motion, he made clear that the mitigating factor at issue related to his alleged willingness to accept responsibility for his crime. In its responsive pleading, the State identified its July 2008 letter as part of the body of proffered rebuttal evidence focusing upon the circumstances of the case and the defendant's alleged self-interest underlying his conditional plea offer. As the trial court found, the pleadings themselves show that the attorney general's letter served as context — that the State declined the defendant's conditional plea offer — and as a summary of why the State at the sentencing phase of trial did not view the plea offer as a mitigating factor. As the trial court further observed, that this was the purpose for admitting the State's rebuttal information, including the July 2008 response letter, is supported by the State's closing remarks on the defendant's plea offer. Accordingly, the record supports the trial court's finding that the July 2008 letter "was admitted as it related to the defendant's, not Ayotte's, state of mind."

We agree with the trial court that "if the State had offered Ayotte's letter to prove her motivations for seeking the death penalty, the letter would not have been admissible because it would not have been relevant to counter defendant's argument that his offer to plead guilty was a mitigating factor." The only issue for the jurors to decide with respect to the plea offer mitigating factor was whether the offer reflected positively or negatively upon the defendant's character: whether, as he contended, it showed that he accepted responsibility for his actions, or whether, as the State contended, the defendant conditionally offered to plead guilty merely to advance his own interests. Neither the State's reasons for rejecting the offer, nor Attorney General Ayotte's alleged personal motives for doing so, affected the mitigating quality of the offer itself; the plea offer mitigating factor required the jurors to assess *the defendant's* credibility and sincerity in making the offer. Therefore, the e-mail messages do not tend to make it more or less probable that he accepted responsibility for his conduct when he offered to plead guilty. *See* RSA 630:5, III (threshold for admissibility of evidence at capital sentencing is whether information relates to or is relevant to an aggravating or mitigating factor).

 For the first time on appeal, the defendant argues that the e-mail messages constitute favorable evidence because they would have been

admissible under the specific contradiction doctrine. This doctrine applies when one party has introduced admissible evidence that creates a misleading advantage, and the opponent is then allowed to introduce previously suppressed or otherwise inadmissible evidence to counter the misleading advantage. *State v. Wamala*, 158 N.H. 583, 589 (2009). The defendant argues that the doctrine applies here because "evidence not otherwise admissible — Ayotte's political motivation — became admissible due to the State's strategy in attacking the mitigating factor." Even assuming that the defendant preserved this argument for appeal, we conclude that, for the reasons we have already discussed, the State did not derive any misleading advantage by introducing the July 2008 letter as part of the body of rebuttal evidence to the plea offer mitigating factor. *See State v. Bird*, 161 N.H. 31, 35 (2010).

We hold that the defendant has failed to establish that the State denied him access to favorable or exculpatory evidence regarding its decision to reject his plea offer in violation of his due process rights under the State Constitution. In so holding, we affirm the trial court's findings and rulings pertaining to the irrelevant and immaterial nature of the e-mail exchange in relation to the plea offer mitigating factor. Because the Federal Constitution affords the defendant no greater protection than does the State Constitution in these circumstances, we reach the same conclusion under the Federal Constitution as we do under the State Constitution. *See Etienne*, 163 N.H. at 95; *Shepherd*, 159 N.H. at 170; *see also Bagley*, 473 U.S. at 675-76; *Brady v. Maryland*, 373 U.S. 83, 86-87 (1963).

We observe that the defendant does not challenge the trial court's legal ruling that our independent statutory review under RSA 630:5, XI(a) focuses upon "whether the jury arbitrarily decided to impose the death penalty," not upon the State's charging decision. He also does not challenge the trial court's ruling that the substance of the e-mail messages does not support his claim that the State failed to comply with his pretrial discovery request relating to his motion to bar the death penalty. Furthermore, the defendant does not challenge the trial court's ruling that even if he were advancing a selective prosecution claim, he failed to demonstrate that he is entitled to the requested discovery. *See Scroggy*, 882 F.2d at 196 ("Politically ambitious and aggressive prosecutors are by no means uncommon . . . . Absent a demonstration of selective prosecution, however, even a clear appearance of impropriety in the participation of the prosecutor is normally insufficient to justify a decision, in collateral proceedings, . . . [to] set[ ] aside a conviction of one found guilty beyond a reasonable doubt in a fair trial before an impartial judge and an unbiased jury."); *Vasquez*, 137 P.3d at 209 (Prosecutors, "as people, inevitably hold individual personal values and

allegiances" and "may also have political ambitions or apprehensions. But that a public prosecutor might feel unusually strongly about a particular prosecution or, inversely, might hesitate to commit to a prosecution for personal or political reasons does not inevitably indicate an actual conflict of interest, much less a constitutional bar to prosecution."); *see also United States v. Armstrong*, 517 U.S. 456, 463-64 (1996) (discussing selective prosecution and the "presumption of regularity").

## IX. MANDATORY SUPREME COURT REVIEW

Pursuant to RSA 630:5, XI (2007), we are required to review the defendant's death sentence to answer three questions. The statute requires that we determine: "(a) [w]hether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor"; "(b) [w]hether the evidence supports the jury's finding of an aggravating circumstance, as authorized by law"; and "(c) [w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." RSA 630:5, XI. Only the first two statutory questions are before us at this stage of the proceeding.

These provisions must be viewed in light of capital sentencing jurisprudence. We previously have reviewed at some length the jurisprudential background relevant to the development of this state's capital murder sentencing scheme. *See State v. Addison*, 160 N.H. 732, 741-47 (2010). Briefly stated, the current sentencing scheme was adopted following the United States Supreme Court's decisions in *Furman v. Georgia*, 408 U.S. 238 (1972) *(per curiam)*, and *Gregg v. Georgia*, 428 U.S. 153 (1976). *See Addison*, 160 N.H. at 742. In *Gregg*, the Supreme Court upheld Georgia's amended statute, upon which RSA 630:5, XI is largely modeled, because "the concerns expressed in *Furman* that the penalty of death not be imposed in an arbitrary or capricious manner can be met by a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance." *Gregg*, 428 U.S. at 195. The Supreme Court described the mandatory appellate review provisions as "an important additional safeguard against arbitrariness and caprice," *id.* at 198, and as "a check against the random or arbitrary imposition of the death penalty." *Id.* at 206. As we have recognized, "[d]eath is different in kind from all other forms of punishment, and meaningful appellate review is a crucial safeguard to ensure that the death penalty is not imposed in an arbitrary and capricious, or wanton and freakish, manner." *Addison*, 160 N.H. at 779.

## A. Passion, Prejudice or Other Arbitrary Factor

According to the defendant, our independent appellate review under RSA 630:5, XI(a) focuses upon the risk of, or the degree to which, any indefensible influence played a role in the sentencing process. The defendant argues that "passion or emotion had undue influence by reason of the State's choice to place great emphasis on the victimization of [Officer] Briggs's survivors, of the survivors of Addison's other crimes, and of the jurors themselves in their capacity as members of a violated Manchester community." Additionally, he argues that the racial identities of Officer Briggs and the defendant and "their respective statuses as much-beloved local police officer and outsider from Boston" created a "significant risk of the influence of prejudice." He further contends that "evidence and [closing] argument" relating to, for example, his future conditions of confinement and the extent of his trial rights, were "not relevant" to the matters at issue in sentencing and, thus, "injected into the sentencing deliberations factors that are arbitrary." The defendant asserts that "[i]n this case, procedural protections did not prevent the jury from exposure to [these] arbitrary influences . . . and did not eliminate the risk deriving from that exposure."

Much of the defendant's argument focuses upon remarks made by the prosecutor during the State's closing argument in the sentence selection phase of trial. We have considered and rejected his characterization that many of the prosecutor's statements constitute impermissible prosecutorial advocacy in Part VII.B.4 (Sentencing Phase Review-Closing Argument) of this opinion. Indeed, the defendant's arguments with respect to the influence of passion, prejudice or any other arbitrary factor do not raise any issues that we have not already considered and addressed. Nevertheless, the defendant argues that, even if the errors that he alleges, viewed in isolation, would not require reversal, based upon "the combined effect of those influences, the death sentence in this case cannot survive this Court's review under RSA 630:5, XI(a)." We disagree.

The statute requires that the jury not impose a sentence of death under the influence of passion, prejudice or any other arbitrary factor. However, "a death penalty case will not be emotionless." *United States v. Barnette*, 211 F.3d 803, 821 (4th Cir. 2000). Certainly, the matters presented throughout the trial would be expected to evoke emotion from witnesses and jurors. As the defendant recognizes, "it is not possible to eliminate all emotion from capital sentencing proceedings."

Our review of the record in this case does not indicate that any influence prohibited under RSA 630:5, XI(a) was interjected into this trial. We note that, as reflected on the Special Findings Form and the Special

Verdict Form included in the appendices to this opinion, the jury found the existence of some aggravating and mitigating factors and did not find the existence of others. Further, we have examined the defendant's "combined effect" assertion and find no support for it in the record. In addition to having considered all of the defendant's specific contentions, we have independently reviewed the record and we determine that the death sentence in this case was not imposed under the influence of passion, prejudice or any other arbitrary factor. *See* RSA 630:5, X, XI(a) (2007).

## B. Evidence of Aggravating Circumstances

Also as part of our mandatory statutory review of the defendant's death sentence, we must determine "[w]hether the evidence supports the jury's finding of an aggravating circumstance, as authorized by law." RSA 630:5, XI(b). The defendant argues that our record review under this provision extends to the fifteen aggravating factors found proven and weighed by the jury in determining the recommended sentence. According to the defendant, we need not evaluate whether the record supports the grave risk of death statutory aggravating factor that the jury found proven at the eligibility phase of trial but did not consider during its sentencing deliberations at the sentence selection phase of trial. The State argues, however, that our record review involves all sixteen aggravating factors found by the jury. With respect to the applicable legal standard, both parties rely upon our traditional standard for reviewing the sufficiency of the evidence in a criminal case. *See, e.g., State v. Burke*, 162 N.H. 459, 460-61 (2011); *State v. Dodds*, 159 N.H. 239, 246 (2009).

Considering the plain language of the statute, we agree with the State that our review extends to evaluating the sufficiency of the evidence for aggravating circumstances regarding all sixteen aggravating factors found by the jury. *See State v. Moussa*, 164 N.H. 108, 127-28 (2012) (outlining standards for statutory construction). We are required under RSA 630:5, XI(b) to determine "[w]hether the evidence supports the jury's finding of an aggravating circumstance, as authorized by law," and the statute does not confine our review to those aggravating circumstances that were both found and weighed by the jury in determining the sentence.

Additionally, we agree with the parties that the plain language of the statute anticipates that we apply our traditional standard for evaluating the sufficiency of the evidence. In particular, viewing all of the evidence, and all reasonable inferences from it, in the light most favorable to the State, we must assess whether a rational trier of fact could have found each aggravating circumstance beyond a reasonable doubt. *See Burke*, 162 N.H. at 460-61; *Dodds*, 159 N.H. at 246. In so doing, we examine each evidentiary

item in the context of all of the evidence, not in isolation, mindful that circumstantial evidence may be sufficient to support a jury finding. *See Burke*, 162 N.H. at 460-61; *Dodds*, 159 N.H. at 246.

Throughout this opinion, we have outlined the evidence supporting the aggravating factors that the jury unanimously found beyond a reasonable doubt. In particular, evidence of the statutory aggravating factors is set forth in Part I (The Capital Murder), Part VI (Guilt Phase Review), and Part VII.A (Sentencing Phase Review-Eligibility Phase Trial). Evidence of the non-statutory aggravating factors also is set forth in those portions of the opinion, as well as in Part VII.B (Sentencing Phase Review-Sentence Selection Phase Trial). Thus, it is not necessary for us to recite here the evidence supporting the jury's findings. After a full review of the record, we conclude that a rational juror could have found proven, beyond a reasonable doubt, each aggravating factor the jury found proven. Therefore, we conclude that the evidence supports the jury's finding as to each aggravating factor, as authorized by law. *See* RSA 630:5, X, XI(b). Because we make this determination, we have no reason to consider what the remedy would be if we had concluded that the evidence was insufficient as to any of the aggravating factors.

We affirm the defendant's capital murder conviction and will conclude our review of his sentence of death after additional briefing and oral argument as to comparative proportionality under RSA 630:5, XI(c). *See Addison*, 160 N.H. at 779-80.

*So ordered.*

DALIANIS, C.J., and HICKS, CONBOY, LYNN and BASSETT, JJ., concurred.

Appendix A

## THE STATE OF NEW HAMPSHIRE

HILLSBOROUGH, SS. SUPERIOR COURT
NORTHERN DISTRICT

### THE STATE OF NEW HAMPSHIRE

## V.

### MICHAEL K. ADDISON

07-S-0254

## SPECIAL FINDINGS FORM: ELIGIBILITY PHASE

GENERAL INSTRUCTIONS:

Beginning with Section I, follow the instructions provided in order to complete the special findings required in Section I and Section II. The foreperson will then sign and date the portion of Section III, which reflects the jury's verdict.

Before announcing that you have reached a decision, you must answer in writing the findings listed in Sections I and II and only one of the three possible decisions listed in Section III.

## Section I. Mental State Statutory Aggravating Factors

Instructions: Mark with an "X" PROVEN or NOT PROVEN for each of these aggravators. "Proven" means that the jury unanimously agrees that the State has proven the aggravator beyond a reasonable doubt. If even one juror finds that the State has not met its burden of proof, the aggravator is "not proven."

1. The defendant purposely killed Officer Michael Briggs.

PROVEN _____
NOT PROVEN _____X____

2. The defendant purposely inflicted serious bodily injury that resulted in the death of Officer Michael Briggs.

PROVEN ___X___
NOT PROVEN _____

3. The defendant purposely engaged in conduct that he knew would create a grave risk of death to another and that resulted in the death of Officer Michael Briggs.

PROVEN ___X____
NOT PROVEN _____

Instructions: If you answered NOT PROVEN to all three of the mental state statutory aggravating factors listed above, proceed directly to Section III(A) to record your decision.

If you unanimously answered PROVEN to one or more of the mental state statutory aggravating factors listed above, proceed to Section II.

## Section II. Additional Statutory Aggravating Factor

**Instructions:** Mark with an "X" PROVEN or NOT PROVEN for the following statutory aggravator. "Proven" means that the jury unanimously agrees that the State has proven the aggravator beyond a reasonable doubt. If even one juror finds that the State has not met its burden of proof, the aggravator is "not proven."

4. The defendant murdered Officer Michael Briggs for the purpose of avoiding or preventing a lawful arrest or effecting an escape from lawful custody.

PROVEN ___X___
NOT PROVEN _____

**Instructions:** If you answered NOT PROVEN to the statutory aggravating factor listed above, proceed directly to Section III(B) to record your decision.

If you unanimously answered PROVEN to the motive statutory aggravating factor listed above, proceed to Section III(C).

## Section III. Decision

**Instructions:** Answer <u>only one</u> of the three statements listed on the next page based upon your written findings in **Section I** and **Section II.**

Answer the statement in Section III(A) only if the jury has found that the State has <u>not proven</u> beyond a reasonable doubt the existence of any of the mental state statutory aggravating factors (Nos. 1-3) listed in **Section I.**

Answer the statement in Section III(B) only if the jury has found that the State has <u>not proven</u> beyond a reasonable doubt the existence of the additional (No. 4) statutory aggravating factor listed in **Section II.**

Answer the statement in Section III(C) only if the jury unanimously has found that the State has <u>proven</u> beyond a reasonable doubt the existence <u>both</u> of (1) at least one of the three mental state statutory aggravating factors listed in Section I; and (2) the additional statutory aggravating factor listed in **Section II.**

## Section III. Decision (Cont.)

**A. NO MENTAL STATE STATUTORY AGGRAVATING FACTORS FOUND.**

We the Jury, find that the State has not proven beyond a reasonable doubt to a unanimous jury the existence of any of the three mental state statutory aggravating factors listed in Section I as is required by law.

FOREPERSON (Signature & Juror Number)
Date: _____, 2008

**B. ADDITIONAL STATUTORY AGGRAVATING FACTOR NOT FOUND.**

We the Jury, find that the State has not proven beyond a reasonable doubt to a unanimous jury the existence of the additional statutory aggravating factor listed in Section II as is required by law.

FOREPERSON (Signature & Juror Number)
Date: _____, 2008

**C. AT LEAST ONE MENTAL STATE STATUTORY AGGRAVATING FACTOR FOUND AND THE ADDITIONAL STATUTORY AGGRAVATING FACTOR FOUND.**

We the Jury, by unanimous vote, find that the State has proven beyond a reasonable doubt both (1) the existence of at least one mental state statutory aggravating factor as is required by law as is answered in Section I; AND (2) the existence of the additional statutory aggravating factor as is required by law as is answered in Section II.

___[Signature]_____[Juror Number]___
FOREPERSON (Signature & Juror Number)
Date: __7/ ___ 17____, 2008

662

Appendix B

THE STATE OF NEW HAMPSHIRE

HILLSBOROUGH, SS. SUPERIOR COURT
NORTHERN DISTRICT

THE STATE OF NEW HAMPSHIRE

V.

MICHAEL K. ADDISON

07-S-0254

**SPECIAL VERDICT FORM**

GENERAL INSTRUCTIONS:

This form is intended to assist you in your deliberations and insure that you answer all the necessary questions in reaching your decision regarding the appropriate sentence in this case. Please follow the instructions and check all the appropriate spaces. After you are all certain that the form reflects the verdict of each juror, the foreman will date and sign the form, and will notify the bailiff that you have reached a decision. The foreman will then announce the decision in open court.

## Section I. Statutory Aggravating Factors

Instructions: During the Eligibility Phase you unanimously found beyond a reasonable doubt the existence of the following aggravating factors. You may not reconsider them now.

1. The defendant purposely inflicted serious bodily injury that resulted in the death of Officer Michael Briggs.

PROVEN _____X_____
NOT PROVEN _____

2. The defendant murdered Officer Michael Briggs for the purpose of avoiding or preventing a lawful arrest or affecting an escape from lawful custody.

PROVEN _____X_____
NOT PROVEN _____

## Section II. Non-Statutory Aggravating Factors

Instructions: Mark with an "X" PROVEN or NOT PROVEN for each of the following aggravating factors. "Proven" means that the jury unanimously agrees that the State has proven beyond a reasonable doubt that the facts or circumstances alleged are true and that those facts or circumstances tend to show that the death sentence is appropriate.

(1) Other Serious Acts of Violence: Assault and Battery and Threatening to Commit a Crime. On or about August 10, 1996, in South Boston, Massachusetts, the defendant did assault and beat Cheryl Kiser and threaten to commit a crime against her by saying he would kill her. The defendant pled delinquent to these two offenses on January 5, 1999.

PROVEN ___X___
NOT PROVEN _____

(2) Other Serious Acts of Violence: Assault with Intent to Kill, Assault and Battery, and Possession of a Firearm without a Permit. On or about December 6, 1996, in Dorchester, Massachusetts, the defendant struck a male victim in the head and then pointed an unlicensed loaded revolver at the victim and pulled the trigger twice. The gun did not fire. The defendant pled guilty and was convicted of these three offenses on July 21, 1997.

PROVEN ___X___
NOT PROVEN _____

(3) Other Serious Acts of Violence: Armed Robbery and Two Counts of Assault and Battery with a Dangerous Weapon (knife and shod foot). On or about March 20, 1997, in Roxbury, Massachusetts, the defendant was armed with a dangerous weapon (a knife) and assaulted Tredaine Purdy with intent to rob him, and did rob and steal from the person of Tredaine Purdy a hat, which was the property of Tredaine Purdy. The defendant also committed two counts of assault and battery upon Tredaine Purdy by means of dangerous weapons, by stabbing Purdy in the back with a knife and kicking Purdy while he was on the ground with his shod foot. The defendant pled guilty and was convicted of these three offenses on December 3, 1997.

PROVEN ___X___
NOT PROVEN _____

(4) <u>Other Serious Criminal Behavior</u>: False Imprisonment. On or about October 27, 2003, in Londonderry, New Hampshire, the defendant, acting in concert with Mathys Morgan, knowingly confined Brian St. Peter unlawfully as to interfere substantially with his physical movements, by keeping him inside a locked vehicle. The defendant pled guilty and was convicted of this offense on November 4, 2003.

**PROVEN** ___X___
**NOT PROVEN** _____

(5) <u>Other Serious Criminal Behavior</u>: Probation Violation. On or about October 27, 2003, in Londonderry, New Hampshire, the defendant violated the terms of his probation by committing the crime of false imprisonment. On August 6, 2004, the defendant stipulated to the violation of probation and was found in violation by the Court.

**PROVEN** ___X___
**NOT PROVEN** _____

(6) <u>Other Serious Criminal Behavior</u>: Armed Robbery. The defendant committed armed robbery when he and his accomplices/co-conspirators, including Antoine Bell-Rogers, robbed customers of the El Mexicano Restaurant in Manchester, New Hampshire on or about October 10, 2006. A jury convicted Michael K. Addison of this offense on February 27, 2008.

**PROVEN** ___X___
**NOT PROVEN** _____

(7) <u>Other Serious Criminal Behavior</u>: Felon in Possession. The defendant was a felon in possession of a deadly weapon when he committed the armed robbery of the El Mexicano Restaurant in Manchester, New Hampshire with his accomplices/co-conspirators, including Antoine Bell-Rogers, on or about October 10, 2006. A jury convicted Michael K. Addison of this offense on February 27, 2008.

**PROVEN** ___X___
**NOT PROVEN** _____

(8) <u>Other Serious Criminal Behavior</u>: Armed Robbery and Conspiracy to Commit Robbery. The defendant, Michael K. Addison, agreed to rob a store and then committed armed robbery with a firearm when he and his accomplices/co-conspirators, including Antoine Bell-Rogers, robbed a 7-Eleven Store in Hudson, New Hampshire on or about October 11, 2006. A jury convicted Michael K. Addison of these two offenses on December 19, 2007.

PROVEN ____X____
NOT PROVEN _____

(9) <u>Other Serious Criminal Behavior</u>: Felon in Possession. The defendant was a felon in possession of a firearm when he committed the armed robbery of a 7-Eleven Store with his accomplices/co-conspirators, including Antoine Bell-Rogers, on or about October 11, 2006, in Hudson, New Hampshire. A jury convicted Michael K. Addison of this offense on December 19, 2007.

PROVEN ____X____
NOT PROVEN _____

(10) <u>Other Serious Criminal Behavior</u>: Accomplice to Reckless Conduct With a Firearm and Conspiracy to Commit Criminal Threatening. The defendant was involved in an incident on or about October 15, 2006, where he and/or his accomplice/co-conspirator Antoine Bell-Rogers agreed to threaten people in a residence and Bell-Rogers, acting in concert with and aided by the defendant, Michael K. Addison, discharged a firearm outside a residence at 345 Edward J. Roy Drive in Manchester, New Hampshire. A jury convicted Michael K. Addison of these two offenses on November 29, 2007.

PROVEN ____X____
NOT PROVEN _____

(11) <u>Other Serious Criminal Behavior</u>: Felon in Possession. The defendant was a felon in possession of a firearm, when he committed the murder of Manchester Police Officer Michael Briggs in Manchester, New Hampshire on or about October 16, 2006.

PROVEN ____X____
NOT PROVEN _____

(12) Other Serious Criminal Behavior: Reckless Conduct. On or about October 16, 2006, the defendant placed or may have placed another in danger of serious bodily injury by disposing of the firearm he used to murder Manchester Police Officer Michael Briggs by leaving it outside in a neighborhood in Manchester, New Hampshire.

PROVEN ___X___
NOT PROVEN _____

(13) Future Dangerousness of the Defendant: The defendant is likely to commit criminal acts of violence in the future which would be a continuing and serious threat to others in prison. In addition to the charged offense of capital murder and the cited statutory and non-statutory aggravating factors, the defendant has engaged in a continuing pattern of criminal and violent conduct, has threatened others with violence and has demonstrated low rehabilitative potential.

PROVEN _____
NOT PROVEN ___X___

(14) Victim Impact Evidence: The defendant caused injury, harm, and loss to the family of Manchester Police Officer Michael Briggs because of the victim's personal characteristics as an individual human being and the impact of the death upon the victim's family. The murder of Officer Michael Briggs has caused the Briggs family extreme emotional suffering, and the victim's family has suffered severe and irreparable harm.

PROVEN ___X___
NOT PROVEN _____

## Section III. Mitigating Factors

**Instructions:** Mark with an "X" PROVEN or NOT PROVEN for each of these mitigators. "Proven" means that at least one juror has found that the defendant has proven by a preponderance of the evidence that the facts or circumstances alleged are true and that those facts or circumstances tend to show that a life sentence is appropriate or sufficient to do justice in this case.

(1) If the defendant is not sentenced to death, he will be automatically, as a matter of law, sentenced to life in prison without the possibility of release.

PROVEN ___X___
NOT PROVEN _____

(2) The defendant attempted to plead guilty to Capital Murder but his offer was rejected by the State.

PROVEN _____
NOT PROVEN ___X___

(3) The homicide did not involve substantial planning or premeditation.

PROVEN ___X___
NOT PROVEN _____

(4) The circumstances of the homicide did not involve torture or protracted cruelty.

PROVEN _____
NOT PROVEN ___X___

(5) In the early morning hours of October 16, 2006, the defendant took possession of the gun, not for the purpose of killing, but rather to keep the gun away from Bell-Rogers who had fought with and threatened to kill Jennifer Roman.

PROVEN _____
NOT PROVEN ___X___

(6) After the defendant fled to his girlfriend's home and then to his grandmother's home, he surrendered without resistance and without causing additional harm.

PROVEN ___X___
NOT PROVEN _____

(7) The evidence does not establish that the defendant purposely killed Officer Briggs with sufficient certainty to justify imposition of the death penalty.

PROVEN _____
NOT PROVEN ___X___

(8) During his two years of pre-trial confinement, the defendant has committed no crimes and his behavior has demonstrated his potential to adjust well in a secure prison setting.

PROVEN _____
NOT PROVEN ___X___

(9) The defendant's mother (Cheryl Kiser) was a fifteen year old girl with a history of psychiatric problems who neglected her prenatal care and who engaged in violence, drug abuse and alcohol abuse during her pregnancy with him.

PROVEN ___X___
NOT PROVEN _____

(10) There were serious prenatal and peri-natal complications of Cheryl Kiser's pregnancy with the defendant.

PROVEN _____
NOT PROVEN \_\_\_X\_\_\_\_

(11) The defendant suffers from impaired brain function.

PROVEN _____
NOT PROVEN \_\_X\_\_\_\_

(12) During the defendant's childhood, his mother engaged in acts of violence, substance abuse, and mentally unstable behavior on occasions when he was in her presence, when he was in her care, and/or when she was living in the same home.

PROVEN \_\_\_X\_\_\_\_
NOT PROVEN _____

(13) Cheryl Kiser was physically abusive to the defendant during his childhood.

PROVEN \_\_\_X\_\_\_\_
NOT PROVEN _____

(14) The defendant was abandoned by his biological father, Michael Wilson.

PROVEN _____
NOT PROVEN \_\_\_X\_\_\_\_

(15) The defendant's biological father, Michael Wilson was a chronic drug abuser who engaged in criminal conduct, including drug dealing, to support his habit.

PROVEN __X__
NOT PROVEN _____

(16) During the defendant's early childhood, he was left alone at times in the care of his mother (Cheryl Kiser) even though the Department of Social Services had instructed that he should never be alone with his mother.

PROVEN __X__
NOT PROVEN _____

(17) During the defendant's childhood, family members who lived in the home with him, such as his mother, his uncles and his adoptive/step father, engaged in substance abuse.

PROVEN __X__
NOT PROVEN _____

(18) During the defendant's childhood, his adoptive/stepfather, Lucious Addison, was guilty of acts of domestic violence against the defendant's adoptive/grandmother, Rosetta Addison, such as threatening to kill her, breaking furniture and/or other threatening or violent behavior.

PROVEN _____
NOT PROVEN __X__

(19) During the defendant's childhood, his mother (Cheryl Kiser), his father (Michael Wilson) and other family members engaged in criminal behavior, including acts of violence of which the defendant was aware as a child and some of which he witnessed.

PROVEN __X__
NOT PROVEN _____

(20) When the defendant was a young child - under the age of 10 - his mother, Cheryl Kiser, told him he was responsible for her bad behavior, including her leaving the home in Brockton.

PROVEN _____
NOT PROVEN __X____

(21) The defendant was in special education programs as a child and adolescent.

PROVEN __X____
NOT PROVEN _____

(22) During the defendant's childhood, when he was placed in small, structured classrooms, with one on one instruction, he was able to maintain his behavior and perform better.

PROVEN __X____
NOT PROVEN _____

(23) During the defendant's childhood, he exhibited symptoms of Attention Deficit Hyperactivity Disorder, beginning at approximately age 4 and continuing through his school years, for which he did not receive treatment.

PROVEN _____
NOT PROVEN __X____

(24) When the defendant was a young child - under the age of 10 - he did not receive the psychological counseling recommended by mental health professionals who evaluated him.

PROVEN __X____
NOT PROVEN _____

(25) During the defendant's childhood, he did not receive the supervision, guidance and nurturing necessary for healthy development.

PROVEN __X__ .
NOT PROVEN _____

(26) The actions of the defendant's family prevented the Massachusetts Department of Social Services from properly investigating and supervising conditions in the Kiser/Addison home in Brockton, Massachusetts.

PROVEN _____ .
NOT PROVEN __X__

(27) During the defendant's childhood, Rosetta Addison worked long hours and attended school, leaving the defendant in the care of many different persons.

PROVEN· __X__ .
NOT PROVEN _____

(28) During the defendant's adolescence, he lived in the Roxbury and Dorchester sections of Boston, where he was exposed to crime, violence, and drug dealing and drug abuse.

PROVEN __X__ .
NOT PROVEN _____

### Section IV. Weighing

**Instructions:** You must now weigh the proven aggravating factors against any proven mitigating factors and determine whether the aggravating factors sufficiently outweigh the mitigating factors to warrant a death sentence. Even if no mitigating factors are found, the jury must decide whether the aggravating factors are in themselves sufficient to warrant a sentence of death.

Does the jury unanimously agree that the statutory and non-statutory aggravating factors found proven beyond a reasonable doubt, sufficiently outweigh all mitigating factors which any juror has found proven by a preponderance of the evidence, so as to warrant imposition of the death penalty?

YES <u> X </u>

NO <u> </u>

If you answered "No", your deliberations are complete. The foreperson will sign the form and the defendant will be sentenced to life without the possibility of parole. If you answered "Yes", please proceed.

## Section V: Sentence

**Instructions:** Understanding that regardless of any of your preceding answers, the jury is never required to impose the death penalty, and that the jury may only impose the death penalty if all 12 jurors so agree, what sentence do you impose?

1. LIFE WITHOUT THE POSSIBILITY OF PAROLE _____

OR

2. DEATH _____ X _____

If you have sentenced the defendant to death, each juror must sign the certification in Section VI.

_12/18/08_
Date

_____[signature]_____
Foreperson

## Section VI. Certification

By signing below, each Juror certifies that consideration of the race, color, religious beliefs, national origin, or sex of the defendant or the victim was not involved in reaching his or her individual decision, and that the individual Juror would have made the same recommendation regarding a sentence for the crime in question regardless of the race, color, religious beliefs, national origin, or sex of the defendant or the victim.

[Signature and Juror Number]
(Signature & Juror Number)

[Signature and Juror Number]
(Signature & Juror Number)

[Signature and Juror Number]
(Signature & Juror Number)

[Signature and Juror Number]
(Signature & Juror Number)

[Signature and Juror Number]
(Signature & Juror Number)

[Signature and Juror Number]
(Signature & Juror Number)

[Signature and Juror Number]
(Signature & Juror Number)

[Signature and Juror Number]
(Signature & Juror Number)

[Signature and Juror Number]
(Signature & Juror Number)

[Signature and Juror Number]
(Signature & Juror Number)

[Signature and Juror Number]
(Signature & Juror Number)

[Signature and Juror Number]
FOREPERSON (Signature & Juror Number)

Date: _Dec. 18,_ , 2008